IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| MERCY HEALTH SYSTEM OF SOUTHEASTERN PENNSYLVANIA, | : : : | Civil Action No. 01-CV-05681 |
| Plaintiff | : : | |
| v. | : : : | |
| ROSS P. RICHARDSON, Chapter 7 Trustee for the Bankruptcy Estate of CSI Financial, Inc., | : : : : : | |
| Defendant | : | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*  \*\*\*  \*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| | | |
|---|---|---|
| FIRST NATIONAL BANK OF MONTANA, INC. and ROSS P. RICHARDSON, Chapter 7 Trustee for the Bankruptcy Estate of CSI Financial, Inc., | : : : : : | Civil Action No. 02-CV-03608 |
| Plaintiffs | : : | |
| v. | : : : | |
| MERCY HEALTH SYSTEM OF SOUTHEASTERN PENNSYLVANIA, Defendant | : : : : : | |

**MERCY HEALTH SYSTEM OF SOUTHEASTERN PENNSYLVANIA'S MEMORANDUM OF LAW IN OPPOSITION TO FIRST NATIONAL BANK OF MONTANA'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

## I. INTRODUCTION

Mercy Health System of Southeastern Pennsylvania ("Mercy") filed this action after it lost over $1 million due to CSI Financial, Inc.'s ("CSI") violations of a "Patient Financing Agreement" (the "Agreement"). Under the Agreement, Mercy sold CSI valuable patient accounts receivable. The Agreement contemplated that CSI would take steps to collect on these accounts, but if it could not, it was required to adhere to specific deadlines to "recourse"

1

these accounts to Mercy for repurchase. CSI systematically violated the recourse provision of the Agreement.

Although CSI violated this provision, CSI (and its funding agent, the First National Bank of Montana (the "Bank")) claimed Mercy was required to repurchase delinquent accounts even if CSI recoursed the accounts after the Agreement's deadline for recourse had expired. CSI thus took credits against new accounts sent by Mercy rather than pay Mercy for them.

Due to CSI's improper actions, Mercy sold millions of dollars of accounts receivable to CSI not for cash but, instead, as "offsets" against alleged obligations CSI claimed Mercy owed to repurchase accounts CSI previously purchased from Mercy. Discovery confirmed that Mercy had no obligation to repurchase these accounts and CSI and the Bank have been unjustly enriched by receiving and "offsetting" Mercy accounts without paying for them.

The Bank moves the Court for partial summary judgment against Mercy on the issue of liability. In support of this motion, the Bank asks the Court to ignore the plain and unambiguous language of the Agreement, Pennsylvania's well-settled law governing third party beneficiaries, and the requirements of the Federal Rules of Civil Procedure. But none of these things can be ignored, and when they are not, the only conclusion to be reached is that the Bank is not entitled to summary judgment.

## II. BACKGROUND

### A. PROCEDURAL BACKGROUND

Mercy instituted this action against CSI in this Court on November 9, 2001 (the "First Action"). On November 30, 2001, CSI and the Bank filed an action involving the same facts and circumstances against Mercy in the District Court for the District of Montana (the "Second Action"). Because Mercy filed first, it moved to dismiss or transfer the Second Action

2

to Pennsylvania.  CSI and the Bank also filed a motion with this Court seeking to dismiss or transfer the action filed here to Montana.

On May 23, 2002, the Honorable Donald W. Molloy, District Court Judge for the District of Montana agreed with Mercy and transferred the Second Action to the Eastern District of Pennsylvania, which was captioned as Civil Action No. 2:02-CV-03608-JW.  Judge Waldman denied CSI's and the Bank's motion to dismiss, and determined the transfer motion was moot in light of Judge Molloy's decision.

On August 27, 2002, Mercy filed a motion to consolidate the two actions.  By order dated October 1, 2002, as amended on October 8, 2002, this Court granted the motion and consolidated the cases under the caption of the First Action.

On December 16, 2002, CSI filed for bankruptcy in the United States Bankruptcy Court for the District of Montana.  On January 31, 2003, Mercy filed a Motion for Relief from Stay, which the Montana Bankruptcy Court ultimately granted.  CSI filed a motion for reconsideration, which was denied.  No appeal was taken.

In October 2003, CSI converted its bankruptcy from Chapter 11 to Chapter 7 and a trustee was appointed.  After the trustee hired counsel, discovery was completed on October 29, 2004.  Trial is scheduled for April 25, 2005.

## B.  FACTUAL BACKGROUND

### 1.  CSI's Fast Trac Program

#### (a)  General Overview of the Program.

CSI's program was designed to pay hospitals 92% of the value of self-pay accounts the hospitals sold to CSI within days of those accounts being purchased by CSI.  [CSI Fast Trac marketing brochure ("CSI Brochure"), Bates Numbered 3711-3721 at 3713, attached hereto as Exhibit ("Exh.") 1].  Under the FastTrac program, which CSI marketed as being

3

completely electronic, hospitals would provide CSI with a file of self-pay patient accounts. [Marketing materials provided by CSI to Mercy, Bates Numbered 3227-3261 at 3235, attached hereto as Exh. 2].

CSI then decided which accounts it wanted to purchase. [1]  CSI would run each individual account through Equifax's scoring system to assign a Beacon score to each account. [Deposition of Peter Parsons ("Parsons Dep."), relevant portions attached hereto as Exh. 5, at 29-30; CSI Brochure at 3713.  Once the score was assigned, CSI and the Bank selected which accounts they wanted to purchase.  [Jaeb Dep. at 58-59, 94-95; Logsdon Dep. at 23-27].

CSI advertised that its threshold Beacon score was 600, but employees testified that at times they would, at their discretion, accept accounts with a lower score into the program. [Id.].  According to CSI's marketing materials, "[CSI] score[s] accounts for two reasons, to ensure the best odds [CSI] will receive payment from the patient, and to eliminate unnecessary and expensive charge backs."  [CSI Brochure at 3713].  In other words, CSI's scoring system was designed to identify those self-pay accounts that were the most collectible.

Once CSI purchased an account, the Bank, as CSI's funding agent, provided the hospital with 92% of the value of the purchased accounts, and provided CSI with the remaining 8%.  [Jaeb Dep. at 55; CSI Brochure at 3713].  Three things could happen to accounts CSI purchased.  [CSI Brochure at 3711-3721].  First, CSI could collect the account.  [Id.].  Second, the account could be bought back by the hospital before collections began because the patient claimed he/she had insurance, had medicare, or disputed the charges on the bill.  [Id.].  Finally,

---

[1] Deposition testimony from CSI employees conflicts over whether the Bank decided or CSI decided which accounts to accept into the program.  [Deposition of Robert Jaeb ("Jaeb Dep."), relevant portions attached hereto as Exh. 3, at 58, 94; Deposition of Robert Logsdon ("Logsdon Dep."), relevant portions attached hereto as Exh. 4, at 23-27].  Regardless of this dispute, however, neither the Bank nor CSI contend that Mercy was involved in deciding which accounts were accepted into the program.

4

the account could be recoursed to the hospital if no payments were received for a specified period of time.  [Id.].

### (b)  Solicitation of Mercy.

CSI's solicitation of Mercy began in August 1999 with an unsolicited direct mailing from CSI to Mercy.  [Parsons Dep. at 21-22].  When Mercy expressed interest in CSI's program, CSI visited Mercy's Conshohocken location and gave Mercy a packet of materials about its program.  [Id. at 32, 37; Deposition of Doug Smith ("Smith Dep."), relevant portions attached hereto as Exh. 6 at 69-78].

CSI's marketing materials were impressive, although as demonstrated below, largely fictional.  CSI represented that 50% of Mercy's self-pay accounts would be accepted into the program.  [CSI Brochure, at 3714].  CSI also represented that over time, it expected Mercy's acceptance rate would increase to 75%.  [Id.].  CSI's materials recognized, however, that "[d]espite the best efforts of everyone involved, some accounts will be placed on [CSI's] program by mistake.  These accounts may have insurance pending, special written arrangements with your facility for extended payments, etc."  [Id. at 3716].  CSI's marketing materials stated that such accounts would be returned to the hospital for repurchase.  [Id. at 3717].  If such a return was made after a 25 day grace period, the hospital became responsible for interest and late fees on the account.  [Id].

CSI also knew that some accounts accepted into the program would be uncollectible.  [CSI Brochure at 3717].  Those accounts, CSI represented, would be recoursed after "90 days and numerous attempts by telephone and mail" to obtain payment.  [Id.].  CSI boasted that its recourse average was a modest 4.8% of accounts placed in its system.  [Id.].  It follows, therefore, that CSI would collect 95% of the accounts it purchased from Mercy and recourse to Mercy less than 5% of those accounts.

5

2. **The Patient Financing Agreement**

In October 1999, CSI presented Mercy with its form Patient Financing Agreement. The Agreement was drafted by CSI and approved by the Bank. [Jaeb Dep. at 117, 119, 175-176]. CSI concedes that Mercy made no changes to the Agreement and signed the form contract it was provided on October 18, 1999. [Id. at 174-175]. The Agreement is attached hereto as Exhibit 7.

Contrary to the Bank's focus on paragraph 5 of the Agreement, the focus of this case is on paragraph 7, which expressly addresses recourse of delinquent accounts. It is also the key provision CSI breached that gives rise to Mercy's damages:

> Recourse. **At the end of each calendar month** during which BANK or CSI holds an account acquired for financing from PROVIDER, **CSI will automatically present to the PROVIDER for repurchase all accounts that are delinquent for 90 days. PROVIDER agrees to reimburse directly to the BANK upon notification by CSI, ninety two (92%) percent of the balance then due on any account that has become 90 days delinquent during the preceding calendar month. CSI will give immediate notice** to provider of all accounts which are ninety days delinquent. PROVIDER will not be held responsible for CSI's 8% prorated fee on any unpaid accounts. CSI will pay to the BANK all of the charges that are in excess of the original balance financed by the patient. CSI and BANK shall have the right of offset against sums due PROVIDER under the Agreement for the amount of any delinquent reimbursement obligations that exceed thirty (30) days.

(Bold emphasis supplied).

This provision envisioned that Mercy would repurchase recourse accounts by paying 92% of the outstanding balance directly to the Bank. But several conditions had to be met before Mercy was obligated to repurchase a recourse account. First, the account had to be delinquent for 90 days. Second CSI had to give Mercy immediate notice that the account was delinquent. Finally, and perhaps most importantly, Mercy's obligation to reimburse the Bank

6

applied only to those accounts that became "90 days delinquent <u>during the preceding calendar month.</u>" (emphasis added).

In short, this provision, much like any other warranty or contractual return provision, allowed CSI a limited window of opportunity to return to Mercy for repurchase delinquent accounts. CSI systematically exceeded the time limit provided in the Agreement.

CSI's violation of the recourse provision undermines the Bank's claim in two respects. First, as CSI's own Agreement provides, Mercy was only required to pay money to the Bank for those accounts that were recoursed after becoming "90 days delinquent during the preceding calendar month." [Agreement at ¶7]. Mercy was not required to pay the Bank money for accounts recoursed many months after this deadline passed.

Second, CSI claimed that the value of these untimely recoursed accounts could be used as an offset or credit against CSI's (and the Bank's) obligation to pay for new accounts sent by Mercy. As a result, CSI (and the Bank) paid nothing for more than $1 million in new accounts from Mercy. These damages more than offset any claim by CSI, and the Bank, as a third party beneficiary, is subject to this defense.

### 3. **The Road to Litigation.**

The problems that resulted in this lawsuit stem from two sources: CSI's poor business practices and a complete lack of oversight by the Bank.

#### (a) **CSI's Unfulfilled Promises.**

CSI's sales presentations proved to be false. For example, CSI's representation to Mercy that its process was "completely electronic" could not have been farther from the truth. What CSI says now it meant by "completely electronic" is that only the initial transmission of new accounts for the program was done electronically. [Parsons Dep. at 26-27 and 56]. In other words, CSI claims "completely electronic" related solely to its ability to accept a file of new

7

accounts by e-mail rather than in hard-copy. [Id.].  The CSI marketing materials sent to Mercy did not explain that completely electronic did not actually mean completely electronic.  [Exh. 1 and 2].

More importantly, CSI's administration of the accounts it purchased was substandard.  This is especially true with how CSI mishandled delinquent accounts

The purpose of the recourse provision is clear and goes hand in hand with CSI's Beacon score model.  As set forth above, CSI scored accounts in order to purchase only those accounts with the highest probability of being collected.  [Parsons Dep. at 30; Smith Dep. at 77-78].  Recognizing that collectibility is at its highest when an account is fresh rather than stale exemplifies the motivation behind CSI's selection of a 90 day recourse provision.  [Parsons Dep. at 52-53].

Mercy understood that CSI was selecting the best accounts and then holding them during the best time period within which to collect them.

If CSI was collecting on those accounts during the fertile time period, then CSI would have no reason to recourse them to Mercy.  If, however, CSI was not successful in collecting during that time period, Mercy believed, based on the Agreement's express language that CSI would "immediately" notify it when an account became 90 days delinquent and "at the end of each month" present for repurchase "all accounts…delinquent for 90 days."  [Smith Dep. at 126, 128, 130, 132].

CSI, however, all but ignored these deadlines.  Thus, when Mercy did not receive recourse files on a monthly basis, it believed that just like CSI's marketing materials provided, CSI had such a low recourse rate that the majority of Mercy's accounts CSI had purchased were

8

being collected. [Deposition of Russ Erdman ("Erdman Dep."), relevant portions attached hereto as Exh. 8, at 108].

Mercy found out just how wrong it was when, in July 2001, CSI recoursed to Mercy 1,300 accounts with a value of $760,000. [Expert Report of Parente Randolph, attached hereto as Exh. 9, at Exh. H]. Of these 1,300 accounts, only 138 were recoursed within the month they became 90 days delinquent. [Id.]. The rest (roughly 90%) were delinquent by far longer. The average age of the accounts recoursed in July 2001 was 222 days.

### (b) The Bank's Blind Eye.

Throughout this litigation, the Bank has portrayed itself as the innocent victim of Mercy's failure to pay for untimely recourse. In reality, the Bank has known all along that the only victim here is Mercy because CSI was not doing what was required of it under the Agreement. For more than a year, the Bank withheld the results of an audit it performed of the Mercy accounts under a dubious claim of work product. Once revealed that the Bank had disclosed the results of the audit to government regulators, it had no choice but to produce it to Mercy. [Deposition of Neysha Humpreys, ("Humphreys Dep."), relevant portions attached hereto as Exh. 10, at 149-151].

A review of the audit results demonstrates why the Bank withheld the report from Mercy. Neysha Humphreys, an internal auditor for the Bank, began an investigation in November 2001 of the accounts recoursed to Mercy. [Audit Report of Neysha Humphreys, attached hereto as Exh. 11]. Even though Ms. Humphreys chose to review only 30 of the 14,000 accounts CSI and the Bank purchased from Mercy, she reached the only conclusion possible: CSI had not timely recoursed 75% of the accounts reviewed to Mercy as required by the Agreement. [Id.].

9

The Bank now claims that regardless of CSI's failure to comply with its obligations under the Agreement, which the Bank must concede it did, the Bank may demand that Mercy repurchase these stale and valueless accounts. But both the language of the Agreement and Pennsylvania law undermine the Bank's claim and its motion for summary judgment.

## III.  ARGUMENT

The Court may grant a motion for summary judgment only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). The Court's role is limited to determining whether a genuine issue of fact exists for trial; therefore, the "court's function is not to weigh the evidence . . ." Metz v. Federal Express Corp., 1999 U.S. Dist. LEXIS 16714, *5 (E.D. Pa. 1999).

In passing on a motion for summary judgment, the Court (1) must view all facts in the light most favorable to Mercy, and (2) must draw all justifiable inferences from those facts in Mercy's favor. The Apartment Source L.P. v. Phila. Newspapers, Inc., 1999 U.S. Dist. LEXIS 4337, *6 (E.D. Pa. 1999). Stated another way, "the evidence of [Mercy] is to be believed, and all justifiable inferences are to be drawn in [Mercy's] favor." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). Therefore, summary judgment is not proper if the evidence is such that a reasonable jury (or finder of fact) could return a verdict for Mercy. Metz, 1999 U.S. Dist. LEXIS 16714 at *5.

Under Third Circuit law, Mercy need only meet the threshold of a "scintilla" of evidence and, if that threshold is met, "the court cannot credit the movant's version of events against the opponent, even if the quantity of the movant's evidence far outweighs that of its

opponent." Big Apple BMW, Inc. v. BMW of North America, Inc., 974 F.2d 1358, 1363 (3d

Cir. 1992) (Mansmann, J.), cert. denied, 507 U.S. 912 (1993). As outlined below, Mercy has

more than met this standard and the Bank's motion for summary judgment should be denied.

### A. THE COURT SHOULD DENY THE BANK'S MOTION BECAUSE THE BANK RELIES ON THE WRONG SECTION OF THE AGREEMENT IN SUPPORT OF ITS MOTION.

The Bank incorrectly contends that paragraph 5 of the Agreement allows it to

demand repurchase of "any account at any time without limitation." [First National Bank of

Montana's Memorandum of Law in Support of Its Motion for Summary Judgment on Contract

Interpretation ("Bank's Brief") at 13]. In support of this contention, the Bank cleverly avoids

explaining to the Court that this case is not about just "any account," but instead is focused on a

specific type of account: those that were recoursed to Mercy. By failing to identify the type of

account at issue here, the Bank attempts to divert the Court's attention away from the specific

provision of the Agreement expressly addressing Mercy's obligations to repurchase recourse

accounts. Under Pennsylvania's law on contract interpretation, the Bank's argument and its

motion fail. [2]

Contract interpretation standards are well established. Whether a contract

provision is ambiguous is a question of law. Sanford Inv. Co. v. Ahlstrom Mach Holdings, Inc.,

198 F.3d 415, 421 (3d Cir. 1999). Absent ambiguity, a court enforces a contract as written. Id.

A contract is not ambiguous unless the provisions in controversy are reasonably or fairly

susceptible of different interpretations. Emerson Radio Corp. v. Orion Sales, Inc., 253 F.3d 159,

163-64 (3d Cir. 2002). However, the fact that parties to a contract disagree upon its proper

---

[2] Because the Bank relies exclusively on Pennsylvania law in its motion for summary judgment, Mercy assumes the Bank concedes that Pennsylvania law applies. Even if the Bank denies such concession, for the reasons which will be set forth in Mercy's Motion for Partial Summary Judgment against the Bank and CSI, which will be filed before the deadline for dispositive motions, Pennsylvania law should apply.

11

interpretation does not necessarily render the writing ambiguous. Halpin v. LaSalle Univ., 639 A.2d 37, 39 (Pa. Super. 1994)( holding that language in a contract referring to a party as "professor for life" could not be interpreted to annul the clear language of the employment contract limiting it to a term of one year).

Paragraph 7 of the Agreement is unambiguous. But the Bank asks the Court to look solely to paragraph 5 of the Agreement and ignore completely paragraph 7. Unfortunately for the Bank, Pennsylvania law prohibits this because in interpreting a contract, the Court must look at the contract as a whole, and not in discrete units. Id. In doing so, when a contract appears to have conflicting provisions, it is well-settled that specific provisions control more general provisions. J.E. Faltin Motor Transp., 273 F.2d 444, 445 (3d Cir. 1959)(holding that specific provisions of lease agreement regarding liability governed over general language about the parties' relationship to each other); Harleysville Mutual Ins. Co. v. GE Reinsurance Corp., No. 02-171, 2002 U.S. Dist. LEXIS 8064, *12-13 (E.D. Pa. May 6, 2002)(finding that because the lawsuit sought damages in excess of $2 million, the parties were not bound by the arbitration clause in the insurance contract, which required arbitrations of all claims not exceeding $2 million); Signet Bank/Maryland v. First Bank of Philadelphia, No. 90-3723, 1991 U.S. Dist. LEXIS 8177, *11 (E.D. Pa. June 14, 1991).

Signet Bank demonstrates why the Bank's reliance on paragraph 5 is wrong and its motion for summary judgment should be denied. The plaintiff in Signet Bank entered into a loan participation agreement with the defendant regarding a $500,000 loan to a third party payable upon demand or no later than a date certain. Id. at *1. The third party failed to make payment when required; thus, defaulting on the loan. Id. at *2. Following the default, and after

12

the parties could not agree on how to address the default, the defendant refused to proceed against the collateral and refused to repurchase plaintiff's participation interest. Id.

The plaintiff filed a breach of contract claim and ultimately moved for summary judgment. 1991 U.S. Dist. LEXIS 8177 at *3. The plaintiff claimed the participation agreement was unambiguous and provided (in paragraph 11) that if the parties could not agree on the steps to take following a default, defendant was required to either proceed against the collateral or repurchase plaintiff's interest in the loan. Id. at *4-5. Defendant responded by claiming the participation agreement was ambiguous because two other provisions in it dealt with repayment of plaintiff's interest and shared risk in the event of default. Id. at 5-6.

In granting summary judgment in favor of plaintiff, the Court followed Pennsylvania's long established rule that specific provisions in a contract control general provisions. Id. at *11. The Court found that while two other sections of the participation agreement addressed repayment of plaintiff's interest and risk allocation, only paragraph 11 dealt specifically with the parties' rights and obligations when they could not agree about the steps to take following an event of default, which was the exact situation the parties faced. Id. at 9-12.

As in Signet Bank, the Bank looks solely to paragraph 5 of the Agreement and claims this provision requires payment on any account at any time without limitation. But a careful analysis of paragraph 5, and the remainder of the Agreement, demonstrates this is not the case. Paragraph 5 discusses to whom Mercy is obligated to reimbursement payment and the amount of that payment. For example, paragraph 5 provides that except in two limited circumstances, Mercy's repurchase obligations were limited to 92 percent, with CSI repaying its eight percent. If, however, the reason for repurchase was because the patient disputed liability

13

for the services or the transaction was fraudulent or illegal, Mercy was required to repurchase 100 percent of the account, allowing CSI to retain its eight percent fee.

Contrary to paragraph 5's discussion generally about the amount of Mercy's repurchase obligation, paragraph 7 deals specifically and exclusively with recourse accounts and the numerous conditions precedent to Mercy's repurchase obligation. First, an account had to be delinquent for 90 days. Second, CSI was required to immediately notify Mercy when an account became 90 days delinquent. Third, CSI was required to automatically present to Mercy at the end of each calendar month all accounts delinquent for 90 days.

But meeting these conditions still did not obligate Mercy to repurchase all the recourse accounts CSI presented to it. Instead, Mercy was obligated to repurchase only an "account that has become 90 days delinquent during the preceding calendar month." [Agreement, paragraph 7 (emphasis added)]. In other words, even if CSI complied with the first three conditions of paragraph 7, if CSI presented an account to Mercy that became 90 days delinquent prior to the month in which it was presented, Mercy was not obligated to repurchase that account, and did not owe the Bank anything.

Paragraph 7 deals with recourse accounts separately and specifically for a reason. CSI's scoring model meant that it was selecting the accounts from Mercy's self-pay portfolio with the highest probability of collection and holding them for the time period when collection was most likely. If after ninety days, CSI could not collect on the accounts, they should have been returned promptly to Mercy.

The Bank's interpretation of the Agreement, that it could demand payment for recourse regardless of its age, turns this risk allocation on its head, and leaves Mercy without its benefit of the bargain. That is, under the Bank's interpretation, CSI could hold onto the accounts

14

it purchased from Mercy indefinitely, make no collection attempts whatsoever, and then whenever it felt like it could send them all back to Mercy, and the Bank could demand payment. This result is absurd.

Moreover, the Bank's interpretation renders the timing provision superfluous. This too violates Pennsylvania law on contract interpretation. Tenos v. State Farm Ins., 716 A.2d 626, 631 (Pa. Super. 1998) (noting "[Pennsylvania's] rules of construction do not permit 'words in a contract to be treated as surplusage…if any reasonable meaning consistent with the other parts can be given to it'").

Applying Pennsylvania contract interpretation law, and common sense, Paragraph 7, which specifically deals with the types of accounts at issue here (recourse accounts) governs, and not the general repurchase allocation set forth in Paragraph 5. Thus, the Bank has relied on the wrong provision, and summary judgment should be denied.

**B.  THE BANK'S MOTION FAILS BECAUSE AS A THIRD PARTY BENEFICIARY, THE BANK IS SUBJECT TO THE DEFENSES MERCY HAS AGAINST CSI FOR BREACHING THE CONTRACT.**

After fighting its designation as a third party beneficiary under the Agreement throughout the course of this litigation, the Bank finally concedes its status as a third party beneficiary to the Agreement. In making this concession, however, the Bank ignores in its motion the overwhelming case law limiting a third party beneficiary's right to enforce a contract.

Instead, the Bank tries to shoe horn itself into two narrow exceptions to these well-settled principles. First, the Bank claims its rights are wholly independent of any of the obligations of the other parties to the Agreement. Second, the Bank stretches credibility and claims that it is a donee beneficiary entitled to enforce its rights without limitation. Neither argument withstands even mild scrutiny.

15

1. **The Bank's Right to Repayment is Expressly Contingent Upon CSI's Performance of the Conditions in Paragraph 7 of the Agreement.**

Pennsylvania law regarding the rights of a third party beneficiary is well settled. That is, a third party beneficiary's rights are no greater than those of parties to a contract. See The Stokes Rowe P'ship v. United Am. Sur. Co., No. 89-0612, 1989 U.S. Dist. LEXIS 11931, at *3 (E.D. Pa. October 5, 1989)(noting, "any claim [that a] plaintiff has as a third-party beneficiary depends upon the validity of the underlying contract between [the promisor and promisee]"); Jewelcor Jewelers v. Corr, 542 A.2d 72, 80 (Pa. Super. 1988) (noting, "it is undisputed that the rights of an alleged third-party beneficiary may arise no higher than the rights of the parties to the contract"); 17A Am. Jur. 2d Contracts §460 (2003); Restatement (Second) of Contracts, §309, cmt. c (1981) (noting that the third-party beneficiary's contract right is "subject to limitations inherent in the contract, and to supervening defenses arising by virtue of its terms").

"Indeed, it would be unjust to allow a mere [third-party beneficiary] to enforce a promise when the bargained for performance has not happened." Wolser v. Slocum, 21 Phila. 275, 278 (Ct. Com. Pl. Phila. County, 1990)(holding donee beneficiaries not entitled to enforce contract where promisee failed to perform its promise to promisor). If a contract "ceases to be binding in whole or in part because of ... the present ... failure of the promisee to perform a return promise which was the consideration for the promisor's promise," the third-party beneficiary is subject to that limitation. Williams v. Paxson Coal Co., 31 A.2d 69, 71 (Pa. 1943). In short, as a third party beneficiary, the Bank's claim is subject to any defenses Mercy has to any claims by CSI based on contractual breaches.

The Bank claims an exception to these general third party beneficiary rules exists when a contract provides that the rights of the beneficiary are not affected by the act or neglect of the promisee. According to the Bank, such an exception applies here because "[t]he Agreement

16

in no way conditions the Bank's right to demand repurchase on CSI's contractual performance, thus any breach of the Agreement by CSI cannot serve as a defense against the Bank's demand to Mercy to repurchase accounts." [Bank's Brief at 16].

The Bank thus ignores the conditions on Mercy's obligations to actually repurchase recourse accounts once a demand is made. As set forth above, with respect to recourse accounts, paragraph 7 of the Agreement provides that Mercy is obligated to repurchase recourse accounts only when certain conditions are met. These conditions were not met regarding the vast majority of the recourse accounts. Thus, Mercy was not obligated to repurchase them. The Agreement expressly ties the Bank's right to repayment to these conditions, and CSI's failure to fulfill these conditions defeats the Bank's claim for payment of any recourse account not recoursed in accordance with paragraph 7.

### 2. Regardless Of What The Bank Calls Itself, Its Rights Are Limited By CSI's Failure To Perform As Required By The Agreement.

The Bank contends that as a donee beneficiary (which it is not),[3] its rights are indefeasible and cannot be changed or modified by the parties. In support of this argument, the Bank relies on the 1989 Pennsylvania Supreme Court case of Biggins v. Shore, 565 A.2 737 (Pa. 1989). But Biggins has no application here.

In Biggins, a partner in a real estate company sold his share of the business to his other partners in exchange for a lump sum payment, and continued payments of $35 for every property sold by the partnership for a period of six years. Id. at 738. According to the contract, if the partner died before the end of the six year period, the $35 payments were to be made to the

---

[3] A third party beneficiary is a donee beneficiary if the purpose of the promisee in obtaining the promise of performance is to make a gift to the beneficiary. Restatement of Contracts, Section 133. The Bank cannot credibly argue that the purpose of CSI entering the Agreement, particularly the recourse provision, was to give the Bank a gift. Taking this position ignores that it was the Bank's money in the first place that funded the purchase of these accounts. Mercy need waste no more of the Court's time refuting the Bank's untenable position because, as described below, the Bank's designation of itself as a donee beneficiary is irrelevant here.

partner's wife.  Id.  Prior to his death, the partner sought to modify the contract by allowing the

partnership to choose between making the $35 payments to his wife or a lump sum payment of

$500 to the local prepatory school.  Id. at 739.  Upon the partner's death, the partnership chose

the latter, and the wife sued the partnership.  Id.

       In upholding the grant of summary judgment to the wife, the Pennsylvania

Supreme Court relied on Restatement of Contracts, Section 142.  565 A.2d at 739-740.  This

section, entitled "variation of the duty to a donee beneficiary by agreement of promisor and

promisee," provides that:

> Unless the power to do so is reserved, the duty of the promisor to
> the donee beneficiary cannot be released by the promisee or
> affected by any agreement between the promisee and the promisor,
> but if the promisee receives consideration for an attempted release
> or discharge of the promisor's duty, the donee beneficiary can
> assert a right to the consideration so received, and on doing so
> loses his right against the promisor.

Restatement of Contracts, §142.

       This statement of the law deals only with situations where the parties to the

contract try by agreement to change the contract in order to modify the third party beneficiary's

rights.  In those circumstances, Pennsylvania has said the third party beneficiary's rights are not

affected by the modification.  Nothing in Biggins or Section 142 of the Restatement of Contracts

addresses the rights of a third party beneficiary where the parties to the contract have not fulfilled

their obligations under the contract.  It is this latter situation at issue in this case.  Thus, the law

set forth in Section B.1. above, including the Restatement (Second) of Contracts, Section 309

applies here.

       There are no allegations that CSI and Mercy attempted to modify or release any

duties to the Bank by way of agreement between them.  Rather, Mercy's duties to the Bank, if

any, were released when CSI failed to perform as required under the Agreement.  Under these

18

circumstances, the well-settled law set forth above applies and limits the Bank's rights by the

claims and defenses Mercy has against CSI. <u>Williams</u>, 31 A.2d 69, 71 (holding that when the

original promisee was unable to enforce an agreement because the promisors failed to perform,

"[i]t would be patently unjust to allow a mere donee beneficiary to enforce it.")

### C. MERCY HAS NEITHER CONCEDED NOR WAIVED ITS DEFENSES AGAINST THE BANK, AND HAS COMPLIED FULLY WITH THE FEDERAL RULES OF CIVIL PROCEDURE.

In a last ditch effort to justify its motion for summary judgment, the Bank makes a

wholly unsupported argument that through its responses to interrogatories, Mercy has either

conceded that it has no defenses against the Bank or waived any right to assert that CSI breached

its contract. Had the Bank made even a cursory review of the Federal Rules of Civil Procedure,

it would not have wasted the Court's time with this meritless argument.

In January 2003, immediately after the parties learned of CSI's bankruptcy and

the imposition of the automatic stay, the Bank served Mercy with contention interrogatories.

Each of the Bank's interrogatories was designed to illicit information, not about any claims

pending against they Bank (because Mercy has asserted none), but discovery CSI was not

entitled to obtain because of the bankruptcy. Accordingly, Mercy objected to the improper

nature of the interrogatories.

In the almost two years since the objections were served, the Bank never

complained to the Court about them until now. The challenge to these two-year old objections,

which the Bank raises by way of its motion for summary judgment, do not comply with the

Federal Rules of Civil Procedure or the Court's Scheduling Order. The Bank also fails to

recognize that Mercy was not obligated to supplement its objections.

The Bank's complaint about Mercy's response to certain interrogatories belongs

in a motion to compel and not in a motion for summary judgment. Pursuant to F.R.C.P.,

33(b)(5), if a party serving interrogatories wants to challenge objections to an interrogatory, it must do so by means of moving for an order under F.R.C.P. 37(a). The Court's September 16, 2004 Order required that any such motions be made before the close of discovery. Discovery closed in this matter on October 29, 2004. The Bank failed to file a motion to compel before the close of discovery and is now precluded from doing so, even under the disguise of summary judgment.

Mercy was under no obligation to amend its responses to the interrogatories, and its failure to do so does not in any way limit Mercy's claims and defenses here. Federal Rule of Civil Procedure 26(e)(2) provides that a duty to supplement exists if (1) the party learns that the response is in some material respect incomplete or incorrect and (2) the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing. F.R.C.P. 26(e)(2). Neither requirement is present here. First, Mercy asserted valid objections to the Bank's interrogatories, and did not provide answers. Because the Bank never successfully moved the Court to compel answers, there is nothing for Mercy to amend.

Second, the Bank cannot credibly claim that it has not learned through the discovery process or other writing the basis for Mercy's claims and defenses in this litigation. In fact, if the Bank had no such knowledge, it could not have identified for the Court all the arguments it "expects" Mercy to make that it tries to refute in its motion. Moreover, the Bank admits in its brief that the parties have engaged in exhaustive discovery. There is no dispute that this exhaustive discovery made clear what claims and defenses Mercy was asserting here. Further, Mercy's expert report details its claims and defenses in this action. Any questions the Bank had about Mercy's position in this case certainly were answered once it received the expert report.

20

Plainly, this argument is nothing more than a red herring designed to distract the Court from the Bank's complete lack of basis for its summary judgment motion. Throughout this litigation Mercy has made its claims and defenses, and the facts supporting those claims and defenses, clear and unambiguous, and has hidden nothing from the parties.

## IV. CONCLUSION

The Bank has not put forth a single valid reason why summary judgment should be granted in its favor. Ignoring the plain and unambiguous language of the Agreement as a whole, the Bank wildly contorts a single provision of the Agreement to support its claim that it is entitled to seek payment from Mercy on any account at any time without limitation. Ignoring the well-settled law regarding third party beneficiaries, the Bank makes the incredible claim that it is entitled to enforce the contract regardless of CSI's numerous breaches. Ignoring the Federal Rules of Civil Procedure, the Bank tries in its motion for summary judgment to achieve the results for which it should have filed a motion pursuant to F.R.C.P. 37 before the close of discovery. But the plain and unambiguous language of the Agreement, the well-settled third party beneficiary law, and the Federal Rules of Civil Procedure cannot be ignored. Applying each correctly defeats the Bank's motion for summary judgment.

Dated: November 23, 2004

STEVENS & LEE, P.C.

By _____
　　　E. Thomas Henefer
　　　Attorney I.D. No. 55773
　　　Stacey A. Scrivani
　　　Attorney I.D. No. 84275
　　　111 North Sixth Street
　　　P.O. Box 679
　　　Reading, Pennsylvania 19603

Attorneys for Plaintiff Mercy Health System

21

## CERTIFICATE OF SERVICE

I, STACEY A. SCRIVANI, ESQUIRE, certify that on this date, I served a true and correct copy of the foregoing memorandum of law in opposition to the Bank's motion for partial summary judgment on the following counsel of record by first class mail, postage prepaid, as follows:

Christopher M. Brubaker, Esquire
Kittredge, Donley, Elson, Fullem & Embick, LLP
The Bank Building
421 Chestnut Street
Philadelphia, PA  19106-2416
Counsel for First National Bank of Montana

Patrick J. Egan, Esquire
239 S. Camac Street
Philadelphia, PA  19107
Counsel for CSI Financial, Inc.

Dated:  November 25, 2004

Stacey A. Scrivani