3

IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| MERCY HEALTH SYSTEM OF SOUTHEASTERN PENNSYLVANIA, | ) ) ) | |
| Plaintiff, | ) ) | No.    01-CV-5681 |
| -vs- | ) ) | |
| CSI FINANCIAL, INC., | ) ) | |
| Defendant. | ) ) | |
| FIRST NATIONAL BANK OF MONTANA, INC. and CSI FINANCIAL, INC., | ) ) ) | CIVIL ACTION Consolidated |
| Plaintiffs, | ) ) | |
| -vs- | ) ) | |
| MERCY HEALTH SYSTEM OF SOUTHEASTERN PENNSYLVANIA, | ) ) ) | |
| Defendant. | ) | COPY |

---

**VIDEOTAPED DEPOSITION OF ROBERT JAEB - VOLUME I**

---

Heard at Lesofski & Walstad Court Reporting
21 North Last Chance Gulch, Suite 201
Helena, Montana
July 12, 2004
9:06 a.m.

LISA R. LESOFSKI, RPR
Lesofski & Walstad Court Reporting
21 North Last Chance Gulch, Suite 201
Helena, Montana 59601 (406)443-2010

VIDEOTAPED DEPOSITION OF ROBERT JAEB - VOLUME I

Page 52

1    Q    And what did the Bank of Montana get out
2    of it?
3        A    92 percent plus the interest.
4    Q    The bank got 92 percent?
5        A    Excuse me, the bank bought the accounts
6    for -- the hospital got 92 percent, the bank got the
7    interest, I'm sorry.
8    Q    And what was the interest at that time, if
9    you can recall?
10       A    15 percent.
11   Q    Were there any late fees?
12       A    No, not at that time.
13   Q    Did CSI split the 15 percent interest with
14   the Bank of Montana?
15       A    No.
16   Q    What did CSI do?  You mentioned servicing
17   collection, billing, tell me about when an account
18   would come in from a hospital what would happen,
19   when you had your first account.
20       A    We would send out the monthly statements
21   and a letter notifying the patient on behalf of the
22   bank that they had purchased the account.  So
23   basically if you think of us as a Visa card type
24   center that is what we did, those type of duties.
25   Q    Let's go back a little further.  What

Page 53

1    would happen -- Do you remember what your first
2    client was, what hospital?
3        A    Probably Lutheran Health Services.
4    Q    And what would happen with respect to them
5    from the very beginning when they wanted to send you
6    some new accounts?
7        A    They would send letters out to all their
8    patients telling them they either had to pay in full
9    or they had a payment option under a loan financing
10   program that may be available to them.  We would go
11   in and work with their patient accounts people, call
12   all the patients, ascertain whether they were going
13   to pay the account off in full today or if they
14   wanted bank financing.  If they did we had the
15   application filled out, the hospital sent that up to
16   us and then we were referred on to the bank after it
17   was credit scored and then it would be -- if it was
18   purchased then the normal billing activities would
19   take place and disclosures.
20   Q    Who was it that made calls to these
21   patients, was it CSI personnel or Lutheran Health
22   Service personnel?
23       A    CSI personnel.
24   Q    And who would be responsible for obtaining
25   an application from a patient?

Page 54

1        A    The hospital's employees.
2    Q    And did they have form applications at
3    their location that they could send out or did they
4    take the information over the phone?
5        A    They had form applications and the
6    patients signed them.
7    Q    And then they forwarded those to CSI?
8        A    Yes.
9    Q    At the time those were -- Strike that.
10   When did CSI provide Lutheran Health Services with
11   its funding?
12       A    When the bank purchased the accounts.
13   Q    Okay, so it wasn't until after there was
14   scoring and a decision made?
15       A    Yes.
16   Q    At that time what was the minimum score
17   required to accept an application?
18       A    640.
19   Q    And the score we're talking about, does it
20   have a formal name?
21       A    Fair Isaacs.  With Equifax it's called a
22   beacon score, with Transunion it's an emperical
23   score.  Basically it's a Fair Isaacs model.
24   Q    Did you use Equifax as opposed to
25   Transunion or both?

Page 55

1        A    At that time we used Equifax.  We use them
2    both, it doesn't make a difference.
3    Q    Would the score be the same?
4        A    It's similar.
5    Q    So if a patient filled out an application
6    and they had a score of 640, what would happen?
7        A    Then the bank would purchase the account.
8    Q    And would Lutheran Health Services get
9    their 92 percent at that time?
10       A    Yes.
11   Q    And would CSI get its 8 percent at that
12   time?
13       A    Yes.
14   Q    Do you know in what form Lutheran Health
15   Services would get its 92 percent, did they receive
16   a check, did they receive a wire or was there some
17   other form of payment?
18       A    Probably both.  I mean, you're going back
19   too far.  Some of them wanted wire transfers, others
20   wanted checks.  I don't recall what they wanted.
21   Q    Tell me about the storing system, how that
22   works?  Once CSI got an application what did they do
23   with it?
24       A    They would pull a credit report in the
25   name of the hospital and along with the credit

VIDEOTAPED DEPOSITION OF ROBERT JAEB - VOLUME I

Page 56

1  report there is a score that's derived from that,
2  and if the score was 640 or higher, at that time
3  then it was referred to the bank for purchase and
4  they would do whatever due diligence they would
5  before the purchase.
6      Q   When you say "on behalf of the hospital,"
7  do you mean there is somebody whose application you
8  were looking at, if they pulled their own credit
9  report they would see that it was Lutheran Health
10 Services that requested it?
11     A   Whatever particular hospital, yes.
12     Q   Was there any other due diligence other
13 than the score?
14     A   They had to be gainfully employed, a
15 citizen of the United States, you know, it would be
16 just general generic requirements.
17     Q   And was that information obtained from the
18 application?
19     A   From the patient itself and/or the credit
20 reporting agency.
21     Q   So the application did not ask questions
22 about employment or citizenship?
23     A   No, it did.
24     Q   So you confirmed it by --
25     A   Yes, they filled out a formal application.

Page 57

1      Q   What other information was on the
2  application?
3      A   You know, employment length, how long they
4  lived at a particular address, wife's employment, et
5  cetera.
6      Q   Was that a form application or was it
7  something that CSI prepared?
8      A   It was a form application that we
9  prepared, it was a simple one-page document.
10 Similar to signing up for a Visa card, just what
11 they would ask is basically what we would ask.
12     Q   How soon after a patient had been
13 discharged from its services at the hospital, any
14 hospital, but in the early part of your business
15 year would that hospital send an account to you?
16     A   Back in those days most of the hospitals
17 did not have the electronic capability of sending us
18 an electronic file, nor did we have the ability to
19 receive one, so everything was done manually. It
20 would depend on how fast the hospital collected the
21 insurance, got their paperwork done or established
22 itself to pay a portion of it. So I could not
23 answer and give you a definitive time frame.
24     Q   When you received an account and it was
25 accepted into the program, at that time did you know

Page 58

1  how many days had passed from the date of discharge
2  until the day it was accepted?
3      A   I'm sure we did but we probably weren't
4  paying attention to it at that point in time.
5      Q   Why wasn't that important?
6      A   Because most facilities weren't very
7  efficient back in those days, to be honest with you.
8      Q   They were not?
9      A   Correct.
10     Q   With respect to once a score was
11 reached -- Let me back up. CSI actually ran the
12 report to get the score; is that correct?
13     A   In the name of the hospital.
14     Q   Right. When I asked CSI I asked CSI as
15 opposed to the Bank of Montana.
16     A   Yes.
17     Q   Was the Bank of Montana informed about the
18 score and then --
19     A   They were supplied all of the background
20 information, we would put it on a floppy and send it
21 with each batch for them.
22     Q   Did they ultimately have the decision as
23 to which accounts to accept?
24     A   Yes.
25     Q   Did CSI have any input into that?

Page 59

1      A   No. Let me back up. There might have
2  been an exception or two that the hospital really
3  wanted us to take it back in those days, and if the
4  hospital wanted it then they talked to the bank and
5  we may have taken it, the bank may have purchased
6  the account.
7      Q   Even though the score was less than 640?
8      A   Yes.
9      Q   What types of reasons would the bank agree
10 to do that?
11     A   Because the guy is a good guy and he just
12 had hard times and they knew him forever and he'll
13 pay.
14     Q   How did CSI learn which accounts the bank
15 was accepting and, again, I'm talking about in this
16 early time frame?
17     A   They would tell us if there was an
18 exception and then we'd have to refer it back to the
19 hospital.
20     Q   So if you sent them a file that had ten
21 accounts on it and you didn't hear back from them --
22     A   We would hear back the next day it was
23 either funded in full or it was not and if there was
24 a discrepancy or an exception they would let us know
25 right away.

Page 92

1  understand that they were dealing with First
2  National Bank of Montana?
3      A   Yes.
4      Q   And they would have no idea who CSI was?
5      A   That's correct.
6      Q   With respect to the Fast Trac
7  relationship, excuse me, the Fast Trac Program once
8  the bank became involved, was it also the bank that
9  made the decision as to what accounts to accept once
10 they had been scored?
11     A   Yes.
12     Q   Was there ever a time when the bank
13 accepted accounts that were scored less than 600?
14     A   It would have been the exception but they
15 may have.
16     Q   Were there ever a time when the bank
17 rejected an account that scored higher than 600?
18     A   Yes.
19     Q   What would be the reasons for that?
20     A   They may not have liked the guy's
21 background.  I mean, there might have been -- Credit
22 scores are kind of a moving target, an individual
23 could have a 600 or a higher score and have
24 delinquent collections or judgments or something
25 against him.  The bank does the due diligence on

Page 93

1  their accounts and if they didn't like something
2  they could send it back.
3      Q   Again, was this due diligence based on
4  their review of the credit report?
5      A   The demographics and the credit report,
6  whatever the bank was looking at, I couldn't tell
7  you.
8      Q   Do you know if the bank ever contacted
9  patients directly when making the decision about
10 whether to accept an account?
11     A   I don't have knowledge of that.
12     Q   Once the bank accepted an account how did
13 they let CSI know that accounts had been accepted?
14     A   It was in the funding document.
15     Q   What is the funding document?
16     A   It was a wire transfer confirmation, it's
17 a list of all of the accounts that they're
18 purchasing and/or rejecting.
19     Q   Where did the wire transfer go?
20     A   It went to CSI and then to the bank, or to
21 the hospital.
22     Q   Why did it go to CSI?
23     A   Because we had the relationship with the
24 hospital, we would send it, forward it on to the
25 particular people at the hospital letting them know

Page 94

1  these accounts were purchased and the money was
2  deposited in their account with the bank.
3      Q   What did CSI do with the information when
4  they received it from the bank?
5      A   They forwarded it to the hospital.
6      Q   What did you do with respect to your own
7  system, what happened to those accounts, were they
8  somehow inputted into your system?
9      A   No, they were there in the system and they
10 were basically activated and we send out the bank
11 letters and the statements, et cetera.
12     Q   So accounts would be integrated into CSI's
13 system when they were first sent from the hospital
14 prior to scoring?
15     A   We would get the accounts and score them
16 and they're in this what we call FoxPro.  So they
17 stay in FoxPro and the bank confirms it and then
18 they were moved to the 400.
19     Q   And did CSI have any input into the
20 decision as to what accounts to accept that --
21     A   The bank had the final decision on
22 everything.
23     Q   Did CSI have any input?
24     A   No.  Let me qualify that.  Okay, we
25 typically never did.  If a particular hospital knew

Page 95

1  this guy wasn't on the credit score, well, as I told
2  you before, and they really wanted it on, we could
3  talk to the bank and say, "Hey, this guy doesn't
4  qualify with the hospital and we want to put them
5  on," and it was up to the bank to accept or reject
6  it at all times.
7      Q   How frequently did that happen?
8      A   It was very rare but it did happen and
9  that was more on the manual ones rather than the
10 Fast Trac.  I don't recall it ever happening on Fast
11 Trac.
12     Q   Did CSI ever have input other than just
13 passing along a hospital's concern regarding a
14 particular account in terms of acceptance or
15 rejection?
16     A   No.
17     Q   Let me back up a little back here in this
18 Fast Trac Program.  How did a hospital in 1996 get a
19 batch of accounts, so to speak, out to CSI?
20     A   Fast Trac didn't start until 1999, so it
21 would be typically the manual application forms
22 coming over at that point in time, until 1999.
23     Q   Let's focus solely on Fast Trac now, so
24 we'll talk about 1999 going forward.  Under the Fast
25 Trac program how did a hospital get accounts out to

Page 116

1  the Bank of Montana?
2     A   They still fund our program.
3        MR. BRUBAKER: When you say "Bank of
4  Montana," that was the --
5        THE WITNESS: First National Bank.
6        MS. SCRIVANI: I apologize. The bank. I
7  meant First National Bank of Montana. Thank
8  you. I'm sorry about that.
9     Q   (By Ms. Scrivani) So they're still
10 funding the program?
11    A   Yes.
12    Q   When you first entered into the
13 relationship with the bank did they have any input
14 into your marketing?
15    A   I'm sure they did.
16    Q   Did they have any input into which clients
17 you solicited?
18    A   No.
19    Q   Did they have any input into drafting your
20 actual marketing materials?
21    A   No.
22    Q   Did they have any input into drafting the
23 contracts that you signed with hospitals that
24 entered the program?
25    A   Yes.

Page 117

1     Q   What involvement did they have in that?
2     A   Their legal staff reviewed it and signed
3  off on them. They reviewed each and every contract.
4     Q   Was there a form contract that was used or
5  was it hospital by hospital?
6     A   No, it was a form contract.
7     Q   When was the form contract first
8  established?
9     A   Back in 1992 in the original format. How
10 it evolved, I couldn't tell you.
11    Q   Who drafted the first contract?
12    A   The Smith Law Firm and the attorneys for
13 Montana Bank, and I was also involved in it.
14    Q   Did the hospitals in the program at any
15 time ever have any input into the contract?
16    A   Yes.
17    Q   When did that happen?
18    A   On a case-by-case basis, each law firm
19 always has something to say.
20    Q   Was it more typical than not for the form
21 contract to be changed as a result of --
22    A   No, it was very seldom changed.
23    Q   Do you recall if when the bank's attorneys
24 reviewed the contract if they suggested any changes
25 or required any changes?

Page 118

1     A   I don't recall.
2     Q   Was the bank's counsel also the Smith Law
3  Firm at the time?
4     A   No, they had their own.
5     Q   Do you know if after the relationship,
6  after CSI entered its relationship with the bank
7  until the time of the bankruptcy if the bank ever
8  requested that the contract be changed, the form
9  contract?
10    A   I don't recall.
11    Q   Do you know if CSI ever changed the
12 contract in that same time period?
13    A   I don't believe it was but -- you know,
14 say that again. Would you mind repeating your
15 question, how you phrased it?
16    Q   Absolutely. At any time between 1996 when
17 CSI first entered its relationship with the bank and
18 the time of bankruptcy did CSI make any amendments
19 or changes to the form contract?
20    A   There probably were changes over the time
21 as it evolved. Some law firm may have suggested
22 something we liked and that would stay in there.
23    Q   Do you have any specific recollection of
24 that happening?
25    A   No, but I'm sure it happened.

Page 119

1     Q   Would CSI have retained drafts of the
2  contract as it evolved over the years?
3     A   Every signed hospital there was a specific
4  contract for, so we still have all of the contracts
5  back to 1992.
6     Q   But if I were to look at those contracts
7  and compare them I wouldn't know what changes were
8  made by CSI as opposed to --
9     A   Well, CSI didn't change them, it was at
10 the request of the attorneys for the hospitals and
11 the bank agreeing to it.
12    Q   Okay. So my question was, if CSI made any
13 changes to the form contract on its own initiative
14 during 1996 to --
15    A   Not without the sign off of the bank.
16    Q   Can you recall any such changes?
17    A   No.
18    Q   Did the bank have any input into the form
19 letter that went out to patients that were accepted
20 into the program?
21    A   Yes.
22    Q   What input did they have?
23    A   They have the final say on everything.
24    Q   Was there a form letter that was drafted
25 that was the same for all patients?

VIDEOTAPED DEPOSITION OF ROBERT JAEB - VOLUME I

Page 172

1   about how recourse would work?
2       A   Not that I recall.
3       Q   How about returns?
4       A   No.
5       Q   How about posting of payments?
6       A   No.
7       Q   Can we turn back again to --
8           MS. SCRIVANI:  Well, I'm not really sure,
9   frankly, who the best person is to ask these
10  questions and I guess I'll ask Mr. Egan.  With
11  respect to the marketing materials that were
12  sent to Mercy, since Mr. Jaeb has testified
13  that he's not exactly sure what happened --
14          MR. EGAN:  I think you're confusing a
15  corporate designee with determining the facts
16  of the case.  This man knows what he knows
17  about the corporation and you can ask him
18  whatever you want.  We're producing
19  Mr. Parsons, we're producing the other
20  witnesses.  You ask them what they know and
21  they will tell you based on what they did when
22  they worked there.  This corporation doesn't
23  even exist so we'll do the best we can but I
24  can't promise you everybody is going to know
25  every last thing about it.

Page 173

1           MS. SCRIVANI:  Well, I'm pretty sure, and
2   we can get the notice out, that the interaction
3   with Mercy and how this contract came about is
4   one of the topics.
5           MR. EGAN:  And Peter Parsons is the person
6   that came and met with Doug Smith and you'll
7   have him here to depose and you can ask him
8   whatever you want.
9           MS. SCRIVANI:  That's fine.  Will he be
10  testifying on behalf of the corporation with
11  respect to those questions?
12          MR. EGAN:  I don't understand the
13  importance of the distinction but sure, why
14  not.
15          MS. SCRIVANI:  I think the importance is I
16  don't want to get to trial and have you say,
17  "Well, he's just testifying on behalf of
18  himself and he's not entitled to speak on
19  behalf of the company."
20          MR. EGAN:  I would not make that a
21  concern.
22          MS. SCRIVANI:  Okay.  Thank you very much.
23          MR. EGAN:  He may be wrong and he might
24  not remember it correctly, I don't know.
25          MS. SCRIVANI:  Well, I agree that that

Page 174

1   could happen.
2       Q   (By Ms. Scrivani)  After you sent Mercy a
3   copy of the contract, and I know you don't recall
4   when that was, do you recall any response at all you
5   got from Mercy with respect to the contract?
6       A   I know there were at that point they were
7   interested, you know, it was a legal review.
8   Whether or not they wanted any revisions made, I
9   don't recall it, and before Doug would sign it or
10  whoever was going to sign it he had to come out and
11  do his due diligence, he did and he was happy with
12  and he said, no, he said he was going to get the
13  contract signed.  I'm sure we talked about
14  procedures, how the files were going to come, and I
15  don't know if Russ sent his files in or not.  So
16  that would be the extent of it.
17      Q   Did Mercy make any changes to the
18  contract?
19      A   I don't recall.
20      Q   Would you have copies of the draft of that
21  if, in fact, they did?
22      A   There may be some in the file but if there
23  is you would have been furnished with a copy of it.
24      Q   Did you have any conversations with any
25  in-house counsel at Mercy regarding the contract?

Page 175

1       A   Not that I recall, no.
2       Q   If you would turn now in the smaller
3   binder please to Exhibit No. 6 I'll ask you to flip
4   through.  Take your time to look at it and let me
5   know when you're finished.
6       A   (Witness reviews document.)  Okay.
7       Q   Do you recognize this document?
8       A   Yes.
9       Q   What is it?
10      A   It's a patient financing agreement,
11  basically the contract between Mercy, the bank and
12  CSI.
13      Q   And I want you to take as much time as you
14  need to look through it so you can answer my
15  question, which is do you recognize this as being
16  the form contract that was prepared by CSI?
17      A   I have no reason to believe that any
18  changes were made, so as far as I know, this was the
19  draft.  I don't recall anything else.
20      Q   With respect to this document do you know
21  if the bank had any input into any of the provisions
22  of this document?
23      A   The bank had agreed to this.  Basically
24  this is the form contract to my knowledge back at
25  that point in time that the bank signed off on and

VIDEOTAPED DEPOSITION OF ROBERT JAEB - VOLUME I

Page 176

1  the bank, in fact, did sign this.
2      Q    Do you recall ever explaining any of the
3  terms of this contract to anyone at Mercy at the
4  time it was being signed?
5      A    No.
6      Q    Would you agree with me looking at this
7  contract that the only parties to this contract are
8  Mercy and CSI?
9      A    No.
10     Q    Why would you not agree with that?
11     A    Because the bank is a party to it.
12     Q    Where does it indicate in the document
13  that the bank is a party?
14     A    Where it refers to the bank and the
15  payments are going to them, the bank is -- CSI has a
16  contract with the bank and they're part of it and
17  the bank has to agree to the hospital being a client
18  of the bank's and purchasing the accounts.
19     Q    Can you point to me where in the document
20  it names the bank as a party to the contract?
21     A    No, I don't.
22     Q    Is it fair to say it doesn't say that?
23         MR. EGAN:  Objection, why don't you show
24  him page 4.
25         THE WITNESS:  That's what I'm looking at,

Page 177

1  number 9.
2         MS. SCRIVANI:  I'm asking him to show me.
3         MR. EGAN:  You're asking him for his legal
4  interpretation.
5         MS. SCRIVANI:  Absolutely not.
6      A    Before you said that, okay, okay.
7      Q    (By Ms. Scrivani)  And I'll let you answer
8  your question.  Mr. Jaeb, you're not an attorney; is
9  that correct?
10     A    That's correct.
11     Q    Never went to law school, right?
12     A    No.
13     Q    So all of my questions with respect to
14  this document are going to be your understanding,
15  not your legal interpretation.  Now, if you may
16  answer my question.
17     A    Number 9 is third-party beneficiary.  The
18  bank is a third-party beneficiary of this agreement
19  and agrees the bank may force provisions, et cetera,
20  of the contract.
21     Q    So is it your understanding that the bank
22  being named as a third-party beneficiary makes it an
23  actual party to the contract?
24     A    It was my understanding, without thinking
25  about it, that everything about this, where the bank

Page 178

1  had to sign off on it, the bank collects the money,
2  the bank does everything, that the bank is
3  definitely a party to the contract.
4      Q    You'll agree with me, however, that the
5  first paragraph of the contract says, "This
6  agreement made and entered into this 18th day of
7  October 1999 between Mercy Health Systems, whose
8  mailing address is," and CSI Financial Inc., that
9  nowhere in that first paragraph is the bank
10  identified as being a party entering the agreement?
11     A    Correct.
12     Q    Now, let me ask you to turn, please, to
13  paragraph 12, which is on page 4.  Are you there?
14     A    Uh-huh.
15     Q    The paragraph reads, "Should it be
16  necessary for either party to initiate legal action
17  to enforce or interpret this agreement," and it goes
18  on, is it your understanding that either party could
19  be CSI, the bank, or Mercy?
20     A    Yes.
21     Q    So you don't understand either to be one
22  or the other as opposed to three entities?
23     A    Correct.
24     Q    Back on the first page of Exhibit 6, the
25  first whereas clause refers to qualified accounts

Page 179

1  receivable.  What is your understanding of a
2  qualified accounts receivable?
3      A    That it met the bank's criteria of
4  whatever the credit score was that the bank wanted
5  and gainfully employed or another capacity to make
6  the payment.
7      Q    Are those the only criteria?
8      A    Yes.
9      Q    So it's credits, score, gainfully
10  employed --
11     A    Or ability to make the payment.  They may
12  be on a pension or a budget or trust or what have
13  you or Social Security.
14     Q    And that was information that the bank
15  obtained from the credit report; is that correct?
16     A    And from the patient themselves.
17     Q    Not from the hospital?
18     A    Well, the hospital would furnish
19  demographic information.  So you get the hospital
20  information and you get the credit information and,
21  of course, the hospital information comes from the
22  patient.  So it's strictly Fast Trac, that's all we
23  had to rely on was the hospital information and the
24  credit information.
25     Q    Would you expect the hospital information