4

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| MERCY HEALTH SYSTEM OF<br>SOUTHEASTERN PENNSYLVANIA,<br><br>        Plaintiff,<br>-vs-<br><br>CSI FINANCIAL, INC.,<br><br>        Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | No.   01-CV-5681 |
| FIRST NATIONAL BANK OF MONTANA,<br>INC. and CSI FINANCIAL, INC.,<br><br>        Plaintiffs,<br>-vs-<br><br>MERCY HEALTH SYSTEM OF<br>SOUTHEASTERN PENNSYLVANIA,<br><br>        Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | CIVIL ACTION<br>Consolidated |

**VIDEOTAPED DEPOSITION OF ROBERT G. LOGSDON**

Heard at the offices of Vision Net Inc.
Hustad Shopping Center, 1084 Helena Avenue
Helena, Montana
July 28, 2004
9:11 a.m.

DEBBIE EICKHOFF, Court Reporter
Lesofski & Walstad Court Reporting
21 North Last Chance Gulch, Suite 201
Helena, Montana 59601 (406)443-2010

Page 21

1  our goal was to have back to them their files, whether,
2  like in Mercy's case, they, I believe they wanted an
3  accepted and a rejected list. We would have those back
4  to them within three or four days.
5      Q.  Well, why don't we start there and go on.
6  Let's start with, in 1999, your understanding of how
7  this process would work. Take me from when the account
8  first came to you from a client, what you would do with
9  it.
10     A.  Well, initially we would set up a --
11 Excuse me. Initially we would set up a protocol, which
12 would be what day of the week we would get their file,
13 what time of the day we would get their file, obviously
14 is somewhat important, because if you receive it after
15 a certain period of time, you really don't have time to
16 work on it that day.
17         Then we would develop what the file format
18 of their file was going to be, which would be what
19 position the last name, the first name, Social Security
20 number, debt amounts, you know, address, all the
21 demographical information, that type of thing, what
22 that format of that file was going to be every single
23 time.
24         So that when we received the file, we
25 didn't have to do any extra programming every single

Page 22

1  time we got a file from them just to process their
2  files.
3         Once we did that, once we had that --
4      Q.  Let me stop you there.
5      A.  Okay.
6      Q.  With respect to that format, was that
7  something that the client would usually say to you they
8  wanted it to be a certain way?
9      A.  At that point in time, we were leaving a
10 lot of it up to the client, how they would send us a
11 file. Now, that being said, we did give them required
12 fields. Obviously we have to have a Social Security
13 number. We had to have a debt amount. We had to have
14 a name, a first and last guarantor name, a street
15 address to mail to. Those type of things.
16        Beyond that, we had wish lists of
17 information that we would like to get, dates of service
18 and things like that that at that point in time we
19 didn't get a lot of.
20     Q.  So the format differed from client to
21 client?
22     A.  Yes, absolutely. No one client --
23     Q.  I am sorry. Keep going.
24     A.  No one client sent the same format. Every
25 client is different.

Page 23

1      Q.  Okay. Now, continue on with this sort of
2  life of an account.
3      A.  Okay. After we built the, you know, the
4  protocol for a client to, so we could process their
5  files, we would get their file from them via e-mail.
6  Sometimes we would get them via disk or whatnot. But
7  most of the time it was via e-mail.
8          We would drop the file into our FoxPro
9  software. Credit score it. Re-upload the credit
10 scores. Process the approved and rejects. Submit a
11 approval list to the bank to fund, with the discounts
12 or whatnot, or the CSI fee and the amount being, to be
13 wired to the client and that such, broken out in that
14 file. And then send the accepted and rejected files
15 back to the client in a format that they had requested.
16     Q.  Okay. With respect to this scoring
17 process, as I understand it from other folks'
18 testimony, and let me know if I am wrong, you guys
19 would run a credit check on each patient account and
20 assign a Beacon score. Is that correct?
21     A.  Each debtor, yes. The guarantor on each
22 patient account, yes, we would run a Beacon score.
23     Q.  And there was a threshold Beacon score in
24 order for there to be acceptance into the program?
25     A.  Correct.

Page 24

1      Q.  And that Beacon score threshold was 600.
2  Does that sound right, in the '99 time frame?
3      A.  Correct. Generally speaking, it was 600
4  then, yes.
5      Q.  And then who made the decision, once the
6  score was in place, as to which accounts were accepted,
7  or was it automatic that everything over 600 was
8  accepted?
9          MR. EGAN:  Objection.
10     A.  Should I answer? Do I answer now?
11     Q.  (By Ms. Scrivani) Yes. I am sorry. Go
12 ahead. Yes.
13     A.  Okay. It was automatic as far as the 600.
14 We did have filters that we tried to place that would
15 prevent a chronically delinquent debtor from being
16 placed on the books. But quite often, the filter would
17 allow, you know, delinquent debtors to get through more
18 than once.
19     Q.  And was that filter something that CSI
20 had?
21     A.  Yes. Well, and the hospitals on their end
22 were also supposed to be taking -- we had what were
23 called recourse accounts, debtors that didn't pay,
24 debtors that defaulted on their loans with CSI. When
25 we would return a recourse file to a client, you know,

Page 25

1 at that point in time, we had made them aware of this
2 person not paying us. We did not expect to receive any
3 more accounts from that person.
4       That being said, as with any business, we
5 knew that from time to time, some will leak through
6 the process. We tried to filter the ones that leaked
7 through on our end.
8   Q.  Was there ever a time when a patient
9 account with a score of less than 600 was accepted into
10 the program?
11  A.  Yes.
12  Q.  When would that happen?
13  A.  When we would receive a file with a large
14 amount of rejects, we would go through the rejects and
15 review each individual reject. Quite often, what the
16 problem was is the Social Security number was either
17 not sent to us or it was corrupted, insomuch as maybe
18 we only got the first five characters or maybe we only
19 got the last four characters or something to that
20 effect. Maybe we didn't get the first name of the
21 debtor so it didn't get scored properly.
22       We would look through all of those
23 rejects, and if we found accounts that had not had --
24 We would look at their credit report; and if it was
25 simply a matter of they didn't have a Beacon score but

Page 26

1 there was no derogatory credit, in other words, a
2 person can have no Beacon but they can have collection
3 items. If we found a no Beacon record with no
4 collection items, no derogatory credit, we would, from
5 time to time, book those.
6   Q.  And when you say "we," you mean CSI?
7   A.  Correct.
8   Q.  And --
9       MR. EGAN: Excuse me. Can somebody
10 get the witness a glass of water or something?
11      THE WITNESS: Please, please. Yes.
12  A.  Can I ask a question? Is it okay for me
13 to ask a question?
14  Q.  (By Ms. Scrivani) No. Unfortunately, it
15 is not. I am sorry. We could do it when we are done
16 with our transcript. You can ask me a question off the
17 record.
18      MR. EGAN: You can do it at the
19 break.
20      THE WITNESS: Okay.
21      MS. SCRIVANI: Are we on break right
22 now?
23      THE WITNESS: No.
24  Q.  (By Ms. Scrivani) Who at CSI would make
25 that decision with respect to accounts that had no

Page 27

1 Beacon score but some collection items?
2   A.  Mr. Jaeb.
3   Q.  Anyone else?
4   A.  No.
5   Q.  Did CSI ever accept into the program
6 accounts where there was a Beacon score but that Beacon
7 score was less than 600?
8   A.  I don't recall. I really don't know.
9 From time to time, with different clients, we would do
10 that with their knowledge, yeah. But it would be on an
11 individual --
12  Q.  Did the First National --
13  A.  I am sorry. But it would be on an
14 individual case-by-case basis.
15  Q.  Did the First National Bank of Montana
16 have any involvement in the acceptance process?
17      MR. BRUBAKER: Objection. Mr.
18 Brubaker.
19  A.  I have no idea.
20  Q.  (By Ms. Scrivani) You can answer.
21  A.  I have no idea.
22  Q.  So what would happen after the accounts
23 were scored at CSI to file accounts?
24  A.  We would upload the approved accounts into
25 our data base, our mainframe database on the 400, the

Page 28

1 AS-400, and begin billing them.
2   Q.  Was this -- Well, let me back up, because
3 I think you testified a couple minutes ago that at some
4 point you sent a file of approved accounts to the bank.
5 Is that correct?
6   A.  Correct. And they would fund the approved
7 accounts.
8   Q.  Are you aware of any time when the bank
9 would have you adjust an accepted file at all?
10  A.  Not that I can recall, no. If they
11 adjusted -- Quite frankly, if they adjusted a file, it
12 would probably have been notified to accounting, not
13 me. I would have been notified to delete an account or
14 something, but very seldom would the bank ever do that.
15  Q.  Ever do what?
16  A.  Send us a, you know, deny an account that
17 we had request be funded.
18  Q.  And you can't think of a time when that
19 happened?
20  A.  Not that I can recall, no.
21  Q.  Following then the funding of those
22 accounts, what happened to those accounts at CSI?
23  A.  They would get uploaded into our mainframe
24 AS-400 IBM database, and we would begin billing them.
25 We would send them an initial notice, notification