5

IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| MERCY HEALTH SYSTEM OF SOUTHEASTERN PENNSYLVANIA, | ) ) ) | |
| Plaintiff, | ) ) | |
| -vs- | ) ) | No.   01-CV-5681 |
| CSI FINANCIAL, INC., | ) ) ) | |
| Defendant. | ) ) ) | |
| FIRST NATIONAL BANK OF MONTANA, INC. and CSI FINANCIAL, INC., | ) ) ) | CIVIL ACTION Consolidated |
| Plaintiffs, | ) ) | |
| -vs- | ) ) | |
| MERCY HEALTH SYSTEM OF SOUTHEASTERN PENNSYLVANIA, | ) ) ) | |
| Defendant. | ) ) | COPY |

---

**VIDEOTAPED DEPOSITION OF PETER PARSONS**

---

Heard at Lesofski & Walstad Court Reporting
21 North Last Chance Gulch, Suite 201
Helena, Montana
July 13, 2004
10:58 a.m.

LAURIE CRUTCHER, RPR
Lesofski & Walstad Court Reporting
21 North Last Chance Gulch, Suite 201
Helena, Montana 59601 (406)443-2010

Page 20

1  Q. Who responded?
2  A. Hospitals that responded -- When I say
3  phenomenal response, I had a lot of interest
4  initially. Then I actually started to make
5  contacts, the sales, businesses, about
6  relationships. I actually got through to the
7  decision makers. And Mercy Health System was one;
8  Green County. I can't think of the name of the
9  hospital. County medical center? Waynesburg was
10 another that we had as a client.
11     Some other -- Lots of hospitals that
12 were interested and visited with me that did not
13 become clients. I had a week's worth of meetings,
14 which is to say about ten meetings with different
15 hospitals. I couldn't tell you who they all were
16 because not all of them became clients.
17 Q. Which ones did become clients?
18 A. The two that I mentioned.
19 Q. Did CSI ever have a client by the name
20 of Wayne County Hospital, that you recall?
21 A. No.
22 Q. That's not a client you would have
23 brought in?
24 A. No.
25 Q. So from the time you started at CSI

Page 21

1  until the bankruptcy, were these the only two
2  clients from Pennsylvania?
3  A. No.
4  Q. Who else joined?
5  A. Warren General Hospital.
6  Q. That was probably the name I was
7  thinking of.
8  A. Could be.
9  Q. Was that a client that you brought in?
10 A. Yes, it was.
11 Q. Anybody else?
12 A. Bob was with me on the initial visit,
13 Bob Jaeb.
14 Q. At Warren?
15 A. At Warren General Hospital. And after
16 that initial visit, that was my client, and it
17 took them over a year from that initial visit to
18 become a client.
19 Q. Anybody else from Pennsylvania?
20 A. That's all I can recall.
21 Q. Let's talk about Mercy. That's why
22 we're here. So Mercy was not specifically
23 targeted by you, but just part of your mass --
24 A. It was blanket mailing and blanket phone
25 call marketing campaign.

Page 22

1  Q. And do you recall who you initially
2  tried to contact at Mercy?
3  A. I believe my initial contact was Doug
4  Smith. I don't recall talking to anybody before
5  Doug. I may have spoken with his secretary
6  or assistant a few times, but Doug and I connected
7  almost right off the bat.
8  Q. And so do you recall sending any
9  solicitation letters to Mercy?
10 A. I believe -- Can you rephrase the
11 question? I'm sorry.
12 Q. You mentioned sometimes you would send
13 a letter initially, sometimes you would make a
14 call. Do you recall with respect to Mercy whether
15 you made a cold call to them or you sent the
16 letter first?
17 A. That's what I thought you meant.
18 Initially, I believe I sent a letter out, and then
19 followed up with phone calls, "Did you get my
20 letter? Is it something you're interested in?,"
21 etc., etc.
22 Q. Do you have a recollection of how soon
23 after you sent a letter that Mercy expressed some
24 interest?
25 A. It was almost immediate. An immediate

Page 23

1  time frame in that business was within a couple of
2  weeks. I didn't spend more than a couple of weeks
3  calling to generate appointments. If the interest
4  wasn't there, there wasn't a point in going to
5  visit with them.
6  Q. So Mercy expressed some interest to you?
7  A. Yes.
8  Q. How was that interest expressed to you?
9  Did you get a written response back, or did Doug
10 give you a call?
11 A. I believe Doug called back, and either
12 he missed me the first time I called -- Anyway we
13 connected on the phone first, and we talked on the
14 phone. I explained the product in more detail.
15 My marketing letter was something that was sent
16 out to get interest, but it didn't explain the
17 program exhaustively. The goal, of course, was to
18 get the hospital to call back, to express
19 interest, start to build a relationship, and then
20 finish up with an onsite visit or two to go
21 through the program in more detail.
22 Q. What did you explain to Doug about the
23 program?
24 A. That we were interested in purchasing
25 his self-pay accounts -- self-pay being accounts

VIDEOTAPED DEPOSITION OF PETER PARSONS

Page 24

1 where the patient is responsible for a portion of
2 the total bill, leaves them with a balance -- that
3 that's the business we were in, and we would like
4 to work with Mercy, and see if they were
5 interested in doing that.
6      Q.  Did you explain to him in any detail how
7 the process would actually work?
8      A.  I'm sure I ran through the electronic
9 scoring, that it didn't require a lot of people to
10 actually process the accounts.  I think that was
11 one of our big selling points, and what gave us a
12 unique aspect in the market.
13     Q.  Do you mean generally or to Mercy?
14     A.  I'm sure I explained it to Mercy.  I
15 couldn't -- Let me rephrase that.  I would have
16 gone through a standard pitch, of which I'd be
17 glad to take you through one.  Is it exactly what
18 I told Mercy?  I'm not sure.
19     Q.  I'm sorry.  My question was a little
20 different.  You mentioned that the electronic
21 scoring process was your major selling point.  My
22 question was: Was it a major selling for -- Do
23 you know if it was something Mercy found as your
24 major selling point, or something you considered
25 to be a major selling point?

Page 25

1          MR. EGAN:  Objection.
2      Q.  (By Ms. Scrivani)  You can answer.
3      A.  Mercy was interested in the electronic
4 scoring.  They were interested in the whole
5 program.  They expressed enough interest to
6 actually -- for us, CSI, to decide it was worth an
7 onsite visit.
8      Q.  What type of information is included in
9 your standard pitch?
10     A.  The standard pitch goes to the fact that
11 it didn't require a lot of manpower; it was
12 electronic; it was instantaneous; we would provide
13 money to the hospital to purchase the accounts;
14 and that we would take over the duties of
15 collecting the accounts from the patient.
16     Q.  Let's take those one at time.  When you
17 say it required no manpower, you mean on behalf
18 the hospital or -- and I'm talking generally, not
19 Mercy -- on behalf of the hospital, or on behalf
20 of CSI, or both?
21         MR. EGAN:  Objection.
22     A.  The fact that it would -- both, the
23 answer is both.  Let me rephrase that and change
24 that to:  Reduced manpower.  It still took people
25 to operate the machinery.  The idea was to make it

Page 26

1 a simpler, more streamlined process.
2      Q.  (By Ms. Scrivani)  Why would it reduce
3 manpower?
4      A.  Leaving more decisions to the computer,
5 electronic and processing.
6      Q.  And was that at the front end when new
7 accounts were initially going out, or the whole
8 process was supposed to reduce manpower?
9      A.  The whole process.  We had automated
10 steps, sending statements to patients and things
11 like that.
12     Q.  And then when you say it was electronic,
13 what do you mean by that?
14     A.  The files were transmitted
15 electronically.  Somebody didn't have to fax it
16 over a fax machine, feed it through.
17     Q.  Was that the case for the whole process?
18         MR. EGAN:  Objection.
19     A.  Can you rephrase that for me?
20     Q.  (By Ms. Scrivani)  Was it your
21 understanding at the time when you were giving
22 this standard pitch that the entire process from
23 start to finish, the transfer of all files, was
24 electronic?
25         MR. EGAN:  Objection.

Page 27

1      A.  No.
2      Q.  (By Ms. Scrivani)  What was and what
3 wasn't electronic?
4      A.  What was electronic was what could be
5 handled electronically, both at the hospital's and
6 at CSI's end, and what was left we would do
7 manually.
8      Q.  Do you know what could be handled
9 electronically at that time?
10     A.  It depended on so many variables, such
11 as the hospital's information system, and how our
12 computers talked to each other.  It varied by
13 client to client.
14     Q.  On then you said it was instantaneous,
15 what do you mean by that?
16     A.  They would transit the file, we would
17 receive it -- instantaneous is probably not an
18 accurate description.  It was quicker than having
19 somebody go through each line of a paper file or
20 each account individually.  In other words, we
21 tried to lump them together.
22     Q.  Lump what together?
23     A.  The files as they came across.  Each
24 patient has their own file of all kinds of
25 different information.

Page 28

1  Q. What are you lumping together? I don't
2 understand.
3  A. I'll rephrase that then. When a patient
4 has an account at a hospital, there's certain
5 information that goes with that account: Date of
6 service, patient's name, who they are, where they
7 live, what their balance is. That's what we would
8 try and lump together to make the decision
9 automated, or leave it up to the computer. So
10 somebody did not have to look at each individual
11 account.
12  Q. How did that information -- date of
13 service, name, balance -- go into the decision
14 whether or not to accept an account?
15  A. All those had to be part of the file in
16 order for us to purchase the account. If that
17 information wasn't present, we couldn't collect it
18 once we did purchase it. So if that information
19 wasn't there, there was no point in scoring it.
20  Q. Did somebody or a computer determine if
21 all of that information was present before scoring
22 it?
23  A. I don't know.
24  Q. Who would know that?
25  A. Rob Logsdon would be the person who did

Page 29

1 that part of the job.
2  Q. And when you say "money to the hospitals
3 to purchase," what do you mean by that?
4  A. Well, the idea of the program was to
5 actually -- for CSI Financial to purchase hospital
6 patient accounts from the hospital at a reduced
7 amount of face value, and then collect on those
8 accounts from the patient.
9  Q. So when did the hospital get their
10 money?
11  A. Well, within three days was what we
12 tried to do, keep as a standard. That was our
13 benchmark.
14  Q. Three days of what?
15  A. Of the initial file scoring.
16  Q. Who performed the scoring?
17  A. That was Rob's job.
18  Q. So CSI?
19  A. Oh, CSI Financial, yes.
20  Q. Was there a threshold score that was
21 necessary?
22  A. Yes.
23  Q. What was that?
24  A. It varied. Rob would be the one to
25 answer that.

Page 30

1  Q. What was the reason for having a
2 threshold?
3  A. To determine our collectability of the
4 account, what our chances were to resolve the
5 account successfully, and to prevent the account
6 from going back to the hospital if we could.
7  Q. How would scoring them prevent the
8 account from going back?
9  A. The beacon score is a credit score, so
10 it lets us know within a reasonable measure if
11 that patient is destitute, or can afford to pay an
12 initial bill, or has been paying bills in the
13 past.
14  Q. Do you know what the range of beacon
15 scores is?
16  A. I don't.
17  Q. Then what was your understanding -- Let
18 me back up. Did you, as part of your standard
19 pitch, did you inform hospitals about what would
20 happen to an account once it had been purchased by
21 CSI?
22  A. Yes.
23  Q. What did those discussions include?
24  A. We would tell the client, that we
25 purchased the account from, that CSI would make

Page 31

1 every reasonable attempt to collect the account
2 through personal telephone calls, letters,
3 collection letters, past due letters; and if we
4 were unable to collect the account, the hospital
5 was required to purchase the account back.
6  Q. Was there any policy or procedure at CSI
7 for the number of calls that were to be made on an
8 account?
9  A. Yes.
10  Q. Do you know what that was?
11  A. I do not.
12  Q. Who would know that?
13  A. Cindy Dorr.
14  Q. How about with respect to the number of
15 past due notices?
16  A. Probably Cindy and Rob, one or the
17 other.
18  Q. How about the number of letters?
19  A. Same thing. Same answer. Cindy or Rob.
20  Q. So did clients ever ask you about that
21 when you were pitching that?
22  A. Yes, they did.
23  Q. Did you have an answer for them?
24  A. I would give them a general formula. I
25 would say basically what I just told you. We

VIDEOTAPED DEPOSITION OF PETER PARSONS

Page 32

1  would send letters, make telephone calls, attempt
2  to collect the debts, and past due notices if they
3  were past due, and at a certain point in time,
4  send the account back as uncollectible.
5      Q. So you couldn't tell them how many
6  calls, or how many letters?
7      A. No.
8      Q. Getting back to Mercy, what do you
9  recall about your first conversation with Doug?
10     A. I met him in his office. I believe it
11 was just him and I.
12     Q. Let me back up. I think you said your
13 first conversation took place over the phone. So
14 let's start with the phone.
15     A. I'm sorry. You're correct. Phone call.
16 Doug expressed interest in the program, wanted
17 more information. I couldn't tell you how the
18 conversation went. It ended up with us making an
19 appointment for a personal visit.
20     Q. That's all you can remember?
21     A. Yes.
22     Q. Do you remember Doug asking you any
23 questions?
24     A. No.
25     Q. Did he ask you to provide any written

Page 33

1  information, or was he just looking for a meeting?
2      A. He may have. I'm not sure. The answer
3  to that question is I don't remember.
4      Q. Do you recall how soon after this phone
5  call you had your meeting?
6      A. I couldn't tell you exactly.
7      Q. You did have a meeting?
8      A. I did have a meeting. I do remember
9  that.
10     Q. If I could ask you, please, in this
11 binder that's in front of you, to turn to the
12 exhibit marked as 50.
13     A. (Complies).
14     Q. I'm going to ask you to -- and this is
15 an exhibit with a number of pages -- please flip
16 through that, take as much time as you like to
17 look at it, and let me know when you're finished.
18     A. (Complies) Okay.
19        MS. SCRIVANI: For the record, Exhibit
20 50 is a document -- the first page is entitled
21 "Contact Sheet," and the entire exhibit is Bates
22 stamped CSI 3759, 3760, 3761, 3762, 3763 -- for
23 whatever reason 3764 is not included in the
24 production -- 3765, 3766, and 3768. 3767 is also
25 not part of this packet.

Page 34

1      Q. (By Ms. Scrivani) Do you recognize this
2  document?
3      A. Yes, I do.
4      Q. What is it?
5      A. This is a file that I would keep when I
6  made a contact with a hospital, to let me know
7  what had been done and what needed to be done.
8      Q. Having looked through this document, is
9  all of the handwriting that appears in Exhibit 50
10 your handwriting?
11     A. I believe it is.
12     Q. Does this document -- Tell me what types
13 of information you would include in this document.
14 Is it every time you have a contact with Mercy,
15 or --
16     A. Sure. That's what it would start out
17 as. And you can see, I mailed a letter initially
18 to Jim Scheiff, I believe. So that's the name and
19 address I had when I mailed the letter. And when
20 I opened the file, that would have been the first
21 entry that I put on there, that I had actually
22 sent a letter, that I would know to follow up
23 later at an appropriate time, based on how long it
24 took them to do that.
25        It looks like from notes here, Doug

Page 35

1  Smith called me back twice, and I never tried to
2  contact him until he called me; returned his call.
3  He was interested in the program, wanted some more
4  info, etc., etc.
5      Q. Looking at the 9/1 entry, you mentioned,
6  "Doug Smith called me two times. Questioned
7  patient notification;" is that what that --
8      A. Yes, that's what it says.
9      Q. Do you recall what that was about, what
10 his questions were?
11     A. No.
12     Q. How about the next? Is that "required
13 work"?
14     A. Reduced workload.
15     Q. Do you recall what he asked you about
16 that?
17     A. No, I can't give you specifics on what
18 those questions were. This is three and a half,
19 four years ago, we're talking.
20     Q. So looking at this document does not
21 refresh your recollection about that conversation?
22     A. No.
23     Q. Was this contact sheet -- Did you keep a
24 contact sheet like this for every new hospital you
25 were soliciting?

Page 36

1    A.  Yes.
2    Q.  Was there anybody else at CSI that
3 worked with you on trying to obtain Mercy as a
4 client?
5    A.  No.
6    Q.  Does looking at this document -- Let me
7 back up.  Do you recall when you went to
8 Pennsylvania to meet with Doug?
9    A.  No, and I didn't see actually the date
10 here on the form of when the actual meeting was.
11 Unless somebody could point it out to me, I don't
12 see it.
13       I definitely had a meeting, because it
14 says "meeting," and it's underlined twice.  There
15 you go.  At the bottom, September Tuesday 28th,
16 4:00 p.m.  I would guess -- I don't know for sure
17 -- that would be the date of our first meeting.
18    Q.  But you don't have a recollection?
19    A.  I don't, no.
20    Q.  The note you have there right above
21 where you read, is that "Doug"?
22    A.  Doug.
23    Q.  Looked?
24    A.  "Looked at three hospitals."
25    Q.  And then the $8 million to $9 million.

Page 37

1 Do you know what that $8 million to $9 million
2 represents?
3    A.  I could take a guess, that that was
4 their initial self-pay file.
5    Q.  And that was something Doug told you?
6    A.  That would have been.  I wouldn't have
7 known that unless he did tell me.
8    Q.  If you would flip to the document that
9 has been -- Well, we'll get to that in a minute.
10      Where did your meeting with Doug, the
11 first meeting you had with Doug in Pennsylvania,
12 take place?
13   A.  That was at the Health System
14 headquarters.  I couldn't tell you the exact
15 address anymore unless it's written on here
16 somewhere.
17   Q.  In Conshohocken?
18   A.  In Conshohocken, One West Elm Street.
19   Q.  Do you recall who you met with?
20   A.  I met with Doug Smith, and at either
21 that meeting or a different time I met with other
22 people.  I couldn't tell you which meeting it was.
23 No, I can't.  I can't tell you who all was there.
24 I just know I met with Doug the first time.
25   Q.  Do you recall what was discussed at the

Page 38

1 meeting?
2    A.  We could have discussed self-pay.  I'm
3 making generalities here.  My apologies.  I don't
4 recall exactly what was discussed.
5    Q.  Do you have any recollection at all of
6 any topics discussed?
7    A.  No, no specific recollection.
8    Q.  Do you have a recollection of any
9 questions that were asked of you by Doug or anyone
10 else at Mercy?
11   A.  I do not.
12   Q.  Do you recall if you discussed the
13 selection of account process?
14   A.  I don't recall it specifically.  I'm
15 sure we did, though.  That's part of the meeting
16 process.
17   Q.  Did you take any notes at that meeting?
18   A.  Pardon me for a second.  (Examines
19 document)  No, I don't believe I did.
20   Q.  Do you know if anybody else at the
21 meeting took notes?
22   A.  I don't.
23   Q.  Do you recall if at that meeting you
24 provided Mercy with any marketing materials?
25   A.  Not specifically, but I'm sure I left

Page 39

1 something with them.  That's part of marketing.
2 You always want to leave them some information to
3 help make their decision.  So I'm sure I did.
4    Q.  Do you recall if at that meeting you
5 left Mercy a copy of the contract?
6    A.  I don't recall if I did that or not.
7    Q.  Did anybody else from CSI go with you to
8 the meeting?
9    A.  Not this meeting.
10   Q.  Did you have a second meeting with Doug
11 at some point?
12   A.  I would need to look through here to
13 see.
14   Q.  I'm just asking if you remember.
15   A.  Yes, I did.  I did have a meeting with
16 Doug.  I had, I believe, three meetings with Doug
17 total.
18   Q.  Did those take place, other than the
19 first -- Does that include the first meeting we
20 just talked about?
21   A.  Yes.  Those would be the meetings at his
22 site, and also Doug -- as I'm sure you're aware --
23 came out to CSI.
24   Q.  Do you have a recollection of having
25 three meetings with Doug at Mercy's location?

Page 52

1    A.  The bank set the criteria that Rob
2  Logsdon would have to accept an account or reject
3  an account.
4    Q.  Do you know on whose system the
5  acceptance actually took place, at the bank or at
6  CSI?
7    A.  You would need to ask Rob Logsdon that.
8    Q.  Moving on to the second sentence there,
9  "You choose which accounts to place on the program
10 and at what time;" what do you mean by "at what
11 time"?
12   A.  The hospital would decide when to send
13 the account, at the age of the account.
14   Q.  And CSI didn't have any particular
15 criteria for that?
16   A.  We knew certain accounts would perform
17 better than others, but it was ultimately up to
18 the hospital which accounts they sent to us for
19 scoring.
20   Q.  What accounts would perform better than
21 others?
22   A.  More recent accounts would do well.
23   Q.  Why is that?
24   A.  They're newer. They're fresh in the
25 people's minds. They had a visit to the hospital.

Page 53

1  Older accounts, "I never went to the hospital.
2  What do you mean?"
3    Q.  But CSI didn't reject older accounts?
4    A.  It was biased on the criteria set up
5  within the system.
6    Q.  What was that criteria?
7    A.  You would need to ask Rob Logsdon.
8    Q.  Did you ever get a question from a
9  client generally, or Mercy specifically, about
10 what that criteria was?
11   A.  General questions I would be able to
12 answer, and just speak in generalities. And I'm
13 sure I got questions from all kinds of clients on
14 what that criteria was.
15   Q.  Do you recall what you answered?
16   A.  I would tell them that it was based on a
17 criteria set by the bank. It was basically a
18 certain credit score within a range of credit
19 scores that we were looking for, that we knew had
20 a good chance of performing well.
21   Q.  Do you know if the age of the account
22 was one of those criteria?
23   A.  I don't know.
24   Q.  Is that something you think you should
25 know if you were indicating to clients that they

Page 54

1  decided what time they could put an account in the
2  program?
3      MR. EGAN: Objection.
4      MR. BRUBAKER: Objection.
5    A.  I don't know. It says right there that
6  it was up to the client on what time they would
7  decide to place that, so it was their --
8    Q.  (By Ms. Scrivani) So would you expect
9  then that an account wouldn't be rejected based on
10 age, based on your representation in the letter?
11     MR. EGAN: Objection.
12   A.  Again, I don't know.
13   Q.  (By Ms. Scrivani) If you would turn now
14 to the page after the letter, which is marked
15 3229, and it's a fax cover sheet.
16   A.  (Complies).
17   Q.  Your message says, "Included is some
18 additional information on our program." Do you
19 know if this fax cover sheet goes with the letter,
20 or the fax is sometime after?
21   A.  No way to tell.
22   Q.  Do you know if, looking at the
23 information that comes after the fax cover sheet,
24 that was the package that you were -- or the
25 additional information you're referring to in the

Page 55

1  fax cover sheet?
2    A.  It's possible.
3    Q.  But you don't know?
4    A.  I don't know.
5    Q.  Are you done looking?
6    A.  I am.
7    Q.  If you would turn one page over, please,
8  in the exhibit to 3230, which appears to be a
9  letter dated 9/1/99, which is the same date as the
10 fax cover sheet, a two page letter from you to
11 Doug Smith; do you recognize this letter?
12   A.  I do.
13   Q.  Do you recall sending this to Doug?
14   A.  No, I don't.
15   Q.  Do you have any idea -- The first line
16 of the letter says, "The following is a copy of my
17 form letter for your records." Do you recall if
18 Doug asked to have that, or if it was your
19 practice to send it, or --
20   A.  Not my practice usually, so I don't
21 recall.
22   Q.  Did Doug not receive this -- let me back
23 up. I think earlier you testified, based on
24 looking at an exhibit, that your initial letter
25 went to Jim Scheiff?

VIDEOTAPED DEPOSITION OF PETER PARSONS

Page 56

1    A. Scheiff.
2    Q. Is this document what would have been
3 your initial form letter that would be sent out as
4 the first solicitation of --
5    A. Probably.
6    Q. So it's likely that this was the first
7 letter that went to Mercy?
8    A. Probably.
9    Q. If you would look down into the third
10 paragraph actually, middle of the paragraph, "The
11 entire process is completed --" I assume that's
12 supposed to be "completely" -- "The entire process
13 is completed electronically with no need for a
14 patient application;" did I read that correctly?
15    A. Yes.
16    Q. What do you mean by -- What process are
17 you referring to there?
18    A. That would be the process of sending the
19 files to CSI Financial for scoring and/or
20 approval.
21    Q. Any other process?
22    A. No.
23    Q. A little bit further in that paragraph,
24 the sentence reads, "Our bank within three working
25 days will electronically transfer the funds to

Page 57

1 your accounts;" who are you referring to there?
2    A. Our bank.
3    Q. Who is "our bank"?
4    A. First National Bank of Montana.
5    Q. Are they named anywhere in this letter?
6    A. I don't believe they are.
7    Q. In the next paragraph down, the section
8 that is sort of -- probably highlighted on the
9 original, "Fast Trac pays you 92 cents on the
10 dollar for every qualified account;" did I read
11 that accurately?
12    A. Yes.
13    Q. Do you know what constitutes a qualified
14 account?
15    A. One that would meet the scoring
16 criteria. One that would be accepted for
17 purchase.
18    Q. But you don't know what the criteria is?
19    A. I couldn't tell you exactly what the
20 criteria was at the time, or what Rob had set up
21 as the criteria, what the bank had told Rob that
22 the criteria would be. So no.
23    Q. At the time of this letter, did you know
24 that criteria?
25    A. No.

Page 58

1    Q. Did you ever know the criteria?
2    A. I knew generalities about the criteria
3 throughout my time at CSI Financial, and it would
4 fluctuate and change based on things set
5 internally, things set by the bank, credit scores.
6 Sometimes the hospitals would have us test
7 accounts with different criteria.
8       So to answer your question, the criteria
9 fluctuated. I always knew in generalities what
10 the criteria was, but the specifics that were
11 programmed into the computer, I didn't have
12 anything to do with that.
13    Q. If you would turn the page to the next
14 paragraph beginning, "Accounts that are not
15 approved for Fast Trac (patient deceased,
16 incorrect social security number, extreme credit
17 problems) would continue to be handled as you do
18 now." The word "extreme" is italicized. What did
19 you mean by an "extreme credit problem" in this
20 letter?
21    A. There's a range of beacon scores, and
22 you asked me what that was, and I don't know. But
23 based on criteria set by any financial
24 institution, they say, "Well, for this program,
25 this is an acceptable credit score. Below that

Page 59

1 would be an extreme credit problem." That credit
2 score and the ones above that would be acceptable
3 as an acceptable credit risk.
4       And what I was referring to was that
5 we're not going to take everything. Some people
6 just don't have credit good enough for even this
7 program to work for them.
8    Q. I know that you didn't know what the
9 threshold score was. But are you saying that
10 anything less than that threshold was an extreme
11 credit problem?
12    A. Yes.
13    Q. Further on in that paragraph, "These
14 accounts will include full documentation of our
15 billing attempts, and are ready to outsource to
16 collections." Are you referring there to accounts
17 that are being returned?
18    A. Yes.
19    Q. And recourse --
20    A. Yes.
21    Q. Let me back up. Do you understand that
22 this program had two different means of returning
23 accounts to --
24    A. (Nods head).
25    Q. Is that a yes?