6

```
           IN THE UNITED STATES DISTRICT COURT
           FOR THE EASTERN DISTRICT OF PENNSYLVANIA
                          * * *
_____CIVIL ACTION NO. 01-CV-5681
MERCY HEALTH SYSTEM OF    :
SOUTHEASTERN PENNSYLVANIA,:
         Plaintiff,       :
                          :
         vs.              :
                          :
CSI FINANCIAL, INC.,      :
         Defendant.       :
_____
FIRST NATIONAL BANK OF
MONTANA, INC. AND CSI
FINANCIAL, INC.,
         Plaintiffs,
         vs.
MERCY HEALTH SYSTEM OF
SOUTHEASTERN PENNSYLVANIA,
         Defendant.
_____
                        * * *
              October 14, 2003
                        * * *

     Oral sworn deposition of DOUGLAS
SMITH, held at the law offices of Kittredge,
Donley, Elson, Fullem & Embick, LLP, 421
Chestnut Street, Fifth Floor, Philadelphia,
Pennsylvania, commencing on or about 10:15 a.m.,
before Heather L. Ashton-Chee Wah, Certified
Shorthand Reporter and Notary Public.
                        * * *
```

```
                APPEARANCES:

STEVENS & LEE, ESQUIRES
BY:  RONALD L. WILLIAMS, ESQUIRE
     620 Freedom Business Center
     Suite 200
     P.O. Box 62330
     King of Prussia, PA 19406

        and

STEVENS & LEE, ESQUIRES
BY:  STACEY A. SCRIVANI, ESQUIRE
     111 North Sixth Street
     P.O. Box 679
     Reading, PA 19603-0679

     Attorneys for Mercy Health System of
     Southeastern Pennsylvania

KITTREDGE, DONLEY, ELSON,
FULLEM & EMBICK, LLP
BY:  CHRISTOPHER J. DAY, ESQUIRE
     421 Chestnut Street
     Fifth Floor
     Philadelphia, PA 19106

     Attorneys for First National Bank
     of Montana, Inc.

ALSO PRESENT:

-Russell Erdman, Designated Rep. Of Mercy
 (present after lunch)
                        * * *
```

```
                    WITNESS INDEX

Examination of Mr. Smith by Mr. Day
     page 4

                        * * *

                      EXHIBITS

Exhibit Smith-1:  Patient Financing Agreement
     Page 102

Exhibit Smith-2:  10-2-01 E-mail
     Page 208

Exhibit Smith-3:  7-11-01 E-mail
     Page 221

Exhibit Smith-4:  10-4-01 Letter
     Page 227

Exhibit Smith-5:  8-23-01 E-mail w/Attachments
     Page 233

Exhibit Smith-6:  10-9-01 Letter
     Page 241

Exhibit Smith-7:  11-28-01 Letter
     Page 243

                        * * *
```

```
         (It is hereby stipulated by and
         between counsel that all
         objections, except as to the form
         of the question, be reserved until
         the time of trial)
     DOUGLAS SMITH, having been duly sworn,
was examined and testified as follows:
EXAMINATION OF MR. SMITH BY MR. DAY:
  Q.  Good morning, Mr. Smith.  My name is
Christopher Day, I represent First National Bank
of Montana in a litigation which also involves
Mercy Health System of Southeastern
Pennsylvania.
     Before we begin your deposition I'd like
to give you a few instructions.  Please allow me
to finish the question before you begin your
answer, because we have a court reporter sitting
to your left who is taking down everything we
say and she can't take both of our statements
down at the same time.  I will certainly accord
you the same courtesy.
  A.  Okay.
  Q.  If you have a... an answer that's yes or
no answer, rather than shaking your head or
```

**Page 69**

1  A. I first heard of CSI Financial when I got
2  a marketing letter from a fellow by the name of
3  Pete Parsons.
4  Q. When was that?
5  A. Well, it was sometime after -- we had
6  just moved to our new building, that one in
7  Conshohocken, in August of '99. So it was some
8  point after we moved that I got the letter.
9  Q. Okay.
10  A. I don't remember the exact day or date
11  that I got it, but --
12  Q. You received the letter?
13  A. -- we moved in in mid August of '99.
14  Q. Okay. And you received the letter?
15  A. I did receive a letter, although I can't
16  remember whether it was directed to me or just
17  generically directed to the CFO. But there was
18  a marketing letter that came to Mercy from Pete
19  Parsons at CSI.
20  Q. And did you speak with anybody at Mercy
21  regarding this marketing letter, or CSI?
22  A. Excuse me, Chris. Do you mean -- at what
23  point?
24  Q. After receiving this letter.

**Page 70**

1  A. Well, certainly we had a conversation at
2  some point, but I don't remember when we had a
3  conversation about it.
4  Q. When you say we, who do you mean?
5  A. Well, I would have discussed it with my
6  superior. I reported to Joe Bradley who's our
7  CFO.
8  Q. Joe Bradley?
9  A. Joe Bradley.
10  Q. All right. And do you remember when you
11  had a conversation with Mr. Bradley about this?
12  A. What date or --
13  Q. Yeah, approximately.
14  A. Approximately? No, I don't remember.
15  Q. Okay. Well, tell me then, give me your
16  recollection of your involvement from the time
17  you received this letter to signing the
18  agreement with -- between CSI and Mercy and the
19  bank.
20  A. Well, as I said, I received the marketing
21  letter. I thought the concept was very unique
22  and interesting because I had never seen any
23  marketing material for a vendor who did work
24  like that, did financing for patient pay

**Page 71**

1  receivable. So I was very intrigued by it. And
2  at some point after receiving the letter I did
3  place a call to Pete Parsons to try to find out
4  about the program.
5  Q. And what did you and Mr. Parsons discuss?
6  A. Well, it was a general overview of the
7  program and how it worked. I was very intrigued
8  during the telephone call because Pete explained
9  to me that one of the things that they did to
10  qualify people for the program was to run an
11  Equifax credit report and score the credit
12  reports with a Beacon score, and that they had
13  to qualify with a minimum Beacon score of 600 to
14  qualify for the program. Now, I thought that
15  that concept was intriguing. And the reason
16  that I was so intrigued by it was that the
17  Beacon score is, in the marketplace, a predictor
18  of whether you're going to pay your bills or
19  not. And it was the first time I had ever seen
20  a vendor who used the Beacon score as a
21  predictor of whether a patient was going to pay
22  a bill or not.
23      Pete indicated that they had a number of
24  clients out in the western part of the United

**Page 72**

1  States where they were very successful using
2  these Beacon scores to predict whether patients
3  would pay bills, and I just thought that the
4  whole thing was really intriguing. That's
5  pretty much what I came away with from that
6  conversation.
7  Q. Okay. Did Mr. Parsons discuss CSI's role
8  in provided financing during that conversation?
9  A. Well, the letter did say that we would
10  finance your patient receivable, and Pete
11  indicated that they would purchase anybody with
12  a Beacon score in excess of 600. But I don't
13  recall that Pete got specific about the source
14  of the financing, just that they scored the
15  patient receivable and they bought ones,
16  accounts, that had a Beacon score in excess of
17  600.
18  Q. Okay. And --
19  A. It was a really sort of high level
20  conversation that probably lasted maybe 10
21  minutes.
22  Q. And what did you do from there with
23  regard to CSI?
24  A. Well, I was really intrigued, as I said,

Page 73

1  after talking to Pete on the phone. And at the
2  next opportunity that I had to talk to Joe, I
3  took the letter and the concept to him what I
4  learned on the telephone.
5  Q. All right. And what did Joe say about
6  it?
7  A. He said look into it.
8  Q. And so did you look into it?
9  A. Well, at some point I did call Pete back
10 and he came out to Mercy, to Conshohocken, and
11 had a meeting with a bunch of us from the
12 finance department and we talked about the
13 program.
14 Q. And who came out to Conshohocken?
15 A. From CSI?
16 Q. Yes.
17 A. Just Pete.
18 Q. Just Pete?
19 A. Yeah.
20 Q. And who did he meet with at Conshohocken?
21 A. It was me, Russ Erdman, Joe Bradley, a
22 fellow by the name of Mike Glitz and Vince
23 Ewing. That was it at the meeting.
24 Q. You said Mike Glick?

Page 74

1  A. Glitz, G-L-I-T-Z.
2  Q. And who was the final person?
3  A. Vince Ewing, E-W-I-N-G.
4  Q. All right. What was Mr. Ewing's position
5  at Mercy?
6  A. At the time, Vince was in the director
7  role, director of patient accounts.
8  Q. Did he report directly to you?
9  A. Yes.
10 Q. Okay. Did he continue in that role
11 through 2001?
12 A. He continued in that role through, yeah,
13 through 2001.
14 Q. Okay. How about Mr. Glitz, what was his
15 position with Mercy?
16 A. His -- Mike's title is manager of patient
17 accounts.
18 Q. Who is the manager of patient accounts
19 today?
20 A. Pardon?
21 Q. What is the -- what are the
22 responsibilities of the manager of patient
23 accounts, generally?
24 A. Generally, all of the billing,

Page 75

1  collection, claims scrubbing, electronic
2  billing, patient phone calls. I think that
3  generally covers it.
4  Q. Okay. And what was Mr. Erdman's
5  position?
6  A. Russ is manager of system support for
7  patient accounts.
8  Q. You say is. Is that what his position
9  with the hospital was back at the time of this
10 meeting?
11 A. Yes.
12 Q. And is that still his position?
13 A. That is still his position, yes.
14 Q. Okay. And what occurred at the meeting?
15 A. Well, Pete came in from Montana and
16 basically went through the program again,
17 repeated a lot of what we talked about on the
18 telephone in terms of how they get an account
19 and create a file with Equifax and get a Beacon
20 score, and then that they provide financing that
21 they will buy accounts that have a Beacon score
22 in excess of 600, that we would receive 92 cents
23 on the dollar for the self-pay accounts that had
24 a Beacon score of greater than 600, that the

Page 76

1  accounts that scored less than 600 would be
2  returned to us, and then we would just follow
3  whatever normal collection routine we pretty
4  much already had in place.
5  Q. Was it your understanding that CSI would
6  determine what the Beacon score was for each
7  account?
8  A. Well, actually, CSI doesn't determine the
9  Beacon score. The Beacon score is part of your
10 Equifax credit file.
11 Q. And --
12 A. So what actually happens is that we send
13 a file to CSI and then CSI uses the Equifax
14 credit report to grab the Beacon score out of
15 that credit report.
16 Q. When you send a file to CSI, would that
17 include the Equifax credit report?
18 A. No.
19 Q. All right. So CSI would get the Equifax
20 credit report?
21 A. Correct.
22 Q. Okay. Okay. What else was discussed?
23 A. I think in general, that was it. It was
24 basically an overview of the program and how it

## Page 77

1  worked; how we would send a file, how they would
2  score it, how they would report back to us the
3  accounts that didn't qualify. And they made it
4  sound very, very simple, very user friendly, and
5  then within a couple days we'd have a check for
6  92 cents for all the accounts that qualified.
7  Q. Did you have an understanding from that
8  meeting that CSI would receive eight percent on
9  each account?
10  A. I don't remember what my understanding
11  was from that meeting, no.
12  Q. Okay. Did you have an understanding as
13  to from where the payments would come for
14  purchasing these accounts?
15  A. From that meeting?
16  Q. Yes.
17  A. I would have to say that from that
18  meeting I didn't have a specific understanding
19  where exactly the money came from, just that CSI
20  had a financing source.
21  Q. Okay. So what happened after that
22  meeting?
23  A. Well, after that meeting, at some point
24  in time Joe Bradley and I would -- had a meeting

## Page 78

1  or discussion about the meeting with Pete
2  Parsons and he asked for my thoughts. I told
3  him that I thought it was an intriguing concept
4  because they had a method of purchasing accounts
5  that had a high probability of being paid and
6  that it was, you know, what seemed to me to be a
7  logical and sound business decision to at least
8  look into it.
9  Q. And what was Mr. Bradley's response to
10  that?
11  A. His response to it was Doug, if you think
12  it's a good idea, you should hop on a plane and
13  go out to Montana.
14  Q. And is that what you did?
15  A. That is what I did.
16  Q. Okay. And what did you do out in
17  Montana? Did you go alone or did you take
18  somebody with you?
19  A. No. I did go alone.
20  Q. Okay.
21  A. Yeah.
22  Q. And what did you do; where did you go?
23  A. Well, I went in October to Helena.
24  Q. October of '99?

## Page 79

1  A. October of '99. And went to... I'm
2  trying to even think how long I was there. It
3  was a relatively short time. I think I arrived
4  on a Sunday afternoon and by Monday afternoon I
5  was probably on my way home. So I was there a
6  relatively short period of time. And while I
7  was there I visited -- no. I'm sorry. Let me
8  amend that. I went out on a Sunday night, I
9  think, and came back on a Tuesday morning.
10  Q. Okay. What did you do while you were out
11  there?
12  A. Well, I didn't do anything on Sunday. I
13  collapsed in my hotel room. But on Monday
14  morning Pete Parsons met me at my hotel and
15  picked me up rather early, it was probably about
16  8:00 in the morning, and then we went, headed
17  over to the CSI offices in Helena. And when I
18  got to the CSI offices I was introduced to Cindy
19  Dorr who I think is either the controller or in
20  a position in the accounting department; a guy
21  named Rob Logsdon who is -- was -- I don't know
22  Rob's exact title, but he was represented to me
23  as the computer expert. I did meet the owner
24  named Bob Jaeb and got a tore of the facility.

## Page 80

1  I probably met a couple other folks who I don't
2  remember their names anymore, probably some
3  customer service people, saw the layout of the
4  office and basically heard a little bit more
5  about the program.
6      At lunchtime I was taken out to lunch,
7  and I think that I was accompanied by Pete,
8  Cindy, Rob and we met a fellow from the Bank of
9  Montana whose name was Scott, but I can't
10  remember his last name. It was something like
11  Scott Lenahan or... but Scott, I remember his
12  name.
13  Q. Does Lenaberg ring a bell?
14  A. I know it started with an L, but...
15  Q. Okay. So this trip to CSI in October of
16  '99, was this your due diligence trip on the --
17  was it your due diligence visit on CSI?
18      MR. WILLIAMS: Objection to form.
19      Go ahead and answer.
20  A. Well -- and actually, I never used the
21  word due diligence, but I would not have felt
22  comfortable recommending to my boss that we
23  enter into an arrangement with a vendor whom I
24  had never seen. We just wouldn't do it. For

### Page 125

1  Q. Okay. So nobody in your department then
2  had prior experience with purchasing back
3  accounts from a vendor?
4  A. That would be true because this was the
5  first experience we had been working with a
6  company like CSI that purchased receivables.
7  Q. Okay.
8       MR. DAY: Ron, can you hand me the
9       Patient Financing Agreement to your
10      right? Thank you.
11 BY MR. DAY:
12 Q. Do you have an understanding, Mr. Smith,
13 as to what Mercy's responsibility was for
14 re-purchasing recourse accounts?
15      MR. WILLIAMS: Objection to form.
16      Go ahead and answer.
17 A. Will you show me in the document what
18 you're referring to.
19 Q. Well, I'm not referring to the document
20 quite yet. I just want to see if you have an
21 independent recollection or understanding of
22 that.
23 A. Are you talking about recourse accounts?
24 Q. Yes.

### Page 126

1  A. Or returns?
2  Q. Recourse accounts.
3  A. I have an understanding, I think.
4  Q. Okay. Can you tell me what that is?
5       MR. WILLIAMS: Objection to form.
6       Go ahead and answer.
7  A. At the end of every month we were to be
8  presented with a file of accounts that were 90
9  days delinquent for a recourse. We owed 92
10 cents back on the dollar for -- actually, the
11 same amount that we received, which would have
12 been 92 cents on the dollar, back to the Bank of
13 Montana. The other eight percent was owed back
14 by CSI so that the bank was made whole for the
15 $1 that we financed.
16 Q. Okay. And would Mercy repay that 92
17 cents on the dollar back directly to the bank?
18 A. Well, these were offset against new
19 files.
20 Q. Okay. So Mercy would or would not pay
21 the 92 cents on the dollar to the bank?
22      MR. WILLIAMS: Objection to form.
23      Go ahead and answer.
24 BY MR. DAY:

### Page 127

1  Q. You can answer.
2       MR. WILLIAMS: You can answer.
3       THE WITNESS: Oh, okay.
4  A. Yeah, we would.
5  Q. And that payment came in different forms,
6  as I understand you're saying. Sometimes it
7  came in offsetting additional files that you
8  would send to CSI?
9       MR. WILLIAMS: Objection to form.
10      Go ahead and answer.
11 A. Yes.
12 Q. Okay. And it would also come in the form
13 of cash or a wire transfer?
14      MR. WILLIAMS: Objection to form.
15      Go ahead, answer.
16 A. There were either checks or wire
17 transfers that we made at some point during the
18 course of the program where there weren't enough
19 offsets.
20 Q. When you say Mercy was to re-purchase
21 accounts that were 90 days delinquent, what do
22 you mean by 90 days delinquent?
23 A. I define 90 days delinquent as 90 days
24 into the program with no payment.

### Page 128

1  Q. What do you mean by 90 days in the
2  program delinquent?
3  A. From the date it was purchased by CSI to
4  the 90th day, if it was in their program and
5  they did not collect any money, that was -- that
6  should have been recoursed back to us, 90 days
7  delinquent.
8  Q. And when should that have been recoursed
9  back to you?
10 A. We were supposed to get a file at the end
11 of every month with accounts that were 90 days
12 old, 90 days delinquent. It's pretty simple.
13 Every month.
14 Q. All right. And when you say you were
15 supposed to get a file with accounts that were
16 90 days delinquent, is it your understanding
17 that you were supposed to receive an account on
18 the 90th day of delinquency?
19 A. Well, the moment an account hit 90 days
20 old and it had not had a payment, in my mind
21 that was a delinquent account. And at the next
22 scheduled recourse file, that should come --
23 that account should come back to us every month.
24 Q. So if an account had 90 days delinquency,

```
                                                    129
1   the 90th day being June 1st, and if the next
2   scheduled recourse file was scheduled to come to
3   you June 30th, then it's your understanding that
4   that account that became delinquent 90 days on
5   June 1st would be returned to you with the file
6   on June 30th?
7           MR. WILLIAMS: Objection to form.
8        Go ahead, answer.
9     A. Assuming that we got a recourse file on
10  May 31st with 90 day delinquent accounts.
11  However, on June -- on May 31st the account in
12  question was 89 days old, it would not have
13  qualified to be a recourse account because it
14  wasn't 90 days old. Therefore, at the next
15  scheduled recourse file, which would be June
16  30th, we should see that account on the file,
17  presuming that there had been no payments.
18    Q. Now, if an account at the time of
19  purchase -- from the time of purchase by the
20  bank were paid each month by the patient and
21  were paid for any... let's say for an entire
22  year and then the patient stopped payment, would
23  you consider the period of delinquency to begin
24  the first date the payment... the first payment
```

```
                                                    130
1   was not received?
2     A. I consider any 90-day period, any period
3   of 90 consecutive days without a payment, to be
4   delinquent.
5     Q. And what was the process for returning
6   recourse accounts to Mercy?
7           MR. WILLIAMS: Objection to form.
8        Go ahead and answer.
9     A. We were supposed to receive a file at the
10  end of every month with accounts that were 90
11  days old for recourse. That was the
12  expectation.
13    Q. When you say an account that was 90 days
14  old, you don't mean 90 days old from the time --
15  I'm sorry.
16    A. 90 consecutive days without payment.
17    Q. Okay. You don't mean 90 days from the
18  time it was purchased, you mean 90 consecutive
19  days from the first time there was a payment
20  missed until the 90th day?
21          MR. WILLIAMS: Objection to form.
22       Go ahead and answer.
23  BY MR. DAY:
24    Q. Is that correct?
```

```
                                                    131
1           I'm not trying to trick you, I'm trying
2   to get a firm understanding here.
3     A. I'm trying to give it to you, Chris.
4   Anytime an account went for 90 days without a
5   payment, as soon as we hit the 90th day, that
6   account should be recoursed back to us.
7     Q. And that 90 days was measured from the
8   first time a payment was missed until the 90th
9   day thereafter?
10    A. Either -- any period of 90 consecutive
11  days without a payment.
12    Q. Well --
13    A. Okay. So let me just illustrate. You
14  make a payment on May 31st, then for the next 90
15  consecutive days you do not make a payment. We
16  now have a block of time of 90 days with no
17  payment. I want the account back as a recourse.
18    Q. Why do you want the account back?
19    A. Because there have been 90 consecutive
20  days without a payment. I want it back. That's
21  90 days delinquent in my mind.
22    Q. Okay. And is this procedure spelled out
23  within the contract, the Patient Findings
24  Agreement that has been marked as Smith-1? I'm
```

```
                                                    132
1   going to hand you that agreement to review.
2     A. I see it spelled out on page three,
3   paragraph seven.
4     Q. And what are the responsibilities of the
5   bank, according to paragraph seven?
6           MR. WILLIAMS: Objection to form.
7        Go ahead and answer.
8     A. Well, let me read the paragraph again.
9   Well, let me just -- if I could, Chris, let me
10  take the whole contract as a whole rather than
11  picking out a certain sentence in a paragraph.
12    Q. Well, I'm asking you what the bank's
13  responsibilities are to this particular
14  paragraph, paragraph seven, which you said
15  defines the recourse obligations.
16    A. Right. The responsibility is, to us, is
17  that every month, at the end of each calendar
18  month which the bank or CSI holds an account,
19  CSI will automatically present to the provider
20  for re-purchase accounts that are delinquent for
21  90 days.
22    Q. Okay.
23    A. Now, in my mind, if I read the entire
24  contract as a whole, I'm also looking at
```