# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| MERCY HEALTH SYSTEM OF SOUTHEASTERN PENNSYLVANIA, | : : : | Civil Action No. 01-CV-05681 |
| Plaintiff | : : | |
| v. | : : | |
| ROSS P. RICHARDSON, Chapter 7 Trustee for the Bankruptcy Estate of CSI Financial, Inc., | : : : : | |
| Defendant | : | |
| ********************************* | *** | ********************************* |
| FIRST NATIONAL BANK OF MONTANA, INC. and ROSS P. RICHARDSON, Chapter 7 Trustee for the Bankruptcy Estate of CSI Financial, Inc., | : : : : : | Civil Action No. 02-CV-03608 |
| Plaintiffs | : : | |
| v. | : : | |
| MERCY HEALTH SYSTEM OF SOUTHEASTERN PENNSYLVANIA, Defendant | : : : | |

## MEMORANDUM OF LAW IN SUPPORT OF MERCY HEALTH SYSTEM OF SOUTHEASTERN PENNSYLVANIA'S MOTION IN LIMINE TO EXCLUDE TESTIMONY BY DAVID JOHNSON

E. Thomas Henefer
Attorney I.D. No. 55773
Stacey A. Scrivani
Attorney I.D. No. 84275
111 North Sixth Street
P.O. Box 679
Reading, Pennsylvania 19603

Attorneys for Plaintiff Mercy Health System of Southeastern Pennsylvania

Dated: January 3, 2005

## I.     INTRODUCTION

Mercy Health System of Southeastern Pennsylvania ("Mercy") filed this action after it lost over $1 million due to CSI Financial, Inc.'s ("CSI") violations of a "Patient Financing Agreement" (the "Agreement"). Under the Agreement, Mercy sold CSI valuable patient accounts receivable. The Agreement contemplated that CSI would take steps to collect these accounts, but if it could not, it was required to adhere to specific deadlines to "recourse" the accounts to Mercy for repurchase. CSI systematically violated the recourse provision of the Agreement.

Although CSI violated this provision, CSI (and its funding agent, the First National Bank of Montana (the "Bank")) claimed Mercy was required to repurchase delinquent accounts even if CSI recoursed the accounts after the Agreement's deadline for recourse had expired. CSI thus took credits against new Mercy accounts rather than pay Mercy for them. Mercy therefore sold millions of dollars of accounts receivable to CSI not for cash but, instead, as "offsets" against Mercy's alleged obligation to pay for untimely recourse accounts. Discovery confirmed that Mercy had no obligation to repurchase these accounts and CSI and the Bank have been unjustly enriched by receiving and "offsetting" Mercy accounts without paying for them.

Mercy moves to preclude "expert" testimony by David Johnson, the Trustee's proposed expert. As outlined below, Johnson's proposed opinions are unreliable and should be precluded from trial pursuant to Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993), and its progeny and Fed. R. Evid. 702.

## II.    FACTUAL BACKGROUND

The facts of this case have been briefed extensively in motions for summary judgment and, rather than repeat the facts at length here, Mercy will summarize the relevant facts with emphasis on those facts particularly relevant to the motion in limine.

### 1.    Overview

Mercy is a Pennsylvania not for profit corporation that provides medical services through its hospitals and related healthcare entities. Like most hospital systems, Mercy services patients who have no insurance and must pay their medical bills themselves.

CSI was in the business of buying and collecting hospital self-pay receivables. CSI would select the self-pay accounts with the highest probability of collection based on CSI's credit scoring system. CSI purchased these accounts from the hospitals for 92% of the value of the accounts. Funding for the purchase of these accounts was provided by the First National Bank of Montana (the "Bank"). CSI would then undertake collection efforts on the accounts.

On or about October 18, 1999, Mercy and CSI entered into the Agreement. [Mercy's Exhibits are included in Mercy's Appendix in Support of its Motion in Limine to Exclude Testimony of David Johnson ("App."), Exhibit ("Exh.") 1]. The Bank is an express third party to the Agreement. The key provision of the Agreement is Paragraph 7, which is the only paragraph in the Agreement that addresses recourse accounts.

This provision envisioned that Mercy would repurchase recourse accounts by paying 92% of the outstanding balance directly to the Bank. But several conditions had to be met before Mercy was obligated to repurchase a recourse account. First, the account had to be delinquent for 90 days. Second CSI had to give Mercy immediate notice that the account was delinquent. Finally, and perhaps most importantly, Mercy's obligation to reimburse the Bank

2

applied only to those accounts that became "90 days delinquent <u>during the preceding calendar month.</u>" (emphasis added).

In short, this provision, much like any other warranty or contractual return provision, allowed CSI a limited window of opportunity to return to Mercy for repurchase delinquent accounts. CSI systematically exceeded the time limit provided in the Agreement.

CSI's violation of the recourse provision undermines CSI's and the Bank's claims in two respects. First, while CSI and the Bank claim damages based on Mercy's alleged failure to pay for untimely recourse accounts, the Agreement provides that Mercy was only required to pay the Bank for those accounts that were recoursed after becoming "90 days delinquent during the preceding calendar month." [App., Exh. 1 at ¶7]. Mercy was not required to pay the Bank money for accounts recoursed many months after this deadline passed.

Second, CSI claimed that the value of these untimely recoursed accounts could be used as an offset or credit against CSI's (and the Bank's) obligation to pay for new Mercy accounts. As a result, CSI (and the Bank) paid nothing for more than $1 million in new accounts from Mercy. These damages more than offset any claim by CSI and the Bank.

**2.    CSI's Mishandling Of Accounts Comes To Light**

CSI's mishandling of delinquent accounts came to a head in July 2001, when CSI recoursed to Mercy 1,300 accounts with a value of $760,000. [App., Exh. 2 at Exh. H]. The vast majority of these were not recoursed timely. [Id.]. In fact, the average age of these accounts was 222 days.

Notably, the Bank has known all along that CSI was violating the Agreement's recourse provision as confirmed by the results of an audit it performed of the Mercy accounts. [App., Exh. 3]. Even though the Bank reviewed only 30 of the 14,000 accounts CSI and the Bank purchased from Mercy, it concluded that CSI had not timely recoursed 75% of the accounts

3

it reviewed.  [Id.].  Among the problems noted in the audit was CSI's change in computer systems in December 2000.  As a result of the transfer of files from the old system to the new, account aging information was lost.  Further, many accounts were simply re-set to zero days past due effectively delaying their recourse.

Discovery also revealed that CSI's own attorney admitted CSI violated the Agreement in a May 9, 2002 letter to another attorney (apparently intended to secure errors and omissions insurance coverage).  In the letter, he explained the problems associated with the computer system conversion and noted his "best estimate is that CSI may be exposed to the tune of $250,000 to $500,000 of the $1,200,000 claimed by Mercy." [App., Exh. 4].  Likewise, in discussions with a third party (American West Bank) about a possible acquisition of CSI in 2002, CSI disclosed that it had a potential liability of $200,000 in this action.  [App., Exh. 5].

In short, while the Bank and CSI have been telling the Court that CSI complied with the Agreement, they have conceded CSI's violation of the Agreement to others.

## III.    JOHNSON'S DEFICIENT REPORT AND OPINIONS

Against this backdrop, CSI proffers an "expert" opinion of David Johnson. Johnson offers two opinions.  [Exh. 6].  First, he opines on what he believes are the contract damages flowing from Mercy's alleged breach of the Agreement.  Second, he opines that but for Mercy's alleged breaches, CSI would have remained a going concern rather than being "forced" into bankruptcy and, as a going concern, CSI was worth $10,500,000.  As explained below, Johnson's opinions are factually incorrect and inadmissible under applicable law.

### A.    Johnson's Speculative And Incorrect Assumptions On Valuation

Johnson concedes that common sense should be used in valuing a business. [App., Exh. 7 at 85].  Yet his approach belies any notion of common sense.  Instead, Johnson relies extensively on speculative or incorrect factual assumptions.

4

Johnson's opinion relied exclusively on the projections prepared by a third party, Senex, in connection with its possible merger with CSI in 2002. As Johnson put it: "There was a study that was prepared [the Senex study] and I just utilized the numbers in the study." [App., Exh. 7 at 37-38]. Notably, however, the Senex projections contain significant assumptions which an expert should have scrutinized in formulating an opinion.

For example, Senex assumed a one year growth rate in CSI's "EBITDA" of nearly 768%. [App., Exh. 8]. "EBITDA" is an acronym for earnings before interest expense, taxes, depreciation, and amortization. In re: PWS Holding Corp. Bruno's Inc., 228 F.3d 224, 233 (3d Cir. 2000).

Common sense dictates that there must be some explanation for a one-year 768% increase in earnings for an established business. And, although Johnson recognized that this was a "material increase" [App., Exh. 7 at 274], he was not aware of anything specific in Senex's business plan that justified this increase. [App., Exh. 7 at 278]. Instead, he simply relied on the assumption that Senex had done its due diligence. [App., Exh. 7 at 277-278].

Ultimately, Johnson conceded that Senex's projections were based on the assumption that someone would provide CSI with additional financing (either equity or debt) of at least $23 million. [App., Exh. 7 at 279].

> Q.    And in reviewing Senex's projections did you account for whether it was the additional funding which would result in the increase in EBITDA by 767 percent?
>
> A.    Well, it has got to start with top line funding or top line revenue, so the ability to have additional funding leads to the ability to generate additional fee income and work down from there.

[App., Exh. 7 at 279].

Johnson then conceded that the $23 million was the linchpin to his opinion on value -- and that he had no reason to believe that CSI had access to such funds:

Q.    So is it your opinion then, since you are relying on Senex's numbers, that CSI would have been worth ten and a half million dollars if it had access to $23,000,000 of debt financing?

A.    Basically, yes.

Q.    Okay. And you are not aware, apart from this Senex data, of any source that CSI had to access $23,000,000 of debt financing in 2002?

A.    I'm not individually aware of additional financing beyond what they already had.

Q.    Which was nowhere near $23,000,000; is that right?

A.    That's my understanding.

[App., Exh. 7 at 290-291; see also App., Exh. 7at 281-282].

In short, Johnson's entire valuation opinion rests on the notion that CSI had access to $23,000,000 even though Johnson concedes CSI had no ability to obtain such funding. Johnson's opinion is thus built upon a false premise having no connection to the facts of the case.

Also suspect is Johnson's approach of determining a hypothetical value of CSI in 2004 rather than in 2002. As outlined below, this was apparently done to enhance the alleged damages by discounting the projected future revenues over a shorter period of time. This approach moves beyond speculation into pure fiction because it assumes that CSI achieved the Senex revenue projections for two years even though CSI did not and could not achieve those revenues because, among other things, it did not have access to the $23 million in capital to which Senex alluded. [App., Exh. 7 at 87-88].

Finally, it is notable that Johnson also relied on the Senex report in a selective fashion. Although he relied on Senex's conclusion about increased revenue, he ignored Senex's projections about increased debt. [App., Exh. 7 at 284-286]. He conceded, of course, that this would have reduced the final value. [Id.]

**B.    Johnson Failed To Follow A Proper Method on the Valuation Opinion**

Johnson concedes he did not follow the process of a formal business valuation which would have required consideration of a variety of factors Johnson ignored. [App., Exh. 7 at 17, 98]. The analysis in question is outlined in IRS Revenue Ruling 59-60 which Johnson conceded is the valuation "benchmark." [App., Exh. 9; App. Exh. 7 at 17].

Rev. Ruling 59-60, notes several relevant factors which Johnson either ignored completely or gave only passing consideration. These included tax returns, balance sheets and profit and loss statements, potential sources of new revenue and potential threats (such as loss of a key customer, loss of financing relationships or exposure in litigation). [App., Exh. 7 at 66-69].

For example, Johnson did not review opportunities for CSI to generate new sources of revenue. [App., Exh. 7 at 71]. Instead, he thought CSI could grow its business because one of the Mercy witnesses described CSI's services as unique. [App., Exh. 7 at 75-77]. Yet he ultimately conceded that Senex's projections were based on the assumption that CSI could obtain $23,000,000 in financing (rather than some notion that CSI's services were unique). [App., Exh. 7 at 279 and 290-91]. Further, he conceded that he did not know whether CSI's services would still be considered unique in 2002. [App., Exh. 7 at 253].

Johnson also did not consider threats to CSI's business. Although Rev. Ruling 59-60 lists as a relevant consideration "the economic outlook in general and the condition of the specific industry in particular," Johnson did not consider economic conditions in the industry. [App., Exh. 7 at 249]. Nor did he consider CSI's competition. [App., Exh. 7 at 250-254].

Johnson also did not consider whether CSI was exposed to potential liability in this action. For example, he never considered CSI's admission through counsel that it had exposure up to $500,000. [App., Exh. 4]. Nor did he consider CSI's representation to American

SL1 500801v1/30512.005

West Bank that it had a possible liability to Mercy of $200,000. [App., Exh. 7 at 244-246]. Johnson conceded that such exposure in litigation would have been relevant had he known of it. [App., Exh. 7 at 244-246].

Rev. Ruling 59-60 also notes that "a study of gross and net income, and of dividends covering a long prior period, is highly desirable." [App., Exh. 9 at Sec. 4.02 (a)]. It also notes that past earnings should be considered and are "usually the most reliable guide as to future expectancy…." [App., Exh. 9 at Sec. 4.02 (d)]. Yet despite Johnson's unfettered access to CSI records and management, he failed to consider CSI's past earnings or recent trends, even though the evidence confirms that CSI had decreasing profitability. [App., Exh. 7 at 103-105 and 255]. Nor did Johnson review CSI tax returns. [App., Exh. 7 at 71].

Another factor noted in Rev. Ruling 59-60 is the market price of stocks of similar corporations. [App., Exh. 9 Sec. 4.01(h)]. Johnson, however, ignored this factor as well. [App., Exh. 7 at 102-103].

Rather than follow the "benchmark" approach outlined in Rev. Ruling 59-60, Johnson simply took Senex's revenue projections "at face value" and assigned a value to CSI based on those projections. [App., Exh. 7 at 37-38, 105, 273]. And even in this limited task, Johnson failed to comply with the case law requirements for admissibility because he failed to test or carefully scrutinize Senex's conclusions. Some more important examples include:

- Although he relied on Senex's projections, he did not confirm the time period Senex was considering. [App., Exh. 7 at 96-97].

- Although Senex's projections note that they are based on "elements of subjective judgment, speculation and analysis," Johnson never inquired about what specific parts of the Senex projections were based on such assumptions. [App., Exh. 7 at 271-273]. Instead, he simply took Senex's projections "at face value" [App., Exh. 7 at 273] even though he concedes he did not know what Senex's subjective thoughts were [App., Exh. 7 at 96, 273].

8

- Johnson did nothing to test the reasonableness of Senex's expense assumptions. [App., Exh. 7 at 295-296].

A reliable methodology would have included steps such as confirming the time period of Senex's projections, speaking with Senex representatives to explore their areas of speculation and evaluating the relevant market to assess whether Senex's revenue projections were reasonable (even with the addition of $23 million in capital). In short, a reliable methodology would have required testing of Senex's assumptions which Johnson did not do.

In fact, Johnson's "testing" of the Senex report appears to have been limited to comparing it to another third party report (the "Geneva report") and assuming that it was reasonable because it was more conservative than the Geneva report. [App., Exh. 7 at 100-101]. But Johnson did nothing to test the accuracy of the Geneva report's conclusions and therefore could not reasonably use the Geneva report for comparison. [App., Exh. 7 at 101].

Finally, Johnson conceded that other offers by third parties to purchase the company would be relevant but he did not see any documentation of offers to purchase CSI even though he thought there had been potential buyers. [App., Exh. 7 at 73-74]. Discovery has revealed several offers for substantially less than the $10.5 million Johnson estimated. [App., Exh. 10 at 45-60].

Johnson did not even know that Senex offered CSI $1.0 million for its assets[1] or about CSI's later proposal which included a $3 million call option for Senex to buy Jaeb's share of the new company (which he would have acquired for CSI's stock). [App., Exh. 12]. He admitted that such an offer would have been relevant to his analysis [App., Exh. 7 at 122 and 266-267], and would have wanted to know whether Senex agreed to the request for a $3 million

---

[1] This $1.0 million offer was made by a company called National Century, which CSI's counsel contends is another name for Senex. [App. Exh. 10 at 55; App., Exh. 11].

9

call option. [App., Exh. 7 at 268-269]. Johnson should have addressed whether the fact that Senex did not accept a $3 million call option indicates that Senex did not think CSI was worth $3 million (much less $10.5 million).

### C.    Johnson's Flawed Causation Opinion

Johnson also opined that Mercy's conduct forced CSI to file for bankruptcy. But this opinion is also built on incorrect assumptions. For example, Johnson essentially opines that the magnitude of the alleged losses were such that CSI could not survive. But the lion's share of the alleged damages represent claims by the Bank (not CSI) to recover money that (if payable) would be paid to the Bank (not CSI).

Johnson utterly failed to explain how a loss allegedly incurred by a separate entity could force CSI to file for bankruptcy. Indeed, Johnson could not even confirm whether these alleged losses were reflected in CSI's financial statements. [App., Exh. 7 at 230-237]. In fact, when asked whether he made any effort to separate the Bank's alleged damages from CSI's alleged damages, his answer was simple: "I don't really care." [App., Exh. 7 at 198].

Johnson also failed to account for (or even consider) other factors that could have played a role in CSI's demise such as a decline in revenue from 1998 forward, actual losses for 2000 and whether CSI was properly run or had management problems (as one could readily infer from the Bank's audit report). [App., Exh. 7 at 241]. Although Johnson's resume claims he is an expert at examining business practices to link them to certain results, he never considered whether CSI's business practices caused its demise. [App., Exh. 7 at 47-48 and 51]. Nor did he perform a "Z Score" analysis which is a statistical analysis tool used to predict whether a business will fail. [App., Exh. 7 at 39-40].

Rather than performing a proper analysis, Johnson simply accepted CSI's claim that but for Mercy's alleged actions, CSI would have remained a going concern. [App., Exh. 7 at

SL1 500801v1/30512.005

238]. And, as with the other relevant parts of his opinion, Johnson simply accepted these representations at face value without testing them. [App., Exh. 7 at 238].

### D.    Johnson's Flawed Methodology On The Contract Damages Opinion

Johnson's approach was equally flawed on his contract damages opinion. First, Johnson failed to review the relevant discovery. His approach is to review only those depositions that the attorney provides him. [App., Exh. 7 at 45-46].

Here, most of Johnson's opinion depends on certain contractual interpretation issues; indeed, he concedes his opinions would have to change if the Court rejects CSI's contractual interpretation arguments. Yet he did not review the sworn testimony of any of the CSI witnesses involved in the contract formation. Nor did he review CSI's marketing materials which could be relevant if the Court finds the Agreement ambiguous. [App., Exh. 7 at 214-215]. Instead, he only reviewed three depositions of Mercy witnesses. [App., Exh. 7 at 128].

Johnson claims he would normally review his client's documents and review documents produced in discovery by third parties. [App., Exh. 7 at 55-58]. Here, however, he did not review critical documents such as the Bank audit report, and the May 29, 2002 letter from CSI's counsel admitting that CSI "may be exposed to the tune of $250,000 to $500,000…." [App., Exh. 3 and 4]. Such documents undermine Johnson's implicit assumption that CSI complied with the Agreement.

As explained below, experts are not allowed to simply take at face value their client's factual representations without testing for accuracy. But Johnson did this repeatedly and conceded as much in his deposition. [App., Exh. 7 at 58]. For example, Johnson did not test the validity of CSI's account data. [App., Exh. 7 at 59-61, 204-205]. Nor did he perform any sampling of the accounts. [App., Exh. 7 at 213]. Instead, his "statistical analysis" was limited to

quantifying the timing of recoursed accounts (which, incidentally, confirms that CSI violated the Agreement).  [App., Exh. 7 at 222-223].

Similarly, he simply "relied on what [he] was told" about CSI's claim that there was a "side agreement" that recourse accounts should be held until Mercy had sufficient offsetting new accounts.  [App., Exh. 7 at 150].  He requested no documentation of this alleged "side agreement," nor did he analyze whether the dates of the actual transfer of accounts between Mercy and CSI supported CSI's allegation of a "side agreement."  [App., Exh. 7 at 150 – 151].

Johnson took similar liberties in his analysis of the contract and alleged damages. For example, he applied a 15% interest rate to all of Mercy's alleged payment obligations even though the Agreement only uses this rate in one limited context (accounts that should have been purged from Mercy's accounts).  [App., Exh. 7 at 182-188].  He then measured the accrual of interest based on CSI's representation that Mercy's payments were due within 10 days, another alleged "term" that does not appear in the contract.  [App., Exh. 7 at 201].  He even included CSI's claim to recover the 8% it allegedly refunded to the Bank as an element of damages despite conceding that the Agreement says Mercy has no obligation to pay the 8%.  [App., Exh. 7 at 188-191].  In typical fashion, Johnson simply accepted these allegations, without testing, because they are claims CSI wants to pursue.

## IV.    ARGUMENT

### A.    Legal Standard Governing Daubert Motions

#### 1.    The Daubert Opinion

In Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993), the Supreme Court held that a district court "must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." Id. at 589.  As a result, a district court must stand as the "gatekeeper" to the admission of expert reports and testimony at trial.  Id. at 589-93.

12

The <u>Daubert</u> Court refused to "set out a definitive checklist" of factors that bear on the district court's inquiry, but offered "some general observations." <u>Id.</u> at 592. Specifically, the Supreme Court discussed testing, peer review, publication, error rates, the existence and maintenance of standards, and general "acceptability" in the relevant scientific community, some or all of which might prove helpful in determining the reliability of a particular "scientific theory or technique." <u>Id.</u> at 592-94. <u>Oddi v. Ford Motor Co.</u>, 234 F.3d 136, 145 (3d Cir. 2000), <u>cert. denied</u>, 121 S. Ct. 1357 (2001); <u>Elcock v. Kmart Corp.</u>, 233 F.3d 734, 745-46 (3d Cir. 2000); <u>In re Paoli Railroad Yard PCB Litig. v. Southeastern Pennsylvania Transp. Auth.</u>, 35 F.3d 717, 742 and n.8 (3d Cir. 1994), <u>reh'g denied</u>, 1994 U.S. App. LEXIS 29233 (3d Cir. Oct. 14, 1994), <u>cert. denied</u>, 513 U.S. 1190 (1995).

The <u>Daubert</u> Court also emphasized that the proponent (here, the Trustee) of the expert testimony and report alone bears the burden of demonstrating the foundational requirements for admissibility by a preponderance of the evidence. <u>Id.</u> at 593.

### 2.    **The Joiner Opinion**

In <u>General Electric Co. v. Joiner</u>, 522 U.S. 136, 146-47 (1997), the Supreme Court reaffirmed the District Court's gatekeeper role and held that the correct standard of review of evidentiary rulings, including <u>Daubert</u> motions, is an abuse of discretion. 522 U.S. at 142. Next, the Court emphasized that the District Court may consider both the expert's methodology <u>and</u> the expert's conclusions. Thus, the Court rejected the petitioner's argument that the district court had committed legal error when it disagreed with the conclusions the expert drew from the studies he had performed:

> [C]onclusions and methodology are not entirely distinct from one another. Trained experts commonly extrapolate from existing data. <u>But nothing in either Daubert or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the ipse dixit of the expert. A</u>

13

> court may conclude that there is simply too great an analytical gap
> between the data and the opinion proffered.

Id. at 146 (emphasis added).[2]

### 3.    The Kumho Tire Opinion

In 1999, the Court held that Daubert applies equally to all expert witnesses under Fed. R. Evid. 702 (those possessing "scientific, technical, or other specialized knowledge"). See Kumho Tire Company, Ltd. v. Carmichael, 526 U.S. 137, 141 and 149 (1999). Kumho Tire also made clear that the list of factors identified in Daubert is a non-exhaustive list and that each factor need not be applied in every case. Id. at 149-51; see also Elcock, 233 F.3d at 745-746. Rather, although a district court should use the Daubert factors to the extent possible, district courts have "considerable leeway" in determining whether an opinion is reliable. Id. at 152; see also id. at 141; Elcock, 233 F.3d at 746.

### 4.    Federal Rule of Evidence 702

Also relevant is Federal Rule of Evidence 702. Courts have found three distinct substantive requirements in Rule 702 for the admission of expert testimony: qualifications, reliability and fit:

> (1)    whether the proposed witness is a qualified expert in the area in which he or she is being offered as an expert;
>
> (2)    whether the proposed expert's testimony is based upon reliable evidence; and
>
> (3)    whether the expert's testimony assists the trier of fact.

Paoli Railroad, 35 F.3d at 741-42 (citing Daubert, 509 U.S. at 587-591); Elcock, 233 F.3d at 741.

---

[2]    *Ipse dixit* is defined in Black's Law Dictionary as "a bare assertion resting on the authority of an individual." Black's Law Dictionary 828 (6th ed. 1990).

14

First, "at a minimum a proffered expert witness . . . must possess skill or knowledge greater than the average layman. . . ." Elcock, 233 F.3d at 741 (3d Cir. 2000). A basic understanding of a general subject matter does not alone qualify a witness as an expert on that specific subject. See In re Unisys Savings Plan Litigation, 173 F.3d 145, 156-57 (3d Cir. 1999)(expert who had background in investments for property and casualty insurance was properly excluded from testifying about life insurance investments). In one case, the Third Circuit upheld a district court's exclusion of a proposed witness who, although he possessed both academic and practical experience in a relevant subject area, lacked specialized knowledge of the specific issues which formed the basis of his theory of liability. Surace v. Caterpillar, Inc., 111 F.3d 1039, 1055-56 (3d Cir. 1997).

Next, because Rule 702 requires reliability, the proponent must establish that the expert's opinions are based on "good grounds." Paoli Railroad, 35 F.3d at 748; see also Daubert, 509 U.S. at 590. A witness' "subjective belief or unsupported speculation" does not constitute "good grounds" for the opinions. Daubert, 509 U.S. at 590. See Parkway Garage, Inc. v. City of Phila., 1994 U.S. Dist. LEXIS 10900, *31 (E.D. Pa. Aug. 3, 1994) (testimony based on "pure speculation" is unreliable).

The third requirement under rule 702 is that the expert's testimony must assist the trier of fact (i.e., it must "fit" the subject matter at issue). Daubert, 509 U.S. at 591. That is, there must be a connection between the opinion and the facts of the case. Heller v. Shaw Industries, Inc., 167 F.3d 146, 159 (3d Cir. 1999); Paoli Railroad, 35 F.3d at 742-43, 746.

## 5. Application of Daubert And Its Progeny

The Third Circuit has repeatedly affirmed rulings by trial courts excluding proposed expert testimony from trial under Daubert. The applicable case law reveals three critical concepts: (1) an expert may not merely rely on his or her own intuition without proper

testing or investigation of a hypothesis; (2) the district court's role as a gate keeper requires it to exclude testimony that is unreliable under Daubert; and (3) a failure to satisfy Daubert's standards may not be cured by subjecting the expert to cross examination.

First, Daubert requires proper testing to establish reliability. Simply put, experts may not rely on their own mere intuition alone. Or, as one District Court aptly observed, "before the gates to the courtroom will be opened in this Circuit, a proposed expert must do more than simply say 'let me in (because I say so).'" Pappas v. Sony Electronics, Inc., 136 F. Supp. 2d 413, 422 (W.D. Pa. 2000).

For example, in Oddi, 234 F.3d 136, 158, the Court held that expert testimony was properly excluded where the expert conducted no tests and "used little, if any, methodology beyond his own intuition." The Third Circuit has reached similar conclusions in numerous other cases. See also Paoli Railroad., 35 F.3d at 762 (exclusion where expert witnesses' conclusions were based only on plaintiff's self representations).

Second, the case law confirms that exclusion is required where Daubert and its progeny are not satisfied. One example is Elcock, 233 F.3d 734, 750, where the Court held that the district court erred by allowing a vocational rehabilitation expert to testify given "serious doubts" about his methods. Moreover, the Elcock Court held that the District Court erred by admitting an expert's testimony on damages when the "economic damages model relied on several empirical assumptions that were not supported by the record." Id. at 755-56.

Third, the district court's gatekeeper role is not fulfilled by allowing unreliable expert testimony into evidence under the assumption that it is subject to cross examination and the fact finder can properly weigh the testimony. "[W]e must resist the temptation to answer objections to receipt of expert testimony with the shorthand remark that the [fact-finder] will

16

give it 'the weight it deserves.'" <u>Joy v. Bell Helicopter Textron, Inc.</u>, 999 F.2d 549, 569 (D.C. Cir. 1993) (citations omitted).

Applying these concepts, district courts within the Third Circuit have granted <u>Daubert</u> motions in a variety of contexts. <u>See</u>, <u>e.g.</u>, <u>Hamilton v. Emerson Electric Co.</u>, 133 F. Supp 2d 360, 371-72 (M.D. Pa. 2001); <u>Rapp v. Singh</u>, 2001 U.S. Dist. LEXIS 5705 at *33 (E.D. Pa. May 1, 2001); <u>Saldana v. Kmart Corp.</u>, 84 F. Supp. 2d 629, 635 (D.V.I. 1999).

**6.     <u>Daubert As Applied to Economic Experts</u>**.

Following <u>Kumho Tire</u>, numerous courts have applied <u>Daubert</u> to damages experts. For example, in <u>Elcock</u>, 233 F.3d 734, a damages expert opined about the plaintiff's alleged future wage loss following a slip and fall accident. The Third Circuit held it was an abuse of discretion for the district court to admit the testimony where the expert over-estimated the plaintiff's past earnings and ignored her post-accident earnings. <u>Id.</u> at 755-56. In short, the testimony was inadmissible because the expert had ignored the "real world of" the plaintiff's circumstances. <u>Id.</u> at 756.

One instructive case is <u>JMJ Enterprises, Inc. v. Via Veneto Italian Ice, Inc.</u>, No. 97-CV-0652, 1998 U.S. Dist. LEXIS 5098 (E.D. Pa. Apr. 14, 1998) (Kelly, J.), <u>aff'd</u>, 178 F.3d 1279 (3d Cir. 1999). There, the court rejected proposed expert testimony about lost profits because the testimony was unreliable under <u>Daubert</u>.

Noting that "helpfulness" of the expert testimony to the trier of fact is the "ultimate touchstone" for admissibility, the Court held that to be helpful, "(1) the witness must be qualified as an expert; (2) the expert must have a reasonable factual basis for their testimony; (3) the testimony must be based on reliable methods; and (4) the testimony must be relevant to facts in issue." 1998 U.S. Dist. LEXIS 5098 at *14 (citations omitted).

17

Further, the <u>JMJ Enterprises</u> Court held that the "expert's testimony must have some connection to existing facts" and that "expert testimony that ignores existing data and is based on speculation is inadmissible." <u>Id.</u> at *16. Further, expert testimony based on "speculation or unrealistic assumptions is not helpful." <u>Id.</u> The Court held that the expert could not testify because he was not knowledgeable about the industry and did little to verify his sales projections.

Next, the Court focused on the reliability of the expert testimony. Among other things, the testimony was unreliable because the expert made a number of errors, such as assuming that the plaintiff's expenses would not rise as its sales volume rose. <u>Id.</u> at * 23-25.

Finally, applying Fed. Rule of Evid. 403, the Court held that there was little probative value in the expert's testimony. Instead, the Court held that the plaintiff was "simply presenting their unrealistic hopes through the mouth of an expert." <u>Id.</u> at *26.

Even without applying <u>Daubert</u>, courts are obligated to reject expert testimony on damages that is factually unsupported and speculative. For example, in <u>Williams v. Rene</u>, 72 F.3d 1096, 1101-03 (3d Cir. 1995), the Court held that an expert's testimony about future earnings capacity was inadmissible because the expert ignored the employer's actual salary scale, had no evidence to support the notion that the plaintiff would have qualified for future promotions and, in response to one question, manipulated the future anticipated increases by focusing on a narrow time period in which the plaintiff received an unusual promotion and raise. <u>Id.</u> at 1102. Although the <u>Williams</u> Court did not apply <u>Daubert</u>, it nonetheless found the testimony unsupported and speculative and therefore inadmissible. <u>Id.</u>

SL1 500801v1/30512.005

**B.     The Court Should Preclude Johnson's Proposed Testimony**

**1.     Johnson Lacks The Necessary Qualifications**

As a threshold matter, Johnson's qualifications for the valuation opinion are deficient. Although there are several recognized certifications in the industry [App., Exh. 7 at 28-32; Exh. 13], Johnson has no certification in performing business valuations. [App., Exh. 7 at 21]. He has only attended three or four seminars on valuation since 1997 and none that were exclusively devoted to valuations. In other words, Johnson's background in accounting is not enough to qualify him to opine on business valuation matters. See In re Unisys Savings Plan Litigation, 173 F.3d at 156-57; Surace, 111 F.3d at 1055-56.

Johnson's qualifications are lacking in another respect because his opinion depends on projections of future sales. Johnson, however, is an accountant, not an expert on projecting sales or revenues for a business. As noted in JMJ Enterprises, 1998 U.S. Dist. LEXIS 5098 at * 15-16, an accounting background does equate to expertise in projecting sales.

**2.     Johnson Relies On Incorrect Or Insupportable Assumptions**

Experts may not rely on assumptions that are not supported by the evidence or are speculative. E.g., JMJ Enterprises, 1998 U.S. Dist. LEXIS 5098 at * 16. But that is exactly what Johnson has done here.

Johnson's opinion on value is based on a fundamental -- and erroneous – set of assumptions about CSI's future earnings potential. To begin, Johnson relied on the Senex report which itself states that its conclusions are based on speculation. Despite this he did nothing to determine how the conclusions were speculative. This alone is sufficient to preclude his testimony as explained in Meterlogic. Inc. v. KLT, Inc. 2003 U.S. Dist. LEXIS 25496 (W.D. Mo. April 24, 2003), aff'd, 368 F.3d 1017 (8th Cir. 2004). There, the Court refused to allow an expert to opine about lost profits based on a report prepared by a third party which contained

19

speculative assumptions about profits the business might obtain if it pursued certain strategies. The Court derided the expert's reliance on the report as "speculation based upon speculation." Id. at *9. This same criticism applies to Johnson's reliance on the Senex report.

Worse yet, as Johnson conceded, Senex's future revenue assumptions were entirely dependent on CSI obtaining $23 million to fund its operations. [App., Exh. 7 at 290-291]. But Johnson recognizes that CSI did not have access to such funds. [App., Exh. 7 at 290-291]. Instead, CSI was a business that was losing money and teetering on the brink of bankruptcy. No one was about to lend CSI $23 million and Johnson has not pointed to any evidence to suggest otherwise.

Johnson's assumptions about future earnings are therefore inconsistent with the "real world" evidence. Elcock, 233 F.3d at 756. Instead, his entire analytical methodology is a castle built on sand, i.e., is based on unfounded assumptions and is itself therefore unreliable and inadmissible. Williams, 72 F.3d at 1101-03 (reversing admission of expert damages testimony where, despite significant detail, underlying assumption was "unsupported and speculative").

Likewise, Johnson's approach of valuing CSI based on the assumption that it would have stayed in business until 2004 and would have obtained the revenues Senex projected is speculative. CSI apparently favors this approach because Johnson's method was to discount to present value the future earnings Senex projected for the 2002 to 2006 time frame. Of course, by discounting only back to 2004, rather than to 2002, the present value ends up being higher. Johnson conceded that if he discounted to 2002, the number would have been lower (in fact, it is closer to $4 million than to $10.5 million). Nonetheless, it is an exercise in fiction to assume that CSI obtained such revenues (factually it did not and, even in theory, could not have without at least $23 million in capital it did not have).

20

Contrary to Johnson's approach when damages are determined on a "going concern" basis, they must be determined as of the date the business went out of business and not as of the date of trial to avoid speculation. <u>Coastal Fuels v. Caribbean Petroleum Corp.</u>, 175 F.3d 18, 26-29 (1st Cir. 1999). As the Court noted there, the question is "what a reasonable buyer would have paid for Coastal in 1993 (rather than in 1998, where any going concern value assumes Coastal survives until 1998)." <u>Id.</u> at 28.

### 3. Johnson Improperly Ignored Critical Facts

In determining whether expert testimony will "assist the trier of fact to understand the evidence or to determine a fact in issue," as required by Federal Rule of Evidence 702, the court should consider "whether expert testimony proffered in the case is sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute." <u>Daubert</u>, 509 U.S. at 591 (quoting <u>United States v. Downing</u>, 753 F.2d 1224, 1242 (3d Cir. 1985)). <u>See also</u> <u>Elcock</u>, 233 F.3d at 755-56 (excluding damages expert's testimony about future wage loss because the expert's opinion was not based on the plaintiff's pre- or post-accident earnings). Thus, an expert may not ignore critical facts of the case. <u>JMJ Enterprises</u>, 1998 U.S. Dist. LEXIS 5098 at * 16.

Here, Johnson ignored many critical facts. Most glaring is how Johnson ignored the fact that CSI did not have access to the $23 million in capital it needed to achieve (at least in theory) the revenues Senex projected. He also selectively relied on the Senex report by accepting its conclusions about future earnings while ignoring Senex's conclusions about CSI's projected debt. [App., Exh. 7 at 284-286]. Such selective reading of the report is not permitted. <u>JMJ Enterprises</u>, 1998 U.S. Dist. LEXIS 5098 at * 19-20.

He further ignored critical facts concerning other offers for CSI which discovery confirmed were all substantially less than the $10.5 million Johnson projects. [App., Exh. 7 at 73-74; App., Exh. 10 at 45-60]. Indeed, he did not even examine Senex's offer (or the

21

subsequent negotiations) to determine what Senex believed CSI was worth. [App., Exh. 7 at 266-269].

Johnson also ignored many of the factors that are relevant under Rev. Ruling 59-60 such as CSI's history of declining profitability, its competition, its true prospects for generating new sources of revenue, or its threats such as its exposure in this case (as CSI's own counsel conceded in his May 2002 letter).

Johnson also ignored critical facts concerning his contract damages opinion. These center on CSI's lack of compliance with the Agreement. Again, there was ample evidence that CSI violated the Agreement's recourse provision yet Johnson simply assumed that CSI was in full compliance.

By ignoring key facts, Johnson has offered opinions which are simply wrong and would mislead any jury. Daubert, Rule 702 (and even Rule 403) prohibit an expert from offering opinions that are divorced from economic reality. Accordingly, Johnson's testimony should be excluded. Williams, 72 F.3d at 1102 (rejecting expert damages model that was not supported by facts in record); JMJ Enterprises, 1998 U.S. Dist. LEXIS 5098 at * 19-20.

### 4.    Johnson Failed To Follow Proper Testing Procedures.

Critical to the reliability inquiry is whether the expert performed any testing to assure that the underlying factual assumptions are sound. For example, in Oddi, 234 F.3d 136, 158, the Court held that expert testimony was properly excluded where the expert conducted no tests and "used little, if any, methodology beyond his own intuition." See also Jaurequi v. Carter Mfg. Co., 173 F.3d 1076, 1084 (8th Cir. 1999)(unreliable expert opinion properly excluded due to a lack of proper testing which rendered the opinion little more than "unabashed speculation."); Minasian v. Standard Chartered Bank, PLC, 109 F.3d 1212, 1216 (7th Cir. 1997)("Our district judge was not snookered" by witness' testimony which made conclusions without analysis.).

One instructive case is <u>Hamilton v. Emerson Electric Co.</u>, 133 F. Supp 2d 360, 371-72 (M.D. Pa. 2001), where the Court granted a <u>Daubert</u> motion to exclude an expert from testifying about the failure of a brake on a miter saw.  Among the problems with the proposed testimony was that the expert had not performed proper testing and accordingly, his "conclusion that the saw was defective is based only on his own authority…." <u>Id.</u>

Similarly, the expert cannot blindly rely on the representations of the party without testing the veracity of those assertions.  As the Third Circuit noted in <u>Paoli Railroad,</u> expert testimony should be excluded where expert witnesses' conclusions were based only on plaintiff's self representations.  35 F.3d at 762.  Or as the Court noted in <u>JMJ Enterprises</u>, expert testimony is not proper if the expert is "simply presenting [the party's] unrealistic hopes through the mouth of an expert."  1998 U.S. Dist. LEXIS 5098 at * 26

Here, however, Johnson took everything CSI told him at face value without testing the assertions for accuracy.  These included representations about an alleged "side agreement" on the timing of recoursed accounts as well as accepting without verification the account data CSI supplied.  [App., Exh. 7 at 58-61, 150, 204-205, 222-223].  He also simply accepted at face value CSI's representations that it would have remained a going concern but for Mercy's alleged breach of contract.  [App., Exh. 7 at 238].  Johnson summed up his approach succinctly:  "Most information we accept at face value."  [App., Exh. 7 at 58].

Similarly, Johnson did nothing to test Senex's assumptions.  Instead, he accepted them "at face value" [App., Exh. 7 at 273], and adopted them as his own based on his assumption that Senex had done its due diligence.  [App., Exh. 7 at 277-278].  He never explored the areas of Senex's conclusions that Senex found speculative.  [App., Exh. 7 at 271-273].  Indeed, Johnson

23

never even confirmed the precise time period covered in the Senex report.  [App., Exh. 7 at 96-97].

Johnson's approach is insupportable under <u>Daubert</u> and Rule 702 and his testimony should be excluded.

### 5.    Johnson Failed To Properly Explore Causation

An expert cannot testify on causation where he or she has failed to explore possible causes other than those outlined in the opinion.  <u>E.g.</u>, <u>Raskin v. The Wyatt Co.</u>, 125 F.3d 55, 67-68 (2d Cir. 1997)(excluding expert opinion on causes for anomalies in demographics of defendant's work force where expert failed to consider factors other than alleged age discrimination that might account for anomalies); <u>Hamilton</u>, 133 F. Supp. 2d at 371-72 (failure to consider other possible theories rendered expert opinion inadmissible).

Johnson, however, failed to analyze the other possible (and more likely) causes for CSI's bankruptcy.  Instead, Johnson simply assumes that Mercy breached the Agreement and, therefore, this breach caused CSI's eventual demise.  But, as outlined in Mercy's motion for summary judgment, the undisputed facts confirm that CSI, not Mercy, breached the Agreement.  Indeed, CSI's own counsel admitted that CSI faced a potential liability for violating the Agreement's recourse provisions.  Although CSI's counsel recognized that CSI breached the contract, its so-called expert here did not even consider this possibility.

Nor did he consider whether, even if Mercy had breached the contract, CSI's demise was caused by other factors such as a bad business model (for example, purchasing patient self-pay accounts in the hopes of securing 8% of those accounts' value).  Nor did he consider whether poor management (as one could infer from the Bank's audit report) caused or contributed to CSI's demise.  All of these factors should have been considered especially in light of CSI's documented history of declining profitability.  Indeed, experts are required to account

for factors other than the defendant's alleged conduct that may have caused the alleged harm. R.J. Reynolds Tobacco Company v. Premium Tobacco Stores, Inc., 2004 U.S. Dist. LEXIS 13443 at *25, (N.D. Ill. July 19, 2004).

A reliable analysis of the reasons for CSI's demise should have included an examination of both CSI's compliance (or lack thereof) under the Agreement as well as CSI's historical performance to assess (a) the cause of CSI's demise, and (b) what role, if any, Mercy's alleged breach of the Agreement played in CSI's demise. Failure to perform such an analysis (or even to ask the questions in the first instance) renders an opinion unreliable. In such cases, courts reason that there is no methodology to evaluate, and absent a reliable methodology, the opinion must be excluded. See Joiner, 522 U.S. at 146; Oddi, 234 F.3d at 158.

## V.    **CONCLUSION**

Given the significant facts Johnson ignored, his reliance on speculative and insupportable assumptions and his failure to follow proper testing methods, his opinion is best characterized as a conclusion in search of a justification rather than an objective analysis of the facts. Accordingly, his testimony should be excluded. E.g., JMJ Enterprises, 1998 U.S. Dist. LEXIS 5098 at * 26 (excluding testimony where party was "simply presenting their unrealistic hopes through the mouth of an expert."). Mercy therefore respectfully requests that the Court grant its motion in limine.

## CERTIFICATE OF SERVICE

I, STACEY A. SCRIVANI, certify that true and correct copies of Mercy's Motion

to Preclude the Testimony of David Johnson, supporting Memorandum of Law, and proposed

Order were sent to the following persons via federal express, this 3rd day of January, 2005:

Christopher M. Brubaker, Esquire
Kittredge, Donley, Elson, Fullem & Embick, LLP
The Bank Building
421 Chestnut Street
Philadelphia, PA  19106-2416
Counsel for First National Bank of Montana

Patrick J. Egan, Esquire
239 S. Camac Street
Philadelphia, PA  19107
Counsel for CSI Financial, Inc.

Dated: January 3 , 2005

Stacey A. Scrivani

SL1 500801v1/30512.005