## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| MERCY HEALTH SYSTEM OF SOUTHEASTERN PENNSYLVANIA, | : : : | Civil Action No. 01-CV-05681 |
| Plaintiff | : : | |
| v. | : : | |
| ROSS P. RICHARDSON, Chapter 7 Trustee for the Bankruptcy Estate of CSI Financial, Inc., | : : : : | |
| Defendant | : | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\* \*\*\* \*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| | | |
|---|---|---|
| FIRST NATIONAL BANK OF MONTANA, INC. and ROSS P. RICHARDSON, Chapter 7 Trustee for the Bankruptcy Estate of CSI Financial, Inc., | : : : : : | Civil Action No. 02-CV-03608 |
| Plaintiffs | : : | |
| v. | : : | |
| MERCY HEALTH SYSTEM OF SOUTHEASTERN PENNSYLVANIA, Defendant | : : : : | |

## <u>MERCY HEALTH SYSTEM OF SOUTHEASTERN PENNSYLVANIA'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR PARTIAL SUMMARY JUDGMENT ON ITS CLAIM FOR BREACH OF CONTRACT AGAINST CSI FINANCIAL, INC.</u>

## I.    INTRODUCTION

Mercy Health System of Southeastern Pennsylvania ("Mercy") filed this action

after it lost over $1 million due to CSI Financial, Inc.'s ("CSI") violations of a "Patient

Financing Agreement" (the "Agreement"). Under the Agreement, Mercy sold CSI valuable

patient accounts receivable. The Agreement contemplated that CSI would take steps to collect

on these accounts, but if it could not, it was required to adhere to specific deadlines to "recourse"

1

these accounts to Mercy for repurchase. CSI systematically violated the recourse provision of the Agreement.

Although CSI violated this provision, CSI (and its funding agent, the First National Bank of Montana (the "Bank")) claimed Mercy was required to repurchase delinquent accounts even if CSI recoursed the accounts after the Agreement's deadline for recourse had expired. CSI thus took credits against new accounts sent by Mercy rather than pay Mercy for them.

Due to CSI's improper actions, Mercy sold millions of dollars of accounts receivable to CSI not for cash but, instead, as "offsets" against Mercy's alleged obligation to repurchase untimely recourse accounts. Discovery confirmed that Mercy had no obligation to repurchase these accounts and it has been damaged by selling to CSI and the Bank new accounts without being paid for them. Accordingly, Mercy is entitled to partial summary judgment on the issue of liability with respect to its claim for breach of contract against CSI.

Damages, however, will need to be determined at trial. This is because there is a dispute over the dollar amount of untimely recourse accounts. Mercy's experts have determined that this amount exceeds $1.0 million. On the other hand, CSI has admitted, through its counsel (in a letter apparently sent to counsel for an errors and omissions carrier) that the amount of CSI's exposure is between $200,000.00 and $500,000.00.

2

## II.    BACKGROUND

### A.  PROCEDURAL BACKGROUND

This action represents the consolidation of two actions.  The first was filed by Mercy here and the second was filed in Montana (and later transferred here) by CSI and the Bank.

On August 27, 2002, Mercy filed a motion to consolidate the two actions.  By order dated October 1, 2002, as amended on October 8, 2002, this Court granted the motion and consolidated the cases under the caption of the First Action.

On December 16, 2002, CSI filed for bankruptcy in the United States Bankruptcy Court for the District of Montana.  On January 31, 2003, Mercy filed a Motion for Relief from Stay, which the Montana Bankruptcy Court ultimately granted.

In October 2003, CSI converted its bankruptcy from Chapter 11 to Chapter 7 and a trustee was appointed.  After the trustee hired counsel, discovery was completed on October 29, 2004.  Trial is scheduled for April 25, 2005.

### B.  FACTUAL BACKGROUND

#### 1.  CSI's Fast Trac Program

##### (a)    General Overview of the Program.

CSI's program was designed to pay hospitals 92% of the value of self-pay accounts the hospitals sold to CSI within days of those accounts being purchased by CSI.  [CSI Fast Trac marketing brochure ("CSI Brochure"), Bates Numbered 3711-3721 at 3713, included in Appendix of Mercy Health System of Southeastern Pennsylvania's in Support of its Motions for Summary Judgment ("App."), Exhibit ("Exh.") 1].  Under the FastTrac program, which CSI marketed as being completely electronic, hospitals would provide CSI with a file of self-pay patient accounts.  [Marketing materials provided by CSI to Mercy, Bates Numbered 3227-3261

at 3235, App., Exh. 2]. CSI then decided which accounts it wanted to purchase.[1] CSI would run each individual account through Equifax's scoring system to assign a Beacon score to each account. [Deposition of Peter Parsons ("Parsons Dep."), App., Exh. 5, at 29-30; CSI Brochure at 3713]. Once the score was assigned, CSI and the Bank selected which accounts they wanted to purchase. [App., Exh. 3 at 58-59, 94-95; App., Exh. 4 at 23-27].

CSI advertised that its threshold Beacon score was 600, but CSI employees testified that at times they would, at their discretion, accept accounts with a lower score into the program. [Id.]. According to CSI's marketing materials, "[CSI] score[s] accounts for two reasons, to ensure the best odds [CSI] will receive payment from the patient, and to eliminate unnecessary and expensive charge backs."[2] [CSI Brochure at 3713]. In other words, CSI's scoring system was designed to identify those self-pay accounts that were the most collectible.

Once CSI purchased an account, the Bank, as CSI's funding agent, provided the hospital with 92% of the value of the purchased accounts, and provided CSI with the remaining 8%. [Jaeb Dep. at 55; CSI Brochure at 3713]. Three things could happen to accounts CSI purchased. [CSI Brochure at 3711-3721]. First, CSI could collect the account. [Id.]. Second, the hospital could buy back the account before collections began because the patient claimed he/she had insurance, had medicare, or disputed the charges on the bill. [Id.]. Finally, the account could be recoursed to the hospital if no payments were received for a specified period of time. [Id.].

---

[1] Deposition testimony from CSI employees conflicts over whether the Bank decided or CSI decided which accounts to accept into the program. [Deposition of Robert Jaeb ("Jaeb Dep."), App., Exh. 3, at 58, 94; Deposition of Robert Logsdon ("Logsdon Dep."), App., Exh. 4, at 23-27]. Regardless of this dispute, however, neither the Bank nor CSI contend that Mercy was involved in deciding which accounts were accepted into the program.

[2] A charge back is synonymous with a recourse account.

4

### (b)    Solicitation of Mercy.

CSI's solicitation of Mercy began in August 1999 with an unsolicited direct mailing from CSI to Mercy. [Parsons Dep. at 21-22]. When Mercy expressed interest in CSI's program, CSI visited Mercy's Conshohocken location and gave Mercy a packet of materials about its program. [Id. at 32, 37; Deposition of Doug Smith ("Smith Dep."), App., Exh. 6 at 69-78].

CSI's marketing materials were impressive, although as demonstrated below, largely fictional. CSI represented that 50% of Mercy's self-pay accounts would be accepted into the program. [CSI Brochure, at 3714]. CSI also represented that over time, it expected Mercy's acceptance rate would increase to 75%. [Id.]. CSI's materials recognized, however, that "[d]espite the best efforts of everyone involved, some accounts will be placed on [CSI's] program by mistake. These accounts may have insurance pending, special written arrangements with your facility for extended payments, etc." [Id. at 3716]. CSI's marketing materials stated that such accounts would be returned to the hospital for repurchase. [Id. at 3717]. If such a return was made after a 25 day grace period, the hospital became responsible for interest and late fees on the account. [Id].

CSI also knew that some accounts accepted into the program would be uncollectible. [CSI Brochure at 3717]. Those accounts, CSI represented, would be recoursed after "90 days and numerous attempts by telephone and mail" to obtain payment. [Id.]. CSI boasted that its recourse average was a modest 4.8% of accounts placed in its system. [Id.]. It follows, therefore, that CSI would collect 95% of the accounts it purchased from Mercy and recourse to Mercy less than 5% of those accounts.

5

## 2.  The Patient Financing Agreement

In October 1999, CSI presented Mercy with its form Patient Financing

Agreement.  The Agreement was drafted by CSI and approved by the Bank.  [Jaeb Dep. at 117,

119, 175-176].  CSI concedes that Mercy made no changes to the Agreement and signed the

form contract it was provided on October 18, 1999.  [Id. at 174-175].  The Agreement is included

in the Appendix as Exhibit 7.  On behalf of Mercy, the Agreement was signed by Joseph

Bradley, Mercy's Chief Financial Officer and the only person at Mercy authorized to sign or

modify the Agreement.  [Deposition of Joseph Bradley ("Bradley Dep."), App., Exh. 8 at 36-37].

On CSI's behalf, the Agreement was signed by Robert Jaeb, CSI's president and the only person

authorized by CSI to sign or modify the Agreement.  [App., Exh. 7].

The focus of this case is on Paragraph 7, which expressly addresses recourse of

delinquent accounts.  It is also the key provision CSI breached that gives rise to Mercy's

damages:

> Recourse.  **At the end of each calendar month** during which BANK or CSI holds an account acquired for financing from PROVIDER, **CSI will automatically present to the PROVIDER for repurchase all accounts that are delinquent for 90 days. PROVIDER agrees to reimburse directly to the BANK upon notification by CSI, ninety two (92%) percent of the balance then due on any account that has become 90 days delinquent during the preceding calendar month.  CSI will give immediate notice** to provider of all accounts which are ninety days delinquent.  PROVIDER will not be held responsible for CSI's 8% prorated fee on any unpaid accounts.  CSI will pay to the BANK all of the charges that are in excess of the original balance financed by the patient.  CSI and BANK shall have the right of offset against sums due PROVIDER under the Agreement for the amount of any delinquent reimbursement obligations that exceed thirty (30) days.

(Bold emphasis supplied).

6

This provision envisioned that Mercy would repurchase recourse accounts by paying 92% of the outstanding balance directly to the Bank. But several conditions had to be met before Mercy was obligated to repurchase a recourse account. First, the account had to be delinquent for 90 days. Second CSI had to give Mercy <u>immediate notice</u> that the account was delinquent. Finally, and perhaps most importantly, Mercy's obligation to reimburse the Bank applied only to those accounts that became "90 days delinquent <u>during the preceding calendar month.</u>" (emphasis added).

In short, this provision, much like any other warranty or contractual return provision, allowed CSI a limited window of opportunity to return to Mercy for repurchase delinquent accounts. CSI systematically exceeded the time limit provided in the Agreement.

### 3. <u>CSI's Failure to Timely Recourse Accounts.</u>

The purpose of the recourse provision is clear and goes hand in hand with CSI's Beacon Score model. As set forth above, CSI scored accounts in order to purchase only those accounts with the highest probability of being collected. The 90 day recourse provision reflects the logical conclusion that collectibility is at its highest when an account is fresh rather than stale.

When Mercy signed the contract, it understood this law of averages as well. Mercy understood that CSI was selecting the best accounts from its self pay population, and then holding them during the best time period within which to collect them. If CSI was collecting on those accounts during the fertile time period, then CSI would have no reason to recourse them to Mercy. If, however, CSI was not successful in collecting during that time period, Mercy believed, based on the Agreement's express language that CSI would "immediately" notify it when an account became 90 days delinquent and "at the end of each month" present for repurchase "all accounts...delinquent for 90 days."

7

Mercy expected, as expressly provided in the Agreement, to receive at the end of each month all accounts that became 90 days delinquent during the preceding month. [Affidavit of Russ Erdman ("Erdman Aff."), App., Exh. 9 at ¶ 14, 30]. However, throughout the course of the relationship, many months would go by without CSI ever sending Mercy accounts for recourse. [Id. at ¶ 7]. When Mercy did not receive recourse files on a monthly basis, it believed that, just like CSI's marketing materials provided, CSI had such a low recourse rate that the majority of Mercy's accounts CSI had purchased were being collected. [Id. at ¶ 14].

Mercy found out just how wrong it was when beginning in Marcy 2001, CSI returned recourse files with dollar values significantly larger than any other recourse file previously sent. In fact, in July 2001, CSI recoursed back to Mercy 1,300 accounts with a value of $760,000. Of these 1,300 accounts, only 138 were recoursed within the month they became 90 days delinquent. The rest were delinquent by far longer. The average age of the accounts recoursed in July 2001 was 222 days.

Mercy's receipt of this overwhelming recourse file prompted it to review all the other recourse files CSI had sent to Mercy over the course of their relationship. [Erdman Aff. at ¶ 15]. The results were staggering. The overwhelming majority of accounts CSI recoursed to Mercy were untimely, many by more than a year. These abysmal results are documented in the schedules prepared by Russ Erdman, the Mercy employee responsible for sending and receiving patient account files between Mercy and CSI, and attached to the Erdman Affidavit. as Exhibit A. [Id. at Exh. A].

As explained in detail in the Erdman Affidavit, the three schedules represent the three hospitals in the CSI program. [Id. at 18-26]. Each schedule identifies the dates new account files were accepted by CSI and the Bank into the program and the dates CSI recoursed

8

accounts back to Mercy. [Id.]. For each recourse file, Mr. Erdman attempted to identify the age

of the amounts included therein. [Id.]. For the amounts other than those identified as "under 90

days" and "unknown payment date," Mr. Erdman assumed that if an account came back to

Mercy at exactly the same amount at which it was sold to CSI, no payments had ever been

received on the account. [Id. at ¶ 25]. Mr. Erdman was forced to make this assumption because

he did not have access to CSI's records at the time her prepared the schedules. [Id.]. In

discovery, Mercy received limited information from CSI's records, and its experts were able to

confirm that Mr. Erdman's assumption was correct. [Erdman Aff., ¶ 26].

These schedules show just how rarely CSI recoursed accounts as required by the

Agreement. Beginning as early as 5 months into the relationship, CSI returned untimely

recourse to Mercy. For example, the Philadelphia schedule shows that 90% of the April 12,

2000 recourse file contained accounts from Mercy's first batch of new accounts sent in October

1999. These accounts did not receive a single patient payment. Therefore, they were untimely

by April.

This pattern persisted throughout the course of Mercy's relationship with CSI. As

these schedules reflect, more than 85% of every recourse file after this April 2000 file was

delinquent for each hospital by far longer than 90 days.

### 4. CSI and the Bank Admit CSI's Recourse was untimely.

CSI went through a computer software conversion that resulted in the loss of data

critical to recoursing accounts in a timely fashion. CSI witnesses disclaimed having any

recollection of problems resulting from the software conversion that occurred in December 2000.

[Deposition of Cindy Dorr ("Dorr Dep."), App., Exh. 10 at 165; Volume II of Jaeb Dep. ("Jaeb

Dep. 2"), App., Exh. 11. at 12-13; Deposition of Tammy Lamping ("Lamping Dep."), App., Exh.

9

12 at 8-82]. But a former CSI employee, Rob Logsdon, the person responsible for the conversion, provided a detailed description of CSI's problems.

Mr. Logsdon testified that in December 2000, CSI converted its data management software from Datapax to Intelec. [Logsdon Dep. at 40-41]. Following the conversion, CSI learned that approximately $1 million in recourse had been "lost." [Logsdon Dep. at 59]. Mr. Logsdon explained that prior to conversion, customer service employees marked accounts that should have been recoursed as "suspended" rather than "closed." [Logsdon Dep. at 60]. During the conversion, the Intelec program recognized only accounts marked as "closed" as closed, and considered all accounts marked as "suspended" to be active accounts. [Logsdon Dep. at 60]. In other words, $1 million worth of accounts that should have been recoursed to CSI's customers (including Mercy) long before December 2000, were not recoursed until March, April or May 2001 (at the earliest), when the problem was finally discovered. [Logsdon Dep. at 62].

Additionally, the conversion caused an undetermined number of accounts to re-age after the conversion. According to Mr. Logsdon, if the last "transaction" on an account prior to the conversion was the application of interest or late fee charges, as opposed to a payment, after conversion, the account would not register a date of last payment, essentially restarting the recourse clock. [Logsdon Dep. at 65-66]. In other words, an account could have been 89 days delinquent the day of the conversion but after the conversion re-aged to suggest that it was not delinquent at all, once again starting the 90 day delinquency clock.

Notably, the Bank was aware of this problem and how it caused untimely recourse. In an internal audit, the Bank noted, among other things, that as a result of the computer conversion problems "[a]ccounts originated prior to 2001 were not timely returned."

10

[Bank Audit Documents, App., Exh. 13 at 1]. As the Bank further noted: "the old system and the conversion process to the new system had inherent flaws in the processing which allowed some accounts to not get recoursed when they should have been." [Id.].

Further, the Bank noted that "all accounts not invoiced prior to conversion were reaged by the system and marked for recourse review during the March billing cycle." [Id.]. The Bank also noted problems with the old system including a "time period when accounts for recourse were not getting to Cindy to process on the old system (this situation lasted until mid-December 2000)...." [Id.].

CSI has also admitted these problems in a letter written by its attorney Jim Sewell to another attorney seeking advice about potential insurance coverage for this litigation. [May 9, 2002 Letter from Jim Sewell to Thomas A. Budewitz, App., Exh. 14]. In the letter, Mr. Sewell described the problems with the computer conversion in much the same way as Mr. Logsdon.[3] [Id.]. In the letter, Mr. Sewell explained how accounts, many of which were 60-75 days old at the time of the conversion, were reaged and "simply reset to -0- days." [Id.]. The letter also notes that it took CSI 90 days to discover and correct "the problem with the computer system." [Id.]. According to Mr. Sewell, as a result of this, "our best estimate is that CSI may be exposed to the tune of $250,000 to $500,000 of the $1,200,000 claimed by Mercy." [Id.].

Finally, Mr. Jaeb's testimony reveals another plausible reason why CSI did not timely recourse accounts to Mercy. Under Paragraph 7 of the Agreement, CSI was responsible to pay back to the Bank its 8% on all recoursed accounts, plus any interest or late fees that accrued. Mr. Jaeb conceded CSI did not want to recourse accounts because "we didn't want to lose our fee...." [Jaeb Dep. at 67]. By holding onto accounts long after reaching their 90 day

delinquency, CSI secured for itself an interest free loan from the Bank. It is no wonder, therefore, why CSI was not anxious to recourse accounts to Mercy as required by the Agreement.

### 5. CSI's "Explanation" For The Untimely Recourse Is Not Supported By The Record.

Rather than challenge the undisputed record evidence that more than 85% of the accounts recoursed to Mercy were not timely, CSI has cobbled together an incredible story in an attempt to avoid liability. The record, however, does not support this story.

First, CSI attempted to start the recourse clock a full 30 days after both Mercy and the Bank understood under the Agreement it would start. Both Mr. Jaeb and Ms. Dorr testified, and neither the Bank nor Mercy disagree, that an account did not become 90 days delinquent until it had gone 90 consecutive days without a payment.[4] [Jaeb Dep. at 38; Dorr Dep. at 61-62]. While this would not present a discrepancy with respect to accounts on which payments were being made and then ceased, the majority of the untimely recourse were accounts on which no payments had ever been made. As for these accounts, CSI now claims they did not become 90 days delinquent until 90 days had passed without a payment from the date the first payment was due, which was at least 120 days after they were accepted into the program. [Jaeb Dep. at 199-200; Dorr Dep. at 28-29].

Not even the Bank buys this story. Bank witnesses testified that the Bank believed an account on which no payment was ever received became 90 days delinquent 90 days from the "turn" date, or date the account was purchased. [Deposition of Neysha Humphreys ("Humphreys Dep."), App., Exh. 15 at 121-124]. At that point, the account became delinquent

---

[3] This document was produced to Mercy by a third party pursuant to a subpoena. To the extent this document was ever privileged (and Mercy denies that it was), any privilege was lost when CSI produced this document to the third party.
[4] The 90 days would continue to run even if a payment was made if that payment was less than the minimum monthly payment required on the account.

12

and should have been recoursed. Documents produced by the Bank also support this testimony. [App., Exh. 13]. In the face of this contradiction from the Bank, CSI's timetable is implausible.

CSI's second "explanation" for these grossly delinquent accounts resonates with Cindy Dorr, CSI's Controller and the employee who was responsible for, but failed to timely recourse accounts to Mercy. Ms. Dorr testified during her deposition that the reason CSI did not send Mercy recourse accounts on a monthly basis was because she was allegedly told by Mr. Erdman, that Mercy would accept recourse files only when it was ready to send a new account file (which did not happen and which was not required to happen every month). [Dorr Dep. at 123-124].

Mr. Erdman vehemently denies this accusation and when pressed further about it, Ms. Dorr cannot substantiate her allegations. [Erdman Aff. at ¶¶ 28-29]. She cannot remember when this alleged limitation was put in place and cannot recall if this alleged mandate was made orally or in writing. [Dorr Dep. at 123-124]. In fact, there was no such agreement much less a written one.

CSI's other witnesses cannot substantiate this "story" either. Mr. Jaeb testified that he recalled Ms. Dorr telling him about this alleged limitation, but he too could not remember when it occurred, and could not remember if he did anything in response to this alleged amendment to the Agreement. [Jaeb Dep. at 212, 230-231]. Rob Logsdon, a former CSI employee at the time of his deposition, testified that he also could not remember exactly when Ms. Dorr informed him of this alleged limitation, but was sure that it was some time in 2001, more than a year into the relationship. [Logsdon Dep. at 62]. In other words, Ms. Dorr's story does not account for CSI's failure to timely recourse accounts in the year 2000.

13

Most importantly, Ms. Dorr's "story" is thoroughly undermined by the facts surrounding when Mercy sent new account files as compared to when CSI sent recourse files. The schedules attached to Mr. Erdman's Affidavit show that Ms. Dorr's "story" does not correspond to the actual account transaction details. The analysis compares the date accounts were purchased by CSI and the Bank (Batch Dates) and the date CSI sent recourse files to Mercy. These schedules demonstrate that Mercy often sent new account files to CSI (in both 2000 and 2001) without receiving recourse files in return.

For example, Mercy sent new account files to CSI in May and August 2000. [Erdman Aff., Exh. A]. However, CSI did not send any corresponding recourse files during those months. [Id.]. In fact, not a single recourse file was sent between April 2000 and October 2000. [Id.]. Although Mercy sent new account files in November 2000 and January 2001, CSI did not send recourse files in return until March 2001. [Id.]. Again, in April and May 2001, Mercy sent new account files, but CSI did not send a return recourse file until it sent the behemoth and overwhelming untimely July 2001 recourse file. [Id.].

Plainly, there is no evidence in the record to support CSI's claim that Mercy would accept recourse accounts only when it was ready to send a batch of new accounts.

### 6. The Impact of CSI's Breach.

CSI sent these untimely recourse files as "payment" for the new accounts files Mercy continued to send CSI. After the Bank's initial funding of Mercy's first new account file, Mercy received very little actual money for the accounts it sold to CSI and the Bank. [Erdman Aff. at ¶ 35-37]. Instead, CSI offset new account files with recourse, return and payment files.[5]

---

[5] A returned account was one that Mercy repurchased either because it learned after selling the account to CSI that the patient had insurance, had Medicare, was deceased or wanted his/her account to stay with Mercy. Although there were problems with these accounts as well, the focus of this case is on recourse accounts. A payment file contained accounts on which the patient paid Mercy directly rather than CSI.

14

[Id.]. In other words, CSI would purchase Mercy's new accounts by sending back to Mercy (albeit sporadically) recourse accounts. The problem, however, is that CSI was sending back to Mercy recourse accounts Mercy had no obligation to repurchase because more than 85% of those accounts had not become 90 days delinquent in the month in which they were recoursed. CSI was, therefore, obtaining new and valuable accounts for free.

## III.   ARGUMENT

The Supreme Court has emphasized the judicial policy favoring use of summary judgment for the prompt and efficient resolution of claims without factual issues or legal bases. Celotex Corp. v. Catrett, 477 U.S. 317, 327 (1986) (summary judgment is not a "disfavored procedural shortcut" but an integral part of the judicial process "designed 'to serve the just, speedy and inexpensive determination of every action").

The standards for granting summary judgment are well-established. The Court must determine whether "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). See also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986). Only facts that affect the outcome of the case are "material." Anderson, 477 U.S. at 248.

When considering a motion for summary judgment, all evidence submitted must be viewed in the light most favorable to the nonmoving party and all inferences must be drawn in that party's favor. Celotex Corp. v. Catrett, 477 U.S. 317, 322-32; Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). As Rule 56(c) makes clear, once the moving party submits a properly supported motion, the burden shifts to the non-moving party to demonstrate the existence of a genuine dispute. See Rule 56(e); see also Anderson, 477 U.S. at 256. To make that showing, the nonmoving party "must do more than simply show that there is

15

some metaphysical doubt as to the material facts." Matsushita, 475 U.S. at 586. The non-moving party, therefore, must come forward with "specific facts showing that there is a triable issue." Fed. R. Civ. P. 56(e). "The mere existence of a scintilla of evidence in support of the [nonmovant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." Anderson, 477 U.S. at 252. Moreover, if "the evidence [submitted by the nonmovant] is merely colorable, or is not significantly probative, summary judgment may be granted." Id. at 249-50. And, unsupported allegations in a memorandum and pleadings are insufficient to repel summary judgment. Schoch v. First Fidelity Bancorp., 912 F.2d 654, 657 (3d Cir. 1990).

**A.    The Undisputed Evidence Demonstrates CSI Breached Paragraph 7 Of The Agreement, And Mercy Is Entitled To Summary Judgment On Its Breach Of Contract Claim Against CSI.**

CSI breached the requirements of Paragraph 7 of the Agreement, which is the only provision in the Agreement that addresses the handling of recourse accounts – the type of accounts at issue in this litigation. Contrary to CSI's current position, Paragraph 7, as written in the Agreement remained the deal between Mercy and CSI throughout the course of the relationship and was never modified. As a result of CSI's breach of Paragraph 7, Mercy sold to CSI millions of dollars in new accounts for which it never received payment. Mercy is entitled to partial summary judgment on the issue of liability because of CSI's breach.

**1.    Paragraph 7 Controls This Contract Dispute.**

Mercy anticipates that CSI, like the Bank, will try to avoid liability by asking this Court to focus on provisions in the Agreement that are not applicable to recourse accounts. However, because Mercy's claim against CSI focuses exclusively on recourse, under Pennsylvania's contract interpretation law, the only appropriate provision for the Court's consideration is Paragraph 7.

16

Whether a contract provision is ambiguous is a question of law. <u>Sanford Inv. Co.</u> <u>v. Ahlstrom Mach Holdings, Inc.</u>, 198 F.3d 415, 421 (3d Cir. 1999). Absent ambiguity, a court enforces a contract as written. <u>Id</u>. A contract is not ambiguous unless the provisions in controversy are reasonably or fairly susceptible of different interpretations. <u>Emerson Radio</u> <u>Corp. v. Orion Sales, Inc.</u>, 253 F.3d 159, 163-64 (3d Cir. 2002). However, the fact that parties to a contract disagree upon its proper interpretation does not necessarily render the writing ambiguous. <u>Halpin v. LaSalle Univ.</u>, 639 A.2d 37, 39 (Pa. Super. 1994) (holding that language in a contract referring to a party as "professor for life" could not be interpreted to annul the clear language of the employment contract limiting it to a term of one year).

Pennsylvania law requires that the Court look at the contract as a whole, and not in discrete units. <u>Id</u>. In doing so, when a contract appears to have conflicting provisions, it is well-settled that specific provisions control more general provisions. <u>J.E. Faltin Motor Transp.</u>, 273 F.2d 444, 445 (3d Cir. 1959)(holding that specific provisions of lease agreement regarding liability governed over general language about the parties' relationship to each other); <u>Harleysville Mutual Ins. Co. v. GE Reinsurance Corp.</u>, No. 02-171, 2002 U.S. Dist. LEXIS 8064, *12-13 (E.D. Pa. May 6, 2002)(finding that because the lawsuit sought damages in excess of $2 million, the parties were not bound by the arbitration clause in the insurance contract, which required arbitrations of all claims not exceeding $2 million); <u>Signet Bank/Maryland v.</u> <u>First Bank of Philadelphia</u>, No. 90-3723, 1991 U.S. Dist. LEXIS 8177, *11 (E.D. Pa. June 14, 1991).

<u>Signet Bank</u> demonstrates why Mercy's reliance on Paragraph 7of the Agreement is correct. The plaintiff in <u>Signet Bank</u> entered into a loan participation agreement with the defendant regarding a $500,000 loan to a third party payable upon demand or no later than a date

17

certain.  Id. at *1.  The third party failed to make payment when required; thus, defaulting on the loan.  Id. at *2.  Following the default, and after the parties could not agree on how to address the default, the defendant refused to proceed against the collateral and refused to repurchase plaintiff's participation interest.  Id.

The plaintiff filed a breach of contract claim and ultimately moved for summary judgment.  1991 U.S. Dist. LEXIS 8177 at *3.  The plaintiff claimed the participation agreement was unambiguous and provided (in paragraph 11) that if the parties could not agree on the steps to take following a default, defendant was required to either proceed against the collateral or repurchase plaintiff's interest in the loan.  Id. at *4-5.  Defendant responded by claiming the participation agreement was ambiguous because two other provisions in it dealt with repayment of plaintiff's interest and shared risk in the event of default.  Id. at 5-6.

In granting summary judgment in favor of plaintiff, the Court followed Pennsylvania's long established rule that specific provisions in a contract control general provisions.  Id. at *11.  The Court found that while two other sections of the participation agreement addressed repayment of plaintiff's interest and risk allocation, only paragraph 11 dealt specifically with the parties' rights and obligations when they could not agree about the steps to take following an event of default, which was the exact situation the parties faced.  Id. at 9-12.

As in Signet Bank, only Paragraph 7 of the Agreement deals specifically and exclusively with recourse accounts and the numerous conditions precedent to Mercy's repurchase obligation.  First, an account had to be delinquent for 90 days.  Second, CSI was required to immediately notify Mercy when an account became 90 days delinquent.  Third, CSI was required to automatically present to Mercy at the end of each calendar month all accounts that had become 90 days delinquent in the preceding month.

18

There is nothing ambiguous about the language that Mercy "agrees to reimburse directly to the Bank...ninety two (92%) percent of the balance then due on any account that has become 90 days delinquent during the preceding calendar month." This provision unambiguously limits Mercy's repayment obligation to accounts that became 90 days delinquent the prior month and ensures (or should have ensured) the return of delinquent accounts on a timely basis. Because this provision is unambiguous, the Court should enforce it as written. Sanford Inv. Co., 198 F.3d at 421.

Notably, the Bank and CSI recognized the importance of the deadline in this provision in the Bank audit report and in the May 2002 letter for CSI's lawyer. CSI also apparently recognized the problem because in subsequent contracts (produced pursuant to a third party subpoena) it changed the language of its standard recourse provision from "became 90 days delinquent during the preceding calendar month" to "has been delinquent for at least 90 days or greater during the preceding calendar month." [App. Exh. 17].

Paragraph 7 deals with recourse accounts separately and specifically for a reason. CSI's scoring model meant that it was selecting the accounts from Mercy's self-pay portfolio with the highest probability of collection and holding them for the time period when collection was most likely. If, after ninety days, CSI could not collect on the accounts, they should have been returned promptly to Mercy.

Any other interpretation of the Agreement turns this risk allocation on its head, and leaves Mercy without its benefit of the bargain. That is, under any other interpretation, CSI could hold onto the accounts it purchased from Mercy indefinitely, make no collection attempts whatsoever, and then whenever it felt like it could send them all back to Mercy, and could demand payment. This result is absurd.

19

Moreover, any other interpretation would render the timing provision superfluous. This too violates Pennsylvania law on contract interpretation. <u>Tenos v. State Farm Ins.</u>, 716 A.2d 626, 631 (Pa. Super. 1998) (noting "[Pennsylvania's] rules of construction do not permit 'words in a contract to be treated as surplusage…if any reasonable meaning consistent with the other parts can be given to it'").

Applying Pennsylvania contract interpretation law, and common sense, Paragraph 7, which specifically deals with the types of accounts at issue here (recourse accounts) governs the parties' dispute. As explained below, CSI breached this provision of the Agreement and Mercy is entitled to summary judgment.

### 2. Paragraph 7 was Never Amended.

A careful review of the record and the history of the relationship between CSI and Mercy reveals that Paragraph 7 was never amended in any way. In a desperate effort to avoid liability, CSI now claims that Paragraph 7 was amended to eliminate CSI's requirement to recourse accounts at the end of every month, and instead recourse them only when Mercy sent a new account file. The undisputed record defeats this effort.

There is no dispute that this alleged "amendment" was not in writing. [App., Exh. 3 at 230-231]. As such, because Paragraph 8 of the Agreement required all amendments to be in writing, to the extent such an amendment was made orally, it was not permitted by the express language of the Agreement.

Pennsylvania law regarding waiver of a no oral modification provision does not save CSI's desperate attempt either. Pennsylvania law provides that where a contract has a no-oral modification clause, there can be no oral modification of the contract unless there is first a waiver of the requirement. <u>CIT Corp. v. Jonnet</u>, 419 Pa. 435, 214 A.2d 620 (1965)(affirming trial court's judgment in favor of seller for breach of sales contract where buyer could not

20

establish waiver of no oral modification provision). Moreover, such waiver must be based on

valid consideration and be proved by evidence which is clear, precise, and convincing.

Pellegrene v. Luther, 403 Pa. 212, 215, 169 A.2d 298, 299 (1961). "Otherwise, written

documents would have no more permanence than writings penned in disappearing ink." Jonnet,

214 A.2d at 622.

   Here, there is no evidence at all that the parties agreed to waive the no-oral

modification clause. No consideration was given for the alleged modification and the record

contains no evidence, let alone the clear and convincing evidence required by Pennsylvania law,

of an intent to waive. In the absence of any evidence showing that the parties signed a written

amendment or waived the no-oral modification clause, CSI cannot meets its burden of showing

that the parties modified Paragraph 7 of the Agreement.

   First, the record is devoid of evidence that any consideration was given in

exchange for this alleged modification. In fact, CSI does not even allege the existence of such

consideration.

   Second, there is no evidence of intent to waive the written amendment provision

by either party, let alone clear and convincing evidence. Indeed, the evidence actually

demonstrates the contrary. Early in 2001, CSI presented Mercy with a First Amendment to the

Patient Financing Agreement (the "First Amendment"), which made changes to various

paragraphs in the Agreement, including the recourse paragraph. Mercy refused to sign the First

Amendment. Although the First Amendment did not contain the alleged amendment CSI now

claims, that CSI reduced the First Amendment to a writing suggests CSI understood and

expected that any modifications to the Agreement required a writing. Douglas v. Benson, 439

A.2d 779 (Pa. Super. 1982) (finding that when parties undertook to reduce their negotiations to

writing, they did not intend to waive the no oral modification clause). Mercy's refusal to sign the First Amendment also demonstrates Mercy had no desire to modify the Agreement at all.

Moreover, this alleged modification was supposedly agreed to by two people who did not have the authority to do so. The undisputed record evidence demonstrates that only Mr. Bradley on behalf of Mercy, and only Mr. Jaeb on behalf of CSI were authorized to enter and modify the Agreement. [App., Exh. 8 at 36-37]. Yet, in Ms. Dorr's "story" this alleged modification was made between her and Mr. Erdman. Since neither was authorized to bind either Mercy or CSI, even if such conversation took place (which Mercy denies), it had no binding effect on either party.

Perhaps the most obvious evidence that the parties did not intend to orally modify the Agreement can be seen in CSI's conduct. According to CSI, this alleged modification occurred sometime in 2001, although the exact date is unknown. [Logsdon Dep. at 62]. Mr. Erdman's schedules demonstrate that only one time between January and July 2001 did CSI send a recourse file to Mercy in return for a new account file. Mercy sent new account files in January, March, April and May. If an "amendment" to the Agreement had been made as CSI claims, then CSI should have sent Mercy recourse files in January, March, April and May. It did not. Instead, CSI sent one file in March (likely when it discovered the lost recourse caused by the computer conversion) and not another one until July 2001.[6] Accordingly, even if the evidence supported CSI's recently fabricated claim of an amendment, Mercy would still be entitled to summary judgment because CSI breached this "amendment" also.

---

[6] Even if the evidence supported CSI's claim of a modification, that would not explain why the accounts in the March and July 2001 recourse files, which were upwards of 300 days delinquent were not recoursed to Mercy in 2000, before the alleged modification occurred.

SL1 502102v1/30512.005

### 3. **CSI Breached Paragraph 7.**

The undisputed evidence demonstrates that CSI breached Paragraph 7 of the

Agreement. The elements of a breach of contract action in Pennsylvania are well settled. A

claim for breach of contract has three elements: (1) the existence of a contract, including its

essential terms, (2) a breach of duty imposed by the contract and (3) resultant damages.

Williams v. Nationwide Mut. Ins. Co., 750 A.2d 881, 884 (Pa. Super. 2000).

Each of these three elements has been established here. First, there is no dispute

regarding the existence of a contract between Mercy and CSI.

Second, CSI breached its obligations under Paragraph 7 of the Agreement by

failing to timely recourse accounts. And, CSI's repeated failure to recourse accounts at the end

of the month in which they became delinquent caused Mercy's damages. There is no dispute

that CSI did not send Mercy recourse files every month. And, as the schedules to Mr. Erdman's

affidavit demonstrate, the sporadic recourse files that were sent consisted primarily of accounts

that had not become 90 days delinquent in the month preceding when CSI recoursed them, but

instead had been delinquent for hundreds of days.

Although the Agreement allowed CSI "the right of offset against sums due

[Mercy] under the Agreement for the amount of any delinquent reimbursement obligations," that

right applied only to those "delinquent reimbursement obligations" that were recoursed to Mercy

as required by Paragraph 7 of the Agreement – in the month following when they became 90

days delinquent. But CSI did not limit its offsetting to such accounts. Rather, CSI repeatedly

recoursed to Mercy accounts that were delinquent by far longer than 90 days and continued to

offset those against the new account files Mercy sent CSI, in violation of the Agreement.

As a result of CSI's improper offsetting, CSI obtained new and valuable accounts

from Mercy without paying for them. The "purchase" of these accounts for no value constitutes

23

Mercy's damages. Mercy's expert has calculated this value to exceed $1.0 million. While a fact question exists as to the actual amount of damages Mercy has suffered at the hand of CSI, there is no dispute that CSI breached Paragraph 7 of the Agreement and that breach caused Mercy to be damage.

## IV.    CONCLUSION

That CSI breached the Agreement is clear. For almost two years, CSI purchased valuable accounts receivable from Mercy without actually paying for them because it was offsetting the purchase of these new accounts with untimely recourse Mercy had no obligation to repurchase. As a result of CSI's conduct, Mercy has been damaged in excess of a million dollars. Mercy requests that its motion for partial summary judgment on the issue of liability for CSI's breach of contract claim be granted.

Dated: January 3 , 2005

STEVENS & LEE, P.C.

By _____
      E. Thomas Henefer
      Attorney I.D. No. 55773
      Stacey A. Scrivani
      Attorney I.D. No. 84275
      111 North Sixth Street
      P.O. Box 679
      Reading, Pennsylvania 19603

Attorneys for Plaintiff Mercy Health System of
Southeastern Pennsylvania

24

## CERTIFICATE OF SERVICE

I, STACEY A. SCRIVANI, certify that true and correct copies of Mercy Health

System of Southeastern Pennsylvania's Motion for Partial Summary Judgment on its Claim for

Breach of Contract against CSI Financial, Inc. and supporting Memorandum of Law were sent to

the following persons via federal express, this 3rd day of January, 2005:

Christopher M. Brubaker, Esquire
Kittredge, Donley, Elson, Fullem & Embick, LLP
The Bank Building
421 Chestnut Street
Philadelphia, PA 19106-2416
Counsel for First National Bank of Montana

Patrick J. Egan, Esquire
239 S. Camac Street
Philadelphia, PA 19107
Counsel for CSI Financial, Inc.

Dated: January 3, 2005

Stacey A. Scrivani