IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| MERCY HEALTH SYSTEM OF SOUTHEASTERN PENNSYLVANIA, | : : | Civil Action No. 01-CV-05681 |
| Plaintiff | : : : | |
| v. | : : | |
| ROSS P. RICHARDSON, Chapter 7 Trustee for the Bankruptcy Estate of CSI Financial, Inc., | : : : : : | |
| Defendant | : | |
| ************************************ | *** | ************************************ |
| FIRST NATIONAL BANK OF MONTANA, INC. and ROSS P. RICHARDSON, Chapter 7 Trustee for the Bankruptcy Estate of CSI Financial, Inc., | : : : : | Civil Action No. 02-CV-03608 |
| Plaintiffs | : : | |
| v. | : : | |
| MERCY HEALTH SYSTEM OF SOUTHEASTERN PENNSYLVANIA, Defendant | : : : : | |

**MERCY HEALTH SYSTEM OF SOUTHEASTERN PENNSYLVANIA'S STATEMENT OF UNCONTESTED FACTS IN SUPPORT OF ITS MOTION FOR PARTIAL SUMMARY JUDGMENT ON ITS CLAIM FOR BREACH OF CONTRACT AGAINST CSI FINANCIAL, INC. AND IN SUPPORT OF ITS MOTION FOR SUMMARYJUDGMENT ON THE CLAIMS OF CSI FINANCIAL, INC. AND THE FIRST NATIONAL BANK OF MONTANA**

The following are Mercy Health System of Southeastern Pennsylvania's ("Mercy") Statement of Uncontested Facts in Support of its Motion for Partial Summary Judgment on Its Claim for Breach of Contract Against CSI Financial, Inc. ("CSI") and in Support of its Motion for Summary Judgment on the Claims of CSI Financial, Inc. and First National Bank of Montana:

1

## CSI'S FAST TRAC PROGRAM

### General Overview of the Program.

1. CSI's program was designed to pay hospitals 92% of the value of self-pay accounts the hospitals sold to CSI within days of those accounts being purchased by CSI. [CSI Fast Trac marketing brochure ("CSI Brochure"), Bates Numbered 3711-3721 at 3713, included in Mercy Health System of Southeastern Pennsylvania's Appendix in Support of its Motions for Summary Judgment ("App."), Exhibit ("Exh.") 1].

2. Under the FastTrac program, which CSI marketed as being completely electronic, hospitals would provide CSI with a file of self-pay patient accounts. [Marketing materials provided by CSI to Mercy, Bates Numbered 3227-3261 at 3235, App., Exh. 2].

3. CSI then decided which accounts it wanted to purchase. CSI would run each individual account through Equifax's scoring system to assign a Beacon score to each account. [Deposition of Peter Parsons ("Parsons Dep."), App., Exh. 5, at 29-30; App., Exh. 1 at 3713].

4. Once the score was assigned, CSI and the Bank selected which accounts they wanted to purchase. [App., Exh. 3 at 58-59, 94-95; App., Exh. 4 at 23-27].

5. CSI advertised that its threshold Beacon score was 600, but CSI employees testified that at times they would, at their discretion, accept accounts with a lower score into the program. [Id.].

6. According to CSI's marketing materials, "[CSI] score[s] accounts for two reasons, to ensure the best odds [CSI] will receive payment from the patient, and to eliminate unnecessary and expensive charge backs." [App., Exh. 1 at 3713].

SL1 503294v1/30512.005

7.  Once CSI purchased an account, the Bank, as CSI's funding agent, provided the hospital with 92% of the value of the purchased accounts, and provided CSI with the remaining 8%. [App., Exh. 3 at 55; App., Exh. 1 at 3713].

8.  Three things could happen to accounts CSI purchased. [App., Exh. 1 at 3711-3721].

9.  First, CSI could collect the account. [Id.].

10. Second, the hospital could buy back the account before collections began because the patient claimed he/she had insurance, had medicare, or disputed the charges on the bill. [Id.].

11. Finally, the account could be recoursed to the hospital if no payments were received for a specified period of time. [Id.].

### Solicitation of Mercy.

12. CSI's solicitation of Mercy began in August 1999 with an unsolicited direct mailing from CSI to Mercy. [App., Exh. 5 at 21-22].

13. When Mercy expressed interest in CSI's program, CSI visited Mercy's Conshohocken location and gave Mercy a packet of materials about its program. [Id. at 32, 37; Deposition of Doug Smith ("Smith Dep."), App., Exh. 6 at 69-78].

14. CSI represented that 50% of Mercy's self-pay accounts would be accepted into the program. [App., Exh. 1 at 3714].

15. CSI also represented that over time, it expected Mercy's acceptance rate would increase to 75%. [Id.].

16. CSI's materials recognized, however, that "[d]espite the best efforts of everyone involved, some accounts will be placed on [CSI's] program by mistake. These accounts may

3

have insurance pending, special written arrangements with your facility for extended payments, etc." [Id. at 3716].

17. CSI's marketing materials stated that such accounts would be returned to the hospital for repurchase. [Id. at 3717].

18. If such a return was made after a 25 day grace period, the hospital became responsible for interest and late fees on the account. [Id].

19. CSI also knew that some accounts accepted into the program would be uncollectible. [App., Exh. 1 at 3717].

20. Those accounts, CSI represented, would be recoursed after "90 days and numerous attempts by telephone and mail" to obtain payment. [Id.].

21. CSI boasted that its recourse average was a modest 4.8% of accounts placed in its system. [Id.].

### THE PATIENT FINANCING AGREEMENT

22. In October 1999, CSI presented Mercy with its form Patient Financing Agreement. The Agreement was drafted by CSI and approved by the Bank. [App., Exh. 3 at 117, 119, 175-176].

23. CSI concedes that Mercy made no changes to the Agreement and signed the form contract it was provided on October 18, 1999. [Id. at 174-175]. The Agreement is included in the Appendix as Exhibit 7.

24. On behalf of Mercy, the Agreement was signed by Joseph Bradley, Mercy's Chief Financial Officer and the only person at Mercy authorized to sign or modify the Agreement. [Deposition of Joseph Bradley ("Bradley Dep."), App., Exh. 8 at 35-36].

4

25. On CSI's behalf, the Agreement was signed by Robert Jaeb, CSI's president. [App., Exh. 7].

26. Paragraph 7 of the Agreement provides:

> Recourse. **At the end of each calendar month** during which BANK or CSI holds an account acquired for financing from PROVIDER, **CSI will automatically present to the PROVIDER for repurchase all accounts that are delinquent for 90 days. PROVIDER agrees to reimburse directly to the BANK upon notification by CSI, ninety two (92%) percent of the balance then due on any account that has become 90 days delinquent during the preceding calendar month. CSI will give immediate notice** to provider of all accounts which are ninety days delinquent. PROVIDER will not be held responsible for CSI's 8% prorated fee on any unpaid accounts. CSI will pay to the BANK all of the charges that are in excess of the original balance financed by the patient. CSI and BANK shall have the right of offset against sums due PROVIDER under the Agreement for the amount of any delinquent reimbursement obligations that exceed thirty (30) days.

[App., Exh. 7 (Bold emphasis supplied)].

27. This provision envisioned that Mercy would repurchase recourse accounts by paying 92% of the outstanding balance directly to the Bank. [Id.].

28. But several conditions had to be met before Mercy was obligated to repurchase a recourse account. [Id.].

29. First, the account had to be delinquent for 90 days. [Id.].

30. Second CSI had to give Mercy <u>immediate notice</u> that the account was delinquent. [Id.].

31. Finally, Mercy's obligation to reimburse the Bank applied only to those accounts that became "90 days delinquent <u>during the preceding calendar month.</u>" (emphasis added). [Id.].

5

## CSI'S FAILURE TO TIMELY RECOURSE ACCOUNTS.

32.     Mercy expected, as expressly provided in the Agreement, to receive at the end of each month all accounts that became 90 days delinquent during the preceding month. [Affidavit of Russ Erdman ("Erdman Aff."), App., Exh. 9 at ¶ 14, 30].

33.     However, throughout the course of the relationship, many months would go by without CSI ever sending Mercy accounts for recourse. [Id. at ¶ 7].

34.     When Mercy did not receive recourse files on a monthly basis, it believed that, just like CSI's marketing materials provided, CSI had such a low recourse rate that the majority of Mercy's accounts CSI had purchased were being collected. [Id. at ¶ 14].

35.     Mercy's receipt of this overwhelming recourse file prompted it to review all the other recourse files CSI had sent to Mercy over the course of their relationship. [App., Exh. 9 at ¶ 15].

36.     As explained in detail in the Erdman Affidavit, the three schedules represent the three hospitals in the CSI program. [Id. at 18-26].

37.     Each schedule identifies the dates new account files were accepted by CSI and the Bank into the program and the dates CSI recoursed accounts back to Mercy. [Id.].

38.     For each recourse file, Mr. Erdman attempted to identify the age of the amounts included therein. [Id.].

39.     For the amounts other than those identified as "under 90 days" and "unknown payment date," Mr. Erdman assumed that if an account came back to Mercy at exactly the same amount at which it was sold to CSI, no payments had ever been received on the account. [Id. at ¶ 25].

40. Mr. Erdman was forced to make this assumption because he did not have access to CSI's records at the time her prepared the schedules. [Id.].

41. In discovery, Mercy received limited information from CSI's records, and its experts were able to confirm that Mr. Erdman's assumption was correct. [App., Exh. 9 at ¶ 26].

### CSI AND THE BANK ADMIT CSI'S RECOURSE WAS UNTIMELY.

42. CSI went through a computer software conversion that resulted in the loss of data critical to recoursing accounts in a timely fashion. CSI witnesses disclaimed having any recollection of problems resulting from the software conversion that occurred in December 2000. [Deposition of Cindy Dorr ("Dorr Dep."), App., Exh. 10 at 165; Volume II of Jaeb Dep. ("Jaeb Dep. 2"), App., Exh. 11. at 12-13; Deposition of Tammy Lamping ("Lamping Dep."), App., Exh. 12 at 8-82].

43. But a former CSI employee, Rob Logsdon, the person responsible for the conversion, provided a detailed description of CSI's problems. Mr. Logsdon testified that in December 2000, CSI converted its data management software from Datapax to Intelec. [App., Exh. 4 at 40-41].

44. Following the conversion, CSI learned that approximately $1 million in recourse had been "lost." [Id. at 59].

45. Mr. Logsdon explained that prior to conversion, customer service employees marked accounts that should have been recoursed as "suspended" rather than "closed." [Id. at 60].

SL1 503294v1/30512.005

46. During the conversion, the Intelec program recognized only accounts marked as "closed" as closed, and considered all accounts marked as "suspended" to be active accounts. [Id. at 60].

47. In other words, $1 million worth of accounts that should have been recoursed to CSI's customers (including Mercy) long before December 2000, were not recoursed until March, April or May 2001 (at the earliest), when the problem was finally discovered. [Id. at 62].

48. According to Mr. Logsdon, if the last "transaction" on an account prior to the conversion was the application of interest or late fee charges, as opposed to a payment, after conversion, the account would not register a date of last payment, essentially restarting the recourse clock. [Id. at 65-66].

49. Notably, the Bank was aware of this problem and how it caused untimely recourse. In an internal audit, the Bank noted, among other things, that as a result of the computer conversion problems "[a]ccounts originated prior to 2001 were not timely returned." [Bank Audit Documents, App., Exh. 13 at 1].

50. As the Bank further noted: "the old system and the conversion process to the new system had inherent flaws in the processing which allowed some accounts to not get recoursed when they should have been." [Id.].

51. Further, the Bank noted that "all accounts not invoiced prior to conversion were reaged by the system and marked for recourse review during the March billing cycle." [Id.].

52. The Bank also noted problems with the old system including a "time period when accounts for recourse were not getting to Cindy to process on the old system (this situation lasted until mid-December 2000)...." [Id.].

8

53. CSI has also admitted these problems in a letter written by its attorney Jim Sewell to another attorney seeking advice about potential insurance coverage for this litigation. [May 9, 2002 Letter from Jim Sewell, App., Exh. 14].

54. In the letter, Mr. Sewell described the problems with the computer conversion in much the same way as Mr. Logsdon. [Id.].

55. In the letter, Mr. Sewell explained how accounts, many of which were 60-75 days old at the time of the conversion, were reaged and "simply reset to -0- days." [Id.].

56. The letter also notes that it took CSI 90 days to discover and correct "the problem with the computer system." [Id.].

57. According to Mr. Sewell, as a result of this, "our best estimate is that CSI may be exposed to the tune of $250,000 to $500,000 of the $1,200,000 claimed by Mercy." [Id.].

58. Under Paragraph 7 of the Agreement, CSI was responsible to pay back to the Bank its 8% on all recoursed accounts, plus any interest or late fees that accrued. [App., Exh. 7 at ¶ 7].

59. Mr. Jaeb conceded CSI did not want to recourse accounts because "we didn't want to lose our fee…." [App., Exh. 3 at 67].

### CSI'S "EXPLANATION" FOR THE UNTIMELY RECOURSE IS NOT SUPPORTED BY THE RECORD.

60. Both Mr. Jaeb and Ms. Dorr testified, and neither the Bank nor Mercy disagree, that an account did not become 90 days delinquent until it had gone 90 consecutive days without a payment. [App., Exh. 3 at 38; App., Exh. 10 at 61-62].

9

61. CSI claims they did not become 90 days delinquent until 90 days had passed without a payment from the date the first payment was due, which was at least 120 days after they were accepted into the program. [App., Exh. 3 199-200; App., Exh. 10 at 28-29].

62. Bank witnesses testified that the Bank believed an account on which no payment was ever received became 90 days delinquent 90 days from the "turn" date, or date the account was purchased. [Deposition of Neysha Humphreys ("Humphreys Dep."), App., Exh. 15 at 121-124].

63. Ms. Dorr testified during her deposition that the reason CSI did not send Mercy recourse accounts on a monthly basis was because she was allegedly told by Mr. Erdman, that Mercy would accept recourse files only when it was ready to send a new account file (which did not happen and which was not required to happen every month). [App., Exh. 10 at 123-124].

64. Mr. Erdman vehemently denies this accusation and when pressed further about it, Ms. Dorr cannot substantiate her allegations. [App., Exh. 9 at ¶¶ 28-29].

65. She cannot remember when this alleged limitation was put in place and cannot recall if this alleged mandate was made orally or in writing. [App., Exh. 10 at 123-124].

66. According to CSI, this alleged modification occurred sometime in 2001, although the exact date is unknown. [App., Exh. 4 at 62].

67. CSI admits this alleged "amendment" was not in writing. [App., Exh. 3 at 230-231].

68. Early in 2001, CSI presented Mercy with a First Amendment to the Patient Financing Agreement (the "First Amendment"), which made changes to various paragraphs in

10

the Agreement, including the recourse paragraph. [First Amendment to the Patient Financing Agreement, App., Exh. 16].

69. Mercy refused to sign the First Amendment. [App., Exh. 3 at 230-231].

70. Mr. Jaeb testified that he recalled Ms. Dorr telling him about this alleged limitation, but he too could not remember when it occurred, and could not remember if he did anything in response to this alleged amendment to the Agreement. [App., Exh. 3 at 212, 230-231].

71. Rob Logsdon, a former CSI employee at the time of his deposition, testified that he also could not remember exactly when Ms. Dorr informed him of this alleged limitation, but was sure that it was some time in 2001, more than a year into the relationship. [App., Exh. 4 at 62].

72. The schedules attached to Mr. Erdman's Affidavit show that Ms. Dorr's "story" does not correspond to the actual account transaction details. [App., Exh. 9 at Exh. A].

73. The analysis compares the date accounts were purchased by CSI and the Bank (Batch Dates) and the date CSI sent recourse files to Mercy. [Id.].

74. These schedules demonstrate that Mercy often sent new account files to CSI (in both 2000 and 2001) without receiving recourse files in return. [Id.].

75. Mercy sent new account files to CSI in May and August 2000. [App., Exh. 9 at Exh. A].

76. CSI did not send any corresponding recourse files during those months. [Id.].

77. In fact, not a single recourse file was sent between April 2000 and October 2000. [Id.].

11

78. Although Mercy sent new account files in November 2000 and January 2001, CSI did not send recourse files in return until March 2001. [Id.].

79. Again, in April and May 2001, Mercy sent new account files, but CSI did not send a return recourse file until it sent the behemoth and overwhelming untimely July 2001 recourse file. [Id.].

### THE IMPACT OF CSI'S BREACH.

80. After the Bank's initial funding of Mercy's first new account file, Mercy received very little actual money for the accounts it sold to CSI and the Bank. [App., Exh. 9 at ¶ 35-37].

81. Instead, CSI offset new account files with recourse, return and payment files. [Id.].

### OFFERS TO PURCHASE CSI

82. Mr. Jaeb identified four offers to purchase CSI prior to filing for bankruptcy:

(a) AmericanWest Bank offered a total of $1.0 million for 51% ownership of CSI; $500,000 in cash and $500,000 in debt assumption [App., Exh. 11 at 50].

(b) First Horizon offered $1.0 million for CSI's assets. [App., Exh. 11 at 53-54].

(c) National Century offered $1.0 million for CSI's assets. [App., Exh. 11 at 55].

(d) Netlink informally offered $3.0 million for CSI's assets. [App., Exh. 11 at 55-56].

83. Each of these offers were rejected by Jaeb. [App., Exh., 11 at 45-60].

SL1 503294v1/30512.005

84. Mr. Jaeb rejected the AmericanWest offer because he wanted to obtain other bids to see if he could obtain a higher price. [App. Exh. 11 at 45].

85. He rejected the First Horizon offer because he deemed it too low. [App., Exh. 11 at 54-55].

86. The National Century offer was rejected because Mr. Jaeb felt like he could not work with the people there. [App., Exh. 11 at 46].

87. The Netlink offer was rejected because Mr. Jaeb "didn't think they were a real player." [App., Exh. 11 at 46].

### CSI'S EXPERT

88. Johnson's opinion relied exclusively on the projections prepared by a third party, Senex, in connection with its possible merger with CSI in 2002. [Mercy Health System of Southeastern Pennsylvania's Appendix in Support of its Motion in Limine ("Daubert App."), Exh. 6].

89. As Johnson put it: "There was a study that was prepared [the Senex study] and I just utilized the numbers in the study." [Daubert App., Exh. 7 at 37-38].

90. Senex assumed a one year growth rate in CSI's "EBITDA" of nearly 768%. [Daubert App., Exh. 8].

91. Johnson recognized that a one-year 768% was a "material increase" [App., Exh. 7 at 274], but admitted he was not aware of anything specific in Senex's business plan that justified this increase. [Daubert App., Exh. 7 at 278].

92. Instead, he simply relied on the assumption that Senex had done its due diligence. [Daubert App., Exh. 7 at 277-278].

13

93. Johnson conceded that Senex's projections were based on the assumption that someone would provide CSI with additional financing (either equity or debt) of at least $23 million. [Daubert App., Exh. 7 at 279].

94. Johnson then conceded that the $23 million was the linchpin to his opinion on value -- and that he had no reason to believe that CSI had access to such funds:

> Q. So is it your opinion then, since you are relying on Senex's numbers, that CSI would have been worth ten and a half million dollars if it had access to $23,000,000 of debt financing?
>
> A. Basically, yes.
>
> Q. Okay. And you are not aware, apart from this Senex data, of any source that CSI had to access $23,000,000 of debt financing in 2002?
>
> A. I'm not individually aware of additional financing beyond what they already had.
>
> Q. Which was nowhere near $23,000,000; is that right?
>
> A. That's my understanding.

[Daubert App., Exh. 7 at 290-291; see also Daubert App., Exh. 7 at 281-282].

95. Although Johnson relied on Senex's conclusion about increased revenue, he ignored Senex's projections about increased debt. [Daubert App., Exh. 7 at 284-286].

96. He conceded that this would have reduced the final value. [Id.]

**Johnson Failed To Follow A Proper Method on the Valuation Opinion**

97. Johnson concedes he did not follow the process of a formal business valuation which would have required consideration of a variety of factors Johnson ignored. [Daubert App., Exh. 7 at 17, 98].

98. The analysis in question is outlined in IRS Revenue Ruling 59-60 which Johnson conceded is the valuation "benchmark." [Daubert App., Exh. 9; Daubert App. Exh. 7 at 17].

14

99. Johnson did not review opportunities for CSI to generate new sources of revenue. [Daubert App., Exh. 7 at 71].

100. Instead, he thought CSI could grow its business because one of the Mercy witnesses described CSI's services as unique. [Daubert App., Exh. 7 at 75-77].

101. Johnson ultimately conceded that Senex's projections were based on the assumption that CSI could obtain $23,000,000 in financing (rather than some notion that CSI's services were unique). [Daubert App., Exh. 7 at 279 and 290-91].

102. Johnson conceded that he did not know whether CSI's services would still be considered unique in 2002. [Daubert App., Exh. 7 at 253].

103. Johnson also did not consider threats to CSI's business. [Daubert App., Exh. 7 at 249-254].

104. Johnson did not consider economic conditions in the industry. [Daubert App., Exh. 7 at 249].

105. Nor did he consider CSI's competition. [Daubert App., Exh. 7 at 250-254].

106. Johnson never considered CSI's admission through counsel that it had exposure up to $500,000. [Daubert App., Exh. 4].

107. Nor did he consider CSI's representation to American West Bank that it had a possible liability to Mercy of $200,000. [Daubert App., Exh. 7 at 244-246].

108. Johnson conceded that such exposure in litigation would have been relevant had he known of it. [Daubert App., Exh. 7 at 244-246].

109. Johnson failed to consider CSI's past earnings or recent trends, even though the evidence confirms that CSI had decreasing profitability. [Daubert App., Exh. 7 at 103-105 and 255].

110. Nor did Johnson review CSI tax returns. [Daubert App., Exh. 7 at 71].

111. Although Johnson relied on Senex's projections, he did not confirm the time period Senex was considering. [Daubert App., Exh. 7 at 96-97].

112. Although Senex's projections note that they are based on "elements of subjective judgment, speculation and analysis," Johnson never inquired about what specific parts of the Senex projections were based on such assumptions. [Daubert App., Exh. 7 at 271-273].

113. Instead, he simply took Senex's projections "at face value" [Daubert App., Exh. 7 at 273] even though he concedes he did not know what Senex's subjective thoughts were [Daubert App., Exh. 7 at 96, 273].

114. Johnson did nothing to test the reasonableness of Senex's expense assumptions. [Daubert App., Exh. 7 at 295-296].

115. Johnson conceded that other offers by third parties to purchase the company would be relevant but he did not see any documentation of offers to purchase CSI even though he thought there had been potential buyers. [Daubert App., Exh. 7 at 73-74].

116. Discovery has revealed several offers for substantially less than the $10.5 million Johnson estimated. [Daubert App., Exh. 10 at 45-60].

117. Johnson did not even know that Senex offered CSI $1.0 million for its assets or about CSI's later proposal which included a $3 million call option for Senex to buy Jaeb's share of the new company (which he would have acquired for CSI's stock). [Daubert App., Exh. 12].

118. He admitted that such an offer would have been relevant to his analysis [Daubert App., Exh. 7 at 122 and 266-267], and would have wanted to know whether Senex agreed to the request for a $3 million call option. [Daubert App., Exh. 7 at 268-269].

### Johnson's Flawed Causation Opinion

119. Johnson also failed to account for (or even consider) other factors that could have played a role in CSI's demise such as a decline in revenue from 1998 forward, actual losses for 2000 and whether CSI was properly run or had management problems (as one could readily infer from the Bank's audit report). [Daubert App., Exh. 7 at 241].

120. Although Johnson's resume claims he is an expert at examining business practices to link them to certain results, he never considered whether CSI's business practices caused its demise. [Daubert App., Exh. 7 at 47-48 and 51].

121. Nor did he perform a "Z Score" analysis which is a statistical analysis tool used to predict whether a business will fail. [Daubert App., Exh. 7 at 39-40].

122. Johnson simply accepted CSI's claim that but for Mercy's alleged actions, CSI would have remained a going concern. [Daubert App., Exh. 7 at 238].

123. Johnson simply accepted these representations at face value without testing them. [Daubert App., Exh. 7 at 238].

### Johnson's Flawed Methodology On The Contract Damages Opinion

124. Johnson reviewed only three depositions that the attorney provides him. [Daubert App., Exh. 7 at 45-46].

125. John did not review CSI's marketing materials which could be relevant if the Court finds the Agreement ambiguous. [Daubert App., Exh. 7 at 214-215].

SL1 503294v1/30512.005

126. Johnson claims he would normally review his client's documents and review documents produced in discovery by third parties. [Daubert App., Exh. 7 at 55-58].

127. Here, however, he did not review critical documents such as the Bank audit report, and the May 29, 2002 letter from CSI's counsel admitting that CSI "may be exposed to the tune of $250,000 to $500,000...." [Daubert App., Exh. 3 and 4].

128. Johnson did not test the validity of CSI's account data. [Daubert App., Exh. 7 at 59-61, 204-205].

129. Nor did he perform any sampling of the accounts. [Daubert App., Exh. 7 at 213].

130. Instead, his "statistical analysis" was limited to quantifying the timing of recoursed accounts. [Daubert App., Exh. 7 at 222-223].

131. He "relied on what [he] was told" about CSI's claim that there was a "side agreement" that recourse accounts should be held until Mercy had sufficient offsetting new accounts. [Daubert App., Exh. 7 at 150].

132. He requested no documentation of this alleged "side agreement," nor did he analyze whether the dates of the actual transfer of accounts between Mercy and CSI supported CSI's allegation of a "side agreement." [Daubert App., Exh. 7 at 150 – 151].

133. Johnson applied a 15% interest rate to all of Mercy's alleged payment obligations even though the Agreement only uses this rate in one limited context (accounts that should have been purged from Mercy's accounts). [Daubert App., Exh. 7 at 182-188].

134. He then measured the accrual of interest based on CSI's representation that Mercy's payments were due within 10 days, another alleged "term" that does not appear in the contract. [Daubert App., Exh. 7 at 201].

135.   He even included CSI's claim to recover the 8% it allegedly refunded to the Bank as an element of damages despite conceding that the Agreement says Mercy has no obligation to pay the 8%. [Daubert App., Exh. 7 at 188-191].

Dated: January **3**, 2005

                                            STEVENS & LEE, P.C.

                                            By: _/s/ Stacey A. Scrivani_
                                            E. Thomas Henefer
                                            Attorney I.D. No. 55773
                                            Stacey A. Scrivani
                                            Attorney I.D. No. 84275
                                            111 North Sixth Street
                                            P.O. Box 679
                                            Reading, Pennsylvania 19603

                                            Attorneys for Plaintiff Mercy Health System of Southeastern Pennsylvania

SL1 503294v1/30512.005

## CERTIFICATE OF SERVICE

I, STACEY A. SCRIVANI, certify that true and correct copies of Mercy's Statement of Uncontested Facts were sent to the following persons via federal express, this 3rd day of January, 2005:

> Christopher M. Brubaker, Esquire
> Kittredge, Donley, Elson, Fullem & Embick, LLP
> The Bank Building
> 421 Chestnut Street
> Philadelphia, PA 19106-2416
> Counsel for First National Bank of Montana
>
> Patrick J. Egan, Esquire
> 239 S. Camac Street
> Philadelphia, PA 19107
> Counsel for CSI Financial, Inc.

Dated: January 3, 2005

Stacey A. Scrivani