IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| MERCY HEALTH SYSTEM OF SOUTHEASTERN PENNSYLVANIA, | : | |
| | : | |
| Plaintiff | : | |
| | : | Civil Action |
| v. | : | No. 01-CV-05681 |
| | : | |
| ROSS P. RICHARDSON, Chapter 7 Trustee for the Bankruptcy Estate of CSI Financial, Inc., | : | |
| | : | |
| Defendant | : | |
| | : | |
| | *** | |
| FIRST NATIONAL BANK OF MONTANA, INC. and ROSS P. RICHARDSON, Chapter 7 Trustee for the Bankruptcy Estate of CSI Financial, Inc., | : | |
| | : | |
| Plaintiffs | : | Civil Action |
| | : | No. 02-CV-03608 |
| v. | : | |
| | : | |
| MERCY HEALTH SYSTEM OF SOUTHEASTERN PENNSYLVANIA, | : | |
| | : | |
| Defendant | : | |
| | : | |

**MERCY HEALTH SYSTEM OF SOUTHEASTERN PENNSYLVANIA'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT ON THE CLAIMS OF CSI FINANCIAL, INC. AND THE FIRST NATIONAL BANK OF MONTANA**

## I.    INTRODUCTION

Mercy Health System of Southeastern Pennsylvania ("Mercy") filed this action after it lost over $1 million due to CSI Financial, Inc.'s ("CSI") violations of a "Patient Financing Agreement" (the "Agreement"). Under the Agreement, Mercy sold CSI valuable patient accounts receivable. Notably, CSI analyzed each account for creditworthiness and other

1

criteria, scored the accounts under a "Beacon" scoring system and selected only the best accounts to purchase from Mercy.

The Agreement contemplated that CSI would take steps to collect these accounts, but if it could not, it was required to adhere to specific deadlines to "recourse" the accounts to Mercy for repurchase. CSI systematically violated the recourse provision of the Agreement.

Although CSI violated this provision, CSI (and its funding agent, the First National Bank of Montana (the "Bank")) claimed Mercy was required to repurchase delinquent accounts even if CSI recoursed the accounts after the Agreement's deadline for recourse had expired. CSI thus took credits against new Mercy accounts rather than pay Mercy for them. Mercy therefore sold millions of dollars of accounts receivable to CSI not for cash but, instead, as "offsets" against Mercy's alleged obligation to pay for untimely recourse accounts. Discovery confirmed that Mercy had no obligation to repurchase these accounts and CSI and the Bank have been unjustly enriched by receiving and "offsetting" Mercy accounts without paying for them.

Despite CSI's breach, the Bank and CSI nevertheless ask the Court to award them damages. In pursuit of the these damages, the Bank and CSI have asserted a host of claims against Mercy, including breach of contract, conversion, constructive fraud, negligent misrepresentation and punitive damages. These claims, however, all arise solely out of the contractual relationship between the parties and not from any independent duty or obligation. As such, the gist of the Bank's and CSI's action sounds in contract and not in tort, and all of the Bank's and CSI's tort claims should be dismissed.

The Bank's and CSI's remaining breach of contract claims are meritless. In essence, CSI and the Bank claim that, despite CSI's highly-touted "Beacon" score analysis of accounts, Mercy's accounts allegedly did not met the Agreement's requirements. Thus, CSI and

2

the Bank claim that the new accounts Mercy sent to offset recourse were worthless and Mercy has therefore not paid for the recourse accounts.

This claim fails to recognize, however, that Mercy never had any obligation to repurchase the vast majority of the recourse accounts CSI sent back because they were untimely.

More flawed than this breach of contract theory is CSI's claim for damages. CSI contends that but for Mercy's breach of the Agreement, this severly undercapitalized and mismanaged company had the potential to be worth $10.5 million. This valuation is based entirely on the opinion of CSI's "expert." However, as explained in the Memorandum of Law in Support of Mercy Health System of Southeastern Pennsylvania's Motion to Exclude Testimony by David Johnson ("Mercy's Daubert Brief"), this opinion is so speculative and unreliable, it must be excluded, leaving CSI with no support for this claim.

Mercy moves for summary judgment as to all the Bank's and CSI's claims.

## II.    FACTUAL BACKGROUND

For the convenience of the Court, Mercy incorporates by reference the Factual Background section of Mercy Health System of Southeastern Pennsylvania's Memorandum of Law in Support of its Motion for Partial Summary Judgment on its Claim for Breach of Contract Against CSI Financial, Inc. ("Mercy's Summary Judgment Brief"). Here, Mercy provides a brief summary of the critical facts already detailed in Mercy's Summary Judgment Brief, and asserts only those additional facts necessary for this motion.

### A.  Overview

Mercy is a Pennsylvania not for profit corporation that provides medical services through its hospitals and related healthcare entities. Like most hospital systems, Mercy services patients who have no insurance and must pay their medical bills themselves.

CSI was in the business of buying and collecting hospital self-pay receivables. CSI would select the self-pay accounts with the highest probability of collection based on CSI's credit scoring system. CSI purchased these accounts from the hospitals for 92% of the value of the accounts. Funding for the purchase of these accounts was provided by the Bank. CSI would then undertake collection efforts on the accounts.

On or about October 18, 1999, Mercy and CSI entered into the Agreement. [Appendix in Support of Mercy Health System of Southeastern Pennsylvania's Motions for Summary Judgment ("App.), Exh.7]. The Bank is an express third party to the Agreement. The key provision of the Agreement is Paragraph 7, the only paragraph in the Agreement that addresses recourse accounts.

This provision envisioned that Mercy would repurchase recourse accounts by paying 92% of the outstanding balance directly to the Bank. But several conditions had to be met before Mercy was obligated to repurchase a recourse account. First, the account had to be delinquent for 90 days. Second CSI had to give Mercy immediate notice that the account was delinquent. Finally, and perhaps most importantly, Mercy's obligation to reimburse the Bank applied only to those accounts that became "90 days delinquent during the preceding calendar month." (emphasis added).

In short, this provision, much like any other warranty or contractual return provision, allowed CSI a limited window of opportunity to return to Mercy for repurchase delinquent accounts. CSI systematically exceeded the time limit provided in the Agreement.

CSI's violation of the recourse provision undermines CSI's and the Bank's claims in two respects. First, while CSI and the Bank claim damages based on Mercy's alleged failure to pay for untimely recourse accounts, the Agreement provides that Mercy was only required to

4

pay the Bank for those accounts that were recoursed after becoming "90 days delinquent during the preceding calendar month." [App., Exh. 7 at ¶7]. Mercy was not required to pay the Bank money for accounts recoursed many months after this deadline passed.

Second, CSI claimed that the value of these untimely recoursed accounts could be used as an offset or credit against CSI's (and the Bank's) obligation to pay for new Mercy accounts. As a result, CSI (and the Bank) paid nothing for more than $1 million in new accounts from Mercy. These damages more than offset any claim by CSI and the Bank.

### B. CSI's Mishandling Of Accounts Comes To Light

CSI's mishandling of delinquent accounts came to a head in July 2001, when CSI recoursed to Mercy 1,300 accounts with a value of $760,000. [Expert Report of Parente Randolph, App., Exh. 18 at Exh. H]. The vast majority of these were not recoursed timely. [Id.]. In fact, the average age of these accounts was 222 days.

Notably, the Bank has known all along that CSI was violating the Agreement's recourse provision as confirmed by the results of an audit it performed of the Mercy accounts. [Bank Audit Documents, App., Exh. 13]. Even though the Bank reviewed only 30 of the 14,000 accounts CSI and the Bank purchased from Mercy, it concluded that CSI had not timely recoursed 75% of the accounts it reviewed. [Id.]. Among the problems noted in the audit was CSI's change in computer systems in December 2000. As a result of the transfer of files from the old system to the new, account aging information was lost. Further, many accounts were simply re-set to zero days past due effectively delaying their recourse.

Discovery also revealed that CSI's own attorney admitted CSI violated the Agreement in a May 9, 2002 letter to another attorney (apparently intended to secure errors and omissions insurance coverage). In the letter, he explained the problems associated with the computer system conversion and noted his "best estimate is that CSI may be exposed to the tune

5

of $250,000 to $500,000 of the $1,200,000 claimed by Mercy." [App., Exh. 14]. Likewise, in discussions with a third party (American West Bank) about a possible acquisition of CSI in 2002, CSI disclosed that it had a potential liability of $200,000 in this action. [App., Exh. 19].

In short, while the Bank and CSI have been telling the Court that CSI complied with the Agreement, they have conceded CSI's violation of the Agreement to others.

### C. CSI's and the Bank's Claims

Mercy filed this action on October 9, 2001 against CSI alleging breach of contract. In response to Mercy's complaint, the Bank and CSI filed their own action against Mercy in the United States District Court for the District of Montana (the "Montana Complaint"). In the Montana Complaint, The Bank and CSI alleged claims for (1) Breach of Contract (Count I); (2) Anticipatory Breach (Count II); (3) Conversion (Count III); (4) Constructive Fraud (Count IV); (5) Negligent Misrepresentation (Count V); and (6) Punitive Damages (Count VI) against Mercy.

Mercy moved to dismiss the Montana Complaint or in the alternative to transfer the action to this Court. The Montana Court transferred the case to this Court and consolidated it with this action.

After its motion to dismiss this action was denied, CSI filed an Answer with Counterclaims ("CSI's Counterclaim") that mirrored the claims in the Montana Complaint.

The Montana Complaint and CSI Counterclaim allege that Mercy violated the Agreement by failing to remit payments it received directly from patients whose accounts had been sold to CSI. Next, they claim Mercy sent accounts that did not meet the requirements of the Agreement. Finally, CSI and the Bank claim that Mercy did not pay for accounts CSI and the Bank returned and recoursed to Mercy.

6

These alleged breaches mirror the tort claims in the Montana Complaint and CSI Counterclaim. For example, the basis for the conversion claim is that Mercy kept patient payments on accounts that had been sold to CSI and the Bank. Likewise, the constructive fraud and negligent misrepresentation claims simply restate one of the contract claims alleging that Mercy represented that the accounts it was selling CSI and the Bank met the requirements of the Agreement when they allegedly did not.

### D. History of CSI's Business Diminution Damage Claim.

In February 2004, more than two years after this case was filed, CSI informed the Court and Mercy for the first time in a status conference memorandum that it intended to seek damages for business diminution from Mercy. This claim was not included in any of CSI's pleadings, and CSI has not sought leave of the Court to amend its pleadings to include this claim.

This counterclaim has been dubious from the beginning. When the issue was first raised during the February 24, 2004 status conference, CSI's counsel indicated that there was a single potential purchaser for CSI that did not buy CSI because of this litigation. Thus, the Court's March 1, 2004 Order ordered CSI to send Mercy's counsel the name of "the potential purchaser."

When CSI's counsel sent the required information, suddenly the number of potential suitors had doubled. According to CSI, First Horizon Bank in Tennessee and AmericanWest Bank in Washington had expressed an interest in purchasing CSI, but later changed their minds.

By the time CSI's president and majority shareholder (Robert Jaeb) was deposed in July 2004, the number of potential suitors had doubled again. Mr. Jaeb explained that in addition to First Horizon and AmericanWest, two other companies, New Century and Netlink, also expressed interest in CSI in 2002. Mr. Jaeb described the offers as follows:

7

- AmericanWest Bank offered a total of $1.0 million for 51% ownership of CSI; $500,000 in cash and $500,000 in debt assumption  [Jaeb Dep. 2 at 50].

- First Horizon offered $1.0 million for CSI's assets.  [Jaeb Dep. 2 at 53-54].

- National Century offered $1.0 million for CSI's assets.  [Jaeb Dep. 2 at 55].

- Netlink informally offered $3.0 million for CSI's assets.  [Jaeb Dep. 2 at 55-56].

Jaeb's deposition confirmed why none of these deals came to fruition.  It was not because any of these suitors backed away from their offers.  Rather, it was CSI that rejected each and every one of these offers.  Mr. Jaeb rejected the AmericanWest offer because he wanted to obtain other bids to see if he could obtain a higher price.  [Jaeb Dep. 2 at 45].  He rejected the First Horizon offer because he deemed it too low.  [Jaeb Dep. 2 at 54-55].  The National Century offer was rejected because Mr. Jaeb felt like he could not work with the people there.  [Jaeb Dep. 2 at 46].  And, the Netlink offer was rejected because Mr. Jaeb "didn't think they were a real player."  [Jaeb Dep. 2 at 46].

Following Mr. Jaeb's deposition, Mercy believed that it finally had CSI's "story" regarding its new damages theory.  However, one day before the close of discovery CSI disclosed for the first time the existence of valuation data generated by a company called Senex Management Corp. in which Senex analyzed CSI's business for a possible acquisition or merger.[1]  [App., Exh. 21].

The next day CSI served its "expert" report in which CSI's so-called "expert" opined that but for Mercy's alleged conduct, CSI would have been worth over $10.5 million.  In

---

[1] Initially, Mercy believed Senex was yet another suitor not previously disclosed by CSI.  However, it turns out that Senex was affiliated with National Century, and the valuation was prepared in connection with National Century's discussions with CSI.  [App., Exh. 20].

support of this opinion, CSI's expert, Dave Johnson, relied almost exclusively on the valuation data generated by Senex to support future income projections, which had been produced for the first time a day earlier.

As described in Mercy's Daubert Brief, the Senex valuation raised more questions than answers; questions CSI's expert never bothered to ask. For example, the Senex valuation was based on the assumption that someone would provide CSI with additional financing (either equity or debt) of at least $23 million. Johnson conceded, however, that while this $23 million was the linchpin to his value opinion, he had no reason to believe CSI had access to or could obtain access to such funds. [Deposition of David Johnson ("Johnson Dep."), App., Exh. 22 at 290-291 and 281-282].

In short, Johnson's entire valuation opinion rests on the notion that CSI had access to $23 million even though Johnson concedes CSI had no ability to obtain such funding. Johnson's opinion is thus built upon a false premise having no connection to the facts in this case.

Johnson's opinion also does not account for what third parties were willing to pay for CSI in an arms length transaction. In fact, Johnson did not consider that Senex (through National Century) was willing to pay only $1 million for CSI's assets, a mere fraction of Johnson's valuation.

Plainly, neither the record evidence nor Johnson's unreliable expert opinion supports CSI's claim for $10.5 million in damages for the value of its business.

## III. ARGUMENT

The Supreme Court has emphasized the judicial policy favoring use of summary judgment for the prompt and efficient resolution of claims without factual issues or legal bases. Celotex Corp. v. Catrett, 477 U.S. 317, 327 (1986) (summary judgment is not a "disfavored

9

procedural shortcut" but an integral part of the judicial process "designed 'to serve the just, speedy and inexpensive determination of every action").

　　　　The standards for granting summary judgment are well-established.  The Court must determine whether "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  See also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986).  Only facts that affect the outcome of the case are "material." Anderson, 477 U.S. at 248.

　　　　When considering a motion for summary judgment, all evidence submitted must be viewed in the light most favorable to the nonmoving party and all inferences must be drawn in that party's favor.  Celotex Corp. v. Catrett, 477 U.S. 317, 322-32;  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).  As Rule 56(c) makes clear, once the moving party submits a properly supported motion, the burden shifts to the non-moving party to demonstrate the existence of a genuine dispute.  See Rule 56(e); see also Anderson, 477 U.S. at 256.

　　　　To make that showing, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita, 475 U.S. at 586.  The non-moving party, therefore, must come forward with "specific facts showing that there is a triable issue." Fed. R. Civ. P. 56(e). "The mere existence of a scintilla of evidence in support of the [nonmovant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." Anderson, 477 U.S. at 252.  Moreover, if "the evidence [submitted by the nonmovant] is merely colorable, or is not significantly probative, summary judgment may be granted." Id. at 249-50.  And, unsupported allegations in a memorandum and

10

pleadings are insufficient to repel summary judgment. <u>Schoch v. First Fidelity Bancorp.</u>, 912
F.2d 654, 657 (3d Cir. 1990).

### A. Pennsylvania Law Applies To This Litigation.

This Court has jurisdiction of this matter because the parties are citizens of
different states and the amount in controversy exceeds $75,000.00. As such, there is a potential
choice of law issue between Pennsylvania law, the law of the jurisdiction in which this Court sits
and in which Mercy is a citizen, and Montana law, the law of the jurisdiction in which the Bank
and CSI are citizens.

To the extent a dispute exists regarding choice of law, Pennsylvania and not
Montana law applies here. In its motion for summary judgment, the Bank relied exclusively on
Pennsylvania law. Accordingly, Mercy assumes the Bank concedes that Pennsylvania law
applies. <u>Kelvin Cryosystem, Inc. v. Lightnin</u>, Civil Action No. 03-CV-00881, 2004 U.S. Dist.
LEXIS 23298, *27 (E.D. Pa. Nov. 15, 2004)(Gardner, J.)(finding no conflict of law issue where
out of state defendant relied on Pennsylvania law in support of its motion for summary
judgment). CSI has not yet indicated a position regarding which states law applies; therefore, a
choice of laws analysis is warranted here.

In the absence of agreement, a federal court sitting in diversity of citizenship
jurisdiction must apply the choice of law rules of the jurisdiction in which it sits. <u>Klaxon Co. v.
Stentor Electric Mfg. Co.</u>, 313 U.S. 487 (1941). Therefore, the Court must apply the choice of
law rules of the Commonwealth of Pennsylvania.

In Pennsylvania, the choice of law analysis first requires a determination of
whether the laws of the competing jurisdictions actually differ. <u>Kelvin</u>, 2004 U.S. Dist. LEXIS
23298, *27. If there is no conflict, then no further analysis is necessary and the law of the forum
state applies. <u>Id.</u> If there is a conflict, the Court must apply the Pennsylvania test for resolving a

conflict and must "analyze the governmental interests underlying the issue and determine which state has the greater interest in the application of its laws." Id., quoting Ratti v. Wheeling Pittsburgh Steel Corp., 758 A.2d 695, 702 (Pa. Super. 2000).

　　　　The primary claims in this litigation are breach of contract claims. Mercy has asserted breach of contract claims against CSI and the Bank, and the Bank and CSI have asserted breach of contract claims against Mercy. Since the general and well known contract principles involved here are the elements of a contract and breach of contract (and there are no claims that the elements under Pennsylvania or Montana law differ), there is a false conflict, and Pennsylvania law applies to these claims. Kelvin, 2004 U.S. Dist. LEXIS 23298, *28-29.

　　　　In addition to their contract claims, the Bank and CSI have asserted tort claims, including conversion, constructive fraud, and negligent misrepresentation against Mercy. Under both Pennsylvania and Montana law, these claims are barred because they are little more than contract claims wrapped in tort packaging.

　　　　Pennsylvania and Montana law provide that when claims arising from the same facts are asserted as both contract and tort claims, the tort claims cannot be sustained in the absences of a duty independent of the contract. Factory Mkt. v. Schuller Int'l, 987 F. Supp. 387, 394 (E.D. Pa. 1997) (applying gist of action doctrine to dismiss tort claims); eToll, Inc. v. Elias/Savion Advertising, Inc., 811 A.2d 10, 14 (Pa. Super. 2002)(gist of the action doctrine precludes parties from "re-casting ordinary breach of contract claims into tort claims"); Boise Cascade Corp. v. First Security Bank, 600 P.2d 173 (Mt. 1979)("a cause of action may sound in tort although it arises out of a breach of contract, if a defaulting party, by breaching the contract also breaches a duty which he owes to the other party independent of the contract.").

12

Here, Mercy's only connection to the Bank and CSI is the Agreement. Mercy owed the Bank and CSI no duties other than those it agreed to in the Agreement. And, as discussed below, it is the duties arising under the Agreement that CSI and the Bank claim Mercy breached, even though they have couched those breaches as torts. Each and every one of the issues the Bank and CSI complain about in their tort claims are items expressly identified and addressed in the Agreement.

Under both Pennsylvania and Montana law, the tort claims are subject to a "gist of the action" analysis. And, under both states' laws, the tort claims are barred. As such there is a false conflict, no further analysis is necessary, and Pennsylvania law applies.

CSI and the Bank also have asserted a claim for punitive damages against Mercy. Once again, a false conflict exists between Pennsylvania and Montana law. Neither states laws allow punitive damages for a breach of contract action. Johnson v. Hyundai Motor America, 698 A.2d 631 (Pa. Super. 1997)(holding punitive damages are not recoverable in an action based on an alleged breach of contract); Weter v. Archambault, 61 P.3d 771 (Mt. 2002)("Mont. Code Ann. § 27-1-220 prohibits punitive damages arising from breach of contract")

Additionally, neither Pennsylvania nor Montana allow a claim for punitive damages to be asserted as an independent cause of action. Digregorgio v. Keystone Health Plan E., 840 A.2d 361 (Pa. Super. 2003); Paulson v. Kustom Enterprises, Inc., 483 P.2d 708 (Mt. 1971)("punitive damages are not given as a matter of right ... nor can exemplary damages constitute the basis of a cause of action, for they are mere incidents to it").

Here, despite their window dressing, all of CSI's and the Bank's claims are in the nature of a breach of contract action. As such, the tort claims are barred by the gist of the action

13

doctrine, which leaves no cause of action on which CSI or the Bank can be awarded punitive

damages.

Because all the claims at issue result in a false conflict between the laws of

Pennsylvania and Montana, no further choice of law analysis is necessary and Pennsylvania law

applies.

**B.   The Bank's And CSI's Tort Claims Are Barred Because They Arise From The Same Facts As And Are Simply A Restatement Of Their Breach Of Contract Claims.**

Although the only relationship between CSI and the Bank on one hand and Mercy

on the other is a contractual one, the Bank and CSI have attempted to restate their breach of

contract claims against Mercy as tort claims.  However, Pennsylvania's gist of the action and

economic loss doctrines prohibit this attempt.

**1.   <u>The gist of the action doctrine bar's the Bank's and CSI's tort claims.</u>**

"'When a plaintiff alleges that the defendant committed a tort in the course of

carrying out a contractual agreement, Pennsylvania courts examine the claim and determine

whether the 'gist' or gravamen of it sounds in contract or tort; a tort claim is maintainable only if

the contract is 'collateral' to conduct that is primarily tortious.'" <u>Caudill Seed & Warehouse Co. v.</u>

<u>Prophet 21, Inc.,</u> 123 F. Supp. 2d 826, 833 (E.D. Pa. 2000) (quoting <u>Sunquest Info. Sys., Inc. v.</u>

<u>Dean Witter Reynolds, Inc.,</u> 40 F. Supp. 2d 644, 651 (W.D. Pa. 1999)). The gist of the action test

requires the Court to determine the essential nature of the claim alleged by distinguishing

between contract and tort claims on the basis of the source of the duties allegedly breached;

where the duties essentially flow from an agreement between the parties, the claim is deemed

contractual in nature, whereas if the duties breached were of a type imposed on members of

society as a matter of social policy, the claim is deemed essentially based in tort. <u>See</u> <u>Caudill</u>

14

Seed, 123 F. Supp. 2d at 833 (citing Phico Ins. Co. v. Presbyterian Medical Servs. Corp., 444 Pa. Super 221, 229, 663 A.2d 753 (1995)).

Here, the Bank's and CSI's claims rise and fall based on the language of the Agreement and Mercy's performance of its contractual obligations. For example, the very issues the Bank and CSI complain about (failing to remit patient payments, misrepresenting that accounts "met the requirements of the contract" and refusing to repurchase recourse and return accounts) are all matters which are covered by Paragraph 2 of the Agreement. In fact, the Bank and CSI assert in their pleadings that the same set of facts constituting conversion, constructive fraud and negligent misrepresentation also constitute a breach of the Agreement. [Montana Complaint at ¶ 20, CSI Counterclaim at ¶ 16].

In short, there is no question that the Bank's and CSI's tort claims are intertwined with the contractual claims. The gist of this action is therefore a contractual dispute and the Court should dismiss Counts III, IV and IV of the Montana Complaint and CSI Counterclaim.

### 2.  The Bank's and CSI's tort damages are barred by the economic loss doctrine.

It is the character of the harm which determines the scope of the available remedies and the economic loss doctrine prohibits recovery in tort for economic losses flowing only from a contract. Duquesne Light Co. v. Westinghouse Elec. Corp., 66 F.3d 604, 620 (3d Cir. 1995) (a "party negotiating with another can insist on contract language that protects it against the other parties' innocent, but wrong representations"). Pennsylvania state courts and federal courts applying Pennsylvania law have applied the principles espoused in the U.S. Supreme Court's opinion in East River S.S. Corp. v. Transamerica Delaval, Inc., 476 U.S. 858 (1986)(noting that if tort remedies "progressed too far, contract law would drown in a sea of tort."). The East River Court's analysis flowed from the recognition that tort and contract

15

remedies are distinct because tort law is concerned with safety and is not intended to provide remedies for violations of duties assumed by agreement.

Although the economic loss doctrine originated in the field of products liability, subsequent cases have extended the doctrine's reach. Lower Lake Dock Co. v. Messinger Bearing Corp., 577 A.2d 631 (Pa. Super. 1990)(applying economic loss doctrine to negligence claims). Among other things, the doctrine has been applied to claims arising out of negligent misrepresentations made to induce the purchase of goods. Eagle Traffic Control v. Addco, 882 F. Supp. 417 (E.D. Pa. 1995)(applying economic loss doctrine to negligent misrepresentations made to induce sale of traffic safety equipment); see also Apollo Group v. Avnet, Inc., 58 F.3d 477 (9th Cir. 1995)(applying economic loss doctrine to negligent misrepresentations made in sale of computer hardware).

Plainly, losses based upon and flowing from a party's loss of the benefit of the bargain are economic losses not cognizable in a tort action. See Dusquesne Light, 66 F.3d at 619 (citing Rem Coal Co. v. Clark Equip., Co., 563 A.2d 128, 129 (Pa. Super. 1989)). As the Third Circuit held in Dusquesne Light:

> [W]here there is privity in contract between two parties, and where the policies behind tort law are not implicated, there is no need for an additional tort of negligent misrepresentation. Breach of contract, promissory estoppel, unjust enrichment and other contract or quasi-contract remedies all protect parties who negotiate their agreement to a writing.

66 F.3d at 620.

Here, the only harm alleged by the Bank and CSI are losses flowing from their claimed loss of benefit of the bargain. Specifically, Paragraph 2 of the Agreement. The Agreement (and alleged breach thereof) is the only source from which loss could flow as the Agreement is the sole basis of Mercy's obligations to the Bank and CSI. No other obligations

16

exist between Mercy on the one hand and CSI and the Bank on the other from which they could look to as a source of loss. These pure economic losses are, therefore, not cognizable in tort actions. As such, the Bank and CSI's tort claims should be dismissed.

### C. Mercy Is Entitled To Summary Judgment On The Bank's And CSI's Breach Of Contract Claim Regarding Recourse Accounts.

Like Mercy's breach of contract claim against CSI, recourse accounts are at the heart of the Bank's and CSI's breach of contract claims against Mercy. The Bank and CSI claim that Mercy failed to pay for recourse accounts because the new account files Mercy sent, which CSI used to offset the recourse files did not meet the requirements of a qualified account under the Agreement. However, as Mercy articulated in Mercy's Summary Judgment Brief, 85% of the accounts CSI recoursed to Mercy were untimely and Mercy had no obligation to repurchase them. Therefore, whether or not the accounts Mercy sent to CSI to pay for this recourse were qualified is irrelevant.

In Mercy's Summary Judgment Brief, Mercy detailed how CSI failed to recourse accounts as required by the Agreement, while continuing to take new and valuable accounts from Mercy as payment for this untimely recourse. Although Mercy incorporates by reference the entire Argument section of Mercy's Summary Judgment Brief here as if set forth fully herein, a summary of the argument here helps explain why the Bank's and CSI's breach of contract claim fails.

The first issue surrounding CSI's and the Bank's breach of contract claims is the application of the correct provision of the Agreement. Although the Bank and CSI have made clear in various filings with the Court that they believe Paragraph 5 of the Agreement controls, Pennsylvania's contract interpretation law says otherwise. As detailed in Mercy's Summary Judgment Brief, Pennsylvania law requires that the Court look at the contract as a whole, and not

17

in discrete units. Halpin v. LaSalle Univ., 639 A.2d 37, 39 (Pa. Super. 1994).  In doing so, when

a contract appears to have conflicting provisions, it is well-settled that specific provisions control

more general provisions.  J.E. Faltin Motor Transp. Inc. v. Eazor Express, Inc., 273 F.2d 444,

445 (3d Cir. 1959)(holding that specific provisions of lease agreement regarding liability

governed over general language about the parties' relationship to each other); Harleysville

Mutual Ins. Co. v. GE Reinsurance Corp., No. 02-171, 2002 U.S. Dist. LEXIS 8064, *12-13

(E.D. Pa. May 6, 2002)(finding that because the lawsuit sought damages in excess of $2 million,

the parties were not bound by the arbitration clause in the insurance contract, which required

arbitrations of all claims not exceeding $2 million);  Signet Bank/Maryland v. First Bank of

Philadelphia, No. 90-3723, 1991 U.S. Dist. LEXIS 8177, *11 (E.D. Pa. June 12, 1991).

  Here, Paragraph 7 of the Agreement deals specifically and exclusively with

recourse accounts and the numerous conditions precedent to Mercy's repurchase obligation.

Paragraph 5, to the contrary, discusses to whom Mercy is obligated to reimbursement payment

for returned accounts and the amount of that payment.  Paragraph 5 does not address how

recourse accounts should be handled.  In fact, the word recourse does not even appear in

Paragraph 5.

  Contrary to Paragraph 5's discussion generally about the amount of Mercy's

repurchase obligation, Paragraph 7 discusses only recourse accounts and the numerous

conditions precedent to Mercy's repurchase obligation.  First, an account had to be delinquent for

90 days.  Second, CSI was required to immediately notify Mercy when an account became 90

days delinquent.  Third, CSI was required to automatically present to Mercy at the end of each

calendar month all accounts that became delinquent for 90 days in the preceding calendar month.

18

But meeting these conditions still did not obligate Mercy to repurchase all the recourse accounts CSI presented to it. Instead, Mercy was obligated to repurchase only an "account that has become 90 days delinquent during the preceding calendar month." [App., Exh. 7 at ¶ 7 (emphasis added)]. In other words, Mercy had the right to receive the account back during the calendar month after it first became 90 days delinquent. If the recourse was delayed beyond this deadline, Mercy was not required to accept the account back or pay the Bank for it.

Although the Agreement allowed CSI "the right of offset against sums due [Mercy] under the Agreement for the amount of any delinquent reimbursement obligations," that right applied only to those "delinquent reimbursement obligations" that were recoursed to Mercy as required by Paragraph 7 of the Agreement -- at the end of the month following when they became 90 days delinquent. But CSI did not limit its offsetting to such accounts. Rather, CSI repeatedly recoursed to Mercy accounts that were delinquent by far longer than 90 days and continued to offset those against the new account files Mercy sent CSI, in violation of the Agreement. In fact, the record demonstrates that 85% of the accounts recoursed to Mercy by CSI were not recoursed in accordance with paragraph 7 of the Agreement.

CSI and the Bank have repeatedly acknowledge that CSI breached the Agreement by failing to timely recourse accounts. The Bank noted the breach when it finally performed an audit of CSI's recourse record. This record, according to the audit, demonstrated that of the mere 30 accounts audited (out of more than 14,000), 75% had not been recoursed as required by the Agreement. [App., Exh. 13]. CSI admitted in various letters that it had breached the Agreement and was liable to Mercy for this breach for anywhere between $200,000 and $500,000. [App., Exhs. 14 and 19].

19

Now, CSI claims that the new account files Mercy sent to CSI were not qualified accounts under the Agreement and, therefore, Mercy did not actually "pay" for the recourse accounts CSI was sending back to Mercy. But the flaw in CSI's claim is that 85% of the recourse accounts it was sending Mercy were accounts Mercy had no obligation to repurchase because they were not timely under the Agreement. As such, the quality of accounts Mercy sold to CSI, which CSI improperly used to offset these grossly untimely recourse accounts is irrelevant. In other words, CSI had no right to recourse the untimely accounts to Mercy and seek payment in return, but it did. That CSI now claims Mercy's offset accounts were no good does not give rise to damages to CSI or the Bank and their breach of contract claims regarding recourse accounts fail as a matter of law.

### D.  Mercy is Entitled to Summary Judgment on CSI's Claim for Business Diminution.

In February 2004, CSI advised the Court and Mercy for the first time that it was seeking to hold Mercy responsible for CSI's bankruptcy and ultimate demise. CSI seeks $10.5 million in damages for this claim. The sole basis for CSI's $10.5 million claim is the opinion of its expert David Johnson. As explained in Mercy's Daubert Brief, this opinion is unreliable and should be deemed inadmissible. Without this report, CSI cannot support it claim, and it should be dismissed.

The Court has discretion to make admissibility determinations on an expert report on a motion for summary judgment. J&J Snack Foods Corp. v. Earthgrains Co., 220 F. Supp. 2d 358 (D. N.J. 2002). This threshold determination of the admissibility of proposed expert testimony is governed by the principles of Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579 (1993) and Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137 (1999). J&J Snack, 220 F. Supp. 2d at 368.

When a claim requires expert opinion or expert opinion provides the only basis for a claim, and that expert opinion is deemed inadmissible, summary judgment is properly granted on that claim.  See Oddi v. Ford Motor Co., 234 F.3d 136 (3d Cir. 2000) (trial court properly granted summary judgment after excluding expert testimony as unreliable); Pappas v. Sony Electronics, 136 F. Supp. 2d 413 (W.D. Pa. 2000) (granting summary judgment to defendant after plaintiff's causation expert was excluded because he failed to employ a reliable methodology before reaching his conclusions); Schmerling v. Danek Medical, Inc., No. 96-2749, 1999 U.S. Dist. LEXIS 13952 (E.D. Pa. 1999) (rejection of plaintiff's expert report left plaintiff with no proof of an essential element of a claim mandates the entry of summary judgment).

An essential element of CSI's breach of contract claim is damages, which Pennsylvania law provides "cannot be recovered unless the evidence affords sufficient basis for estimating them with reasonable certainty." Hood v. Meininger, 105 A.2d 126 (Pa. 1954); see also Spang & Co. v. U.S. Steel Corp., 545 A.2d 861 (Pa. 1988) ("As a general rule, damages are not recoverable if they are too speculative, vague or contingent and are not recoverable for loss beyond an amount that the evidence permits to be established with reasonable certainty"); Wujcik v. Yorktowne Dental Assoc., Inc., 701 A.2d 581, 584 (Pa. Super. 1997) (holding law requires plaintiff to produce evidence which establishes with a fair degree of probably, a basis for establishing damages).

CSI's claim for damages regarding its potential value had Mercy not breached the contract cannot be established with reasonable certainty, and is, instead speculative, vague and contingent. CSI bases its $10.5 million claim entirely on the opinion of its "expert." But, as Mercy explained in its Daubert Brief, which is being filed simultaneously with this motion, and which is incorporated herein as if set forth fully, this opinion is unreliable and should be excluded.

First, Johnson's qualifications for providing a valuation opinion are deficient. He had none of the recognized certifications in performing business valuations, and virtually no education in this area. Additionally, Johnson is an accountant and not qualified as an expert on projected sales and revenues for a business.

Second, Johnson's report was based on incorrect and unsupportable assumptions. To begin, Johnson relied on the Senex projection, which itself said it was based on speculation. Worse yet, as Johnson conceded, Senex's future revenue assumptions were entirely dependent on CSI obtaining $23 million to fund its operations. But Johnson recognized CSI did not have access to such funds.

Johnson also erroneously assumed that CSI would have stayed in business until 2004, even though it filed for bankruptcy in 2003. Although the Senex projections covered the 2002-2006 time frame, to determine present value, Johnson discounted back only to 2004, instead of 2002 (which results in a difference of over $6 million).

Third, Johnson ignored critical facts. For example, Johnson ignored that CSI did not have access to $23 million to support Senex's projections. He also ignored facts surrounding offers CSI received for its assets, which were significantly less than $10.5 million.

22

Fourth, Johnson failed to follow proper testing procedures. Johnson concedes that he took everything CSI told him at face value without testing the assertions for accuracy. He also did nothing to investigate the facts upon which the Senex projections were based.

Finally, Johnson failed to properly explore causation. Johnson assumed that Mercy breached the Agreement and this breach caused CSI's eventual demise. Both assumptions are erroneous. As explained in Mercy's Summary Judgment Brief, CSI's lawyer admits CSI, and not Mercy breached the Agreement. Further, Johnson never even considered if any other factors such as a bad business model or poor management contributed to CSI's demise. A reliable opinion should have analyzed causation issues.

Given the significant facts Johnson ignored, his reliance on speculative and insupportable assumptions and his failure to follow proper testing methods, his opinion is best characterized as a conclusion in search of a justification rather than an objective analysis of the facts. Accordingly his testimony should be excluded.

Johnson is the only expert CSI disclosed pursuant to the requirements of F.R.C.P. 26 and the Court's Scheduling Order. As such, well-settled Third Circuit law provides that CSI cannot offer an expert opinion by any other undisclosed expert should Johnson's opinion be precluded. See Hagans v. Henry Weber Aircraft Distributors, Inc., 852 F.2d 60, 63-65 (3d Cir. 1988); Semper v. Santos, 845 F.2d 1233, 1237-38 (3d Cir. 1988).

Moreover, the valuation of CSI's business is a complicated process requiring the type of specialized knowledge contemplated by F.R.E. 702. Accordingly, expert testimony under F.R.E. 702, and not lay opinion testimony under F.R.E. 701 is required.

23

Johnson's opinion, therefore, is the only support CSI puts forward for its newly alleged $10.5 million damage theory. With the exclusion of this opinion, CSI cannot sustain this theory, and Mercy is entitled to summary judgment.

## IV.    CONCLUSION

Mercy is entitled to summary judgment on all of the Bank's and CSI's claims against it. The Bank's and CSI's tort claims fail because they are merely restatements of their breach of contract claims and are, therefore, barred by Pennsylvania's gist of the action and economic loss doctrines. The breach of contract claims asserted by the Bank and CSI against Mercy are not supported by the undisputed record evidence, which demonstrates that it was CSI and not Mercy that breached the Agreement. Finally, CSI's outrageous $10.5 million claim for business diminution is based solely on the unsupported assumptions and half-hearted analysis of its expert, whose opinion is inadmissible under the standards of Daubert and Kumho. Absent this "opinion," CSI has no other evidence to support this claim, and it should be dismissed as a matter of law.

Dated: January **3**, 2005

STEVENS & LEE, P.C.

By _____

E. Thomas Henefer
Attorney I.D. No. 55773
Stacey A. Scrivani
Attorney I.D. No. 84275
111 North Sixth Street
P.O. Box 679
Reading, Pennsylvania 19603

Attorneys for Plaintiff Mercy Health System

24

## CERTIFICATE OF SERVICE

I, STACEY A. SCRIVANI, certify that true and correct copies of Mercy Health

System of Southeastern Pennsylvania's Motion for Summary Judgment on the Claim CSI

Financial, Inc. and the First National Bank of Montana and supporting Memorandum of Law

were sent to the following persons via federal express, this 3rd day of January, 2005:

Christopher M. Brubaker, Esquire
Kittredge, Donley, Elson, Fullem & Embick, LLP
The Bank Building
421 Chestnut Street
Philadelphia, PA 19106-2416
Counsel for First National Bank of Montana

Patrick J. Egan, Esquire
239 S. Camac Street
Philadelphia, PA 19107
Counsel for CSI Financial, Inc.

Dated: January **3** , 2005

Stacey A. Scrivani

SL1 502637v2/30512.005