Case 2:02-cv-03608-JKG   Document 56   Filed 01/31/2005   Page 1 of 20

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| MERCY HEALTH SYSTEM OF SOUTHEASTERN PENNSYLVANIA<br><br>    Plaintiff,<br><br>v.<br><br>ROSS P. RICHARDSON, Chapter 7 Trustee for the Bankruptcy Estate of CSI Financial, Inc.,<br><br>    Defendant. | CIVIL ACTION<br>Case No. 01-CV-5681 |
| FIRST NATIONAL BANK OF MONTANA, INC. and ROSS P. RICHARDSON, Chapter 7 Trustee for the Bankruptcy Estate of CSI Financial, Inc.,<br><br>    Plaintiffs,<br><br>v.<br><br>MERCY HEALTH SYSTEM OF SOUTHEASTERN PENNSYLVANIA<br><br>    Defendant. | CIVIL ACTION<br><br>Consolidated |

## ORDER

AND, NOW, this _____ day of _____, 2005, upon consideration of Mercy Health System of Southeastern Pennsylvania's Motion for Summary Judgment on the Claims of CSI Financial, Inc. and the First National Bank of Montana together with supporting documents; and; the First National Bank of Montana's Response and Memorandum of Law in opposition thereto, together with supporting documents, it is hereby ORDERED that the Motion is DENIED.

_____
                        J.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| MERCY HEALTH SYSTEM OF SOUTHEASTERN PENNSYLVANIA, | : : : | |
| Plaintiff | : : | Civil Action No. 01-CV-05681 |
| v. | : : : | |
| ROSS P. RICHARDSON, Chapter 7 Trustee for the Bankruptcy Estate of CSI Financial, Inc., | : : : : | |
| Defendant | : | |
| ***************************** | *** | ***************************** |
| FIRST NATIONAL BANK OF MONTANA, INC. and ROSS P. RICHARDSON, Chapter 7 Trustee for the Bankruptcy Estate of CSI Financial, Inc., | : : : : : | Civil Action No. 02-CV-03608 |
| Plaintiffs | : : | |
| v. | : : : | |
| MERCY HEALTH SYSTEM OF SOUTHEASTERN PENNSYLVANIA, | : : : | |
| Defendant | : | |

### FIRST NATIONAL BANK OF MONTANA'S RESPONSE TO MERCY HEALTH SYSTEM OF SOUTHEASTERN PENNSYLVANIA'S MOTION FOR SUMMARY JUDGMENT ON THE CLAIMS OF CSI FINANCIAL, INC AND THE FIRST NATIONAL BANK OF MONTANA

The First National Bank of Montana ("Bank") by its counsel, Kittredge, Donley, Elson, Fullem and Embick, LLP, hereby responds to Mercy Health System of Southeastern Pennsylvania's ("Mercy") Motion for Summary Judgment on the Claims of CSI Financial, Inc. and the First National Bank of Montana.[1] As set forth in the accompanying memorandum of law

---

[1] Mercy has filed a joint motion against both CSI Financial, Inc. and the First National Bank of Montana, two separate entities with distinct claims. The Bank's Response to the Motion, Supporting Memorandum of Law and

and Objections to Mercy's Statement of Uncontested Facts in Support of its Motions for Summary Judgment, which are incorporated herein by reference, Mercy has failed to establish that it is entitled to judgment as a matter of law regarding the Bank's claims in this case. Accordingly, Mercy's motion for summary judgment must be denied.

Respectfully Submitted,

KITTREDGE, DONLEY, ELSON,
FULLEM & EMBICK, LLP

Dated: January 31, 2005

JOSEPH M. DONLEY, ESQUIRE
CHRISTOPHER BRUBAKER, ESQUIRE
I.D. NOS. 23058/82057
400 Market Street, Suite 200
Philadelphia, PA 19106-2416
(215) 829-9900

Attorneys for Plaintiff
First National Bank of Montana

---

Objections to Mercy's Statement of Uncontested Facts address only those facts and arguments related to the Bank's claims.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| MERCY HEALTH SYSTEM OF SOUTHEASTERN PENNSYLVANIA, | : | |
| | : | Civil Action |
| Plaintiff | : | No. 01-CV-05681 |
| | : | |
| v. | : | |
| | : | |
| ROSS P. RICHARDSON, Chapter 7 Trustee for the Bankruptcy Estate of CSI Financial, Inc., | : | |
| | : | |
| Defendant | : | |
| ************************************* | *** | ***************************************** |
| FIRST NATIONAL BANK OF MONTANA, INC. and ROSS P. RICHARDSON, Chapter 7 Trustee for the Bankruptcy Estate of CSI Financial, Inc., | : | Civil Action No. 02-CV-03608 |
| | : | |
| Plaintiffs | : | |
| | : | |
| v. | : | |
| | : | |
| MERCY HEALTH SYSTEM OF SOUTHEASTERN PENNSYLVANIA, | : | |
| | : | |
| Defendant | : | |

### FIRST NATIONAL BANK OF MONTANA'S MEMORANDUM OF LAW IN OPPOSITION TO MERCY HEALTH SYSTEM OF SOUTHEASTERN PENNSYLVANIA'S MOTION FOR SUMMARY JUDGMENT ON THE CLAIMS OF CSI FINANCIAL, INC AND THE FIRST NATIONAL BANK OF MONTANA

Plaintiff, First National Bank of Montana, Inc., by its counsel, Kittredge, Donley, Elson, Fullem & Embick, LLP hereby submits this Memorandum of Law in Opposition to Mercy Health System of Southeastern Pennsylvania's Motion for Summary Judgment on the Claims of CSI Financial, Inc. and the First National Bank of Montana.

I.  **INTRODUCTION**

This case arises out of a dispute among the parties over their respective rights and obligations under the Patient Finance Agreement ("Agreement"). (A true and correct copy of the Agreement is attached to the Bank's Objections to Mercy's Statement of Uncontested Fact and Counterstatement of Fact ("Counterstatement") as Exhibit A.) The parties in this matter are: Mercy Health System of Southeastern Pennsylvania ("Mercy") a party to the Agreement; CSI Financial, Inc.[1] ("CSI") a party to the Agreement; and, the First National Bank of Montana ("Bank") an express third-party beneficiary of the Agreement. Mercy and CSI entered into the Agreement on or about October 18, 1999. (Exhibit A, at p. 1 and 5.) The Bank, is also a signatory to the Agreement, although it is simply an express third party beneficiary. (Exhibit A, p. 4 and 5.) The Bank as a third party beneficiary enjoys rights granted by the Agreement but has no obligations under the Agreement. Rather, the Agreement expressly sets forth the obligations of both CSI (Paragraph 1, CSI Obligations) and Mercy, referred to as "PROVIDER" in the Agreement, (Paragraph 2, Provider Obligations), but does not contain a similar Paragraph for the Bank. (Exhibit A, p. 1-2.)

The Bank had the right to demand repurchase of any account at any time. (Exhibit A, p. 3, para. 5.), Paragraph 5 states as follows:

> 5. **REUMBURSEMENT BY PROVIDER.** PROVIDER understands and agrees that accounts acquired for financing by CSI under this Agreement will be financed by the BANK. ... PROVIDER agrees to pay directly to the BANK on demand ninety two (92%) percent of the balance then due on any account which was acquired for financing from PROVIDER by CSI, that the BANK requires CSI to repurchase.

(Exhibit A, p. 3, para. 5.)

---

[1] During the pendency of this action CSI Financial, Inc. filed for bankruptcy and is now represented in this action by Ross P. Richardson, Chapter 7 Trustee for the Bankruptcy Estate of CSI Financial, Inc. For ease of reference this party will be referred to simply as "CSI" throughout this Memorandum.

2

The Agreement also provides for the repurchase of accounts by Mercy under different scenarios including, *inter alia*, the account becoming 90 days delinquent at any point during repayment by the patient (para. 7), and the account not meeting certain specifications set forth in the Agreement (para. 2). (Exhibit A, pp. 2-4 para. 2 and 7.)

On November 1, 2004 the Bank filed a motion for partial summary judgment regarding the interpretation of the Agreement. The Bank maintains that under the clear unambiguous language of the Agreement it has the right to demand that Mercy repurchase any account at any time. Mercy responded to the Motion arguing an alternative interpretation of the Agreement which does not adhere to Pennsylvania's principles of contract interpretation. The Motion is still pending. Mercy has now filed its own motion for summary judgment against the Bank which raises both legal and factual issues which foil any claim of right to summary judgment on Mercy's behalf. Regarding the legal issue of contract interpretation Mercy is simply wrong. Regarding the factual issues Mercy has failed to establish the lack of a genuine issue of material fact under its theory for relief as its Statement of Uncontested Facts highlights a dispute of a fact central to its position.

As set forth in the Bank's motion for summary judgment and recapped below the Agreement gives the Bank the right to demand repurchase of any account at any time. This interpretation is supported by the plain language of the Agreement and is consistent with the intent of the parties as manifested in the Agreement and the relationship of the parties thereunder. Mercy's proffered interpretation would essentially re-write the Agreement by elevating one provision over all others and does not comport with the nature of the relationships among the parties under the Agreement.

## II. FACTUAL BACKGROUND

Almost immediately after the Agreement was entered CSI began returning accounts to Mercy for repurchase under the terms of the Agreement. In total, approximately 70% of the accounts financed from the first batch of patient accounts receivable were returned to Mercy for repurchase under the various provisions of the Agreement that allow for repurchase. (Deposition of William Partain October 9, 2003 ("Partain Dep.") at 94:17–95:16. True and correct copies of the relevant pages of the Partain Dep. are attached to the Counterstatement as Exhibit B.) From the beginning Mercy resisted repurchasing the accounts with cash as contemplated by the Agreement. (Deposition Transcript of Cindy Dorr July15, 2004 ("Dorr Dep.") at 59:9–60:9; 76:14–78:6; 100:18–101:1. True and correct copies of the relevant pages of the Dorr Dep. are attached to the Counterstatement as Exhibit C.) (Deposition Transcript of Robert Jaeb July 12, 2004 ("Jaeb Dep.") at 206:17-207:13; 208:8-14; 211:5–212:8. True and correct copies of the relevant pages of the Jaeb Dep. are attached to the Counterstatement as Exhibit D.) Mercy also refused to accept any accounts for repurchase until Mercy had a new batch of accounts to offset (in whole or in part) the accounts being returned. (Dorr Dep. at 59:9–60:9; 76:14–78:6; 100:18–101:1; 123:17 – 124:4; 125:11-13; Jaeb Dep. at 198:17-21; 206:17-207:13; 208:8-14; 211:5–212:8; 287:12-15; Deposition Transcript of Neysha Ann Humphreys ("Humphreys Dep.") at 90:13 – 92:3; 113:14 – 115:18. True and correct copies of the relevant pages of the Humphreys Dep. are attached to the Counterstatement as Exhibit E.) In the spirit of good faith CSI allowed Mercy to repurchase the accounts by way of offset. (Jaeb Dep. at 208:8-14.) Thus, Mercy would send new accounts for financing to "pay" for the accounts being repurchased.

However, the quality of the accounts being submitted to CSI for financing by the Bank never improved over the first batch and approximately 70% of all accounts financed by the Bank

4

throughout the duration of the contract were returned to Mercy for repurchase because they did not satisfy the criteria of the Agreement. (Partain Dep. at 94:17–97:17; 110:12–111:2; Dorr Dep. at 42:5–45:23.) Mercy's own records show that Mercy received $3,064,086.81 in wired funds from the Bank for accounts it submitted for financing. (True and correct copies of Mercy's bank statements, Bates numbered 6075-6098, are attached to the Counterstatement as Exhibit F.) Approximately $1.1 million of these funds were sent after the initial funding. (Id.) Mercy even instituted a process whereby patients would be billed twice and if no payment was received by Mercy only then would an account be sent to CSI for consideration in the program. If a payment was made by the patient then Mercy would keep the account. (Deposition Transcript of Russ Erdman ("Erdman Dep.") at 113:9 – 116:17. True and correct copies of the relevant pages of the Erdman Dep. are attached to the Counterstatement as Exhibit G.) As a result of the high rate of returned accounts Mercy never became current on its obligation to repurchase accounts. (Dorr Dep. at 59:9 – 60:9; 76:14 – 78:6; 100:18 – 101:1; Humphreys Dep. at 90:13 – 92:3; 113:14 – 115:18.) Throughout September 2001 the Bank attempted to enforce the Agreement through CSI. (Partain Dep. at 69:18 – 74:20; and, 105:1 – 106:7; Jaeb Dep. at 275:17 – 277:10; 278:9-16; See also, E-mail correspondence between CSI and Mercy are attached to the Counterstatement as Exhibit H.) Mercy acknowledged its obligation to repay the Bank for the returned accounts through September 2001. (Deposition Transcript of Doug Smith October 14, 2003 ("Smith Dep.") at 213:14 – 221:3. True and correct copies of the relevant pages of the Smith Dep. are attached to the Counterstatement as Exhibit I. E-mail correspondence between CSI and Mercy attached hereto as Exhibit H; Jaeb Dep. at 274:23 -275:23.)

In October 2001 the Bank made a demand directly on Mercy to bring current its obligation to repurchase accounts under the Agreement by paying to the Bank the outstanding

5

amount then due and owing. (Partain Dep. at 79:4 – 80:1; Deposition Transcript of Kenneth Kaiser October 8, 2003 ("Kaiser Dep.") at 59:6-11; 63:3-20; 66:10 – 67:8. True and correct copies of the relevant pages of the Kaiser Dep. are attached to the Counterstatement as Exhibit J; E-mail from Kenneth Kaiser to Doug Smith October 2, 2001 is attached to the Counterstatement as Exhibit K.)

## III. LEGAL STANDARD

"Summary judgment is appropriate, 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'" RCN Corporation v. Paramount Pavilion Group LLC, 2004 U.S. Dist. LEXIS 4398, CA No. 03-CV-1706, *15 (E.D.P.A., Mar. 10, 2004) (quoting Fed. R. Civ. P. 56(c)). "The moving party bears the burden of proving that no genuine issue of material fact is in dispute." Id. at *16. "When a party moves for summary judgment and the issue is contract interpretation, we will grant summary judgment if the contractual language is subject to only one reasonable interpretation." Id. (citing Sanford Inv. Co. v. Ahlstrom Mach. Holdings, Inc., 198 F.3d 415 (3d Cir. 1999) (applying Pennsylvania law)). "When a writing is clear and unequivocal, its meaning must be determined by its content alone." Murphy v. Duquesne University of the Holy Ghost, 565 Pa. 571, 591 (2001) (citations omitted).

## IV. DISCUSSION

### A. Paragraphs 5 and 7 of the Agreement do not Conflict and there is no Basis to Interpret Paragraph 7 as limiting Paragraph 5.

Mercy's entire argument about why Paragraph 7 of the Agreement controls is premised on the argument that Paragraphs 5 and 7 of the Agreement conflict and that under the doctrine of the specific controls the general, Paragraph 7 as the more specific controls Paragraph 5. This

6

argument is flawed from the outset. The Paragraphs deal with two separate issues. Paragraph 5 is titled "Reimbursement by Provider" while Paragraph 7 is titled "Recourse." There is some overlap between the two provisions as Paragraph 5 deals with <u>any</u> account and an account that is subject to the provisions of Paragraph 7 is obviously an account. However, this does not mean these two provisions conflict.

"Pennsylvania contract law begins with the firmly settled point that the intent of the parties to a written contract is contained in the writing itself." Bohler-Uddeholm America, Inc. v. Ellwood Group, Inc., 247 F.3d 79, 92 (3d Cir. 2001) (internal quotation marks and citations omitted). When interpreting a provision of the contract consideration must be given to the contract as a whole. Duquesne, 565 Pa. at 591 ("The whole contract must be taken together in arriving at contractual intent."); Bohler-Uddeholm, 247 F.3d at 97. Pennsylvania's law of contract interpretation does not allow words to be read into a contract that are not there or to interpret one provision of a contract so as to alter or contradict the plain meaning of a separate provision. Bohler-Uddeholm, 247 F.3d at 92 (an unambiguous contract must be interpreted by its content alone); RCN Corporation, 2004 U.S. Dist. LEXIS at *19 ("One portion of an agreement cannot be interpreted to annul another part of the same agreement.") (citation omitted).

Paragraph 5 clearly sets forth the role that the Bank strictly as financier, under the Agreement. Paragraph 5 of the Agreement is unambiguous regarding Mercy's obligation to reimburse the Bank for any account on demand and that the Bank is not responsible for any administrative, settlement and accounting issues. The relevant language is set forth below:

> 5. **REIMBURSEMENT BY PROVIDER.** PROVIDER understands and agrees that accounts acquired for financing by CSI under this Agreement will be financed by the BANK. PROVIDER understands that CSI is the administrator of all accounts. Provider agrees to deal only with CSI with respect to administrative,

7

> settlement and accounting inquiries. PROVIDER agrees to pay directly to the BANK on demand ninety two (92%) percent of the balance then due on any account which was acquired for financing from PROVIDER by CSI, that the BANK requires CSI to repurchase.

(Exhibit A, at ¶ 5.)

The meaning of this provision is clear on its face. Mercy is obligated to pay to the Bank 92% of the amount then due on any account upon demand and to deal solely with CSI with respect to accounting questions. The only restriction is that the Bank must also require CSI to repurchase its portion of the account. This is consistent with the overall premise of the contract. The contract contemplates that Mercy will pay CSI 8% of the face amount of patient accounts receivables that are financed by the Bank, with Mercy retaining 92%. (Exhibit A, at ¶ 6.) Thus, when an account is repurchased CSI would pay the Bank 8% and Mercy would pay the Bank 92%.

At the outset of the Agreement in the first 'whereas' clause it states that CSI has contracted with the Bank to provide financing for Mercy's (PROVIDER'S) patients. As the Bank is an express third party beneficiary under the Agreement and has not contracted directly with Mercy, it is only natural that the Agreement spells out Mercy's duty to reimburse the Bank. The purpose of the Agreement was not to shift the ultimate risk of loss on the patient account receivables (non-payment by the patient) from Mercy to the Bank. The purpose was to provide Mercy with cash up-front on its qualified patient accounts receivables, with the ultimate risk of loss still to be born by Mercy. CSI was paid by Mercy for obtaining financing on qualified patient accounts and to service and collect on these accounts. The Bank recouped its investment by collecting interest from the patient and was protected from loss by being able to return any account at any time. While Mercy bore the ultimate risk of loss on any non-performing

accounts, it still received a benefit from this arrangement in the form of the use of the money, interest free, while CSI attempted to collect the account from the patient.

The Bank was further protected from loss because Mercy has recognized that CSI was the administrator of all accounts and that it would look solely to CSI on administrative issues. Again this is consistent with the overall structure of the program, The Bank provided the money upfront, Mercy supplied the account receivables and received 92% of the face amount up front, and CSI administered and collected the accounts and received 8% of the face amount up front. In other words, in recognition of the fact that CSI not the Bank was administering the accounts, and as an inducement for the Bank to provide the financing, Mercy agreed that the Bank would not be responsible for any accounting issues arising under the Agreement. This, in essence, would put the parties most nearly back in the position they started from: The Bank would get its money back; Mercy would get the accounts back; and CSI as administrator of the accounts would be responsible to Mercy for any accounting issues.

Paragraph 7 can be read to fit squarely within this arrangement. Paragraph 7 deals with the return of delinquent accounts to Mercy, or in other words, accounts upon which CSI was unable to collect. Paragraph 7 outlines the responsibilities of CSI and Mercy with respect to delinquent accounts. CSI is to give Mercy notice of the delinquent accounts and return the accounts to Mercy. Mercy, upon notice by CSI, is to pay directly to the Bank 92% of the outstanding amount of any such account. Paragraph 7 also gives the Bank and CSI the right to offset amounts due from Mercy under this provision against new accounts. The Bank has no obligations to either CSI or Mercy under Paragraph 7, or any other provision of the Agreement for that matter. Paragraph 7 deals with the administration of non-performing accounts between CSI and Mercy.

9

7. **RECOURSE.** At the end of each calendar month during which BANK of CSI holds any account acquired for financing from PROVIDER, CSI will automatically present to the PROVIDER for repurchase all accounts that are delinquent for 90 days. PROVIDER agrees to reimburse directly to the BANK upon notification by CSI, ninety two (92%) percent of the balance then due on any account that has become 90 days delinquent during the preceding calendar month. CSI will give immediate notice to PROVIDER of all accounts which are ninety days delinquent. PROVIDER will not be held responsible for CSI'S 8% prorated fee on any unpaid accounts. CSI will pay to the BANK all fo the charges that are in excess of the original balance financed by the patient. CSI and BANK shall have the right of offset against sums due PROVIDER under this Agreement for the amount of any delinquent reimbursement obligations that exceed thirty (30) days.

Mercy would have the Court read Paragraph 7 as only requiring Mercy to repurchase accounts that are delinquent for 90 days if they were notified by CSI of the account by the end of the next calendar month. However, reading the contract as a whole, as even Mercy admits the Court must do in its Motion, it is clear that this is not the case. It is CSI's obligation, not the Bank's, to notify Mercy of delinquent accounts. Paragraph 5 clearly states that the Bank is not responsible for any administrative, settlement and accounting issues. Thus, if the Mercy's interpretation of Paragraph 7 were correct the Bank's ability to recover on delinquent accounts would be totally in the hands of CSI and it would in effect be held responsible for the administration of accounts. Finally, under Mercy's interpretation the language in Paragraph 5 allowing the Bank to demand repurchase of any account at any time would be rendered mere surplusage.

By taking both paragraphs as they come it is apparent that there is no "conflict" and enforcing both, as written, would give full effect to the parties relationship. There is nothing in Paragraph 5, Paragraph 7 or the remainder of the Agreement that suggests that the Bank forfeits its right to be reimbursed by Mercy for a breach by CSI. The Bank is not contractually obligated to provide financing under the Agreement. Neither CSI nor Mercy can force the Bank to provide

10

financing. If the Bank did not provide financing neither CSI nor Mercy would have a remedy under the Agreement against the Bank. This fact is further illustrated by the posture of this case in which there are no claims against the Bank by either party. The Bank does have an inducement to provide financing as contemplated by the Agreement, Paragraph 5. Paragraph 5 allows the Bank to cash out at any time, to take its money and go. This is the bargain the parties struck. Paragraph 7 cannot be read to change that. By allowing the Bank to demand repurchase of any account at any time, even one that CSI did not timely recourse, the relationship between the parties is preserved. This recognizes that the Bank has no control over the quality of the patient account receivables supplied by Mercy, nor the quality of the collection efforts and administration of the receivables by CSI. If Mercy has been damaged by CSI's alleged failure to timely submit accounts under Paragraph 7, then that is an issue between Mercy and CSI not Mercy and the Bank. In other words, allowing the Bank to demand repurchase from Mercy under Paragraph 5 of an account which was not "timely" recoursed under Paragraph 7, does not leave Mercy without a remedy. Mercy can pursue a claim against CSI for any damages it incurred due to any conduct of CSI—the administrator of the accounts by having to repurchase the delinquent account at a later date.

However, even if the Court would accept Mercy's interpretation of Paragraph 7, there remain genuine issues of material fact over the parties' performance under Paragraph 7 such that it would be inappropriate to enter summary judgment under Mercy's theory.

**B. Mercy has failed to carry its burden of establishing the absence of a genuine issue of material fact.**

    1. <u>Mercy's Statement of Uncontested Facts and the Erdman Affidavit both acknowledge and highlight a genuine dispute over a material fact.</u>

On a motion for summary judgment the moving party has the initial burden of identifying the evidence that demonstrates the absence of a genuine issue of material fact. <u>Allegheny International, Inc. v. Allegheny Ludlum Steel Corp.</u>, 40 F.3d 1416 (3d Cir. 1994). In applying the standard all inferences must be drawn against the moving party. <u>Id.</u> Far from showing the absence of a genuine issue of material fact, Mercy has highlighted one and attempted to introduce evidence that is improper on a motion for summary judgment.

Mercy has submitted what it titles a "Statement of Uncontested Facts" ("Mercy's Statement of Facts" which in fact highlights a dispute over a material fact that is central to Mercy's theory of the case.[2]  Mercy claims that CSI was untimely in submitting accounts for recourse under Paragraph 7 of the Agreement. However, both Mercy's Statement of Facts and the Affidavit of Russ Erdman, on which Mercy's Statement of Facts relies, highlight the dispute over whether or not Mercy would accept recourse accounts from CSI on a monthly basis. In addition, the Erdman Affidavit fails to comply with the requirements of Federal Rule of Civil Procedure 56(e) governing the form and content of an affidavit used to support a motion for summary judgment. In effect, if the Erdman affidavit were allowed to stand it would turn Mr. Erdman into both Judge and Jury.

Mercy's Statement of Facts also contains information that is only relevant if the Court were to determine that the Agreement is ambiguous. A finding that the Agreement was ambiguous would be fatal to Mercy's Motion for Summary Judgment. <u>See, Bohler-Uddeholm</u>

---

[2] The Bank, contemporaneously with this Memorandum, has filed Objections to Mercy's Statement of Facts and a Counterstatement of Fact which is incorporated herein by reference. The arguments noted there in will be summarized here.

America, Inc. v. Ellwood Group, Inc., 247 F.3d 79 (3d Cir. 2001); Allegheny International, Inc. v. Allegheny Ludlum Steel Corp., 40 F.3d 1416 (3d Cir. 1994).

The Bank has also identified deposition testimony and documents that raise a genuine issue of material fact. Most importantly that it is disputed as to whether or not Mercy would accept recourse accounts on a monthly basis and whether or not Mercy waived any alleged breach of paragraph 7 by promising to pay the Bank through September 2001. (See Counterstatement para.3 and 10.)

   2. <u>Through its answers to interrogatories Mercy has conceded that it has no defenses against the Bank under the Agreement and/or has waived any right to assert CSI's conduct as a breach.</u>

While it is the Bank's position that under the plain meaning of the Agreement Mercy cannot assert a breach of the Agreement by CSI as a defense to a demand for repurchase made by the Bank, through its conduct in this case Mercy has waived the right to assert any such defense. In its complaint against CSI Mercy outlined various allegations regarding CSI's performance under the Agreement in its complaint against CSI. (Mercy's Complaint against CSI ("Mercy Complaint") at para. 8-16, a true and correct copy of which is attached to the Counterstatement as Exhibit L.) In answer to the Bank and CSI's complaint against Mercy, Mercy repeatedly denied the allegations against it and incorporated by reference the allegations in the Mercy Complaint that CSI had breached the Agreement. (Mercy's Answer and Affirmative Defenses ("Mercy Answer") at para. 19-21, 23-24, 26-28, 30-32, 35-39, and 41-42, a true and correct copy of which is attached as Exhibit M.) Mercy also included affirmative defenses which allege that CSI and/or the Bank breached the Agreement. (Mercy Answer, at Affirmative Defenses 13 and 16.) The Bank's claims against Mercy proceeded alone after CSI's bankruptcy stayed the claims

13

between CSI and Mercy. (See Order of Judge Waldman dated January 7, 2003. A true and correct copy of the Order is attached to the Counterstatement as Exhibit N)

On January 27, 2002 the Bank served interrogatories on Mercy. (A true and correct copy of the Bank's Interrogatories directed to Mercy ("Bank's Interrogatories") are attached to the Counterstatement as Exhibit O.) The Bank's Interrogatories contained several contention interrogatories directed to Mercy's claims that CSI had breached the Agreement and therefore the Bank was not entitled to recover. (Bank's Interrogatories, at para. 6-19.) These contention interrogatories were necessary to allow the Bank to meet Mercy's allegations that it was not liable to the Bank based on CSI's breach of the Agreement as set forth in Mercy's Answer, both in the answer itself and as an affirmative defense. (See Mercy's Answer, at para. 19-21, 23-24, 26-28, 30-32, 35-39, 41-42, and Affirmative Defenses 13 and 16.) Mercy's response to these contention interrogatories was to state:

> Objection. Mercy objects to the interrogatory because it improperly seeks to obtain information on behalf of Defendant CSI, which is not permitted to participate in this case due to the automatic stay imposed when it filed for bankruptcy on December 16, 2002. Mercy has not asserted any claims against the Bank. Therefore, it has no legitimate reason for asking this contention interrogatory other than to obtain information for CSI that CSI cannot obtain on its own.

(Mercy's Responses and Objections to the Bank's First Set of Interrogatories Directed to Mercy at para. 6-19, a true and correct copy of which is attached as Exhibit P.)

The Bank took exception to the evasive and merit less objections to the contention interrogatories and by letter dated March 4, 2003 from Christopher M. Brubaker to Ronald L. Williams (then Mercy's counsel of record) demanded complete responses to these interrogatories. (A true and correct copy of the letter dated March 4, 2003 from Christopher M. Brubaker to Ronald L. Williams is attached to the Counterstatement as Exhibit Q.) Mercy

14

responded through Mr. Williams by first claiming their responses complied with the Pennsylvania Rules of Civil Procedure, and then the Federal Rules of Civil Procedure, and as such would not be amending their responses. (Letters dated March 5 and 7, 2003 from Ronald L. Williams to Christopher M. Brubaker, true and correct copies of which are attached to the Counterstatement as Exhibit R.) As discovery has now ended and Mercy has failed to amend their responses they are bound by their responses.

By refusing to provide the Bank with information related to the defenses asserted in its answer on the basis that the Bank is not entitled to the information; Mercy has clearly either conceded that the Agreement does not allow it to assert any alleged breach of the Agreement by CSI as a defense to the Bank's demand for payment, or have waived any such defense. Answers to interrogatories are a form of party admission. 7-33 Moore's Federal Practice - Civil §33.160.

Otherwise, the responses would be in clear violation of the Federal Rules of Civil Procedure. Federal Rule of Civil Procedure 26(b)(1) provides in pertinent part that, "parties may obtain discovery regarding any matter, not privileged that is relevant to the claim or defense of any party... ." "Interrogatories may relate to any matters which can be inquired into under Rule 26(b)(1), and the answers may be used to the extent permitted by the rules of evidence." F.R.C.P. 33(c). The Bank properly sought information relevant to the defenses asserted against it by Mercy, and was entitled to receive same. By signing the objections and responses Mr. Williams certified that to the best of his knowledge information and belief the responses and objections were consistent with the Federal Rules of Civil Procedure, "not interposed for any improper purpose such as to harass or to cause unnecessary delay or needless increase in the cost of the litigation," and not unreasonable or unduly burdensome given the needs of the case. Fed. R. Civ. P. 26(g)(2)(A)(B) and (C). Mercy, through its counsel, reaffirmed that the responses

were in compliance with the Federal Rules of Civil Procedure even after the Bank explained why it was entitled to the information. After purposely and repeatedly refusing to provide the Bank with information related to CSI's alleged breach of the Agreement because the Bank "is not entitled to the information", Mercy cannot now assert those very same allegations as a defense to the Bank's claims.

## V.  CONCLUSION

Mercy has failed to establish the absence of a genuine issue of material fact or that it is entitled to judgment as a matter of law. Mercy's attempt to construe Paragraph 7 of the Agreement as the controlling provision of this entire case is contrary to Pennsylvania law. Mercy's own statement of fact acknowledges a dispute over a fact that is central to its theory of the case. The rest of the facts that Mercy seeks to raise in this Motion are not appropriate for a motion for summary judgment as a matter of law. The Bank has set forth facts, through both deposition testimony and documents, that establish a genuine issue of material fact. Fore all of the foregoing reasons Mercy's Motion for Summary Judgment must be denied.

**Respectfully Submitted,**

**KITTREDGE, DONLEY, ELSON,
FULLEM & EMBICK, LLP**

_____
JOSEPH M. DONLEY, ESQUIRE
CHRISTOPHER BRUBAKER, ESQUIRE
I.D. NOS. 23058/82057
400 Market Street, Suite 200
Philadelphia, PA 19106-2416
(215) 829-9900

Dated: January 31, 2005

Attorneys for Plaintiff
First National Bank of Montana

## CERTIFICATE OF SERVICE

I, CHRISTOPHER M. BRUBAKER, hereby certify that on this date I caused to be served a true and correct copy of the foregoing First National Bank of Montana's Response and Memorandum of Law in Opposition to Mercy Health System of Southeastern Pennsylvania's Motion for Summary Judgment on the Claims of CSI Financial, Inc. and the First National Bank of Montana, via Federal Express Overnight Delivery, as follows:

> Stacey A. Scrivani, Esquire
> Stevens & Lee
> 111 N. Sixth Street
> P.O. Box 679
> Reading, PA 19603-0679
>
> Patrick J. Egan, Esquire
> 239 S. Camac Street
> Philadelphia, Pennsylvania 19107

Dated: January 31, 2005

Christopher M. Brubaker