## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

MERCY HEALTH SYSTEM OF
SOUTHEASTERN PENNSYLVANIA,

                Plaintiff

    v.

ROSS P. RICHARDSON, Chapter 7 Trustee
for the Bankruptcy Estate of CSI Financial,
Inc.,

                Defendant

:
:
:    Civil Action
:    No. 01-CV-05681
:
:
:
:
:
:
:
:
:

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\* \*\*\* \*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

FIRST NATIONAL BANK OF MONTANA,
INC. and ROSS P. RICHARDSON, Chapter 7
Trustee for the Bankruptcy Estate of CSI
Financial, Inc.,

                Plaintiffs

    v.

MERCY HEALTH SYSTEM OF
SOUTHEASTERN PENNSYLVANIA,

                Defendant

:
:
:
:    Civil Action
:    No. 02-CV-03608
:
:
:
:
:
:
:
:
:

---

## FIRST NATIONAL BANK OF MONTANA'S OBJECTIONS TO MERCY HEALTH SYSTEM OF SOUTHEASTERN PENNSYLVANIA'S STATEMENT OF UNCONTESTED FACTS IN SUPPORT OF ITS MOTION FOR PARTIAL SUMMARY JUDGMENT ON ITS CLAIM FOR BREACH OF CONTRACT AGAINST CSI FINANCIAL, INC. AND IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT ON THE CLAIMS OF CSI FINANCIAL, INC AND THE FIRST NATIONAL BANK OF MONTANA AND COUNTERSTATEMENT OF FACTS

Plaintiff, First National Bank of Montana, Inc. ("Bank"), by its counsel, Kittredge,

Donley, Elson, Fullem & Embick, LLP hereby submits these Objections to Mercy Health System

of Southeastern Pennsylvania's ("Mercy") Statement of Uncontested Fact in Support of its

Motion for Partial Summary Judgment on its Claims for Breach of Contract against CSI

Financial, Inc. and in Support of its Motion for Summary Judgment on the Claims of CSI

Financial, Inc. and the First National Bank of Montana ("Mercy's Statement of Fact") and Counterstatement of Fact.

### General Objections

The Bank previously filed a motion for partial summary judgment on the issue of interpretation of the Patient Finance Agreement ("Agreement"), which governs the rights and obligations of the parties to this case, on November 1, 2004. The resolution of that motion is still pending. Mercy's motion for summary judgment against the Bank is essentially a cross-motion for summary judgment on the issue of contract interpretation. This is a question of law and ripe for judicial determination. Halpin v. La Salle University, 639 A.2d 37 (Pa. Super. 1994) (interpretation of a contract is a question of law). However, Mercy is attempting to improperly cloud the legal issue of interpreting the Agreement with documents and testimony that are inadmissible regarding the interpretation of an unambiguous contract. "A written contract which is deemed unambiguous must be held to express all of the negotiations, conversations, and agreements made prior to its execution, and neither oral testimony, nor prior written agreements, or other writings are admissible to explain or vary the terms of the contract." Id. at 39 (internal quotation marks and citations omitted).

Should the Court find that the Patient Finance Agreement is ambiguous, then the question of its meaning is not appropriate for summary judgment. Bohler-Uddeholm America, Inc. v. Ellwood Group, Inc., 247 F.3d 79 (3d Cir. 2001); Allegheny International, Inc. v. Allegheny Ludlum Steel Corp., 40 F.3d 1416 (3d Cir. 1994) (ambiguous writings are interpreted by the fact finder). Mercy apparently concedes that the marketing materials are only relevant if the Agreement is deemed ambiguous in Statement number 125 stating "John (sic) did not review CSI's marketing materials which could be relevant if the Court finds the Agreement ambiguous."

2

Mercy has also included an affidavit by Russ Erdman ("Erdman Affidavit"), attached to Mercy's Appendix as Exhibit 9, which acknowledges that there is a disputed issue of material fact, includes conclusions of law and fact, and does not even identify documents used to create the affidavit. Such an affidavit cannot be the basis to support a motion for summary judgment. Rule 56(c) has very specific requirements for an affidavit either supporting or opposing a motion for summary judgment which the Erdman Affidavit does not meet.

> Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein. Sworn or certified copies of all papers or parts thereof referred to in an affidavit shall be attached thereto or served therewith.

F.R.C.P 56(e). The Erdman Affidavit contains conclusions of law and fact (Mercy's Appendix, Exhibit 9 para. 6, 13, 26, and 31-32) and fails to identify the documents used to create various schedules which are attached as an exhibit to the affidavit and are referred to throughout the affidavit (Mercy's Appendix, Exhibit 9 para. 16-26, and 32). Conclusions of law are for the court to determine while conclusions of fact are the province of the jury, not Mr. Erdman. With respect to the schedule created by Mr. Erdman the only information provided is that it was made using information produced in discovery. In a case involving tens of thousands of pages of documents such a vague reference regarding the identity of the documents used does not even come close to the requirement that documents referred to in an affidavit be attached.

Interestingly, both the Erdman Affidavit and Mercy's Statement of Fact concede that there is a disputed issue of material fact regarding whether or not Mr. Erdman told Cindy Dorr of CSI that Mercy would only accept recourse files when they had new account files ready to send. (Mercy's Appendix, Exhibit 9 para. 27-30; Mercy's Statement of Fact para. 63-71.) "[C]ertain scenarios may arise where a material fact cannot be resolved without weighing the credibility of

3

a particular witness or individual ... ." Schoonejongen v. Curtiss-Wright Corp., 143 F.3d 120, 130 (3d Cir. 1998). In such a case summary judgment is inappropriate because there is sufficient evidence on either side for reasonable minds to differ. Id. In Schoonjongen the moving party submitted an affidavit, together with other corroborating affidavits and deposition testimony, on a material issue in dispute. Id. at 130. The court held witness credibility was not implicated where there was no evidence of any kind offered by the non-moving party. Id. Here, both the Erdman Affidavit and Mercy's Statement of Fact clearly demonstrate that there is a dispute over what was or was not said by Mr. Erdman to Ms. Dorr. Clearly this is a situation where the credibility of both Mr. Erdman and Ms. Dorr must be determined by the jury in order to resolve the issue over whether Mercy would accept recourse accounts from CSI without having new accounts ready. Furthermore, the facts at issue here, which are clearly in dispute, are only relevant to the Bank's claims if the Court rejects the Bank's position on the proper interpretation of the Agreement which is set forth in the Bank's Motion for Partial Summary Judgment that is pending before the Court.

Given the widespread failure to conform with the mandates of Rule 56(e) and the Erdman Affidavit's tacit acknowledgement of a disputed issue of material fact the Erdman Affidavit should be stricken in its entirety along with all statements of "uncontested" fact that are premised on the Erdman Affidavit.

### **Specific Objections**

Objection to numbers 1, 3, 6-11, and 14-21. The CSI Fast Trac marketing brochure, Bates numbered 3711-3721, and attached to Mercy's Appendix in Support of its Motions for Summary Judgment ("Mercy's Appendix") as Exhibit 1 is a document that speaks for itself. The rights of the parties to this action are governed by the Patient Finance Agreement ("Agreement").

4

(A true and correct copy of the Agreement is attached hereto as Exhibit A.)  Extrinsic evidence, including other writings, is not admissible to explain or vary the terms of an unambiguous contract.  Halpin v. La Salle University, 639 A.2d 37 (Pa. Super. 1994).  As set forth in the Bank's Motion for Partial Summary Judgment the Agreement is unambiguous and must be interpreted on its face.  The CSI Fast Trac marketing brochure, Bates numbered 3711-3721 and attached as Exhibit 1 to Mercy's Appendix, is not part of the Agreement nor is it incorporated into the terms of the Agreement.  Therefore, it is irrelevant to a motion for summary judgment on the interpretation of the Agreement.  Should the Court find the Agreement ambiguous, then the interpretation of the Agreement is not an appropriate subject for a motion to dismiss as it becomes an issue of fact for the trier of fact.  Bohler-Uddeholm America, Inc. v. Ellwood Group, Inc., 247 F.3d 79 (3d Cir. 2001); Allegheny International, Inc. v. Allegheny Ludlum Steel Corp., 40 F.3d 1416 (3d Cir. 1994) (ambiguous writings are interpreted by the fact finder).

Objection to number 2.  The marketing materials provided by CSI to Mercy, Bates numbered 3227-3261, and attached to Mercy's Appendix as Exhibit 2 are documents that speak for themselves.  The rights of the parties to this action are governed by the Agreement.  (Exhibit A hereto.)  Extrinsic evidence, including other writings, is not admissible to explain or vary the terms of an unambiguous contract.  Halpin v. La Salle University, 639 A.2d 37 (Pa. Super. 1994).  As set forth in the Bank's Motion for Partial Summary Judgment the Agreement is unambiguous and must be interpreted on its face.  The marketing materials provided by CSI to Mercy, Bates numbered 3227-3261 and attached as Exhibit 2 to Mercy's Appendix, are not part of the Agreement nor are they incorporated into the terms of the Agreement.  Therefore, they are irrelevant to a motion for summary judgment on the interpretation of the Agreement.  Should the Court find the Agreement ambiguous, then the interpretation of the Agreement is not an

appropriate subject for a motion to dismiss as it becomes an issue of fact for the trier of fact. Bohler-Uddeholm America, Inc. v. Ellwood Group, Inc., 247 F.3d 79 (3d Cir. 2001); Allegheny International, Inc. v. Allegheny Ludlum Steel Corp., 40 F.3d 1416 (3d Cir. 1994) (ambiguous writings are interpreted by the fact finder).

Objection to numbers 4-5, 7, 12-13, 22-24, 42-48 and 59. The rights of the parties to this action are governed by the Agreement. (Exhibit A hereto.) Extrinsic evidence, including oral testimony, is not admissible to explain or vary the terms of an unambiguous contract. Halpin v. La Salle University, 639 A.2d 37 (Pa. Super. 1994). As set forth in the Bank's Motion for Partial Summary Judgment the Agreement is unambiguous and must be interpreted on its face. Should the Court find the Agreement ambiguous, then the interpretation of the Agreement is not an appropriate subject for a motion to dismiss as it becomes an issue of fact for the trier of fact. Bohler-Uddeholm America, Inc. v. Ellwood Group, Inc., 247 F.3d 79 (3d Cir. 2001); Allegheny International, Inc. v. Allegheny Ludlum Steel Corp., 40 F.3d 1416 (3d Cir. 1994) (ambiguous writings are interpreted by the fact finder). To the extent these "facts" are not being proffered as evidence of the meaning of the Agreement they are either immaterial to the parties' performance thereunder and are therefore irrelevant, or they are in dispute. A Counter Statement of Facts is presented below.

Objection to numbers 25-31, 58. The Patient Finance Agreement is a document that speaks for itself. Interpretation of an unambiguous contract is a question of law for the court to decide. Halpin v. La Salle University, 639 A.2d 37 (Pa. Super. 1994); Bohler-Uddeholm America, Inc. v. Ellwood Group, Inc., 247 F.3d 79 (3d Cir. 2001); Allegheny International, Inc. v. Allegheny Ludlum Steel Corp., 40 F.3d 1416 (3d Cir. 1994). The interpretation of an ambiguous contract is not the proper subject of a motion for summary judgment. Bohler-

Uddeholm America, Inc. v. Ellwood Group, Inc., 247 F.3d 79 (3d Cir. 2001); Allegheny
International, Inc. v. Allegheny Ludlum Steel Corp., 40 F.3d 1416 (3d Cir. 1994) (ambiguous
writings are interpreted by the fact finder).

Objection to numbers 32-41, 64, and 72-81. As noted in detail above, the Erdman
affidavit is materially deficient in several respects because it does not conform to the
requirements of F.R.C.P. 56(e) and tacitly acknowledges the existence of a dispute over a
material fact. The Erdman Affidavit should be stricken in its entirety along with these
paragraphs from Mercy's Statement of Fact which rely on the Erdman affidavit for support.

Objection to numbers 49-52. The Bank's internal audit, attached to Mercy's Appendix as
Exhibit 13, are documents that speak for themselves. The rights of the parties to this action are
governed by the Agreement. (Exhibit A hereto.) Extrinsic evidence, including other writings, is
not admissible to explain or vary the terms of an unambiguous contract. Halpin v. La Salle
University, 639 A.2d 37 (Pa. Super. 1994). As set forth in the Bank's Motion for Partial
Summary Judgment the Agreement is unambiguous and must be interpreted on its face. The
Bank's internal audit documents, attached as Exhibit 13 to Mercy's Appendix, are not part of the
Agreement nor are they incorporated into the terms of the Agreement. Therefore, they are
irrelevant to a motion for summary judgment on the interpretation of the Agreement. Should the
Court find the Agreement ambiguous, then the interpretation of the Agreement is not an
appropriate subject for a motion to dismiss as it becomes an issue of fact for the trier of fact.
Bohler-Uddeholm America, Inc. v. Ellwood Group, Inc., 247 F.3d 79 (3d Cir. 2001); Allegheny
International, Inc. v. Allegheny Ludlum Steel Corp., 40 F.3d 1416 (3d Cir. 1994) (ambiguous
writings are interpreted by the fact finder).

Objection numbers 53-57. The May 9, 2002 letter from Jim Sewell, attached to Mercy's Appendix as exhibit 14, is a document that speaks for itself. The rights of the parties to this action are governed by the Agreement. (Exhibit A hereto.) Extrinsic evidence, including other writings, is not admissible to explain or vary the terms of an unambiguous contract. Halpin v. La Salle University, 639 A.2d 37 (Pa. Super. 1994). As set forth in the Bank's Motion for Partial Summary Judgment the Agreement is unambiguous and must be interpreted on its face. The May 9, 2002 letter from Jim Sewell, attached as Exhibit 14 to Mercy's Appendix, are not part of the Agreement nor are they incorporated into the terms of the Agreement. Therefore, they are irrelevant to a motion for summary judgment on the interpretation of the Agreement. Should the Court find the Agreement ambiguous, then the interpretation of the Agreement is not an appropriate subject for a motion to dismiss as it becomes an issue of fact for the trier of fact. Bohler-Uddeholm America, Inc. v. Ellwood Group, Inc., 247 F.3d 79 (3d Cir. 2001); Allegheny International, Inc. v. Allegheny Ludlum Steel Corp., 40 F.3d 1416 (3d Cir. 1994) (ambiguous writings are interpreted by the fact finder).

Objection to numbers 82-135. These allegations pertain to a claim by CSI against Mercy and have no bearing on the Bank's claims against Mercy. Moreover, extrinsic evidence is not admissible to explain or vary the terms of an unambiguous contract. Halpin v. La Salle University, 639 A.2d 37 (Pa. Super. 1994). Should the Court find the Agreement ambiguous, then the interpretation of the Agreement is not an appropriate subject for a motion to dismiss as it becomes an issue of fact for the trier of fact. Bohler-Uddeholm America, Inc. v. Ellwood Group, Inc., 247 F.3d 79 (3d Cir. 2001); Allegheny International, Inc. v. Allegheny Ludlum Steel Corp., 40 F.3d 1416 (3d Cir. 1994) (ambiguous writings are interpreted by the fact finder).

**Counter Statement of Facts**

8

1.    Starting almost immediately CSI began returning accounts to Mercy for repurchase under the terms of the Agreement. In total, approximately 70% of the accounts financed from the first batch of patient accounts receivable were returned to Mercy for repurchase under the various provisions of the Agreement that allow for repurchase. (Deposition of William Partain October 9, 2003 ("Partain Dep.") at 94:17–95:16. True and correct copies of the relevant pages of the Partain Dep. are attached hereto as Exhibit B.)

2.    From the beginning Mercy resisted repurchasing the accounts with cash as contemplated by the Agreement. (Deposition Transcript of Cindy Dorr July15, 2004 ("Dorr Dep.") at 59:9–60:9; 76:14–78:6; 100:18–101:1. True and correct copies of the relevant pages of the Dorr Dep. are attached hereto as Exhibit C.) (Deposition Transcript of Robert Jaeb July 12, 2004 ("Jaeb Dep.") at 206:17-207:13; 208:8-14; 211:5–212:8. True and correct copies of the relevant pages of the Jaeb Dep. are attached hereto as Exhibit D.)

3.    Mercy also refused to accept any accounts for repurchase until Mercy had a new batch of accounts to offset (in whole or in part) the accounts being returned. (Dorr Dep. at 59:9–60:9; 76:14–78:6; 100:18–101:1; 123:17 – 124:4; 125:11-13; Jaeb Dep. at 198:17-21; 206:17-207:13; 208:8-14; 211:5–212:8; 287:12-15; Deposition Transcript of Neysha Ann Humphreys ("Humphreys Dep.") at 90:13 – 92:3; 113:14 – 115:18. True and correct copies of the relevant pages of the Humphreys Dep. are attached hereto as Exhibit E.)

4.    In the spirit of good faith CSI allowed Mercy to repurchase the accounts by way of offset. (Jaeb Dep. at 208:8-14.)

5.    However, the quality of the accounts being submitted to CSI for financing by the Bank never improved over the first batch and approximately 70% of all accounts financed by the

9

Bank throughout the duration of the contract were returned to Mercy for repurchase. (Partain Dep. at 94:17–97:17; 110:12–111:2; Dorr Dep. at 42:5–45:23.)

      6.    Mercy's own records show that Mercy received $3,064,086.81 in wired funds from the Bank for accounts it submitted for financing. Approximately $1.1 million of these funds were sent after the initial funding. (True and correct copies of Mercy's bank statements, Bates numbered 6075-6098, are attached hereto as Exhibit F.)

      7.    Mercy even instituted a process whereby patients would be billed twice and if no payment was received by Mercy only then would an account be sent to CSI for consideration in the program. If a payment was made by the patient then Mercy would keep the account. (Deposition Transcript of Russ Erdman ("Erdman Dep.") at 113:9 – 116:17.) True and correct copies of the relevant pages of the Erdman Dep. are attached hereto as Exhibit G.)

      8.    As a result of the high rate of returned accounts Mercy never became current on its obligation to repurchase accounts. (Dorr Dep. at 59:9 – 60:9; 76:14 – 78:6; 100:18 – 101:1; Humphreys Dep. at 90:13 – 92:3; 113:14 – 115:18.)

      9.    Throughout September 2001 the Bank attempted to enforce the Agreement through CSI. (Partain Dep. at 69:18 – 74:20; and, 105:1 – 106:7; Jaeb Dep. at 275:17 – 277:10; 278:9-16; See also, E-mail correspondence between CSI and Mercy attached hereto as Exhibit H.)

      10.    Mercy acknowledged its obligation to repay the Bank for the returned accounts through September 2001. (Deposition Transcript of Doug Smith October 14, 2003 ("Smith Dep.") at 213:14 – 221:3. True and correct copies of the relevant pages of the Smith Dep. are attached hereto as Exhibit I. E-mail in Exhibit H; Jaeb Dep. at 274:23 -275:23.)

11.    In October 2001 the Bank made a demand directly on Mercy to bring current its obligation to repurchase accounts under the Agreement by paying to the Bank the outstanding amount then due and owing. (Partain Dep. at 79:4 – 80:1; Deposition Transcript of Kenneth Kaiser October 8, 2003 ("Kaiser Dep.") at 59:6-11; 63:3-20; 66:10 – 67:8. True and correct copies of the relevant pages of the Kaiser Dep. are attached hereto as Exhibit J; E-mail from Kenneth Kaiser to Doug Smith October 2, 2001 attached hereto as Exhibit K.)

12.    A true and correct copy of Mercy's complaint in this matter is attached hereto as Exhibit L.

13.    A true and correct copy of Mercy's Answer and Affirmative Defenses is attached hereto as Exhibit M.

14.    A true and correct copy of the Order of Judge Waldman dated January 7, 2003 is attached hereto as Exhibit N.

15.    A true and correct copy of the Bank's Interrogatories directed to Mercy is attached hereto as Exhibit O.

16.    A true and correct copy of Mercy's Responses and Objections to the Bank's First Set of Interrogatories Directed to Mercy is attached hereto as Exhibit P.

17.    A true and correct copy of the letter dated March 4, 2003 from Christopher M. Brubaker to Ronald L. Williams is attached hereto as Exhibit Q.

18.    Letters dated March 5 and 7, 2003 from Ronald L. Williams to Christopher M.

Brubaker, true and correct copies of which are attached hereto as Exhibit R.

**Respectfully submitted,**

**KITTREDGE, DONLEY, ELSON,
FULLEM & EMBICK, LLP**


JOSEPH M. DONLEY, ESQUIRE
CHRISTOPHER BRUBAKER, ESQUIRE
I.D. NOS. 23058/82057
400 Market Street, Suite 200
Philadelphia, PA 19106-2416
(215) 829-9900

Dated: January 31, 2005

Attorneys for Plaintiff
First National Bank of Montana

12

# EXHIBIT "A"

## PATIENT FINANCING AGREEMENT

THIS AGREEMENT made and entered into this _18th_ day of _October_, 1999, between MERCY HEALTH SYSTEM whose mailing address is 1 West Elm St, Conshohocken, PA 19428 (herein PROVIDER) and CSI FINANCIAL, INC., 100 North Park Avenue, P.O. Box 182, Helena, MT, 59624 (herein CSI).

WHEREAS, CSI has contracted with The FIRST NATIONAL BANK of MONTANA (herein BANK) to supply PROVIDER's PATIENTS with prompt financing for qualified accounts receivable, and

WHEREAS, PROVIDER being desirous of obtaining prompt funds for its qualified accounts receivable, PROVIDER will participate in a program offered by CSI whereby patients of PROVIDER may be provided financing for sums due PROVIDER for services rendered by PROVIDER as described in this Agreement, and

NOW THEREFORE, in consideration of the terms and provisions of this Agreement, the parties agree as follows:

1.  CSI OBLIGATIONS. CSI agrees:

    1.1. This Agreement and all transactions performed hereunder by CSI shall be in accordance with all applicable federal, state and local laws, rules and regulations including, without limitation, Truth in Lending laws and as any of the same may be modified or amended from time to time. CSI agrees to indemnify, defend and hold PROVIDER harmless from any claim or liability relating to any violations of the forgoing laws and regulations;

    1.2. To provide all forms and documents necessary to facilitate the approval and financing of patient accounts as contemplated by this Agreement and

    1.3. Provide assistance in the training of PROVIDER's employees with respect to the procedures and guidelines governing the accounts receivable financing program. CSI will also supply the necessary training material.

    1.4. The person who executes this agreement on behalf of CSI is duly authorized to do so.

2.    PROVIDER OBLIGATIONS.    PROVIDER agrees:

2.1. Qualified accounts of the PROVIDER which have been submitted to CSI for financing, shall be subjected to this agreement.  PROVIDER warrants that each such account is a bona fide obligation for goods and services rendered and that it has complied with all applicable federal, state and local laws, rules and regulations and as any of the same may be modified or amended from time to time.  PROVIDER agrees to indemnify, defend and hold CSI harmless from any claim or liability relating to the financing of an invalid account receivable.

2.2. To present to CSI, on behalf of its patients, for financing only a valid debt that arises from legal and bona fide  provision of goods or services, free of all liens and encumbrances and not subject to offset or counterclaim;

The term Valid Debt refers to those accounts that are owed by the patient to the Provider.  All accounts that are transferred to the Bank that should have been purged from the Provider's accounts receivable register, will be charged interest at the rate of fifteen percent (15%) by the Bank to the Provider for the duration of the time the accounts in question remain assigned to the Bank.  Provider will be billed for accrued interest on said accounts and the accrued Interest must be paid on or before thirty (30) days after the billing date or until the account(s) is repurchased by the Provider from the Bank.

2.3 To forward directly to the BANK any payment from a patient whose account  has been financed by CSI or BANK under the terms of this Agreement.

2.4. Not to assess a surcharge on any transaction for which the patient has requested financing of his/her account by CSI under the terms of this Agreement;

2.5. PROVIDER will furnish a copy of its annual financial report to CSI to be furnished to BANK at the end of such PROVIDER's fiscal year for each year in which CSI or BANK holds an unpaid account financed by Bank.

2.6. The person who executes this agreement on behalf of PROVIDER is duly authorized to do so.

3.    TRADEMARKS AND TRADE NAMES.  Both CSI and the PROVIDER agree that all trademarks and trade names shall remain the exclusive property of the respective parties. The PROVIDER may display the service marks and other materials provided by CSI if it so desires.

-2-

4.  ACCOUNT ADJUSTMENTS.  PROVIDER agrees to establish and maintain a fair and uniform policy to resolve disputes involving its patients' accounts that have been financed by CSI.  All disputes involving the goods or services shall be settled between PROVIDER and the Patient; PROVIDER agrees to indemnify, defend and hold CSI and BANK harmless from any claim or liability relating to any such dispute between a patient and PROVIDER. In addition, CSI agrees to indemnify the Hospital against any liability arising out of disputes between CSI and the patient.

5.  REIMBURSEMENT BY PROVIDER.  PROVIDER understands and agrees that accounts acquired for financing by CSI under this Agreement will be financed by the BANK.  PROVIDER understands that CSI is the administrator of all accounts.  PROVIDER agrees to deal only with CSI with respect to administrative, settlement and accounting inquiries. PROVIDER agrees to pay directly to the BANK on demand ninety two (92%) percent of the balance then due on any account which was acquired for financing from PROVIDER by CSI, that the BANK requires CSI to repurchase. PROVIDER will not be held responsible for CSI'S 8% prorated fee on unpaid accounts. The obligation hereunder for PROVIDER to reimburse CSI is limited to the following circumstances and the circumstances described in paragraph 7.

    5.1. transactions in which the patient disputes liability
         for the services;

    5.2. transactions that are fraudulent or illegal.


6.  PAYMENT OF FEES.  PROVIDER will pay to CSI a fee of eight percent (8%) for the processing and settlement of all accounts financed by CSI and the BANK.  The fee will be paid by discounting accounts as they are acquired for financing by CSI by the amount of the fee provided for above.  The BANK will electronically deposit ninety two percent (92%) of the financed account balance directly into PROVIDER'S bank account and the remaining eight percent (8%) directly into CSI'S bank account.


7.  RECOURSE.  At the end of each calendar month during which BANK or CSI holds any account acquired for financing from PROVIDER, CSI will automatically present to the PROVIDER for repurchase all accounts that are delinquent for 90 days. PROVIDER agrees to reimburse directly to the BANK upon notification by CSI, ninety two (92%) percent of the balance then due on any account that has become 90 days delinquent during the preceding calendar month. CSI will give immediate notice to PROVIDER of all accounts which are ninety days delinquent. PROVIDER will not be held responsible for CSI'S 8% prorated fee on any unpaid

-3-

accounts. CSI will pay to the BANK all of the charges that are in excess of the original balance financed by the patient. CSI and BANK shall have the right of offset against sums due PROVIDER under this Agreement for the amount of any delinquent reimbursement obligations that exceed thirty (30) days.

8. AMENDMENT. This Agreement may not be amended except by written agreement between the parties.

9. THIRD PARTY BENEFICIARY. PROVIDER acknowledges that Bank is a third party beneficiary of this Agreement and agrees that BANK may directly enforce the provisions hereof in its own name and for its own benefit, provided the BANK has made a reasonable effort to enforce the provisions through CSI.

10. TERMINATION. CSI or PROVIDER may terminate this Agreement without notice for a material breach. In such case the terminating party will not be held liable for any direct or consequential damages incurred by the breaching party as the result of termination. Termination shall not affect the obligations of PROVIDER with respect to accounts acquired for financing by CSI prior to termination. This agreement is for a term of one year and shall be automatically renewed for successive one year periods unless Notice of Termination is given by any party thirty (30) days prior to the anniversary date hereof. Either party may terminate this agreement, without cause, upon providing the other party 60-day written notice, certified mail, return receipt requested to the address set forth above.

11. EFFECTIVE DATE, BINDING EFFECT. This Agreement shall be effective upon its execution by both parties and shall bind the successors, assignees and representatives of the parties.

12. ATTORNEYS FEES. Should it be necessary for either party to initiate legal action to enforce or interpret this Agreement, the prevailing party shall be entitled to all costs and expenses, including reasonable attorney's fees, incurred as a result of such legal action.

13. ASSIGNABILITY. This Agreement is not assignable without the prior written consent of the other party, except that either may assign this Agreement or the administration or servicing hereof to an affiliate upon written notice to the other.

14. CONFIDENTIALITY. PROVIDER recognizes CSI's proprietary

-4-

interest in the financing plan in this agreement and agrees not to disclose this contract embodied or information concerning CSI's financing plan to other parties.

15.  SEVERABILITY.  If any part of this Agreement shall be held to be invalid, illegal or unenforceable, the validity, legality or enforceability of the remainder of the Agreement shall not in any way be affected or impaired thereby.

IN WITNESS WHEREOF, the parties have signed this Agreement the day and year first above written.

PROVIDER: MERCY HEALTH/SYSTEM

By _____

Title: _____

CSI FINANCIAL, INC.

By _____

TITLE: _____

FIRST NATIONAL BANK OF MONTANA

BY: _____

Title: _____

-5-

# EXHIBIT "B"

1                IN THE UNITED STATES DISTRICT COURT FOR THE                    Page 1

2                     EASTERN DISTRICT OF PENNSYLVANIA

3

4

MERCY HEALTH SYSTEM OF SOUTHEASTERN )

5   PENNSYLVANIA,                                      )

                                                       )

6             Plaintiff,                               )          C O P Y

                                                       )

7             vs.                                      )    CAUSE NO. 01-CV-5681

                                                       )

8   FIRST NATIONAL BANK OF MONTANA,                    )

    INC., a National Banking                           )

9   Association, and CSI FINANCIAL,                    )

    INC., a Montana corporation,                       )

0                                                      )

              Defendants.                              )

1   _____ )

2

3

4                  Taken at 1015 Mount Avenue, Suite C

                         Missoula, Montana 59801

5              Thursday, October 9, 2003 - 8:55 a.m.

6

7

3                        D E P O S I T I O N

9                                OF

)                         WILLIAM PARTAIN

2

3

    Reported by Sheri J. Hazlett, RPR, 1015 Mount Avenue,

    Suite C, Missoula, Montana 59801, (406)721-1143,

    1-800-769-1052, Freelance Court Reporter and Notary Public

    for the State of Montana, residing in Kalispell, Montana.

MERCY HEALTH, et al. v. FIRST NATIONAL, et al.    10/9/2003    WILLIAM PARTAIN

Page 66

1    Q    Do you recall when the bank received its first
2    funding request for Mercy?
3    A    I don't specifically.
4    Q    Do you know if it was in '99?
5    A    Again, I believe it was.
6    Q    How did -- how often, from let's say '99 until
7    the end of the year, did Mercy send funding requests to
8    the bank?
9    A    I don't know.
10    Q    Who would know that?
11    A    The servicing loan officer.
12    Q    Was that Mr. Lenaburg?
13    A    Initially.
14    Q    When did he stop being the servicing loan
15    officer?
16    A    I don't know specifically. It would have been
17    in 2000, I think, in the first half of the year.
18    Q    What was -- who became the servicing loan
19    officer?
20    A    Ken Kaiser.
21    Q    What was the reason for the change?
22    A    The servicing loan officer had a full plate in
23    Missoula, and we had really Thesia Crooks in Libby we felt
24    like -- and Ken had the availability of time to work on
25    it.

Page 67

1    Q    Was he located in Libby?
2    A    He was in Libby.
3    Q    Did Mr. Lenaburg continue working for the bank
4    after this change was made?
5    A    He did.
6    Q    Did his position change at all?
7    A    I don't think so.
8    Q    When did he stop working for the bank?
9    A    I don't remember. I think it was sometime later
10    towards the end of the year 2000.
11    Q    What was the reason that he left the bank?
12    A    He got another job. He went to work for a
13    pharmaceutical sales company.
14    Q    Did he leave voluntarily, or did the bank
15    request that he leave?
16    A    He left voluntarily.
17    Q    Following change from Mr. Lenaburg to
18    Mr. Kaiser, did Mr. Lenaburg then have any involvement at
19    all with any of the CSI accounts?
20    A    I don't think so.
21    Q    In terms of the grand scheme of the bank's
22    lending business, how big a portion of that business was
23    the CSI patient funding?
24    A    At what point?
25    Q    In 1999.

Page 68

1    A    I don't recall.
2    Q    Was it greater in 1999 than it was in 1996?
3    A    Yes.
4    Q    Do you know how much greater?
5    A    I don't.
6    Q    And of the portion of the bank's loan business
7    that was CSI, do you know how much of that business was
8    Mercy business?
9    A    Say that again.
10    Q    In 1999, of the portion of the bank's lending
11    business that belonged to CSI, do you know how much of
12    that business belonged to Mercy?
13    A    In '99, I don't.
14    Q    Do you know at any time how big Mercy's business
15    was?
16    A    What do you mean by "how big"?
17    Q    How much of CSI's total business was attributed
18    to Mercy.
19    A    It was significant, but I can't tell you the --
20    Q    More than 50 percent?
21    A    No.
22    Q    More than 30 percent?
23    A    I'd be speculating.
24    Q    During the course of Mercy's relationship with
25    CSI, prior to a time when a dispute arose, did you have

Page 69

1    any contact with any people from Mercy?
2    A    No.
3    Q    Do you know if anybody at the bank had any
4    contact with anybody from Mercy, again, prior to that
5    time?
6    A    I don't believe so.
7    Q    When did the bank first become aware that CSI
8    had a problem with Mercy?
9    A    It was.
10         MR. DAY: Objection to the form.
11         You can answer.
12         MS. SCRIVANI: What's the basis for your
13    objection?
14         MR. DAY: You have no foundation that the bank
15    became aware of a problem between CSI and Mercy. I'm not
16    sure what the characterization of the problem between CSI
17    and Mercy means.
18    Q    (BY MS. SCRIVANI) Did the bank ever become
19    aware that CSI had a dispute of any kind with Mercy?
20    A    Yes.
21    Q    When did that happen?
22    A    To the best of my memory, in late August, early
23    September of 2001.
24    Q    How did the bank become aware of the dispute at
25    that time?

18 (Pages 66 to 69)

eac30cb2-cfe2-4108-9493-064bce55942

MERCY HEALTH, et al. v. FIRST NATIONAL, et al.   10/9/2003   WILLIAM PARTAIN

Page 70

1    A   Well, let me qualify. Not dispute, but a -- we
2    learned of the dispute in October of 2001.
3    Q   What did you learn in late August, early
4    September of 2001?
5    A   There's a large chargeback amount that occurred
6    in August of 2001.
7    Q   Do you know the amount of the chargeback?
8    A   At the time it was a million, two, I think,
9    somewhere in that range.
10   Q   What was the reason for that chargeback?
11   A   I don't have all the reasons, but there were
12   recourse accounts for accounts that were beyond 90 days
13   past due in their payments. There may have been in there
14   some return requests as well.
15   Q   Whose return request?
16   A   Mercy's.
17   Q   Do you know the reason for Mercy's return
18   request?
19   A   I do not.
20   Q   With respect to the recourse accounts that were
21   beyond 90 days past due, do you know how far past 90 days
22   past due they were?
23   A   I didn't.
24   Q   Are there any documents that demonstrate how far
25   past 90 days past due they were?

Page 71

1    A   Not that we saw at that time.
2    Q   Did you learn anything other than there was a
3    large chargeback in late August/early September 2001
4    regarding the Mercy account?
5    A   Yes.
6    Q   What else?
7    A   That Mercy had been promising new funding
8    requests to be used as an offset against those chargebacks
9    and that Mercy had not been receiving or accepting those
10   chargebacks due to some format issues.
11   Q   How did you learn this information?
12   A   Through Bob Jaeb.
13   Q   Did you speak to him directly?
14   A   Yes.
15   Q   And what happened? Did you call him because you
16   noticed a problem?
17   A   Yes.
18   Q   And you believe that was in late August or early
19   September?
20   A   Yes.
21   Q   How did you notice there was a problem?
22   A   I was made aware. I'm not remembering exactly
23   how I was made aware of the size of the chargeback amounts
24   that were sent back in August and were still outstanding
25   as of the end of August.

Page 72

1    Q   Is that what prompted your call to Mr. Jaeb?
2    A   Yes.
3    Q   What did you ask him when you called? What did
4    you talk about?
5    A   Talked about why the size of the large amount
6    and whether or not Mercy was able -- why they weren't
7    paying, were they able to pay.
8    Q   What did he tell you?
9    A   What I mentioned previously, that they were
10   waiting for new funding requests to offset those accounts,
11   and that there had been format discussions as to how those
12   files would be submitted through their data processing
13   guy, and there was kind of a back-and-forth on that.
14   Q   Did he say anything else?
15   A   Not at that time.
16   Q   Was there any resolution reached at the end of
17   that conversation?
18   A   He would proceed to contact Mercy and press them
19   for either new accounts to come in as funding, as he said
20   they said they would do, or to send cash.
21   Q   Do you know if Mr. Jaeb did, in fact, contact
22   Mercy following your call?
23   A   He told me that he did.
24   Q   When did he tell you that?
25   A   During September.

Page 73

1    Q   What did he say happened with respect to Mercy?
2    A   He said that they were telling him that they had
3    a big funding request that would be coming any day.
4    Q   Did he tell you how much that funding request
5    was for?
6    A   He believed it would be sufficient to cover the
7    chargeback amounts that were sent in early August.
8    Q   What was the bank's intention if, in fact, the
9    request came with respect to the money? Were you going to
10   wire it to Mercy, or were you going to use it as an
11   offset?
12   A   The purpose if they submitted it was to pay --
13   it would be used as an offset.
14   Q   Did Mr. Jaeb tell you anything else about that
15   conversation regarding Mercy?
16   A   Just that he was pursuing it regularly with
17   them.
18   Q   Did you say anything to him in the conversation?
19   A   To pursue it and to get it paid and to get it
20   paid before month end.
21   Q   What, if anything, happened following that
22   conversation with respect to Mercy?
23   A   There were a couple of small fundings that were
24   sent, significantly less than we were expecting in early
25   September. I believe in excess of 100,000.

19 (Pages 70 to 73)

eac30cb2-cfe2-4108-9493-064bce55942c

MERCY HEALTH, et al. v. FIRST NATIONAL, et al.    10/9/2003    WILLIAM PARTAIN

Page 74

1    Q    And did the bank use those fundings to offset
2    against the chargebacks?
3    A    Yes.
4    Q    Did anything else happen with respect to Mercy
5    at this time?
6    A    No.
7    Q    Did you ever contact Mercy directly yourself
8    during the months of August or September of 2001?
9    A    I did not. I pursued it through CSI.
10    Q    Did you have any other conversations with
11    Mr. Jaeb following one we just spoke about?
12    A    I called him regularly. I don't remember the
13    frequency, but I -- it would have been at least weekly
14    through September.
15    Q    What did he tell you during these calls?
16    A    That Mercy continued to promise a very large
17    funding that would be sufficient to cover the chargeback
18    of August of 2001.
19    Q    Did that funding come in September?
20    A    It did not.
21    Q    Did anything else happen during the month of
22    September regarding Mercy? Any actions by the bank or CSI
23    other than what we talked about?
24    A    No.
25    Q    What happened in October of 2001?

Page 75

1    A    When we hadn't received payment after the
2    repeated promises, I contacted Ken Kaiser -- I believe I
3    was on the road at the time -- and asked him to draft a
4    demand letter and send it directly to Mercy.
5    Q    Would you turn please to Exhibit 7 in your book.
6    Take a minute to look at that.
7    A    Okay.
8    Q    Is that the letter you're referring to as the
9    demand letter?
10    A    It is.
11    Q    Did you see this prior to the time that
12    Mr. Kaiser sent it to Mr. Smith?
13    A    I don't believe I did.
14    Q    Did you see it soon after he sent it?
15    A    Yes.
16    Q    Did Mr. Kaiser consult with you at all regarding
17    the contents of this prior to when he sent it?
18    A    The specific contents I think we talked in
19    general terms. Our goal was to demand payment so the
20    chargeback amount with Mercy -- it wasn't -- we weren't
21    trying to end the relationship with Mercy, but we wanted
22    to make sure Mercy knew that we expected payment on what
23    had been charged back to them. And this amount that's
24    listed must have been what was remaining of that
25    chargeback amount after the offsets of early September.

Page 76

1    ʹ    Is that amount 1,084,733.50.
2    A    Yes.
3    Q    And how did the bank calculate that number?
4    A    That would have been coordinated between Cindy
5    Dorr of CSI and Thesia Crooks.
6    Q    What information would Cindy Dorr and Thesia
7    have used to reach that number?
8    A    The information on the invoices to the hospital
9    through the accounts recourse to the hospital as well as
10    the offset of those fundings in early September.
11    Q    Whose invoices were you referring to that were
12    sent to the hospital regarding recourse?
13    A    CSI.
14    Q    Did the bank have anything to do with those
15    invoices?
16    MR. DAY:    What do you mean "have anything to
17    do"?
18    MS. SCRIVANI:    In the preparation of them or
19    providing information that went into them.
20    A    CSI led the process. I believe we relied on CSI
21    for that number.
22    Q    (BY MS. SCRIVANI) Did the bank do any
23    investigation of CSI's recourse number -- independent
24    investigation?
25    A    Subsequent to this time, yes.

Page 77

1    Q    At the time this Exhibit 7 was sent, that number
2    was based solely on CSI's information?
3    A    I don't know that for certain. Thesia may have
4    been involved, Ken Kaiser may have worked on something
5    like that.
6    Q    What independent review by the bank was
7    conducted at some time later, of the recourse number?
8    A    Subsequent to the filing of the litigation and
9    in conjunction with litigation.
10    Q    And what was that independent review?
11    MS. SCRIVANI:    Objection to the extent it calls
12    for, I guess, work product and documents or information
13    created in anticipation of litigation.
14    Q    (BY MS. SCRIVANI) Other than anything that your
15    counsel might have done for you, did the bank do anything
16    on its own without the assistance of counsel to make an
17    independent review of a recourse number allegedly owed by
18    Mercy?
19    MR. BRUBAKER:    Objection to the extent it calls
20    for work product of the client which is protected under
21    the Federal Rules of Civil Procedure either in
22    anticipation of litigation or for trial.
23    MS. SCRIVANI:    Are you instructing your witness
24    not to answer?
25    MR. BRUBAKER:    To the extent he can answer

20 (Pages 74 to 77)

eac30cb2-cfe2-4108-9493-064bce55942c

MERCY HEALTH, et al. v. FIRST NATIONAL, at al.    10/9/2003    WILLIAM PARTAIN

Page 78

1 without revealing that information, he can answer the
2 question.
3      MS. SCRIVANI: I completely don't understand
4 your question at all.
5      Q    (BY MS. SCRIVANI) Did the bank do an
6 independent evaluation of the Mercy recourse amount?
7      A    It did.
8      Q    And did it do that evaluation solely for
9 purposes of litigation?
10     A    Yes.
11     Q    Did the bank engage an attorney for purposes of
12 doing that evaluation? Strike that.
13          Was an attorney hired by the bank in any way
14 involved in that independent evaluation.
15          MR. DAY: What do you mean by "involved"?
16     Q    (BY MS. SCRIVANI) Did an attorney direct the
17 independent evaluation to occur?
18     A    It was part of the discussions with the
19 attorney.
20     Q    Was there any evaluation performed by the bank
21 regarding the recourse number that did not involve
22 discussions with an attorney?
23     A    I don't believe so.
24     Q    How soon following the sending of the e-mail
25 marked Exhibit 7 did the bank conduct its independent

Page 79

1 review of the recourse number?
2      A    Again, it was after the litigation was filed, so
3 it was sometime in mid to late December of 2001.
4      Q    Is Exhibit 7 the only document that the bank
5 sent to Mercy demanding payment, to the best of your
6 knowledge?
7      A    Apart from the litigation, yes.
8      Q    Did the bank receive a response from Mercy
9 regarding an exhibit following the sending of Exhibit 7?
10     A    No.
11     Q    Did the bank do anything regarding Mercy
12 following sending of Exhibit 7 other than filing
13 litigation?
14          MR. DAY: Objection.
15     Q    (BY MS. SCRIVANI) You can answer.
16     A    We contacted counsel. There were discussions
17 between Bob Jaeb and Doug Smith that we were copied on
18 e-mails.
19     Q    What did those discussions consist of?
20     A    Exchanges as far as Mercy's complaint about
21 CSI's processes and recourse timing and Bob Jaeb's
22 responding to it in depth.
23     Q    Sorry, Bob Jaeb's --
24     A    Bob Jaeb's responding in depth to those things.
25 Attorneys very quickly were involved. And that was in

Page 80

1 October.
2      Q    Who did the bank hire as counsel at that time?
3      A    Jim Sewell.
4      Q    Had Mr. Sewell previously been counsel to the
5 bank?
6      A    Yes.
7      Q    Had Mr. Sewell previously been counsel to CSI?
8      A    Yes.
9      Q    If you would turn now, please, to Exhibit 20.
10 Take your time to look through that.
11     A    Okay.
12     Q    Do you recognize the document that's marked
13 Plaintiff's Exhibit 20?
14     A    Yes.
15     Q    What is this document?
16     A    It is a complaint filed by First National Bank,
17 CSI Financial, against Mercy.
18     Q    Did you review this document prior to the time
19 that it was filed in the District Court for the District
20 of Montana?
21     A    I don't believe so.
22     Q    Did you have any involvement in the preparation
23 of this document prior to its filing in court?
24     A    I had conversation with an Attorney Sewell.
25     Q    Anything other than your conversations with

Page 81

1 Mr. Sewell regarding the preparation of this document?
2      A    No.
3      Q    Did you see this document sometime after it was
4 filed with the court?
5      A    Yes.
6      Q    Do you know how soon after it was filed that you
7 saw it?
8      A    Early December.
9      Q    Did Mr. Sewell file this complaint without your
10 approval?
11     A    No.
12     Q    Did you authorize him to file it even though you
13 had not seen it on behalf of the bank?
14     A    Yes.
15     Q    If you would turn, please, to -- I think it's
16 page 7 of the complaint.
17          MR. DAY: What paragraph?
18          MS. SCRIVANI: I'm looking at paragraph 20.
19     Q    (BY MS. SCRIVANI) Do you have that in front of
20 you?
21     A    Yes.
22     Q    The paragraph alleges that, quote, Mercy's
23 conduct as herein alleged constitutes a substantial and
24 material breach of its contract with CSI and Bank, and CSI
25 and Bank have suffered consequential damages in an amount

21 (Pages 78 to 81)

eac30cb2-cfe2-4108-9493-064bcad59a2c

Page 94

1    A    In the first half of 2002.
2    Q    How did you learn of those efforts?
3    A    I don't recall.
4    Q    Is there anything that would help you remember
5    what those efforts were?
6    A    I don't know.
7    Q    Would talking to Mr. Jaeb help you remember what
8    those efforts were?
9    A    Possibly.
10    Q    Would talking to Cindy Dorr refresh your
11    recollection as to what those efforts were?
12    A    Possibly.
13    Q    Is there anybody else at CSI that you could talk
14    to that could help refresh your recollection about those
15    efforts?
16    A    Not that I know of.
17    Q    Other than discovery efforts of CSI, does the
18    bank have any independent evidence that Mercy provided
19    accounts that were not legitimate?
20    A    Apart from those two areas, no.
21    Q    With respect to the bank's claim --
22    A    May I back up on that?
23    Q    Sure.
24    A    The sheer volume of the chargeback levels of
25    Mercy was much higher than the other hospitals as a

Page 95

1    percentage of the total. Their chargeback percentages
2    were in excess of 70 percent.
3    Q    What was the average chargeback for the other
4    hospitals in the program?
5    A    Somewhere in the low 20 percent range.
6    Q    What does the fact that Mercy had a 70 percent
7    chargeback rate mean to you?
8    A    Makes me question the validity of the accounts
9    that were submitted.
10    Q    Is that based on anything other than your own
11    personal gut feeling?
12    MR. DAY: Objection. He didn't say anything
13    about his own personal gut feeling.
14    Q    (BY MS. SCRIVANI) You can answer.
15    A    That combined with some of the reviews that I
16    mentioned earlier.
17    Q    That were performed by Ms. Humphries?
18    A    And I think Bob Jaeb and Cindy Dorr.
19    Q    What reviews were performed by Bob Jaeb and
20    Cindy Dorr?
21    A    I don't know the specifics to --
22    Q    Do you know that, in fact, they did perform some
23    review?
24    A    To the best of my memory, they did.
25    Q    Do you know when that review was performed? Let

Page 96

1    me back up. Did they perform a review together, or did
2    they perform reviews independent of one another?
3    A    I don't know.
4    Q    Do you have any idea when reviews were performed
5    by either Mr. Jaeb or Ms. Dorr?
6    A    Specifically I don't know.
7    Q    Do you know what year?
8    A    I think in 2002.
9    Q    Did their reviews result in any written product?
10    A    Not that I recall seeing.
11    Q    Did they ever talk to you about their review?
12    A    I believe they did.
13    Q    What did they tell you about it?
14    A    I'm trying to remember the specifics, and I'm
15    not.
16    Q    Do you remember generally?
17    A    I think generally was is that they had
18    identified some that were not.
19    Q    Some what?
20    A    Accounts that were not legitimate.
21    Q    Did they tell you how many?
22    A    The second -- excuse me.
23    Q    Sorry. Did they tell you how many?
24    A    I don't recall.
25    Q    I apologize. I didn't mean to interrupt.

Page 97

1    A    There was another element of that, was the high
2    number of return requests that Mercy made on CSI.
3    Q    What did they say about that?
4    A    That it was high. It was a large number.
5    Q    Did they ever show you any documentation to
6    support their claim that they had found some accounts that
7    were not legitimate and that their return-request rate was
8    high?
9    A    Again, I don't recall seeing documentation. I
10    think this was a phone call.
11    Q    So now, other than a portion of Neysha's review,
12    discovery efforts by CSI, which I assume include these --
13    this review by Cindy Dorr, Bob Jaeb, and the sheer volume
14    of chargebacks that Mercy had, is there any other evidence
15    that the bank has that Mercy did not provide legitimate
16    accounts?
17    A    I think that's it.
18    Q    Now, the other conduct you told me about in
19    response to my question about the conduct referred to in
20    paragraph 20 of Exhibit 20 was Mercy's failure to pay
21    recourse. What evidence does the bank have regarding
22    Mercy's alleged failure to pay recourse amounts?
23    A    The amount is still outstanding and due.
24    Q    And is there anything other than that the bank
25    has an amount it considers outstanding and due?

eac30cb2-cfe2-4108-9493-064bce55942c

MERCY HEALTH, et al. v. FIRST NATIONAL, et al.    10/9/2003    WILLIAM PARTAIN

Page 102

1   indicator that the borrower is not capable of making
2   payments. So it's more a question of what's the quality
3   of the person that owes the debt, what's their financial
4   condition.
5       Q    (BY MS. SCRIVANI) What was the reason that CSI
6   could not collect on some of Mercy's accounts for greater
7   than 90 days?
8       MR. DAY: If you know.
9       MS. SCRIVANI: I'm only asking for what he
10  knows. I'm not asking for something he doesn't know.
11      MR. DAY: Again, you're asking about what was
12  the reason for CSI being unable to collect on accounts.
13      MS. SCRIVANI: I'm asking if he knows.
14      MR. DAY: How does he give an answer generally
15  for accounts? He has to answer specifically for an
16  account.
17      MS. SCRIVANI: I'm asking generally. I can get
18  specifically.
19      A    No.
20      Q    (BY MS. SCRIVANI) Do you know, with respect to
21  any of the accounts that Neysha Humphries submitted in her
22  sample, the reason why any of the accounts became
23  delinquent accounts?
24      A    I don't recall.
25      Q    Did you ever know what the reason was?

Page 103

1       A    I may have.
2       Q    How would you have learned what the reason was?
3       A    If that was something she documented on her
4   worksheet.
5       Q    How would Neysha know what the reason was?
6       A    I don't know that she did.
7       Q    Do you know if Neysha ever spoke directly with
8   any of Mercy's patients during her review?
9       A    I don't know. I don't believe so.
10      Q    Does the chargeback that occurred in August of
11  2001 constitute the amount of the bank's damages in this
12  litigation?
13      A    It's increased based on additional accounts that
14  were subsequently charged back to the hospital.
15      Q    When did those chargebacks occur?
16      A    Over the next number of months. I don't know
17  the specifics on that.
18      Q    When did the bank completely cease its
19  relationship with Mercy?
20      MR. DAY: Objection to the form.
21      A    What do you mean "cease its relationship"?
22      Q    (BY MS. SCRIVANI) When did you stop having any
23  sort of relationship at all? You stopped receiving
24  funding requests, they stopped sending patient files.
25      A    I believe the funding request stopped in that

Page 104

1   October time frame. I don't believe we had any after
2   September.
3       Q    When did Mercy stop sending patient files?
4       A    That's when.
5       Q    Same time?
6       A    Same time.
7       Q    Were there patients whose file had been sent to
8   CSI prior to this time that then stopped paying to the
9   bank?
10      A    That's my understanding.
11      Q    And then those accounts became part of the
12  chargeback amount?
13      A    Correct.
14      Q    What are the bank's current damages that they're
15  seeking against Mercy in this litigation?
16      A    I can only speak in approximate terms. We're
17  about -- the outstanding chargeback dollar amounts, it's
18  in the range of a million, six. We believe the
19  corresponding interest that would have resulted from their
20  failure to pay and costs of attorneys and so forth.
21      Q    How much have you paid in attorney's fees to
22  date for this litigation?
23      A    I don't know.
24      Q    Do you have an approximation?
25      A    I think in the hundred-grand range. 100,000.

Page 105

1       Q    Has the bank made any effort to obtain the
2   approximately $1.6 million it claims Mercy owes from CSI?
3       MR. DAY: Besides the litigation?
4       MS. SCRIVANI: Well, the bank hasn't sued CSI in
5   the litigation.
6       MR. DAY: Can you repeat your question.
7       MS. SCRIVANI: Can you read it back.
8       (The last question was read back.)
9       A    We pursued it first through CSI to collect from
10  the hospital. Those were the initial amounts that were
11  charged back. And then had the direct communication that
12  we sent the first of October to Mercy on that chargeback
13  amount.
14      Q    (BY MS. SCRIVANI) My question was a little
15  different. I apologize. It was confusing after she read
16  it back.
17      MR. DAY: Are you asking whether the bank tried
18  to get the money owed from Mercy out of CSI?
19      MS. SCRIVANI: That's correct.
20      A    Other than what I've said?
21      Q    (BY MS. SCRIVANI) I think what you told me were
22  steps that the bank took through CSI to be get money from
23  Mercy. My question is whether the bank took any steps to
24  get money directly from CSI for the amounts it claims
25  Mercy owes, the approximate 1.6 or whatever it was back in

MERCY HEALTH, et al. v. FIRST NATIONAL, et al.    10/9/2003    WILLIAM PARTAIN

Page 106

1  October of 2001.
2       MR. DAY: Did you try to get CSI to pay --
3       THE DEPONENT: Not pay, no.
4       MR. DAY: Yes or no?
5    Q   (BY MS. SCRIVANI) So the answer is no, you did
6  not seek payment from CSI?
7    A   Correct.
8    Q   Were there any other hospitals that sent
9  accounts to CSI that the bank would consider to be not a
10 legitimate account?
11   A   Not that I know of.
12   Q   Were there any other hospitals in the CSI
13 program that refused to pay chargebacks or recourse
14 amounts because they were delinquent in excess of 91 days?
15   A   The Chandler case may have. I don't remember
16 clearly.
17   Q   Anyone other than Chandler that you can recall?
18   A   No.
19   Q   If you would turn please, in Exhibit 20, to
20 paragraph 26?
21   A   Which exhibit?
22   Q   Exhibit 20.
23   A   What number?
24   Q   Twenty-six I'm focusing on the last section of
25 the last sentence there that says, "retained the proceeds

Page 107

1  of such collections and placed such accounts with
2  collection." We already talked about the evidence the
3  bank has regarding protection of proceeds. What evidence
4  does the bank have that Mercy actually placed those same
5  accounts for collections with Pennsylvania collection
6  agencies?
7    A   I believe this was through the work that
8  Bob Jaeb and Cindy Dorr did, as well as Neysha Humphries.
9  I think her testing may have included that.
10   Q   Do you remember seeing any documents that
11 demonstrate that accounts were placed with --
12   A   No.
13   Q   If you would turn, please, to paragraph 30 of
14 the same exhibit, Exhibit 20, the complaint.
15   A   (Deponent complied.)
16   Q   Exhibit 30 lists a number of things that the
17 bank --
18      MR. BRUBAKER: Exhibit 30.
19   Q   (BY MS. SCRIVANI) Paragraph 30 lists a number
20 of things that Mercy was dutybound to the bank and CSI to
21 do. The third bullet point down says, "Not misrepresent
22 the nature of the accounts offered to bank for purchase."
23 Is it alleging that Mercy did, in fact, misrepresent the
24 nature of the accounts to the bank for purchase?
25      MR. DAY: You're asking what the bank is

Page 108

1  alleging in this case, or are you referring to the
2  complaint?
3       MS. SCRIVANI: This case is consolidated with
4  our case in Pennsylvania, so the complaint still exists
5  there.
6       MR. DAY: You're asking what the bank --
7       MS. SCRIVANI: This is sort of like a double
8  negative here. It says Mercy had a duty to do this,
9  so I'm asking if the bank is alleging that Mercy did, in
10 fact, do it.
11   A   Yes.
12   Q   (BY MS. SCRIVANI) What misrepresentations does
13 the bank allege Mercy made regarding the accounts offered
14 to the bank for purchase?
15   A   Back to either the accounts not being
16 legitimate, valid, they weren't to submit disputed
17 accounts.
18   Q   What misrepresentations did Mercy make about
19 those -- let me back up. When Mercy presented those
20 accounts for purchase by the bank, did they make any
21 specific representations about the accounts?
22   A   Any time they would present the accounts, they
23 were to present only valid accounts to be purchased.
24   Q   It's your understanding that if an account was
25 not valid, then it constituted a misrepresentation by

Page 109

1  Mercy?
2    A   Yes.
3    Q   When you use the word "valid accounts," is that
4  the same as we talked about as being a legitimate account
5  earlier?
6    A   Yes.
7    Q   And with respect to paragraph 31 of the same
8  exhibit, "Mercy breached its duties as described in the
9  foregoing paragraph and induced bank to purchase accounts
10 that did not meet the requirements of the contract," how
11 did Mercy induce the bank into purchasing accounts that
12 didn't meet the requirement of the contract?
13   A   By submitting those accounts in a funding
14 request as if they were legitimate accounts.
15   Q   So the bank, what, relied on the funding
16 request?
17   A   Yes.
18   Q   Did the funding request come from Mercy, or did
19 the funding request come from CSI?
20   A   From Mercy to CSI to the bank.
21   Q   Again, if you would turn now to page --
22 paragraph 36 of the same exhibit. The very end of that
23 sentence -- very end of that paragraph, "The bank did not"
24 -- sorry, let me start at the beginning. "Mercy failed to
25 disclose to CSI or the bank" -- sorry, strike that. We

28 (Pages 106 to 109)

eac30cc2-cfe2-4108-9493-064bce65942c

MERCY HEALTH, et al. v. FIRST NATIONAL, et al.     10/9/2003     WILLIAM PARTAIN

Page 110

1  already talked about that.
2      With respect to paragraph 37, the last sentence,
3  "Mercy failed to exercise reasonable care and competence
4  in obtaining and communicating information about the
5  accounts it offered for sale to bank and CSI," how did
6  Mercy fail to exercise reasonable care and competence?
7      A   By sending accounts that were not legitimate for
8  purchase.
9      Q   Does the bank contend that Mercy purposely sent
10  accounts that it knew were not legitimate?
11     A   What do you mean "contend"?
12     Q   Is that your allegation in this litigation, that
13  Mercy intentionally sent accounts that it knew were not,
14  quote, legitimate under the contract?
15     A   I don't know how to answer that from a legal
16  standpoint. It's my belief that they did.
17     Q   What is your belief based on?
18     A   What I've already mentioned earlier and the
19  sheer volume that was either returned by their request or
20  charged back.
21     Q   How does the sheer volume make you believe that
22  Mercy intentionally sent files that it knew were not
23  legitimate?
24     A   More than tripling the other return type
25  accounts of any other hospital makes it highly suspect.

Page 111

1  It appears that garbage was just being dumped, garbage was
2  being presented for us to purchase.
3      Q   Is there anything other than that sheer volume
4  that leads you to believe that Mercy intentionally sent
5  files that were not legitimate?
6      A   That combined with the information I mentioned
7  earlier, the work that CSI did.
8      Q   Okay.
9      MS. SCRIVANI: I actually think now is a good
10  time to take a lunch break.
11     (Recess taken 12:05 to 1:15 p.m.)
12     Q   (BY MS. SCRIVANI) Before we went on our lunch
13  break, we were finishing up our discussion basically of
14  Mercy and the bank's claims against Mercy. And I have a
15  couple questions on that before we move on. Other than
16  what you told me about what Neysha Humphries did in terms
17  of doing some sort of a review in December of 2001, did
18  the bank do any other investigation of the claims that it
19  has asserted against Mercy in the litigation?
20     A   Not that I recall.
21     Q   And with respect to that approximately $1.6
22  million that the bank -- which, if I'm correct, that
23  excludes your attorney's fees and interest?
24     A   Yes.
25     Q   How did the bank calculate that approximately

Page 112

1  $1.6 million?
2      A   It is the total of the accounts that were sent
3  back to Mercy that have not been paid for by Mercy through
4  either new accounts being submitted or by cash.
5      Q   And where did the bank obtain its information in
6  order to establish what the total amount of the accounts
7  sent back is?
8      A   Through CSI and Cindy Dorr at CSI and Thesia
9  working together, but the primary source was CSI.
10     Q   During the course of the relationship that Mercy
11  had with the bank, was there ever a time that the bank
12  sent a wire of money to Mercy, or did the bank always
13  offset new accounts for chargebacks?
14     A   No. They were wires. I can't tell you all the
15  times. But we would never have had any outstanding
16  balances without having sent them wires of funds.
17     Q   When did the bank start setting off funds with
18  new accounts so that wires were not sent? Let me back up.
19     Did there come a time when the bank would not
20  send a wire for a new funding and just set it off?
21     A   I don't know the timing of that.
22     Q   But did it happen?
23     A   Yes, it did.
24     Q   Do you know what year it happened?
25     A   I think 2001.

Page 113

1      MR. DAY: Do you mean when Mercy would not set
2  off or --
3      MS. SCRIVANI: No. I meant when the bank would
4  not send a wire to pay for new accounts that came in, but
5  the new accounts would offset an amount that Mercy owed
6  the bank.
7      MR. DAY: Okay.
8      Q   (BY MS. SCRIVANI) Does that change your answer
9  at all?
10     A   No.
11     Q   You understood my question?
12     A   Yes.
13     Q   Other than Exhibit 6, which we talked about
14  earlier, which is the contract between Mercy and CSI to
15  which the bank is a third party, does the bank have any
16  other contracts with CSI that refer or relate in any way
17  to Mercy?
18     MR. DAY: What do you mean by "refer or relate
19  to Mercy"?
20     MS. SCRIVANI: Any contracts at all between the
21  bank and CSI other than Exhibit 6?
22     A   There is another agreement. I mentioned that
23  earlier. I think it's called an agreement.
24     Q   (BY MS. SCRIVANI) Who is it between?
25     A   CSI and the First National Bank.

29 (Pages 110 to 113)

eac30cb2-cfe2-4108-9493-064bca55942c

# EXHIBIT "C"

DEPOSITION OF CINDY DORR

Page 1

```
 1                IN THE UNITED STATES DISTRICT COURT
 2                  EASTERN DISTRICT OF PENNSYLVANIA
 3     MERCY HEALTH SYSTEM OF                  )
       SOUTHEASTERN PENNSYLVANIA,             )
 4                                            )
 5                    Plaintiff,             )
                                             )    No. 01-CV-5681
         v.                                   )
 6                                            )
 7     CSI FINANCIAL, INC.,                   )
                                             )
 8                    Defendant.             )
                                             )
 9     FIRST NATIONAL BANK OF MONTANA,        )
       INC. and CSI FINANCIAL, INC.,         )
10                                            )
                       Plaintiffs,           )
11                                            )
         v.                                   )
12                                            )
       MERCY HEALTH SYSTEM OF                 )
13     SOUTHEASTERN PENNSYLVANIA,            )
                                             )
14                    Defendant.             )
                                             )
15     _____ )
16
17              VIDEOTAPE DEPOSITION OF CINDY DORR
18         On the 15th day of July, 2004, beginning at
19     8:59 a.m., the videotaped deposition of CINDY DORR,
20     appearing at the insistence of Respondent, was taken at
21     the Office of Lesofsky & Walstad Court Reporting, 21
22     North Last Chance Gulch, Suite 201, Helena, Montana,
23     pursuant to Rule 30 of the Federal Rules of Civil
24     Procedure, before Bambi A. Goodman, Registered
25     Professional Reporter, Certified Realtime Reporter,
       Notary Public.
```

Page 2

```
 1
 2
 3
 4                    A P P E A R A N C E S
 5
 6       Patrick J. Egan, COUNSELOR AT LAW,
             239 S. Camac Street, Philadelphia, PA  19107
 7                   and
         Lewis K. Smith, Esq., SMITH LAW FIRM
 8           26 West 6th Avenue, Helena, MT  59601
             appeared on behalf of CSI Financial, Inc.
 9
10       Stacey A. Scrivani Esq.,
             STEVENS & LEE
11           111 North Sixth Street,
             P.O. Box 679, Reading, PA  19603-0679
12           appeared on behalf of Mercy Health System of
             Southeastern Pennsylvania.
13
14       Christopher M. Brubaker, Esq.,
             KITTREDGE, DONLEY, ELSON, FULLEM & EMBICK
15           421 Chestnut Street, Philadelphia, PA  19106
             appeared on behalf of First National Bank of
16           Montana, Inc.
17
18
19       Also Present:
20           Russ Erdmann, Mercy Health System;
             James T. O'Brien, CPA, ParenteRandolph
21
22
23       Videographer:  Robert Olson, B&B Video Productions
24
25
```

DEPOSITION OF CINDY DORR

Page 40

1　　A　Once it's placed in the system and funded, then
2　the statementing process begins and, depending on the
3　performance of the account, collection activity and
4　payment posting.
5　　Q　Were you involved in collections at all at this
6　time?
7　　A　In '99?
8　　Q　Yes.
9　　A　Very little.
10　　Q　What did you do?
11　　A　I would probably only handle escalated calls
12　from patients.
13　　Q　Who was responsible for collections?
14　　A　In '99, I think there were --
15　　Q　Let me be a little more specific. I mean, in
16　terms of groups, was it customer service that would do
17　collections --
18　　A　Yes.
19　　Q　-- or was there a separate collections
20　department?
21　　A　No, it was customer service.
22　　Q　Okay.
23　　　　And when you say you would handle an escalated
24　call, what do you mean by that?
25　　A　A screaming person.

Page 41

1　　Q　That could be screaming for lots of reasons?
2　　A　Yeah.
3　　Q　Okay. Why were those directed to you?
4　　A　I guess -- I don't know; pecking order, I
5　guess.
6　　Q　Were you supervising customer service?
7　　A　To some extent.
8　　Q　To what extent?
9　　A　I wouldn't say I was supervising them, but
10　possibly participating in some training and mentoring.
11　　Q　Do you know if anyone ever reconciled the fax
12　that got back -- that the bank sent back indicating
13　funds had been sent to a hospital to determine if that
14　date of placement was accurate in CSI's system?
15　　A　Say that again.
16　　Q　Do you know if anyone at CSI ever reconciled
17　the fax which had the detailed list of accounts that
18　were being funded by the bank on a given day to ensure
19　that the placement date in CSI's system reconciled with
20　that fax?
21　　A　I don't know about that.
22　　Q　If such a reconciliation were to take place,
23　who would have done that?
24　　　　MR. EGAN: Objection.
25　　Q　(By Ms. Scrivani) If you know.

Page 42

1　　A　I don't.
2　　Q　So your involvement with collections was
3　minimal. What other involvement would you have in an
4　account, once it was placed?
5　　A　In the event that the account was an invalid
6　account and needed to go back to the hospital for
7　repurchase, if the hospital requested it back, if the
8　account became in default and needed to be billed back
9　to the hospital, then it became -- it came out of the
10　customer service area and into the accounting department
11　for billing and collection to the client.
12　　Q　Okay; let's take those one at a time.
13　　　　What is your understanding of an invalid
14　account?
15　　A　The patient doesn't owe it, the balance is
16　incorrect. And this can be -- this area could be client
17　specific, and insurance hadn't been billed.
18　　Q　Any other things that constitute invalid debt?
19　　A　The account was sent over with a minor child
20　being the guarantor on the account. The accounts were
21　sent over already in bankruptcy. The accounts were sent
22　over for deceased persons.
23　　Q　Anything else that you can recall?
24　　A　I think that covers it.
25　　Q　I'm sorry?

Page 43

1　　A　I think that covers it.
2　　Q　Okay. Was it fairly common for any of these
3　things to happen?
4　　A　Some clients; not all.
5　　Q　What do you mean when you say "some clients"?
6　Some clients had these problems and others didn't?
7　　A　Some hospitals didn't provide their file
8　information to us as thoroughly as others.
9　　　　MR. EGAN: Let me make the record clear
10　when she speaks about clients.
11　　　　MS. SCRIVANI: I thought we had done that
12　earlier.
13　　Q　(By Ms. Scrivani) But when you're talking about
14　a client, you're referring to a hospital.
15　　A　Yes.
16　　Q　And when you're talking about a customer,
17　you're referring to a patient.
18　　A　Yes.
19　　　　MR. EGAN: Thank you.
20　　Q　(By Ms. Scrivani) Which clients were worse at
21　this than others?
22　　A　Mercy was the all-time worst.
23　　Q　What do you mean when you say that?
24　　A　The accounts that we got from Mercy that had
25　not been billed to insurance and sold to us, they were

DEPOSITION OF CINDY DORR

Page 44

1  actually aware that that hadn't been done.
2      Q  How do you know that?
3      A  Because they told me.
4      Q  Who's they?
5      A  The patient accounting office. I believe the
6  lady that I used to talk to a lot was named Mary. She
7  explained to me that their process was to send the
8  patient a sticker on their billing statement requesting
9  their insurance billing information but in the meantime,
10  sold it to us.
11      Q  Do you know Mary's last name?
12      A  No.
13      Q  Did you ever know it and you just don't
14  remember?
15      A  I think I did know it at one time, but I
16  couldn't tell you today.
17      Q  When did Mary tell you this?
18      A  Couldn't give you a date. It was early in the
19  game. And Doug Smith verified that.
20      Q  To you?
21      A  To me.
22      Q  What did Doug say to you?
23      A  He said That's true; and asked us to please get
24  this billing information and supply it to the hospital
25  and then return the balance and then return the account

Page 45

1  to them.
2      Q  And was that part of CSI's services that it
3  advertised to customers?
4      A  No.
5      Q  Do you know if it was advertised to Mercy as
6  being one of CSI's services?
7      A  I don't know that.
8      Q  What else made Mercy the all-time worst, if
9  anything?
10      A  They received payments on accounts that they
11  had sold to us and never informed us of those payments.
12  We were going through some -- we were billing people
13  that had already paid. We were making collection calls
14  to people who had already paid; having to do extensive
15  research on accounts that, in fact, had been paid.
16  Insurance was in the process of being billed. Their
17  system notes that we had access to indicated that CSI
18  had been notified to return the account when, in fact,
19  we never had. Information took months to get from
20  Pennsylvania to Helena.
21      Q  What type of information?
22      A  Joe Smith paid his account in full. Vital
23  information to our collection of the account.
24      Q  All right; we're going to come back to these.
25      What other hospitals besides Mercy had issues?

Page 46

1      A  The only other one that had severe issues was
2  probably an Arizona hospital called Chandler*.
3      Q  What types of issues did they have?
4      A  The same communication problems.
5      Q  When were they a client of CSI?
6      A  They were a client of CSI when I started
7  working there.
8      Q  Did they cease being a client at some point?
9      A  Actually, I'm not sure if they -- gosh, I know
10  we still have accounts for them. I don't know if
11  they're actively using the program; I couldn't say.
12      Q  Okay.
13      Is it fair to say that throughout the entire
14  time Mercy was sending new accounts to CSI, Mercy was
15  the largest hospital in the program?
16      A  I'm not sure about that. Chandler was pretty
17  big.
18      Q  Would you consider Mercy and Chandler to be two
19  of the largest in the program?
20      A  Yes.
21      Q  So considering they were two of the largest
22  hospitals in the program, would it be unusual for them
23  to have the most amount of problems?
24      MR. EGAN: Objection.
25      MR. BRUBAKER: Objection.

Page 47

1      Q  (By Ms. Scrivani) You can answer.
2      A  I didn't see it that way.
3      Q  Why not?
4      MR. EGAN: Same objection.
5      MR. BRUBAKER: Objection.
6      Q  (By Ms. Scrivani) You can answer.
7      A  The problems had been addressed and addressed
8  and readdressed with promises of rectifying the problems
9  that never occurred. And I -- I don't see it as being
10  an acceptable amount of problems for a client that
11  large.
12      Q  Why not?
13      A  Well, they supposedly had all of this
14  technology in place.
15      Q  Who's they; Mercy?
16      A  Mercy, to ensure that these problems would be
17  resolved.
18      Q  What type of technology are you talking about?
19      A  Sending us files, reporting payments to us,
20  notifying us of accounts to be returned which should
21  have been -- could have corrected a problem but we had
22  to wait months and months to get them.
23      Q  All right; let's take them one at a time.
24      With respect to insurance that you claim was
25  not billed or a patient sticker would be -- a sticker

DEPOSITION OF CINDY DORR

Page 56

1    A  Because we didn't have the volume of their
2  accounts that we had from Mercy, I would say no.
3    Q  How about for Chandler?
4    A  Chandler had a lot of -- received a lot of
5  patient payments, and they always sent them on. But the
6  typical process is to notify us of the payment so that
7  we stop collection activity, if there is any going on,
8  and then the -- and forward the payments on to us.
9    Q  When a patient would call you about a Mercy
10  account and you would dial into the system and see the
11  payment, did you stop collection efforts?
12    A  No, we couldn't, because we still didn't have
13  the money.
14    Q  Okay.
15    A  Or we had to try to collect it from Mercy.
16    Q  Did you stop collection efforts with respect to
17  the patient?
18    A  No, we couldn't.  Unless it had been paid in
19  full to the hospital, then we would stop all collection
20  and return the account, in its entirety, to Mercy Health
21  Systems.  If we're talking about a $50 payment, the
22  patient would have to come up with a payment and
23  possibly request their refund from Mercy, because we
24  weren't getting it.
25    Q  When you received a call from a Mercy patient

Page 57

1  and you dialed into Mercy's system and saw the payment
2  there, did you make some sort of a note on Mercy's
3  system?
4    A  No.  On Mercy's system?
5    Q  Yes.
6    A  Oh, I don't know about that.  I didn't do that
7  process, so I don't know if that occurred.
8    Q  How about on CSI's system?  Was there --
9    A  Yeah, we noted the patient's account that yes,
10  in fact there was a payment made at Mercy.  And
11  typically, the patient had to just come up with the
12  payment again.
13    Q  Did that -- did the patients normally do that?
14    A  Some of them did.  Some of them absolutely
15  refused, and they ended up being recoursed or returned
16  back to the hospital.
17    Q  If a patient then sent in another payment,
18  would that be noted on CSI's system?
19    A  Yes.
20    Q  Would Mercy be alerted to that payment?
21    A  No.
22    Q  So what would happen when Mercy sent a payment
23  file that had that person's payment indicated on it?
24    A  Well, the payment file doesn't do any good.  I
25  mean, so we're notified of the payment, we already know

Page 58

1  about the payment.  We need the money.  We need the
2  payment.  Until that money's there, the patient's
3  account is not getting credited.
4    Q  So what happened if Mercy would send you the
5  money then for that account and the patient had paid
6  then again?  What would happen to that payment?
7    A  If it overpaid their account?
8    Q  Yep.
9    A  They would get refunded.
10    Q  Who would get refunded?
11    A  The patient.
12    Q  And that would come out -- CSI would send the
13  refund?
14    A  The First National Bank of Montana sent the
15  refund.
16    Q  Did that happen in every instance?
17    A  That the patient was refunded for overpayment?
18    Q  Yes.
19    A  Yes.
20    Q  Never a time when the patient had a credit
21  balance.
22        MR. EGAN:  Objection.
23        THE WITNESS:  Never a time when they had a
24  credit balance?
25    Q  (By Ms. Scrivani)  Yes.

Page 59

1    A  Lots of times they had a credit balance.
2    Q  So what'd you do with the credit balance?
3    A  We sent them a refund.
4    Q  The patient.
5    A  Yes.
6    Q  Always.
7    A  Yes.
8    Q  What happened if -- let me back up.
9        Mercy would sometimes pay in cash and sometimes
10  pay by offset; is that correct?
11    A  Uh-huh.
12    Q  So what would happen in an offset setting with
13  respect to payments that patient had made directly to
14  Mercy?
15    A  Typically when we would get a file from Mercy,
16  we had a backlog of unpaid invoices.
17    Q  Unpaid -- and what are they invoices for?
18    A  They would get invoices for payments they
19  received.  They would get invoices for recourse.  They
20  would get invoices for returns.  Once a funding was
21  actually occurring, we had to -- the offset funds had to
22  get posted to the oldest invoices first.  And typically,
23  the patient payments we addressed first, because the
24  patients were actually being charged interest on those
25  balances as a result of Mercy withholding those funds.

DEPOSITION OF CINDY DORR

Page 60

1    So it was crucial that the patients got their credit
2    posted to their accounts first, and that was the
3    sequence of posting.
4        Q   So after the patients' accounts were credited,
5    then what was going on?
6        A   Then we went to the recourse invoices, the
7    return invoices.
8        Q   Recourse came before return?
9        A   Yes.
10       Q   Just so we're understanding each other, what is
11   your understanding of a return?
12       A   An invalid account.
13       Q   That was either requested back or CSI sent
14   back.
15       A   Right.
16       Q   What's your understanding of a recourse
17   account?
18       A   A default account.
19       Q   What do you mean when you say "a default
20   account"?
21       A   They just -- it's a valid account, they just
22   don't pay it.
23       Q   And are there some parameters for when an
24   account becomes a default account?
25       A   Parameters?

Page 61

1        Q   Yes.
2        A   Ninety days past due.
3        Q   What is your understanding of 90 days past due?
4        A   They had a payment due 90 days ago that they
5    didn't make and have never made.
6        Q   So 90 consecutive days with no payment.
7        A   That's not necessarily true.
8        Q   Okay; why not?
9        A   If their payment is $50 a month and they have a
10   $50 payment due in January, and February and March. In
11   February they send you ten dollars, they still have a
12   90-day delinquency.
13       Q   Okay. So if a patient did not make their full
14   minimum monthly payment, the account was still
15   considered to be delinquent.
16       A   Correct.
17       Q   Okay. What would happen if, say, in your
18   example $50 January, $50 February, $50 March, January
19   only ten dollars is paid, in February $50 is paid, is
20   the account still delinquent?
21       A   It would be delinquent the $40 they didn't pay
22   in January.
23       Q   Okay. And then let's assume that in March,
24   again, $50 is paid and we're still short that $40. Is
25   that now a recourse account?

Page 62

1        A   Not until April.
2        Q   In April it becomes a recourse account, even if
3    $50 is paid again in April.
4        A   They pay 50, yes. This $40 keeps -- keeps
5    aging on. But typically -- typically -- well, never
6    mind; irrelevant.
7        Q   So is the $40 recoursed or is the entire
8    account recoursed?
9        A   The entire account is recoursed.
10       Q   How much is recoursed back?
11       A   The account, the account's balance.
12       Q   The balance.
13       A   Uh-huh.
14       Q   Not the full amount of the account received at
15   Mercy -- or excuse me, at CSI.
16       A   No; the unpaid balance.
17            MR. BRUBAKER:  Is it all right if we take a
18   break?  My bladder is acting up.
19            MS. SCRIVANI:  That's fine.
20            VIDEO TECHNICIAN:  We are now off the
21   record; the time is 10:16 a.m.
22            (Deposition in recess from 10:16 a.m. to
23   10:28 a.m.)
24            VIDEO TECHNICIAN:  We are now back on the
25   record; the time is 10:28 a.m.

Page 63

1        Q   (By Ms. Scrivani)  Ms. Dorr, what was
2    the -- how was the minimum payment determined for an
3    account?
4        A   It is always four percent of the outstanding
5    balance.  We do make special payment arrangements for
6    patients who have a hard time meeting that minimum
7    payment requirement to have a reduced payment of three
8    percent.
9        Q   Assuming there's no special payment
10   arrangements, were all of the Mercy accounts on a
11   four-percent minimum payment?
12       A   Yes.
13       Q   For the entire time?
14       A   Uh-huh.
15       Q   Okay.  Do you know if any Mercy accounts had
16   any special payment arrangements?
17       A   A lot of them did.
18       Q   Would that somehow be noted in CSI's system?
19       A   Yes.
20       Q   How would you be able to tell, looking on the
21   system, that there was a special payment arrangement?
22       A   You set a fixed payment, a fixed monthly
23   payment.
24       Q   And that appears in the CSI system?
25       A   Yes.

DEPOSITION OF CINDY DORR

Page 76

1  know.
2      Q  And is that Rob Logsdon?
3      A  Yes.
4      Q  Did Mercy ever ask you to break out interest
5  and late fees on their file formats that you sent to
6  them?
7      A  I think it was requested. I know Russ would
8  send e-mail, account specific, not invoice specific, on
9  a particular account. You know, What was the interest?
10  What was the late fees? What kind of payments did the
11  patient make and things like that. But as far as
12  requesting a change in the file format, I -- I don't
13  recall.
14      Q  Was there ever a time when CSI would receive a
15  payment from Mercy, via check as opposed to offset,
16  prior to CSI having the ability to dial into Mercy's
17  system?
18      A  I don't believe so.
19      Q  Could you tell me what year, '99, 2000, 2001,
20  CSI had dial-up access?
21      A  I think it was 2000.
22      Q  Early, middle, late?
23      A  I'm not sure.
24      Q  Did Mercy ever pay CSI by check?
25      A  Occasionally.

Page 77

1      Q  But you don't think it was before dial-up.
2      A  I -- I can't really remember, but I don't think
3  so.
4      Q  Why don't you think so? Why do you have that
5  recollection?
6      A  Because -- because their receivables were
7  getting to be so large, and I was not accustomed to
8  dealing with clients who let their receivables go so
9  long. And I had a lot of pressure from the bank to
10  keep -- to make sure that that receivable wasn't getting
11  out of control. And I had kept requesting payment and
12  requesting payment, and I wasn't -- I was getting
13  promises from Doug Smith, but I wasn't getting any
14  checks. And I had to -- I had to get Bob Jaeb involved
15  to try to get their receivables.
16      Q  When did you get Bob Jaeb involved?
17      A  I think probably by January or February of the
18  first -- within the first three months of sending out
19  invoices and receiving no reimbursement.
20      Q  What year was that?
21      A  I'm mixed up on -- I'm confused on what years
22  everything started with Mercy, so --
23      Q  Well, let me represent to you that Mercy
24  entered its contract with CSI in October of 1999.
25      A  Then it would have been 2000.

Page 78

1      Q  So in 2000 -- in January of 2000, after Mercy
2  had only been a customer for three months, they weren't
3  paying their receivables.
4      A  Right.
5      Q  Had you invoiced Mercy?
6      A  Yes.
7      Q  What did an invoice look like?
8      A  Then?
9      Q  Yes.
10      A  It was a -- it looked like a -- letter.
11      Q  I'm going to ask you to turn in the binder
12  that's in front of you, Exhibit 79.
13          MR. EGAN:  We have that?
14          MR. BRUBAKER:  Do we have that?
15          MS. SCRIVANI:  I don't know.
16      Q  (By Ms. Scrivani)  Ask you to take a look at
17  that; let me know when you're finished.
18      A  Okay.
19      Q  Do you recognize these documents?
20      A  Uh-huh.
21      Q  For the record, these are Bates stamped FNBM 26
22  and 27.
23          Is this an example of an invoice that you were
24  just referring to?
25      A  Uh-huh.

Page 79

1      Q  Is that a yes?
2      A  Yes.
3      Q  And does it indicate here -- strike that.
4          I don't see a date -- these two letters appear
5  to be primarily the same. One has a sticky on it and
6  some writing that the other does not; would you agree?
7      A  Yes.
8      Q  But the content of the letter itself appears to
9  be --
10      A  Yes.
11      Q  These letters are not dated. Do you know the
12  date of these letters?
13      A  No.
14      Q  Does the fax line across the top of the page
15  represent a date close in time to when this was drafted?
16      A  Yes.
17      Q  If you look at the -- could you explain to me
18  what's going on here in the first letter? Let's look at
19  FNBM 26. How you understand this to be an invoice?
20      A  The patient accounting office at Mercy Health
21  Systems was sending faxes to our office daily of
22  accounts that they wanted closed and returned to them.
23  So that's what the first item there is, which this
24  letter would have been -- had those faxed documents
25  attached to it --

Page 100

1    account.
2    Q  So not with respect to all accounts.
3    A  If they requested that. They didn't request
4    it -- that kind of information from me. They may have
5    requested it from an IT person; I don't know.
6    Q  So you don't know.
7    A  Right.
8    Q  If the file did not indicate if payment was to
9    be made by cash payment or offset, how did Mercy find
10   out which CSI was requiring? Did somebody give them a
11   call and say We're going to offset this or send us a
12   check? Did -- how did Mercy know how to pay it?
13            MR. EGAN: Objection; the question assumes
14   that it was CSI's determination that it would be paid by
15   offset which is --
16            MR. BRUBAKER: Objection.
17   Q  (By Ms. Scrivani) If you know.
18   A  My understanding is it was Mercy's request to
19   pay all their invoices by offset.
20   Q  But you know that they paid you by check at
21   times.
22   A  Because their files were not adequate.
23   Q  What do you mean when you say "their files were
24   not adequate"?
25   A  They owed us $500,000, they'd send us a hundred

Page 101

1    thousand dollars worth of accounts.
2    Q  When did they owe you $500,000?
3    A  I was using that as an --
4    Q  Just an example?
5    A  -- as an example.
6    Q  Okay.
7        Were there any other -- strike that.
8        So we were talking about reports prior to
9    December of 2000. And as far as you know, CSI never
10   sent any reports to Mercy regarding its accounts.
11           MR. BRUBAKER: Objection.
12           THE WITNESS: I never sent any reports to
13   Mercy.
14   Q  (By Ms. Scrivani) Were you ever asked for any?
15   A  No.
16   Q  What types of files -- or strike that.
17       What types of invoices would you send to Mercy
18   during this time period before December of 2000?
19   A  What type of invoices?
20   Q  Yes. For what types of things would you
21   invoice?
22   A  Payments that they had received on accounts
23   that we owned, returned accounts, and recoursed
24   accounts.
25   Q  Anything else?

Page 102

1    A  No.
2    Q  So you weren't responsible for letting Mercy
3    know what accounts were accepted into the program.
4    A  No.
5    Q  Did that change any of the files you sent after
6    December of 2000?
7            MR. BRUBAKER: I'm just going to object to
8    the form of that question.
9            MR. EGAN: I didn't understand it either.
10   Q  (By Ms. Scrivani) Let me back up.
11       After December of 2000, did you send any
12   reports to Mercy?
13   A  Did I send any reports to Mercy. You know, I
14   guess my confusion is requesting information and sending
15   a report are two different things to me.
16   Q  Okay.
17   A  I sent them information, but I didn't
18   necessarily send them reports.
19   Q  What type of information did you send them?
20   A  I sent them a recap of all the accounts still
21   unpaid that had been billed to them.
22   Q  When was that?
23   A  It was periodic. I couldn't tell you dates.
24   Q  Okay; what else? And who at Mercy would you
25   send that to?

Page 103

1    A  Usually Russ.
2    Q  What else would you send, in terms of
3    information?
4    A  Just, you know, individual account requests,
5    information that we would get that were typically e-mail
6    requests.
7    Q  Did you ever prepare any reports -- let's go
8    back to prior to December 2002 -- 2000, excuse me -- for
9    CSI internally or for the bank?
10   A  In regards to Mercy?
11   Q  Yes.
12   A  Yes.
13   Q  What type of reports did you prepare prior to
14   December 2000?
15   A  Aging reports, delinquency reports, cash
16   posting reports, all of the same reports --
17   Q  That we discussed earlier.
18   A  -- that we discussed earlier.
19   Q  And they weren't specific to Mercy. They
20   included all the hospitals. Mercy just happened to be
21   on them?
22   A  From time to time they would request that
23   information to be Mercy specific.
24   Q  You mean the bank would request?
25   A  Yes.

DEPOSITION OF CINDY DORR

Page 120

1   Q  Do you have any other involvement with Thesia
2  Crooks other than cash reconciliation?
3   A  No.
4   Q  Anybody else at the bank that you dealt with on
5  a regular basis?
6   A  No.
7   Q  Have you ever seen the contract that Mercy
8  signed with CSI?
9   A  Have I ever seen it?
10   Q  Yes.
11   A  Yes.
12   Q  Did you see it at the time it was signed?
13   A  No.
14   Q  Did you see it when the relationship started?
15   A  No.
16   Q  When was the first time you saw it?
17   A  I don't remember.
18   Q  Was it during the course of the relationship or
19  after the litigation started?
20   A  During the course.
21   Q  You don't recall how far into it you saw it?
22   A  No.
23   Q  What was the reason for seeing it at the time
24  you did?
25   A  Somebody from Mercy requested a copy of it.

Page 121

1   Q  You don't recall who?
2   A  No.
3   Q  They requested it from you?
4   A  Yes.
5   Q  At the time you provided that copy, did you
6  read the contract?
7   A  I don't -- I might have; I don't remember.
8   Q  Do you have a recollection of ever reading the
9  contract?
10   A  No.
11   Q  How did you know what responsibility CSI had
12  with respect to Mercy, if you didn't read the contract?
13       MR. EGAN:  Objection.
14       MR. BRUBAKER:  Objection.
15       THE WITNESS:  I take instruction from my
16  managers.
17   Q  (By Ms. Scrivani)  And who would those be?
18   A  During that time, it would have been Bob.  I
19  took directives from Pete Parsons, Rob Logsdon, the
20  bank.
21   Q  From 1999 till 2002, who was your immediate
22  supervisor?
23   A  Bob -- well, it changed from time to time, but
24  basically Bob Jaeb.
25   Q  In '99, was Bob Jaeb your supervisor?

Page 122

1   A  Yes.
2   Q  How about 2000?
3   A  Yes.
4   Q  How about 2001?
5   A  Yes.
6   Q  Do you recall Bob Jaeb ever telling you
7  anything about the Mercy contract?
8   A  Telling me anything about the contract?
9   Q  Yes.
10   A  No.
11   Q  Do you recall Pete Parsons ever telling you
12  anything about the Mercy contract?
13   A  No.
14   Q  Do you recall Rob Logsdon ever telling you
15  anything about the Mercy contract?
16   A  No.
17   Q  How did you know when to recourse items back to
18  Mercy?  Strike that.
19       Did you have an understanding as to when items
20  were to be recoursed to Mercy?
21   A  Ninety days delinquent.
22   Q  How did you obtain that understanding?  Because
23  it's the same for all your clients?
24   A  Yes, it is the same for all of our clients.
25   Q  So you just assumed it was the same for Mercy.

Page 123

1       MR. EGAN:  Objection.
2       THE WITNESS:  No, I didn't assume; I was
3  told.
4   Q  (By Ms. Scrivani)  Who told you?
5   A  Pete Parsons and Bob Jaeb.
6   Q  What is your understanding of when an account
7  needs to be recoursed to Mercy, in terms of this 90 days
8  delinquency?
9   A  When it needs to be recoursed?
10   Q  Yes.
11   A  When it becomes 90 days past due, in 1999 we
12  were billing them the next month because we were only
13  billing monthly, or in the case of Mercy, whenever they
14  said they would accept it.
15   Q  Well, I'm talking only about Mercy now.  So
16  were you billing them the next month or not?
17   A  I could only send Mercy a bill when they told
18  me they were ready to accept a file.  Sometimes that
19  would be five months.
20   Q  And why do you have that understanding?
21   A  Because if I sent them a file, it would come
22  back to me, I don't accept this file.
23   Q  Come back from who?
24   A  Russ Erdman.
25   Q  Would Russ ever tell you why he wasn't

Page 124

1  accepting a file?
2      A  Because he wasn't prepared to send us a file,
3  and he would only accept it when he was sending us a
4  file.
5      Q  And do you have any of that in writing?
6      A  Probably have a couple e-mails; I'm not sure.
7      Q  So you don't know if there's any e-mails from
8  Russ saying he won't accept a file?
9      A  I don't know if there are any, no.
10      Q  Anybody else at Mercy ever tell you they
11  wouldn't accept a file?
12      A  I never sent a file to anyone except Russ.
13      Q  Russ ever tell you that he wasn't accepting the
14  file in the format you were sending it?
15      A  I think he sent them back a couple times, said
16  I didn't have them named right or something.
17      Q  But that's not the same as not accepting;
18  right?
19      A  Correct.
20      Q  So you think there are some times when he sent
21  them back because they weren't named right and times
22  when you're claiming he wouldn't accept them.
23          MR. EGAN:  Objection.
24          THE WITNESS:  If I didn't have it named
25  right, he didn't like send it back and say I'm not

Page 125

1  taking this, you didn't name it right.  He would send me
2  an e-mail saying You're not using, you know, the proper
3  naming convention or whatever he called it, for the
4  file.  And, you know, I had to change it and fix it and
5  whatever and -- but I don't think that -- I mean, the
6  file still went.
7      Q  (By Ms. Scrivani)  So with respect to the files
8  you're talking about Mercy not accepting, does that mean
9  you never tried to send them, or you sent them and Mercy
10  wouldn't accept them?
11      A  I sent them, and I received an e-mail back, I
12  will not accept these files till I'm prepared to send
13  the file transmission to you.
14      Q  How often did that happen?
15      A  Oh, well, they didn't send us files very
16  frequently, so that didn't happen very frequently.  I
17  couldn't really say how many times.
18      Q  Do you have an estimate?
19      A  No.
20      Q  Would you have retained the e-mails you claim
21  Russ sent you about this?
22          MR. EGAN:  Objection.
23          THE WITNESS:  Probably, but I -- I don't
24  have that same computer and I don't have that -- I'm
25  not on AOL anymore, and that is how our e-mail was set

Page 126

1  up then.
2      Q  (By Ms. Scrivani)  When did it change from AOL
3  to something else?
4      A  I don't remember.
5      Q  You don't recall the year?
6      A  No.
7      Q  When did you get rid of the computer that you
8  had?
9          MR. EGAN:  Objection.
10          THE WITNESS:  Geez, I don't know.  I mean,
11  I get a new computer about every year.
12      Q  (By Ms. Scrivani)  Were you ever asked to
13  provide e-mails to anyone in connection with this
14  litigation?
15      A  Yes.
16      Q  Did you do so?
17      A  As much as I had, I did.
18      Q  What would be a reason why you wouldn't have an
19  e-mail?
20      A  I wouldn't have had any of the e-mails that I
21  would have had when we were on AOL.
22      Q  So at the time you were asked to provide
23  e-mails, you were no longer using AOL.
24      A  Correct.
25      Q  Do you recall the dates of these instances when

Page 127

1  you claim Russ would not accept a file?
2      A  No, I don't.
3      Q  Do you recall the years?
4      A  Between '99 and 2001, or I would say 2000 and
5  2001.
6      Q  That's as best you can narrow it down?
7      A  Yes.
8      Q  Do you still have the files that you sent to
9  Russ that you claim he wouldn't accept?
10      A  Do I still have them?  I'm sure they're
11  probably stored somewhere, but no, I don't have them.
12      Q  If they still exist, would we be able to tell
13  that you had sent them to Russ and he had not accepted
14  them?
15          MR. EGAN:  Objection.
16          THE WITNESS:  I don't think so.
17      Q  (By Ms. Scrivani)  And when you stated earlier
18  that Mercy sometimes wouldn't provide a file for five
19  months, is that based on something you know, or were you
20  giving an example -- an exaggeration?
21          MR. EGAN:  Objection.
22          MR. BRUBAKER:  Objection.
23          THE WITNESS:  I think there was a
24  five-month gap.
25      Q  (By Ms. Scrivani)  Do you know when that was?

# EXHIBIT "D"

VIDEOTAPED DEPOSITION OF ROBERT JAEB - VOLUME I

Page 1

```
 1                  UNITED STATES DISTRICT COURT
 2                EASTERN DISTRICT OF PENNSYLVANIA
 3
 4     MERCY HEALTH SYSTEM OF                )
       SOUTHEASTERN PENNSYLVANIA,            )
 5                                           )
                    Plaintiff,               )  CIVIL ACTION
 6                                           )  No. 01-CV-5681
           -vs-                              )
 7                                           )
                                             )
       CSI FINANCIAL, INC.,                  )
 8                                           )
                    Defendant.               )
 9                                           )
       FIRST NATIONAL BANK OF MONTANA,       )
10     INC., and CSI FINANCIAL, INC.,        )
                                             )
11                  Plaintiffs,              )  CIVIL ACTION
           -vs-                              )  Consolidated
12                                           )
       MERCY HEALTH SYSTEM OF                )
13     SOUTHEASTERN PENNSYLVANIA,            )
                                             )
14                  Defendant.               )
15
16           VIDEOTAPED DEPOSITION OF ROBERT JAEB
17                        VOLUME I
18           On the 12th day of July, 2004, beginning
19     at 9:06 a.m., the deposition of ROBERT JAEB,
20     appearing at the instance of Plaintiff, was heard at
21     Lesofski & Walstad Court Reporting, 21 North Last
22     Chance Gulch, Suite 201, Helena, Montana, pursuant
23     to the Montana Rules of Civil Procedure, before
24     Lisa R. Lesofski, Registered Professional Reporter,
25     Notary Public.
```

VIDEOTAPED DEPOSITION OF ROBERT JAEB - VOLUME I

Page 2

```
 1                  A P P E A R A N C E S:
 2
 3       APPEARING ON BEHALF OF MERCY HEALTH SYSTEM:
 4            STACEY A. SCRIVANI
              Attorney at Law
 5            Stevens & Lee
              111 North Sixth Street
 6            P.O. Box 679
              Reading, Pennsylvania 19603-0679
 7
 8       APPEARING ON BEHALF OF CSI FINANCIAL, INC.:
 9            PATRICK J. EGAN
              Attorney at Law
10            239 South Camac Street
              Philadelphia, Pennsylvania  19107
11
12       APPEARING ON BEHALF OF FIRST NATIONAL BANK OF
         MONTANA:
13
              CHRISTOPHER M. BRUBAKER
14            Attorney at Law
              Kittredge, Donley, Elson, Fullem & Embick
15            421 Chestnut Street
              Philadelphia, Pennsylvania  19106
16
17       ALSO PRESENT:
              Russ Erdman
18            James T. O'Brien
              Robert Olsen, Videographer
19
20
21
22
23
24
25
```

Page 196

1  central billing, that we just decided we would just
2  try and work through this and answer the patient's
3  questions and work together and solve all of the
4  issues.
5      Q   Let me break that down a little bit. And
6  you testified about this earlier and I should have
7  asked you then. When you're talking about Mercy and
8  them combining their billing, what do you base your
9  facts on in that, did somebody from Mercy tell you
10 something about that?
11     A   I think Doug did, I think he told me they
12 put Community, Fitzgerald and Suburban and maybe
13 another one together, and I don't know how long the
14 entity had been put together, and they were trying
15 to get everything centralized, I believe, and,
16 again, this is just recollection, and they had some
17 issues and sometimes the people at the various
18 hospitals didn't get all of the admissions
19 information that they should have on insurance, et
20 cetera, and so we would work with them in trying to
21 get the insurance submitted. In a lot of cases we
22 would return accounts, we worked out a methodology
23 and we'd give them insurance information like that.
24     Q   Let's get back to the paragraph and my
25 question specific to this. Let's just look at the

Page 197

1  first sentence of that paragraph 7 together. "At
2  the end of each calendar month during which a bank
3  or CSI holds an account required for financing from
4  provider, CSI will automatically present to the
5  provider for repurchase all accounts that are
6  delinquent for 90 days." What is your understanding
7  of the provision?
8      A   Just that, at the end of each calendar
9  month we will present accounts to Mercy for
10 repurchase that are 90 days or greater.
11     Q   Well, the word or greater doesn't appear
12 there, so I'm trying to figure out what you mean by
13 90 days or greater.
14         MR. EGAN:  Counsel, he's testified to how
15     he interprets it. You asked him a question
16     about his interpretation, the words are the
17     words.
18     Q   (By Ms. Scrivani)  That's my question, is
19 where do you get the or greater from, why is that
20 your understanding?
21     A   First of all, they're going to be more
22 than 90 days to begin with. If an account hits 90
23 days on the first of the month, they've already done
24 the billing on the 30th so it's going to be almost
25 120 days when that account is sent back to the

Page 198

1  hospital because at this point in time it was once a
2  month.
3      Q   So taking your example, let's assume that
4  on the 30th was the date that you recoursed accounts
5  back to Mercy and an account hit 90 days delinquent
6  on the 1st of the month. Is it your understanding
7  based on this provision that then CSI had an
8  obligation to notify Mercy on the 30th day of that
9  month that that account had become delinquent?
10     A   It depended on whether we were working
11 with a patient or we had all the billing issues
12 solved. We have the Fair Credit Billing Act that we
13 were trying to comply with too and answer all of
14 their questions and, as you know, the clock stops so
15 we can't necessarily get everything resolved in a
16 particular time frame, so it can go much longer than
17 that. And the other thing is that Mercy would only
18 accept these accounts back when they were ready to
19 give us additional new files, so we couldn't give it
20 back to them on the 90th day perhaps if we wanted
21 to.
22     Q   Let's back up a little bit. You talked
23 about federal lending laws and you said the clock
24 stopped. What do you mean by that?
25     A   If there was a dispute or a question

Page 199

1  regarding a bill and a written letter from the
2  patient, we have to stop the clock and we have 60
3  days from the time we get that to answer all of
4  their questions. If we can't answer their questions
5  the patient can't be held responsible for that
6  particular account or we have to adjust off that
7  portion of the balance.
8      Q   Did that stop your internal clock for
9  determining delinquency as well?
10     A   It should have. I don't know if, in fact,
11 it did but it would have, yes.
12     Q   And how would, assuming that it did, how
13 would your systems at CSI know that the clock had to
14 stop for that?
15     A   It shows a dispute resolution pending on
16 there and somehow they put codes in and that's all
17 in there.
18     Q   And is there a date tied to the dispute
19 resolution?
20     A   Yes.
21     Q   And that's the date that you find out that
22 the patient is complaining or disputing?
23     A   Yes.
24     Q   But I guess my question is, putting all
25 that aside, because then if the clock stops then it

Page 204

1    it.
2        Q    Now tell me what types of problems Mercy
3    accounts had in your opinion.
4        A    It was either -- I think the biggest
5    problem was insurance issues and in the beginning
6    they didn't get statements, but after a course of
7    time things had worked out and we didn't have that
8    problem. So I think it primarily came down to
9    whether or not the insurance company was billed and
10   then paid, et cetera, at the end. And you would
11   have to talk to either Cindy's people or somebody in
12   customer services or client services more than me on
13   that.
14       Q    So that would be either Cindy or Tami?
15       A    Yes.
16       Q    Were you involved at all in any account
17   resolutions for Mercy accounts?
18       A    Only dealing with Mercy, not with the
19   individual patients, no.
20   .    Q    And who did you deal with at Mercy?
21       A    Doug Smith.
22       Q    How frequently did you deal with Doug once
23   the contract was signed here?
24       A    In the initial time frame, you know, we
25   had conversations because of the issues with the

Page 205

1    number of accounts that they evidently were going to
2    have to buy back, how are we going to handle them,
3    the disputes and stuff like that, so I'm sure we
4    talked quite a bit to begin with. I can't give you
5    an exact number though.
6        Q    If there was an account that had insurance
7    on it -- Let me back up. So one of the issues that
8    you had with some of the Mercy accounts were that
9    they had insurance that wasn't billed or you didn't
10   know that there was --
11       A    That Mercy didn't even know there was
12   insurance, right.
13       Q    Is it fair to say that there were accounts
14   where the customer was disputing the services?
15       A    Perhaps, yes.
16       Q    Do you have a recollection of those
17   being --
18       A    I do not.
19       Q    Was there anything other than insurance
20   that you recall being an issue with some Mercy
21   accounts?
22       A    I'm the wrong person to ask, you have to
23   ask somebody in customer services or client
24   services.
25       Q    Taking insurance as an example, if

Page 206

1    somebody had insurance that was not billed because
2    either Mercy didn't know or there was wrong
3    information, was that type of an account one that
4    Mercy would, that CSI would return to Mercy or
5    recourse to Mercy?
6        A    Return.
7        Q    And when would that take place in terms of
8    the process?
9        A    I believe we would do that once a month or
10   when Russ would send us a new file.
11       Q    Now, you also testified before with
12   respect to recourse that Mercy didn't want you to
13   send a recourse file until they sent a new account
14   file; is that correct?
15       A    Yeah, at the end, that's correct.
16       Q    What do you mean at the end?
17       A    When we first started out the process we
18   would send them a manual recourse list starting, I
19   think we put the first accounts on in like October,
20   so it must have started in December or January and
21   that went on for six, seven, eight months and then
22   they wanted it sent electronically. So we worked
23   with their staff to do that in some format and they
24   would only be willing to accept the returns in the
25   recourse file when they were ready to send us a new

Page 207

1    file, that also showed the new file accounts to
2    submit and then a list of accounts that had payments
3    that they wanted back, the return file, and then we
4    would do the recourse file too. And then we had to
5    reconcile the accounts that we were going to
6    recourse and they could have actually got a payment
7    so we had to wait until we got the return and the
8    credit balance filed to see if they had got a
9    payment that hadn't been reported to us. So we had
10   to go through all of that. There was no way we
11   could process an account just like that because we
12   had to get all of that extra information to find out
13   whether it was paid or not.
14       Q    And I want to back up and break this down.
15   You said when you first started out there was manual
16   recourse and you said that lasted about six or seven
17   months?
18       A    Something like that.
19       Q    Is it your understanding that Mercy sent,
20   excuse me, CSI sent a manual recourse every month
21   for those six or seven months?
22       A    Yes.
23       Q    Did you have any involvement personally
24   with doing manual recourse?
25       A    I didn't work on it, no.

VIDEOTAPED DEPOSITION OF ROBERT JAEB · VOLUME I

Page 208

1    Q    Who would have that knowledge?
2    A    Accounting and Cindy Dorr's people.
3    Q    So how is it that you know that a recourse
4  file was sent every month for those first six or
5  seven months?
6    A    I saw the statements.
7    Q    What do you mean by a statement?
8    A    The letters listing the accounts, recourse
9  and returned accounts that went back to Mercy.  As a
10 matter of fact, because they were so high, I talked
11 to Doug Smith about it and we got a check for part
12 of it and we had agreed early in the game that
13 because it was so high that they wanted to have the
14 funds offset.
15   Q    When did that take place?
16   A    I couldn't give you the exact month but it
17 was early in the program.
18   Q    And you said that the statements you were
19 referring to were letters back and forth, or I guess
20 it would be letter going one way?
21   A    It would be a monthly statement.
22   Q    What would be contained on the statement?
23   A    Just the accounts that would be recoursed
24 and also to be returned and how much was owed.
25   Q    When you say these were generated

Page 209

1  manually, what do you mean by that?
2    A    They'd send Mercy a list of accounts
3  itemized on what had to be repurchased.
4    Q    You mean like via fax or something as
5  opposed to via e-mail?
6    A    I think they e-mailed them to them.
7    Q    Do you know if those documents have been
8  produced in this case?
9    A    To my knowledge, yes.
10   Q    Were those documents that would have been
11 retained by CSI?  Let me back up.  Does CSI ever
12 have a document destruction or retention policy?
13   A    No.
14   Q    So do you keep every, has CSI always kept
15 every document?
16   A    As far as I know, everything involved with
17 recourse and returns, yes.
18   Q    So if you had these statements -- Strike
19 that.  If these statements existed, CSI should have
20 them?
21   A    Yes, and they were produced.
22   Q    So if I don't have those things does that
23 mean they don't exist?
24        MR. EGAN:  Objection.
25   A    No.

Page 210

1     ·  MR. EGAN:  They were mailed to Mercy, so
2   he's talking about that CSI sent to Mercy.
3    Q    (By Ms. Scrivani)  Did you retain copies
4  of things that you sent to Mercy?
5    A    As far as I know, yes.
6    Q    So my question is if I don't have those
7  things in the production from CSI, does that mean
8  they don't exist?
9        MR. EGAN:  Objection.
10   A    No.
11   Q    (By Ms. Scrivani)  What happened to them?
12   A    As far as I know, they were submitted.  If
13 you didn't have them then you should have got them.
14   Q    And then you said at some point they
15 wanted, they being Mercy, wanted recourse files to
16 be sent electronically; is that correct?
17   A    Yes.
18   Q    Do you remember when that took place?
19   A    No, that was probably seven or eight
20 months into the program.
21   Q    Which if we started in October --
22   A    So that would be 2000.
23   Q    That would put us around May?
24   A    Something like that.
25   Q    And what did you mean by them being sent

Page 211

1  electronically?
2    A    In a particular format that Mercy's people
3  could read and process the accounts off of, saying
4  they wanted it formatted in a particular way.
5    Q    What is your testimony that Mercy would
6  only accept recourse when they were ready to send
7  new accounts based on?
8    A    That became the system.  Whenever they
9  were ready to send us a new file, rather than pay
10 the bank what was owed, whatever the new funding
11 would be would be offset.  At that same time if they
12 were willing to accept the recourse file and they
13 would also send us a file of accounts that they
14 wanted returned and I believe then it was
15 coordinated with the accounts that we show should be
16 returned.  So there would be a little time frame,
17 you have to get all of this straight with Cindy, but
18 this is my understanding, and at the same time we
19 would get a list of accounts that had made payments.
20   Q    To whom?
21   A    To Mercy.  And those accounts may
22 actually -- accounts that we were going to recourse
23 may actually have been making payments directly to
24 Mercy, so we were going to have to go back and redo
25 the files that we were submitting to Mercy.

VIDEOTAPED DEPOSITION OF ROBERT JAEB - VOLUME I

Page 212

1    Q    Did anybody at Mercy ever say that they
2    would not accept a recourse account until they were
3    ready to send a new account?
4    A    Yes.
5    Q    Who said that?
6    A    Mr. Erdman.
7    Q    And who did he say that to?
8    A    To Cindy Dorr.
9    Q    Do you have any personal knowledge of Russ
10   saying that to --
11   A    I believe there is an e-mail to that
12   effect that I've read but I won't swear to it at
13   this point in time.
14   Q    And you've seen that e-mail?
15   A    I believe I have.
16   Q    Did you ever have any conversations with
17   Mr. Erdman in which he stated that Mercy would not
18   accept a recourse file until a new account file
19   could be sent?
20   A    No, I primarily dealt with Doug Smith.
21   Q    So you make that statement based on
22   reviewing the e-mail or discussions with Cindy or
23   both?
24   A    I believe on both at this point in time
25   but, like I say, I'm not sure.

Page 213

1         VIDEOGRAPHER:  We are now off the record.
2    The time is 2:49 p.m.
3         (A brief recess was taken.)
4         VIDEOGRAPHER:  We are now back on the
5    record.  The time is 2:58 p.m.
6    Q    (Ms. Scrivani)  When the procedure for
7    sending Mercy recourse back became electronic did
8    you then ever see the files that were sent from CSI
9    to Mercy?
10   A    We would, Cindy would print them out and I
11   would see some of the printout.  That was the extent
12   of it.
13   Q    What would be included in the printout?
14   A    Recourse, returns and payments.
15   Q    Would she print out the e-mails that sent
16   those items or just the actual file themselves?
17   A    I think just -- all I saw was the files.
18   I don't know.
19   Q    Did those files that you saw indicate a
20   date when they were created?
21   A    I believe so, yes.
22   Q    Did they indicate a date when they were
23   sent to Mercy?
24   A    I don't recall.
25   Q    With respect to the documents that we

Page 214

1    discussed before the break, the manual recourse that
2    you said took place for six or seven months, does
3    CSI still have copies of those documents?
4    A    If we don't, the Smith Law Firm would.
5    Q    And how about with respect to any
6    electronic recourse files that were sent?
7    A    Everything that we have was given to the
8    Smith Law Firm to, as far as the interrogatories
9    were concerned, the demand for production.
10   Q    Without retaining a copy?
11   A    I don't know if we have a copy of them or
12   not.
13   Q    Who was responsible for gathering
14   documents to give to the law firm for production?
15   A    I don't know.
16   Q    It wasn't you?
17   A    No.
18   Q    Who would know the answer to that?
19   A    Most likely Cindy or Melissa, or the Smith
20   Law Firm would probably give you a quicker answer.
21   Q    Turning back to the contract, which is
22   Exhibit 6 and we're looking specifically at the
23   paragraph 7, how did this 90 days for delinquency
24   become part of the contract, why was it 90 days as
25   opposed to 120?

Page 215

1    A    It's just a number that I picked that any
2    time after 90 days if a patient didn't pay that we
3    should have the right to have it repurchased so that
4    the bank gets paid.
5    Q    So there is no magic to 90 days?
6    A    No.
7    Q    It's not based on any sort of collection
8    history?
9    A    No.  When I first designed the program I
10   thought 90 days sounded reasonable.
11   Q    What is your understanding of the term
12   automatically present in this paragraph of
13   Exhibit 6?
14   A    I guess at the time, and probably still
15   is, is that after 90 days we have the right to
16   present to the hospital for repurchase accounts that
17   have not been performing.
18   Q    What do you mean by the right to present?
19   A    Well, in other words, the terms there they
20   have to repurchase them.  If we submit a list to
21   them to repurchase, that's what they're supposed to
22   do.
23   Q    Is it your -- Strike that.  Do you have an
24   understanding as to a time period that automatically
25   refers to?

VIDEOTAPED DEPOSITION OF ROBERT JAEB - VOLUME I

Page 284

1    document?
2       A   Yes.
3       Q   For the record, this document is marked
4    CSI 3887 through CSI 3890 and it is what looks like
5    a draft of a letter dated October 10th, 2001 from
6    Robert Jaeb to Joe Brady.  Would you agree with me
7    that this does not appear to be on letterhead?
8       A   This is a copy of something out of my
9    files.  When I make a copy in my file it isn't on
10   the letterhead.
11      Q   Is this an accurate copy though of what
12   was sent to Mercy?
13      A   Yes.
14      Q   Even though it doesn't have a signature?
15      A   Yes.
16      Q   So you don't keep signed copies of what
17   was sent out?
18      A   No.
19      Q   Looking at No. 1, the first involves
20   interpretation of Section 7 of the agreement, if you
21   would read that paragraph there.
22      A   (Witness reviews document.)  Okay.
23      Q   Did you do some sort of an investigation
24   of the Mercy accounts in order to draft that part of
25   the letter?

Page 285

1       A   I believe Mr. Miller had talked to me on
2    the phone, and Doug may have been involved in that,
3    about a particular account and it was his impression
4    that since we had the account for 90 days, period,
5    we could not recourse the account back to him and he
6    said, "No, we're talking about delinquency."  I
7    says, "In fact, the account that I believe we were
8    talking about at that point in time was making
9    monthly payments and then they discontinued making
10   payments and that's why the account was sold and it
11   was recoursed, the patient had paid all along and
12   then stopped."
13      Q   Who was it that told you that they thought
14   an account that you had simply for 90 days had to be
15   recoursed or not at all?
16      A   Mr. Miller, I believe.
17      Q   Well, if you would look back at
18   Mr. Miller's letter dated October 9th.
19      A   There was dialogue prior to this and
20   that's what I was referring to, I believe.
21      Q   Is it fair to say that Mr. Miller's letter
22   in the second paragraph on the first page says, "CSI
23   has failed to present HMS's delinquent patient
24   accounts for recourse within the contractually
25   required 90 day time period," is that what it says?

Page 286

1       A   That's what it says.
2       Q   And then further on in that paragraph he
3    says, "Under that section on a monthly basis CSI is
4    required to present all accounts that are 90 days
5    delinquent to MHS for recourse," is that what he
6    says?
7       A   That's what he says.
8       Q   So he's referring to 90 days delinquent,
9    not 90 days on your books; is that correct?
10         MR. EGAN:  Objection.
11      A   That's what he's referring to then, but
12   part of our dialogue was we had a verbal
13   conversation and he was talking about a particular
14   account.
15      Q   (By Ms. Scrivani)  And when did that take
16   place?
17      A   Prior to this letter.
18      Q   And that was via telephone?
19      A   Yes.
20      Q   Do you know how much prior to this letter?
21      A   No, I can't recall.
22      Q   And was anybody on the phone other than
23   you or Mr. Miller?
24      A   I believe Doug Smith was but I'm not sure
25   anymore, it's been too long.

Page 287

1       Q   Did Doug Smith ever give you the
2    indication that he believed that the 90 days meant
3    90 days on your books as opposed to delinquency?
4       A   I don't recall that.  No, this was a
5    surprise to me when this issue was raised and that's
6    why I wrote this the way it was.
7       Q   And then if you look, I'm back on
8    Exhibit 62, the next, the second paragraph under
9    Item No. 1, "CSI does send Mercy Health Systems a
10   monthly list of all accounts that are to be
11   recoursed when possible."  What does that mean?
12      A   That means that Mercy doesn't accept the
13   lists until Mr. Erdman was ready to send the file of
14   new accounts, it could be one month, it could be
15   three months.
16      Q   And we talked about your understanding of
17   that prior so I won't go over that again.
18         Next paragraph, "One of our biggest
19   hurdles has been dealing with Mr. Erdman.  He has
20   continually made the process harder than it should
21   be."  What do you mean by that?
22      A   The problems between him and Cindy and
23   Rob, his submission of the files, trying to balance
24   the files, it was a continued problem.  When he's
25   ready to take the files he would and then when we

VIDEOTAPED DEPOSITION OF ROBERT JAEB - VOLUME I

Page 272

1　　　THE WITNESS: Is this the name of the data
2　files going back and forth between each other?
3　　Q　(By Ms. Scrivani) He can't answer your
4　question. I'm sorry.
5　　A　I'm sorry, I don't know.
6　　Q　That's fine. Do you recall if you
7　provided Mr. Smith with a response to this letter?
8　　A　Yes, I'm sure I did.
9　　Q　Do you know when that was?
10　　A　Probably a short time after I got the
11　letter.
12　　Q　If you could please turn to Exhibit 69,
13　I'd ask you to take a look at that, please, and let
14　me know when you're finished. For the record,
15　Exhibit 69 is Bates numbered 1020 through 1021.
16　　A　(Witness reviews document.) Okay.
17　　Q　Do you recognize this document?
18　　A　I believe so.
19　　Q　What is this?
20　　A　It's a letter from Mr. Smith still
21　addressing concerns about his previous letter.
22　　Q　Is it addressed to you?
23　　A　Yes.
24　　Q　Is it dated July 11, 2001?
25　　A　Yes, it is.

Page 273

1　　Q　Do you recall receiving this?
2　　A　I'm sure I did.
3　　Q　Is it fair to say that prior to July 11th
4　you had not responded to Mr. Smith's July 2nd
5　letter?
6　　A　Not necessarily. I may have talked to him
7　on the phone.
8　　Q　But you didn't respond in writing?
9　　A　No, probably not.
10　　Q　Now, if I could ask you to flip please to
11　Exhibit 61.
12　　A　Okay. Isn't this the same?
13　　Q　Is it fair to say that this is the same
14　letter that we just saw in Exhibit 69?
15　　A　It appears to be.
16　　Q　However, the only thing that I can see
17　that's different on it is that it has handwriting on
18　it; is that fair?
19　　A　Yes, it does.
20　　Q　Do you recognize this handwriting?
21　　A　No.
22　　Q　This is not your handwriting?
23　　A　I don't believe so, no.
24　　Q　Do you recall what, if anything, you did
25　to look into the concerns that Mercy raised in

Page 274

1　Exhibits 69 and 68?
2　　A　I don't recall it but I'm sure I would
3　have addressed the particular points that Doug was
4　talking about and, knowing myself, I probably would
5　have gave him a call and told him I was working on
6　it but I can't be sure. That's what I would expect.
7　　Q　Do you recall if you wrote a letter in
8　response?
9　　A　No, I do not. About the only thing I
10　recall is at some point in time that I believe that
11　Doug was satisfied that we were working through the
12　issues I think was a follow up.
13　　Q　Do you recall when that was?
14　　A　No, it would have been shortly after this
15　last letter or something like that, sometime in that
16　time frame, end of July, first part of August. I
17　just don't recall it. But I do know we were working
18　on the issues.
19　　Q　I think you did respond in writing so I'm
20　trying to be fair and find that letter so I can show
21　that to you.
22　　A　Okay.
23　　Q　I'm not locating it right now. So who was
24　it that had, who thought that things were working
25　out better, was it Doug, you, both sides?

Page 275

1　　A　There was a conversation through both of
2　us and it seems to me, and I'm not 100 percent sure,
3　that Doug sent me a letter, "Okay, we understand
4　this, that things are improving and we're going to
5　go forward and we'll start sending you files," and I
6　think it was about the time they had told us he
7　would send a file every two weeks, something like
8　that.
9　　Q　And you think that was sometime at the end
10　of July, August?
11　　A　Yes.
12　　Q　Did Mercy then send some new files?
13　　A　Yes.
14　　Q　Did there come a time when things
15　ultimately weren't working out again?
16　　A　Yes.
17　　Q　Is it fair to say that was in the October
18　time frame?
19　　A　Probably -- we got one file, whenever I
20　received it, late summer, early fall, and then we
21　were talking to Doug where the files were, "We're
22　going to send them, we're going to send them," they
23　didn't do that and then things blew up from there.
24　　Q　And what happened when you say things blew
25　up?

Page 276

1    A   Basically at some point in time I sent him
2 a letter that I knew that the bank was impatient and
3 needed to get the money in here, we needed to get
4 this thing resolved and at some point in time an
5 attorney became involved in it and had some
6 questions and obviously we weren't going to get the
7 files, and the next thing I knew we were sued.
8    Q   What was your understanding of what the
9 bank said they were owed money for?
10    A   For the recourse and returns and payments.
11    Q   All three items?
12    A   Yes.
13    Q   Do you know how much total the bank was
14 claiming was owed?
15    A   I'm not exactly sure of the exact amount
16 now.
17    Q   Do you know or did you ever know of that
18 amount how much was for recourse, how much was for
19 insurance and how much was for payments?
20    A   Yes, I did, yes.
21    Q   Was that indicated on a document
22 somewhere?
23    A   Yes, I believe it was.
24    Q   And who generated that document?
25    A   Cindy Dorr.

Page 277

1    Q   Was that document provided to Mercy?
2    A   I'm sure it was.
3    Q   And how did the bank have an understanding
4 that it was claimed it owed money?
5       MR. BRUBAKER: Objection.
6    A   I don't know how the bank did.
7    Q   (By Ms. Scrivani) But it was the bank
8 that was telling CSI that we needed to do something
9 here?
10    A   It was.
11    Q   But you don't know how the bank knew they
12 were owed money?
13    A   Every time there was a recourse or return
14 or report like that it was also given to the bank so
15 they have records of that information and they show
16 it on their ledger.
17    Q   Do you know if their ledger was kept
18 electronically?
19    A   I don't know how they kept it.
20    Q   If you would turn now to in the smaller
21 binder, Exhibit 7, and I'd ask you to take a look at
22 that and let me know when you're finished.
23    A   Okay.
24    Q   Do you recognize this?
25    A   Yes.

Page 278

1    Q   Is it fair to say that you are -- Let me
2 back up. For the record, this is an e-mail dated
3 Tuesday, October 2nd, 2001 from Ken Kaiser to Doug
4 Smith, a copy to Bill Partain and Bob Jaeb, subject
5 line "Recourse," and it's Bates stamped 3160 I'm
6 thinking. It shows you as a copy on this e-mail.
7 Did you, in fact, receive a copy of this e-mail?
8    A   I'm not sure I did.
9    Q   Do you know if this was the first
10 indication to Mercy that the bank was claiming it
11 owed it money or had you previously provided this?
12    A   I have previously sent Mercy a letter and
13 we had all of the, over the normal course of time
14 all of the recourse returns and payments
15 information, you know, in the regular course of
16 business.
17    Q   I'm confused. Was that included in the
18 letter you sent them or are you saying that --
19    A   I don't recall and -- I don't recall.
20    Q   Who would you have sent your letter to?
21    A   Doug Smith.
22    Q   Do you recall when you would have sent
23 that letter?
24    A   It would have been prior to this time.
25 I'm also not sure I sent him a letter anymore. We

Page 279

1 had so many phone calls with him trying to get this
2 going.
3    Q   So you're not sure if there was a letter
4 or not a letter?
5    A   Not anymore.
6    Q   If I could ask you to turn Exhibit 66.
7 It's in the other book. Take a look at that and let
8 me know when you're finished.
9    A   (Witness reviews document.) Okay.
10    Q   Looking at the -- For the record this is
11 an e-mail exchanged Bates stamped, it's 3176 through
12 3177. Looking at the last e-mail, reading it
13 backwards, it's an e-mail dated August 20th, 2001
14 from Cindy Dorr to Doug Smith and you're shown as a
15 copy on it. Do you recall receiving this e-mail?
16    A   Yes.
17    Q   Is this your understanding of the
18 communication that Mercy got that you testified to
19 earlier showing the breakdown?
20    A   Yes.
21    Q   Do you recall if -- As I can see by
22 looking at this e-mail, it doesn't appear as though
23 any attachments are attached to it.
24    A   They had already got all of the
25 attachments on the files throughout the time, plus

EXHIBIT "E"